**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

LUIS A. GARCIA SAZ, and wife, MARIA DEL    Case No.
ROCIO BURGOS GARCIA,

       Plaintiffs,

8:13CV 220T27 TBM

**vs.**

CHURCH OF SCIENTOLOGY RELIGIOUS
TRUST; CHURCH OF SCIENTOLOGY
FLAG SERVICE ORGANIZATION, INC.;
CHURCH OF SCIENTOLOGY FLAG SHIP
SERVICE ORGANIZATION, INC. d/b/a
Majestic Cruise Lines; IAS
ADMINISTRATIONS, INC; U.S. IAS
MEMBERS TRUST.

       Defendants.

_____ /

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, LUIS A. GARCIA SAZ (hereinafter, "LUIS GARCIA"), and wife,

MARIA DEL ROCIO BURGOS GARCIA (hereinafter, "MARIA GARCIA"), sue

Defendants, CHURCH OF SCIENTOLOGY RELIGIOUS TRUST, a tax exempt trust doing

business in Florida (hereinafter, "CSRT"); CHURCH OF SCIENTOLOGY FLAG SERVICE

ORGANIZATION, INC., a Florida nonprofit corporation (hereinafter, "FLAG"); CHURCH

OF SCIENTOLOGY FLAG SHIP SERVICE ORGANIZATION, INC. d/b/a Majestic Cruise

Lines, a foreign nonprofit corporation doing business in Florida (hereinafter, "SHIP"); IAS

ADMINISTRATIONS, INC., a foreign nonprofit corporation doing business in Florida

(hereinafter, "IAS") and U.S. IAS MEMBERS TRUST a tax exempt trust doing business in



Florida (hereinafter, "USIMT");    [hereinafter, sometimes collectively referred to as "Defendants"], and allege:

## INTRODUCTION

1.      Plaintiffs were formerly members of the Church of Scientology until November of 2010, when they concluded that the Church had lost its spiritual, moral, and financial compass under the leadership of David Miscavige, the self-titled "ecclesiastical leader of the Scientology religion." Through their relationship with Defendants, Plaintiff suffered financial losses caused by Defendants' soliciting contributions for purposes that were never fulfilled and for failing to repay deposits for future services that were never rendered and for fraud as hereinafter alleged.

2.      The Church of Scientology refers to the hierarchical structure of the Scientology religion which is comprised of various corporations and related entities.

3.      The Scientology movement rests entirely upon the writings of one man, L. Ron Hubbard.

4.      The question of whether Scientology is a religion has been disputed since the founding of the Scientology movement.  Plaintiffs are **not** taking a position one way or the other as to the validity of Scientology as a religion.  Rather, Plaintiffs seek to highlight the secular commercial nature of the fraudulent activities and inappropriate business dealings which give rise to this complaint.

5.      David Miscavige is the current leader of the Church of Scientology and its many affiliated organizations, having assumed that role shortly after the death of Scientology founder L. Ron Hubbard in 1986.  His formal title is Chairman of the Board of Religious

Technology Center (RTC), a corporation which controls the trademarked names and symbols of Dianetics and Scientology and which "holds the ultimate ecclesiastical authority regarding the standard and pure application of L. Ron Hubbard's religious technologies." His position is paramount within Scientology. Since assuming the role, set forth above, Miscavige has been faced with ongoing litigation and press accounts alleging illegal and unethical practices. The Church, under the leadership of David Miscavige, has strayed from its founding principles and morphed into a secular enterprise whose primary purpose is taking people's money.

6.      A major activity of Scientology Churches is providing "auditing" and "training" at substantial fees, to persons interested in Scientology.  Persons are accepted for auditing and training on the basis of their interest in Scientology and their ability to pay.

7.      Traditionally the Church derived most of its income from four sources:  (1) auditing and training (2) sales of E-meters, and of Scientology books and recordings to commercial bookstores as well as to other churches and missions of Scientology.

8.      In more recent years the Church has added large, high pressure fundraising drives as its primary source of generating revenue. Plaintiffs were victims of these drives as hereinafter alleged.

9.      On June 5, 1989 the Supreme Court of the United States announced its opinion in *Hernandez v. Commissioner*, 490 U.S. 680 (1989).  The issue in that case was whether contributions to the Church of Scientology qualified as 501(c) (3) charitable contributions. The Supreme Court held that what the Church of Scientology claimed were charitable contributions, involved "quid pro quo" transactions and thus those payments did

not constitute charitable contributions because the giver was receiving a benefit as would occur in a commercial transaction. The Supreme Court of the United States upheld the Internal Revenue Services contention that no contributions to the Church of Scientology qualified for tax deductions and that the Church of Scientology did not enjoy tax exempt status as a charitable organization.  That case has never been reversed and is the law of the land.

10.    Subsequently, in 1993, the IRS reversed its position and granted 501(c) (3) status to the Church of Scientology and related entities, recognizing deductibility of donations. Before the Supreme Court in the *Hernandez* case, and later in proceedings before the IRS the Church asserted that a fundamental principle it operates on is "the Doctrine of Exchange" and that this **mandates** return of funds to dissatisfied parishioners. These statements preclude the Church from taking a contrary position in this case.

11.    This case is not an attack on the religious tenets of the Church of Scientology, although arguments abound that the Church no longer functions as a duly-qualified, tax-exempt, religious organization.  Nor is the case a referendum on the ecclesiastical constructs for how the Church governs its affairs. Rather, this case concerns something much more fundamental, that is, the rights of individuals to pursue claims through the civil judicial system for injuries and grievances sustained under conventions of civil justice applying legal principles of contract, fraud, misrepresentation and unfair and deceptive sales practices.

## JURISDICTION AND VENUE

12.    This Court has original jurisdiction over the parties and the subject matter of this action under 28 U.S.C. § 1332(d) because: (a) there is diversity of citizenship between

Plaintiff and Defendants; and (b) the amount in controversy of at least one of the claims exceeds $75,000.00, exclusive of interest and costs. The Court also has supplemental jurisdiction under 13 U.S.C. § 1367 over other claims related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution, including those involving additional parties. All of the claims arise from a common nucleus of operative facts in that they all relate to Defendants' collective efforts to obtain and retain payments of funds from Plaintiffs through a variety of illegal acts and contrivances.

13.     Venue is proper in this district under 18 U.S.C. § 1391(b) (1) and (3) because a substantial part of the events and omissions giving rise to this action occurred in this district and because Defendants transact business in this district, and because there is no other district in which this action may otherwise be brought.

## PARTIES

14.     Plaintiffs, Luis and Maria Garcia, are citizens and residents of the State of California.

15.     Defendant CSRT is a non-profit trust established to solicit donations for the benefit of Church of Scientology International ("CSI") and its affiliated entities, and has its principal place of business at 319 South Garden Avenue, Clearwater, Florida 33756.

16.     Defendant FLAG is a Florida nonprofit corporation, and has its principal place of business at 503 Cleveland Street, Clearwater, Florida, 33755.

17.     FLAG ministers high levels of services to parishioners from around the world at facilities in Clearwater, Florida.

18.     Defendant SHIP is a foreign non-profit corporation and has its principal place of business at 116 N. Ft. Harrison Avenue, Clearwater, Florida, 33755.

19.     SHIP ministers the highest levels of services to parishioners from around the world aboard a ship operated in the Caribbean as a retreat.

20.     Defendant IAS is a Delaware corporation and has its principal place of business at 210 S. Osceola Avenue, Clearwater, Florida, 33755. The IAS is the official membership organization of Scientology.

21.     Defendant USIMT is, and at all relevant times was, an entity with its principal office in the City of Los Angeles, County of Los Angeles, State of California, but which actively conducts substantial business within the City of Clearwater, State of Florida, through its alter ego, Defendant IAS. Defendant, USIMT is an alter ego of Defendant IAS and is operated, supervised, or controlled by Defendant IAS, which possess a substantial degree of direction over the policies, programs and activities of the USIMT.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

22.     Together, Defendants under Miscavige's leadership, management, and control, function as an interrelated and interdependent network of entities that functions to maximize the funds they can collectively extract from Church members like Plaintiffs, by soliciting contributions for purposes that are never fulfilled and by failing to repay deposits for services that were never rendered. The key to the organizational structure - - indeed, the undisputed leader - - is David Miscavige, who exerts complete, unequivocal control over Defendants, including control over how funds are collected, utilized, and disbursed, regardless of their purported "independent" corporate structures and boards. The Church of

Scientology, at Miscavige's direction, publicly proclaimed to the <u>St. Pete Times Newspaper</u> through an affidavit submitted by one of his direct subordinates, Sue Wilhere, that, *"Mr. Miscavige is Scientology."*

23.   At all times material hereto, Defendants acted in concert either as agents or principals of one another, partners, joint venturers, or co-conspirators.

24.   The types of services or initiatives promoted to members, for which contributions and deposits toward payments were made, varied and consisted of three basic types that are material to this action:

   a.  Contributions toward specific capital programs, such as the Church's "Super Power" project in Clearwater, Florida, a Scientology facility that commenced in 1995, and which, 17 years later, remains unopened;

   b.  Contributions toward national and/or global humanitarian initiatives, purportedly pursued to advance causes such as eradicating child pornography websites around the world, helping natural disaster victims, and other causes, for which contributions raised by the Church were never utilized, vastly underutilized or misappropriated; and

   c.  Deposits toward payments for counseling services (also described as "auditing") and training, as well as accommodations in Church owned facilities, that were never repaid despite the fact that services were never rendered.

25.   Although laudatory on their faces to the unsuspecting public, the solicitations for funding from Plaintiffs were false and misleading, as Defendants failed to utilize the

funds for the proposed purposes, and failed to repay the monies when owed to and demanded by Plaintiffs.  Instead, Defendants improperly utilized the contributions and deposits, to, among other things, engage ranks of professionals to stifle inquiries into the Church's activities and finances, to intimidate members and ex-members, to finance the lavish lifestyle of Miscavige and to fill the coffers of the Church or its subsidiary/affiliated organizations.

## CSRT – THE "SUPER POWER PROJECT"

26.    In 1990, CSRT purchased an entire block of land adjacent to other Church facilities in Clearwater, Florida and began the process of developing and constructing a Scientology facility, which would later become known as the "Super Power" project.

27.    Since then, CSRT has been aggressively contacting Scientologists and using high-powered sales techniques, extracting money for the "Super Power" project.

28.    CSRT informed the IRS, in its application for tax-exempt status that it intended to raise $40 million for construction of the "Super Power" building.  The CSRT has raised at least $200 million for a building for which CSRT spent less than half that amount constructing. Though a groundbreaking ceremony had been held in 1998, 14 years later the facility still sits empty, but aggressive fundraising continues.

29.    To induce plaintiffs to hand over money since at least 2001, CSRT representatives stated at each time the contributions were made by Plaintiffs, that the "Super Power" project was to be completed within that calendar year in which the funds were solicited from Plaintiffs and that the "final amount" of funding was urgently needed to complete construction.

30.    FLAG designates significant space within its facilities to CSRT and its representatives who actively engaged in high pressure solicitation activities.  FLAG also provides housing, food and medical care during CSRT fundraisers.  Plaintiffs' continued receipt of services from FLAG was contingent upon mandatory meetings with CSRT representatives. Plaintiffs, failure to meet with CSRT representatives while at FLAG would have prevented them from continuing their auditing and training services.

31.    With respect to contributions toward capital programs, such as the "Super Power" project of CSRT from Plaintiffs, representations and promises were made to Plaintiffs to induce contributions, including representations about the imminent need for the funding, and the promise that Plaintiffs contributing to the fund would receive approbation and other benefits. Between 1998 and 2005, representatives of CSRT, acting principally through their agent, Charmaine Roger, made repeated requests for funding from Plaintiffs. Such representations included, without limitation, the following:

a. On October 15, 1998, Ms. Roger, accompanied by Matt Feshbach, introduced the "Super Power Expansion Project" to the Plaintiffs at a dinner, and implored Plaintiffs to become "Cornerstone Members" by contributing $35,000.00, toward this status, for which Plaintiffs would receive: (i) recognition on an "Honor Roll" that would be permanently displayed inside the building; (ii) that Plaintiffs' names would be published in promotional materials; (iii) that Plaintiffs would receive forty percent (40%) discounts on the price of, and special treatment in the delivery of, auditing services to be provided at the Super Power building by FLAG; (iv) that Plaintiffs would

receive preferential seating at the Grand Opening ceremonies; and (v) that Plaintiffs would have access to a lounge reserved for "Cornerstone Members" On this date Plaintiffs' contributed $23,000.00 and then on October 21, 1998 contributed the remaining balance of $12,000.00;

b.  Ms. Roger later continued to solicit further contributions up through August of 2005, promising increasing discounts on services of 50%, and access to another lounge known as the "VIP Lounge," reserved for large donors. During this period of time Plaintiffs gave donations of:

> December 3, 1998 - $35,000.00
> May 18, 1999 - $30,000.00
> July 6, 1999 - $10,000.00
> November 3, 1999 - $30,000.00
> March 16, 2000 - $4,500.00
> October 12, 2000 - $6,000.00
> November 28, 2000 - $2,500.00
> December 26, 2000 - $2,500.00
> May 8, 2001 - $21,500.00 and $23,000.00
> July 7, 2002 - $50,000.00
> July 31, 2002 - $15,000.00
> January 30, 2004 - $10,000.00

c.  On August 25, 2005, Ms. Roger approached Plaintiffs in their hotel room while they were in Clearwater, Florida, and asked Plaintiffs to make a $65,000.00 contribution to purchase a large Cross of Scientology to be affixed to the top of the Super Power building. Roger represented that contractors were standing by to do the work once payment was received.  The Plaintiffs

made the $65,000.00 contribution, but the cross was not affixed until five (5) years later in September 2010; and

32.     The Plaintiffs contributed a total of $340,000.00 to the Super Power building. CSRT consistently represented to Plaintiffs that the delays in opening the building and other specific projects, such as the placement of the cross, were due to lack of funds, but these representations were false.  To this day, seventeen (17) years later, the project allegedly remains "incomplete," and the building has not opened.  CSRT has persistently maintained the project in an "incomplete" state to use it as a shill to induce further payments from members, just as they did with Plaintiffs.

33.     The "Super Power" project is STILL not completed, nor is it opened, as of the date of the filing of this Complaint.   Additionally, Plaintiffs have not received the approbation promised.

34.     In early 2011, the City of Clearwater levied fines in excess of $400,000.00 for delays in constructing the building. Contrary to CSRT's earlier, repeated, representations to Plaintiffs that the opening was delayed for lack of funding, CSRT informed the City that the delays were due to other reasons, including but not limited to: (1) changes in the City's building codes and (2) the complexity of the Church's unique plans. In fact, a certificate of occupancy was issued on June 6, 2009 indicating that the building was complete. Notwithstanding the issuance of the certificate of occupancy, even now, the building remains unoccupied and CSRT continues to aggressively solicit funds from members for completion of the building, just as they did with Plaintiffs.

35.    Plaintiffs requested return of their funds in writing on August 8, 2012, but CSRT refused to return the funds.

36.    On each occasion specified above, Defendant, CSRT, fraudulently induced Plaintiffs to make contributions specifically for the "Super Power" project based upon false representations that Defendant needed the money immediately to fund the completion of the "Super Power" project. Each year that the building did not open, Defendant had a new false explanation as to why the Super Power building was incomplete. The completion of the building and delivery of the approbation at that time was a material basis for Plaintiffs making their specific contributions and the failure to complete the building and deliver the approbation resulted in harm to the Plaintiffs. Plaintiffs' contributions would not have been made had Plaintiffs known the ongoing delay in completion of the building was intentional and that explanations for the delay in completion were false.

37.    Defendant, CSRT, at all times knew that the above representations were false when made, and intended that Plaintiffs rely, to their detriment on these false representations.

38.    Plaintiffs, because of their reliance upon Defendant's false representations made the specified contributions to the "Super Power" project and would not have done so had they known the truth.

## FLAG AND SHIP – AUDITING SERVICES AND ACCOMMODATIONS

39.    As members of FLAG and SHIP, Plaintiffs were induced to deposit money in advance of partaking in church services, both counseling "auditing" and Scientology training, as well as food and accommodations provided by FLAG and SHIP.   To encourage these

payments, Churches offered discounts for depositing funds in advance of participating in the services, referred to by the Church as "pre-payments."

40.     These "pre-payments" are maintained within each Scientology church on account for the use by church members, including Plaintiffs for hotel accommodations, meals, counseling sessions and Scientology training courses to be taken in the future.

41.     Plaintiffs deposited as pre-payments $37,413.56 on account with FLAG for counseling sessions, meals and hotel accommodations that FLAG never provided.

42.     Plaintiffs deposited $31,445.45 on account with SHIP for counseling services, meals, and hotel accommodations that SHIP never provided. With respect to deposits toward payments for auditing services, the Defendants took advantage of Plaintiffs by inducing them to make substantial deposits of funds to pay for future services with the express understanding that any unused funds would be returned upon demand.

43.     Plaintiffs have been aware since their initial involvement in Scientology that Defendants maintain a policy of returning funds, whether as "refunds" (i.e., a return of monies after service) or for "repayments" (i.e., a return of monies without the service being taken).

44.     The Defendants set forth how they treated the return of funds to members in their representations to the Internal Revenue Service in a form 1023 filing (Application for Recognition of Tax Exempt Status) to justify their gaining exempt status: *"The Church's refund policy is exceedingly fair. If someone isn't happy with Scientology – which is a very small minority of people – he simply has to make a proper request for his donations back, agree to forego further services and his donations will be returned. For the Church, in*

*addition to the fact that this policy aligns with Scientology principles of exchange, it also serves the purpose of allowing our churches and parishioners who are very happy with Scientology, to carry on without the unhappy few in our midst."*

45.     On December 7, 2010, Plaintiffs made a proper request in writing for repayment of their moneys on account with FLAG for counseling sessions, meals and hotel accommodations that were not provided.

46.     Despite the request, FLAG has failed/refused to repay any of the money on account to the Plaintiffs

47.     On December 7, 2010, Plaintiffs made a proper request in writing for repayment of their moneys on account with SHIP for counseling sessions, meals and hotel accommodations that were not provided.

48.     Despite request, SHIP has failed and refused to repay any of the money on account to the Plaintiffs.

49.     Plaintiffs have retained the services of the law firms listed below, agreeing to reasonable fees for their services.

50.     Plaintiffs have met all conditions precedent to bring this action, or such conditions have been waived.

## INITIATIVES OF IAS (USIMT)

51.     The IAS is the official membership organization of Scientology. The IAS was adopted as the official membership organization for the Church of Scientology in 1984. The IAS is a significant fundraising arm of the Church that proclaims to "unite, advance, support

and protect the Scientology religion and scientologists in all parts of the world so as to achieve the aims of Scientology as originated by L. Ron Hubbard".

52.     The USIMT was established in 1993 to raise tax-deductible contributions from IAS members in the United States. Defendant, USIMT is an alter ego of Defendant IAS and is operated, supervised, or controlled by Defendant IAS, which possess a substantial degree of direction over the policies, programs and activities of the USIMT.

53.     On October 5, 1997, an IAS officer contacted Plaintiff, Luis Garcia, and pressured him to donate money citing an "emergency." The Officer said the IAS was funding a huge protest and demonstrations in Berlin, Germany. Money was allegedly needed on an immediate basis to pay for volunteers' airfare, lodging, and other related costs. At the time Plaintiff was induced to contribute money for this cause, the IAS knew, or reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon, the representations of the IAS, Plaintiff made his $2,000 donation with his American Express card. Plaintiff would not have made this contribution had he known the statements were false.

54.     Plaintiff's October 5, 1997 donation was made for the express purpose of funding the protests in Berlin. The representations made by the IAS on October 5, 1997, regarding the need for and use of the monies solicited were false.

55.     On September 2, 2002, while at FLAG, Plaintiff, Maria Garcia, paid $1,300 to the IAS with her VISA credit card. Michelle Villeneuve, of the IAS, insisted in giving another briefing, which consisted of high pressure solicitations for donations, to Mrs. Garcia, while she was at FLAG in Clearwater, Florida. Villeneuve showed Mrs. Garcia photographs

of gloomy scenes, including starved children in Africa. Villeneuve then told Mrs. Garcia that her donation would go to directly help those children, by introducing Scientology technology to them. Villeneuve explicitly stated the IAS needed the donation urgently, so the program could begin immediately. At the time Plaintiff was induced to contribute money for this cause, the IAS knew, or reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon, the representations of Villeneuve, Plaintiff made her $1,300 donation with her VISA card. Plaintiff would not have made this contribution had she known the statements were false.

56.     Plaintiff's September 2, 2002 donation was made for the express purpose of funding the relief for starving children in Africa. The representations made by the IAS to Plaintiff on September 2, 2002, regarding the need for and use of the monies solicited were false.

57.     On March 6, 2005 while at FLAG, Michelle Villeneuve, an IAS representative, required Plaintiff, Luis Garcia's presence for a mandatory IAS briefing. Plaintiff was told about the church's massive campaign to help the victims of the tsunami in Sumatra, Indonesia and Sri Lanka. Plaintiff was shown pictures of devastation and asked for a donation so volunteer ministers could be sent in to help those victims. At the time Plaintiff was induced to contribute money for this cause, the IAS knew, or reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon, the representations of the IAS, Plaintiff made his $500 donation with his American Express card. Plaintiff would not have made this contribution had he known the statements were false.

58.     Plaintiff's March 6, 2005 donation was made for the express purpose of funding the relief for victims of the tsunami in Sumatra, Indonesia and Sri Lanka. The representations made by the IAS to Plaintiff on March 6, 2005, regarding the need for and use of the monies solicited were false.

59.     While at FLAG, On August 30, 2005, Plaintiff, Luis Garcia, and his family were escorted to the IAS office where they were shown a video featuring Tom Cruise, promoting the responsibilities of Scientologists, as "we are the only ones that can help." Following the video, three IAS officers badgered Plaintiffs for a substantial donation to help the IAS in its campaign to eliminate child pornography on the Internet. The IAS Officers said there were over 100,000 illegal sites filled with child pornography for which they claimed Plaintiffs bore responsibility to eradicate, for the sake of Plaintiffs' own children, through donation, which was needed immediately. At the time Plaintiff was induced to contribute money for this cause, the IAS knew, or reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon, the representations of the IAS Officer, Plaintiff made his $3,000 donation with his VISA card. Plaintiff would not have made this contribution had he known the statements were false.

60.     Plaintiffs' August 30, 2005 donation was made for the express purpose of funding to eradicate child pornography. The representations made by the IAS to Plaintiffs on August 30, 2005, regarding the need for and use of the monies solicited, were false.

61.     On November 20, 2005 an IAS officer met with Plaintiff, Luis Garcia, and told him the IAS needed a donation for a campaign in France. The IAS Officer said the

French government was suppressive and wanted to ban Scientology, and that the IAS was going to investigate the government people involved in order to stop them. The IAS needed the donation immediately, as the funding for this program had to be completed right away for it to be effective. At the time Plaintiff was induced to contribute money for this cause, the IAS knew, or reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon, the representations of the IAS, Plaintiff made his $1,000 donation on his American Express card. Plaintiff would not have made this contribution had he known the statements were false.

62.     Plaintiff's November 20, 2005 donation was made for the express purpose of funding the campaign in France. The representations made by the IAS to Plaintiff on November 20, 2005, regarding the need for and use of the monies solicited, were false.

63.     On March 27, 2006, while at FLAG in Clearwater, Plaintiff, Luis Garcia, was given a briefing ("donation solicitation") by Michelle Villeneuve. Villeneuve told Plaintiff the IAS was "helping in a big way down in Australia, with the bush fires". She described how the fires were ravaging towns and farms, and the IAS had been funding many volunteer ministers to fly to Australia and help. She said the IAS needed a donation right away from Plaintiff to fund this program. At the time Plaintiff was induced to contribute money for this cause, the IAS knew, or reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon, the representations of the IAS, Plaintiff made his $640 donation with his MasterCard. Plaintiff would not have made this contribution had he known the statements were false.

64.     Plaintiff's March 27, 2006 donation was made for the express purpose of funding the relief efforts in Australia. The representations made by the IAS to Plaintiff on March 27, 2006, regarding the need for and use of the monies solicited, were false.

65.     On September 30, 2006 while at FLAG in Clearwater, Plaintiff, Luis Garcia, received the customary and mandatory briefing from the IAS. Plaintiff again met with Michelle Villeneuve from the IAS who stated the IAS needed to urgently fund Public Service Announcements and that these announcements would be aired nationally. At the time Plaintiff was induced to contribute money for this cause, the IAS knew, or reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon, the representations of the IAS, Plaintiff made his $500 donation with his American Express card. Plaintiff would not have made this contribution had he known the statements were false.

66.     Plaintiff's September 30, 2006 donation was made for the express purpose of funding the Public Service Announcements. The representations made by the IAS to Plaintiff on September 30, 2006, regarding the need for and use of the monies solicited, were false.

67.     On June 12, 2007 Plaintiff, Luis Garcia, paid $31,470 to the IAS with his American Express card in two separate transactions. Plaintiff went to the Freewinds Ship operated by SHIP for services. Soon after arrival onboard, Plaintiff was "interviewed" by Ari Lan, Senior SHIP IAS Officer. The IAS stated a substantial donation was needed to help victims of a tornado in Greensburg, Kansas. He said the IAS was funding a huge relief effort and funding volunteer missionaries from Kansas City, Wichita and Dallas. The IAS Officer said the relief effort would be funded in part with immediate donations from Plaintiff. At the

time Plaintiff was induced to contribute money for this cause, the IAS knew, or reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon, the representations of the IAS, Plaintiff made his $31,470 donation with his American Express card. Plaintiff would not have made this contribution had he known the statements were false.

68.     Plaintiff's June 12, 2007 donation was made for the express purpose of funding the tornado victims' relief efforts in Greensburg. The representations made by the IAS to Plaintiff, regarding the need for and use of the monies solicited, were false.

69.     As to each and every allegation in paragraphs 53 through 68, the IAS misled the Plaintiffs into believing that these specific funds would be spent on these humanitarian projects. In fact, these projects did not actually exist or only a small fraction of the money has been spent to create the appearance of extensive humanitarian activities to support the false statements made by the IAS. The IAS has accumulated in excess of $1 billion while misleading Plaintiffs and others into believing that their funds would be spent on humanitarian projects.

70.     As to each and every allegation in paragraphs 53 through 68, Miscavige was the primary spokesperson/fundraiser for the IAS projects to which Plaintiffs were falsely induced to contribute. He widely, and falsely, promoted these IAS activities, as set forth in the aforementioned paragraphs promoted to Plaintiffs, in internationally televised events. The IAS routinely showed numerous videos, viewed by Plaintiffs, of Miscavige falsely presenting its purported "good works" and repeated requests for every Scientologist, including Plaintiffs

to give money to the IAS.  Plaintiffs relied on the false statements of Miscavige in making the above payments.

71.     The purpose of the fundraising efforts set forth in paragraphs 53 to 68 was not to support the causes for which the funds were solicited but rather to enrich the Church. By using false and misleading promotional materials and pronouncements, Defendants, IAS and USIMT, created the appearance of laudatory church activities, (little or none of which actually exist) as a means of soliciting substantial donations from the Plaintiffs.

72.     For each and every contribution, as set forth above in paragraphs 53 to 68, the IAS engaged in repeated, high-pressure sales techniques targeting Plaintiffs, including, but not limited to, repeated late night visits and phone calls, refusing to allow them to leave the room until they had made a "contribution," requiring "contributions" to the IAS as a condition of participation in other Scientology services, "mandatory" attendance at "briefings" with compliance enforced through threat of "ethics reports" being made.

73.     As a means to accomplish these fundraising goals, as set forth above in paragraphs 55 to 60; 63-68,  other Scientology affiliated entities, specifically Defendants, FLAG and SHIP, provided facilities to the IAS to conduct fundraising in close proximity to where auditing and training services are offered to its members, including Plaintiffs.

74.     Defendant FLAG is the "Mecca of Scientology", the largest single Church of Scientology in the world, and the self-described purveyor of advanced Scientology services available at no other location. Eventually, all Scientologists, including Plaintiffs, must travel to FLAG to achieve the promised spiritual enlightenment that Scientology offers. FLAG occupies several buildings in the Clearwater, Florida area, all of which are dedicated to

promoting the goals and objectives of Scientology. Within these facilities FLAG dedicates prominent space to the IAS fundraising activities in close proximity to where FLAG provided specialized auditing and training to the Plaintiffs. IAS promotional materials and videos were prominently displayed throughout FLAG facilities and were seen by Plaintiffs. As specifically set forth in paragraphs 55-60 and 63-66 above, Plaintiffs were aggressively solicited by IAS representatives while attempting to obtain services at FLAG.

75.    FLAG is required to meet certain financial fundraising quotas for the IAS as set by Miscavige.

76.    In order to meet these quotas, FLAG operated in concert with IAS activities with respect to each and every fraudulent solicitation of contributions as set forth in paragraphs 22 through 25, 51 through 76, and 80 through 82. The efforts of the IAS and FLAG constitute a joint enterprise, designed to solicit funds from the Plaintiffs, despite actual knowledge that the funds solicited were not being used for the purposes represented. This joint enterprise was facilitated by requiring that the Plaintiffs undergo involuntary, high pressure sales meetings, sometimes lasting for hours with the IAS, before being eligible to receive further spiritual advancement through the FLAG auditing and training programs.

77.    Defendant SHIP is the Church of Scientology located onboard a Scientology cruise ship, the "Freewinds". SHIP delivers specialized Scientology services available nowhere else. Plaintiffs had to travel to SHIP to achieve the promised spiritual enlightenment that Scientology offers. Aboard the Freewinds, the IAS occupies prominent and large offices dedicated to fundraising efforts. IAS promotional materials and videos soliciting payment to the IAS were displayed on the ship and were seen by Plaintiffs.

78.     SHIP was required to meet certain financial fundraising quotas for the IAS as set by Miscavige.

79.     In order to meet these quotas, SHIP operated in concert with IAS activities with respect to each and every fraudulent solicitation of contributions as set forth in paragraphs 22 through 25, 51 through 73, and 77 through 82.  The efforts of the IAS and SHIP constituted a joint enterprise, designed to solicit funds from the Plaintiffs, despite actual knowledge that the funds solicited were not being used for the purposes represented. This joint enterprise was facilitated by requiring that Plaintiffs, as set forth in paragraphs 67 and 68 above, undergo involuntary, high pressure sales meetings, sometimes lasting for hours with the IAS, before being eligible to receive further spiritual advancement through the SHIP auditing and training programs.

80.     Participation in auditing and training is a fundamental form of participation within the Church. These are required in order for members, including Plaintiffs, to continue to advance within the Church. The Church routinely utilizes the auditing and training process as a forum for high pressure illegal sales tactics, as stated above, to coerce members, including Plaintiffs to contribute to other causes, including the Super Power project and the IAS. During these sessions representations were repeatedly made to Plaintiffs regarding the importance and necessity of funding contributions from Plaintiffs, as a means to achieve their spiritual advancement. Plaintiffs were constantly solicited through the International IAS Events, where Miscavige repeatedly represented to Plaintiffs and members, that IAS sponsored humanitarian activities were in dire need of parishioner's further contributions to fund these efforts, despite the fact that Defendants knew these statements were false and

intended Plaintiffs' to rely on such false statements. Additionally, IAS solicited continuously through the magazine, Impact, which contained repeated references to dire national and global crises that that the IAS was combating, all of which was false and Defendants knew it was false. Plaintiffs relied on these false representations which induced them to give funds.

81.     As to each and every allegation in Paragraphs 51 through 82, the statements set forth in those paragraphs made by the Defendants to induce the Plaintiffs to make contributions were false in that Defendants knew that the requested donations would not be used to fund the campaigns which formed the basis for which the contributions were requested. Defendants knew that these statements were false and Plaintiffs relied upon these false statements of the Defendants in making the contributions. Plaintiffs would not have made the contributions had they known Defendants' statements were false. The statements were material to the Plaintiffs and Defendants knew that they were material in making the false statements. Plaintiffs were harmed by the false statements because the contributions never would have been made had Plaintiffs known that Defendants' statements were false.

82.     Plaintiffs requested their funds be returned on August 8, 2012, but the IAS and USIMT refused to refund the funds.

**COUNT I: CSRT**
FRAUD - "SUPER POWER" PROJECT

83.     This is an action by Plaintiffs against defendant, CSRT for damages for fraud in connection with the "Super Power" project.

84.     Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 38.

85.     Plaintiffs contributed a total of $340,000.00 to the CSRT to fund the "Super

Power" project.

86.   As alleged herein, Defendant CSRT made materially false statements, representations and omissions to Plaintiffs regarding the ongoing need to obtain substantial funding, far in excess of the actual cost required, and utilized, to complete the project. Defendant, CSRT had no intention at the time these materially false statements, representations and omissions were made to Plaintiffs to timely complete the project and provide the benefits and services promised to Plaintiffs when they were induced to make these specific donations. Rather, the statements, representations and omissions were made solely for the purpose of continuing to collect revenue for the Church. As such, these statements, representations and omissions were false at the time they were made and Defendant, CSRT knew or should have known they were false.

87. The Defendant, CSRT, intended Plaintiffs to rely upon the statements, representations and omissions.

88. Plaintiffs reasonably relied to their detriment upon the statements, representations and omissions by the Defendant, CSRT, as more particularly described above, in contributing $340,000.00 to the CSRT for the "Super Power" project.

89. As a direct and proximate result, Plaintiffs have been damaged in that their money was taken under false pretenses and never would have been given if Plaintiffs had known of Defendant's material misrepresentations.

WHEREFORE, Plaintiffs demand judgment against the Defendant, CSRT, for compensatory and punitive damages, and costs.

**COUNT II: CSRT**
ACTION FOR UNFAIR AND DECEPTIVE TRADE PRACTICES – "SUPER POWER"
PROJECT

90. This is an action by the Plaintiffs against Defendant, CSRT, for damages and equitable injunctive relief for unfair and deceptive trade practices in connection with the "Super Power" project.

91. Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 38.

92. The Defendant, CSRT, engaged in "trade or commerce" through the fund-raising activities, advertisements, promotions, and solicitations in connection with the "Super Power" project, and Plaintiffs are "consumers," as defined under § 501.203, Florida Statutes.

93. The Defendant, CSRT, willfully engaged in unfair and deceptive acts and practices by representing to Plaintiffs that there was an ongoing need to obtain substantial funding far in excess of the actual cost required and utilized to complete the "Super Power" project. Defendant, CSRT had no intention at the time these unfair deceptive acts and practices were made to timely complete the project and provide the benefits and services promised to Plaintiffs when they were induced to make these specific donations. Rather, unfair deceptive acts and practices were made solely for the purpose of continuing to collect revenue for the Church. Defendant, CSRT, knew or should have known these practices were unfair, deceptive, or unconscionable, or prohibited by law.

94. Unless the Defendant, CSRT, is permanently enjoined from engaging further in the acts and practices alleged herein, the continued activities of this Defendant will result in irreparable injury to the public, for which there is no adequate remedy at law.

95. The Defendant, CSRT, acting individually or in concert with others, has engaged

in representations, acts, practices, or omissions in trade or commerce which are material, and which were likely to mislead consumers, including Plaintiffs acting reasonably under the circumstances; or the Defendant, CSRT, has engaged in acts or practices in trade or commerce which offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to consumers.

96. As a direct and proximate result of the Defendant, CSRT's acts or practices, Plaintiffs have been damaged in the amount of $340,000.00

WHEREFORE, Plaintiffs demand judgment against the Defendant, CSRT that:

      a. Awards damages against the Defendant, CSRT;

      b. Declares that the unfair and deceptive acts or practices of the Defendant, CSRT are prohibited by law;

      c. Enters a temporary injunction, pending final adjudication and the granting of permanent relief, and thereafter a permanent injunction, enjoining the Defendant, CSRT, from engaging in the unfair and deceptive acts or practices;

      d. Awards reasonable attorney's fees;

      e. Awards costs; and

      f. Orders such other relief as the Court deems appropriate.

### <u>COUNT III: FLAG</u>
### FRAUD- "SUPER POWER" PROJECT

97. This is an action by Plaintiffs against defendant, FLAG for damages for fraud in connection with the Super Power project.

98. Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 38.

99. Plaintiffs contributed a total of $340,000 to fund the "Super Power" project.

100.   FLAG operated in concert with CSRT activities with respect to each and every fraudulent statement, representation and omission to Plaintiffs as set forth in paragraphs 22 through 38. The efforts of the CSRT and FLAG constitute a joint enterprise, designed to solicit funds from the Plaintiffs, despite actual knowledge that the funds solicited were not being used for the purposes represented.

101.   Defendant FLAG intended Plaintiffs to rely upon the fraudulent statements, representations and omissions.

102.   Plaintiffs reasonably relied to their detriment upon the statements, representations and omissions to their detriment.

103.   As a direct and proximate result, Plaintiffs have been damaged in that their money was taken under false pretenses and never would have been given if Plaintiffs had known of Defendants' material misrepresentations.

## COUNT IV: FLAG
### ACTION FOR BREACH OF CONTRACT – FLAG

104.   This is an action by the Plaintiffs against Defendant FLAG for damages for breach of contract.

105.   Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 25 and 39 through 50.

106.   Plaintiffs deposited funds in excess of $37,413.56 with FLAG to be held on account until Plaintiffs elected to use the funds to pay for counseling services and/or accommodations.

107.   Defendant FLAG had represented in its policy and publications that "pre-

payments" would be repaid to Plaintiffs when Plaintiffs so requested them.

108.    Plaintiffs requested that Defendant FLAG repay the funds held on account, but Defendant FLAG has refused to repay the funds, despite a proper written request for return.

109.    As a direct and proximate result of Defendant FLAG's breach, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs demand judgment against Defendant FLAG for compensatory damages and costs.

**COUNT V: SHIP**
ACTION FOR BREACH OF CONTRACT – SHIP

110.    This is an action by the Plaintiffs against Defendant SHIP for damages for breach of contract.

111.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 25 and 39 through 50.

112.    Plaintiffs deposited funds in excess of $31,445.45 with SHIP to be held in trust until Plaintiffs elected to use the funds to pay for counseling services and/or accommodations.

113.    Defendant SHIP had represented in its policy and publications that "pre-payments" would be repaid to Plaintiffs "at once," when Plaintiffs so requested them.

114.    Plaintiffs requested that Defendant SHIP repay the funds held in trust, but Defendant SHIP has failed and refused to repay the funds.

115.    As a direct and proximate result of Defendant SHIP's breach, Plaintiffs have been damaged.

Page 29 of 35

WHEREFORE, Plaintiffs demand judgment against Defendant SHIP for compensatory damages and costs.

### COUNT VI: IAS AND USIMT
### FRAUD - HUMANITARIAN INITIATIVE OF IAS

116.    This is an action by Plaintiffs against the Defendants, IAS and USIMT for damages for fraud in connection with the so-called humanitarian initiatives of IAS.

117.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 25 and 51 through 82.

118.    Plaintiffs were fraudulently induced to contribute a total of $40,410.00 to the IAS for fraudulent humanitarian projects.

119.    As set forth hereinabove, the Defendant, IAS, created a sales pitch to solicit huge amounts of money from the Plaintiffs, by promising that the funds collected would be used for specific altruistic purposes.  In fact, monies collected by the IAS were either not utilized for the stated projects at all, or only minimally so, in order to create the appearance of such efforts. Instead, the IAS went to extraordinary lengths to create the fiction of IAS funded efforts through the use of photos, videos, promotional materials and repeated pronouncements, awards ceremonies and the like,  all of which had a single purpose to solicit an ongoing stream of money. As a result, the IAS and the USIMT have amassed a fortune, exceeding $1 billion in cash, the vast percentage of which has never been used for humanitarian initiatives.  Instead, the funds are hoarded and/or used to finance the lavish lifestyle of persons within the Church, such as Miscavige and/or to destroy critics and fund elaborate investigations of potential critics. As such, these statements, representations and omissions were false at the time they were made and Defendant, IAS knew they were false

and likely to mislead Plaintiffs and others.

120.   The Defendants, IAS and USIMT intended Plaintiffs to rely upon the representations and omissions made by the IAS.

121.   Plaintiffs reasonably relied to their detriment upon the material, false representations and omissions by the Defendant, IAS, as more particularly described above, in contributing $40,410.00 to the IAS for various humanitarian projects which they would not have contributed had they known that the statements were false.

122.   As a direct and proximate result, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs demand judgment against the Defendants, IAS and USIMT, for compensatory and punitive damages, and costs.

### COUNT VII: IAS AND USIMT
ACTION FOR UNFAIR AND DECEPTIVE TRADE PRACTICES –HUMANITARIAN
INITIATIES OF THE IAS

123.   This is an action against the Defendants, IAS and USIMT for damages and equitable relief for unfair and deceptive trade practices in connection with the so-called humanitarian initiatives of the IAS.

124.   Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 25 and 51 though 82.

125.   The Defendant, USIMT, by and through its alter ego, Defendant IAS, and the IAS, engaged in "trade or commerce" through the fund-raising activities, advertisements, promotions, and solicitations in connection with the so-called humanitarian initiatives of the "IAS," and Plaintiffs are "consumers," as defined under § 501.203, Florida Statutes.

126.   The Defendant, USIMT, by and through its alter ego, Defendant IAS, willfully

engaged in unfair or deceptive acts and practices that they knew, were unfair, deceptive, unconscionable, or prohibited by law.

127.    Unless the Defendants, IAS and USIMT are permanently enjoined from engaging further in the acts and practices alleged herein, the continued activities of Defendants will result in irreparable injury to the public, for which there is no adequate remedy at law.

128.    The Defendants, acting individually or in concert with each other, have engaged in representations, acts, practices, or omissions in trade or commerce which are material, and which are likely to mislead consumers acting reasonably under the circumstances; or the Defendants have engaged in acts or practices in trade or commerce which offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to consumers.

129.    As a direct and proximate result of the Defendants' acts or practices, Plaintiffs have been damaged in the amount of $40,410.00.

**COUNT VIII: FLAG**
FRAUD - HUMANITARIAN INITATIVES OF IAS

130.    This is an action by Plaintiffs against the Defendant, FLAG for damages for fraud in connection with the so-called humanitarian initiatives of IAS and USIMT.

131.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 25, 51 through 76 and 80 through 82.

132.    Plaintiffs contributed a total of $40,410.00 to fund the so-called fraudulent humanitarian initiatives of the IAS.

133.    As a means to accomplish the IAS fundraising goals, other Scientology

affiliated entities, specifically Defendant, FLAG, not only provided dedicated facilities to the IAS to conduct its' fundraising in close proximity to where auditing and training services are offered to its members, but also made receipt of such services contingent upon meeting with IAS representatives who engaged in high pressure illegal sales tactics, as stated above, to solicit money from Plaintiffs. In this regard, FLAG and IAS operated a joint enterprise which was designed to solicit funds from church members, including Plaintiffs, despite actual knowledge that the funds solicited are not being used for the express purposes represented as set forth hereinabove. Instead, these funds are being used simply to enrich the Church.

134.    As stated above, while at FLAG, on numerous occasions, Plaintiffs were fraudulently induced, to donate to IAS.

135.    As a direct and proximate result, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs demand judgment against the Defendant, FLAG, for compensatory and punitive damages, and costs.

## COUNT IX: SHIP
### FRAUD - HUMANITARIAN INITATIVES OF IAS

136.    This is an action by Plaintiffs against the Defendant, SHIP for damages for fraud in connection with the so-called humanitarian initiatives of IAS and USIMT.

137.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 25, 51 through 73, and 77 through 82.

138.    Plaintiffs contributed a total of $40,410 to fund the so-called humanitarian initiatives of the IAS.

139.    As a means to accomplish the IAS fundraising goals, other Scientology affiliated entities, specifically Defendant, SHIP, not only provided dedicated facilities to the

IAS to conduct its' fundraising in close proximity to where auditing and training services are offered to its members, but also made receipt of such services contingent upon meeting with IAS representatives who engaged in high pressure illegal sales tactics, as stated above, to solicit money from Plaintiffs. In this regard, SHIP and IAS operated a joint enterprise which was designed to solicit funds from church members, including Plaintiffs, despite actual knowledge that the funds solicited are not being used for the express purposes represented. Instead, these funds are being used simply to enrich the Church.

140.   As stated above, while aboard SHIP, on June 12, 2007, Plaintiff was fraudulently induced to donate $31,470.00 to IAS.

141.   As a direct and proximate result, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs demand judgment against the Defendant, SHIP, for compensatory and punitive damages, and costs.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury of all issues so triable.

By
Theodore Babbitt, Esq.
Florida Bar No. 091146
**BABBITT JOHNSON OSBORNE
& LE CLAINCHE, P.A.**
1641 Worthington Road
Suite 100
West Palm Beach, Florida 33409
Telephone:  (561) 684-2500
Facsimile:  (561) 684-6308
tedbabbitt@babbitt-johnson.com

By
Ronald R. Weil, Esq.
Florida Bar No.  169946
**Weil Quaranta, P.A.**
200 South Biscayne Boulevard
Suite 900
Miami, FL 33131
Phone: 305-372-5352
Fax: 305-372-5355
E-mail: rpw@weillaw.net