```
                  UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
                        TAMPA DIVISION

LUIS A. GARCIA SAZ, and       )  Tampa, Florida
wife, MARIA DEL ROCIO BURGOS  )
GARCIA,                       )
                              )
                Plaintiffs,   )  No. 8:13-cv-220-T-27TBM
                              )
          vs.                 )  October 3, 2013
                              )
CHURCH OF SCIENTOLOGY         )  9:00 a.m.
RELIGIOUS TRUST, et al.,      )
                              )
                Defendants.   )  Courtroom 13B
_____)
```

**TRANSCRIPT OF MOTION HEARING**
BEFORE THE HONORABLE JAMES D. WHITTEMORE
UNITED STATES DISTRICT JUDGE

*Official Court Reporter:*

*Scott Gamertsfelder, RMR, FCRR*
*801 North Florida Avenue*
*Tampa, Florida 33602*
*Telephone:  (813) 301-5898*

*(Proceedings reported by Stenotype; Transcript produced by computer-aided transcription.)*

**A P P E A R A N C E S**

<u>**PLAINTIFF COUNSEL:**</u>

**Theodore Babbitt, Esq.**
Babbitt, Johnson, Osborne & LeClainche
1641 Worthington Road, Suite 100
West Palm Beach, Florida 33409
(561) 684-2500

**Ronald P. Weil, Esq.**
**Amanda McGovern, Esq.**
Weil, Quaranta & McGovern
200 South Biscayne Boulevard, Suite 900
Miami, Florida 33131
(305) 372-5352

<u>**DEFENSE COUNSEL:**</u>

**Nathan M. Berman, Esq.**
**Lee Fugate, Esq.**
Zuckerman Spaeder
101 East Kennedy Boulevard
Tampa, Florida 33602
(813) 223-7961

**F. Wallace Pope, Jr., Esq.**
**Robert V. Potter, Esq.**
Johnson, Pope, Bokor, Ruppel & Burns
911 Chestnut Street
Clearwater, Florida 33756
(727) 461-1818

**Marie Tomassi, Esq.**
Trenam, Kember, Scharf, Barkin,
Frey, O'Neill & Mullis
St. Petersburg, Florida 33701
(727) 820-3952

## TABLE OF CONTENTS

### EXAMINATIONS

| PLAINTIFF | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| THEODORE BABBITT | 125 | 131 | | |
| RONALD WEIL | 137 | 139 | | |

| DEFENDANTS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MICHAEL RINDER | 9 | 39 | 47 | |
| ROBERT JOHNSON | 49 | 86 | 103 | |
| PETER MANSELL | 111 | 117 | | |

### EXHIBITS

| PLAINTIFF | PAGE | LINE |
|---|---|---|
| (No exhibits received.) | | |

| DEFENDANTS | PAGE | LINE |
|---|---|---|
| 1........................ | 10 | 21 |
| 2........................ | 21 | 6 |
| 3........................ | 25 | 11 |
| 7........................ | 28 | 9 |
| 8........................ | 35 | 2 |
| 9........................ | 37 | 3 |
| 12........................ | 61 | 6 |
| 13 and 14............... | 62 | 3 |
| 15........................ | 76 | 9 |
| 16........................ | 77 | 1 |
| 17........................ | 117 | 8 |
| 18........................ | 115 | 11 |
| 19........................ | 125 | 11 |
| 20 and 21............... | 65 | 18 |

## ADDITIONAL INDEXING

|                                       | PAGE | LINE |
|---------------------------------------|------|------|
| Defense Closing Statements.................... | 145  | 11   |
| Plaintiff Closing Statements.................. | 148  | 1    |
| Defense Rebuttal Closing Statement........... | 150  | 21   |
| Order of the Court........................... | 151  | 11   |

1                     **P R O C E E D I N G S**

2  **October 3, 2013**                            **9:00 a.m.**

3                      - - -

4         COURT SECURITY OFFICER:  All rise.

5         The United States District Court in and for the

6 Middle District of Florida is now in session.  The Honorable

7 James D. Whittemore presiding.

8         Please be seated.

9         THE COURT:  Good morning.

10         We are here on the motion filed by counsel.  Let's

11 take the appearances for the lawyers who will be addressing

12 the Court.  Plaintiffs first.

13         MR. BABBITT:  Theodore Babbitt.

14         MS. McGOVERN:  Amanda McGovern.

15         MR. WEIL:  Ron Weil.

16         THE COURT:  Are all three of you going to be

17 addressing the Court?

18         MR. BABBITT:  Potentially, your Honor.

19         THE COURT:  Potentially not.  Listen to what I

20 say, please.

21         For the defense?

22         MR. POPE:  Wallace Pope, your Honor, for FLAG

23 Church and Flag Ship Church.

24         MR. POTTER:  Bob Potter, your Honor, as well for

25 the defendants.

1          THE COURT:  Again, are you guys co-counsel and

2    going to both participate in here because you are of record?

3          MR. POPE:  No, your Honor.  Mr. Potter is prepared

4    to make legal arguments on things that come up.  We will

5    divide our responsibilities.

6          THE COURT:  Who else?

7          MR. BERMAN:  Nathan Berman on behalf of CSRT.

8          THE COURT:  Anybody else?

9          All right.  I have read everything you have

10   submitted, for the most part.  Things that are relevant, in

11   my opinion.  You know your burden, Mr. Pope.  I don't want a

12   bunch of rhetoric.  Let's focus on the issues.  Keep your

13   case succinct.

14          I'll give you about an hour and a half to present

15   your case and we will give an hour and a half to the defense,

16   and we will see where we are.

17          Call your first witness, please.

18          MR. POPE:  Your Honor, we would like to invoke the

19   rule.

20          THE COURT:  What authority do you have to invoke a

21   rule during a hearing of this nature?

22          MR. POPE:  It's an evidentiary proceeding,

23   your Honor.

24          THE COURT:  All right.  I'm asking you for

25   authority.  I know it's an evidentiary hearing.

1          MR. POPE:  For the moment, your Honor, I don't

2     have an authority to cite.

3          THE COURT:  Find some.  You're not in front of a

4     jury trial.

5          MR. POPE:  Your Honor, it is a rule of exclusion.

6     I thought it was fairly much of a given, so I wasn't prepared

7     to --

8          THE COURT:  Well, we learn something all the time,

9     don't we, every day?

10          MR. POPE:  Yes, sir.

11          THE COURT:  What is your concern?

12          MR. POPE:  Well, two of the witnesses, your Honor,

13     that I'm going to call are adverse -- Mr. Rinder and

14     Mr. Johnson -- who are the two key witnesses on the matter.

15     I, frankly, don't want them listening to each other's

16     testimony.

17          THE COURT:  What in the world do they not know

18     that they haven't already heard in this case?

19          MR. POPE:  Well, what they don't know, your Honor,

20     is my approach to the interrogation and what I'm going to --

21     how I'm going to keep it -- keep the rhetoric out and keep to

22     the facts.

23          THE COURT:  Mr. Babbitt, what is your position?

24          MR. BABBITT:  We have no objection to invoking the

25     rule, your Honor.  We would do it ourselves.

1          THE COURT:  Well, let me, hopefully, set a tone.

2          This is a very discrete issue.  The burden on the

3   defendant is high.  This is not a trial on the merits, nor is

4   it a time for unnecessary rhetoric or attacks on individuals

5   or parties.

6          Since you both agree, then the rule will be

7   invoked.  I don't understand why, but I'll go ahead and

8   invoke it.  So tell your witnesses, please, to excuse

9   themselves and not to discuss the case until they are called.

10         MR. BABBITT:  I would point out that Mr. Johnson

11  is here.  He's an attorney for the plaintiffs.  We take the

12  position he can stay here.  He will be a witness.

13         THE COURT:  He's not an attorney of record for the

14  Plaintiff, Mr. Babbitt.

15         MR. BABBITT:  He is not an attorney of record,

16  your Honor.

17         THE COURT:  He's not entitled to be in here.  If

18  he's a witness, the rule of exclusion applies.

19         Who is your first witness, Mr. Pope?

20         MR. POPE:  Mr. Rinder.

21         THE COURT:  Come forward and be sworn, please.

22                     MICHAEL RINDER,

23  having been first duly sworn by the Courtroom Deputy,

24  testified as follows:

25         COURTROOM DEPUTY:  State your name for the record

1  and spell your last name.

2           THE WITNESS:  Michael Rinder, R-i-n-d-e-r.

3                    DIRECT EXAMINATION

4  BY MR. POPE:

5  Q.    Mr. Rinder, state your name and address.

6  A.    Michael Rinder, 808 Bentwood Court, Palm Harbor,

7  Florida.

8  Q.    Mr. Rinder, let's start with the focus of your

9  relationship with the Church of Scientology.

10           You were a senior official with the Church of

11 Scientology International, CSI, of the mother church of the

12 Scientology religion for more than 25 years?

13 A.    That's correct.

14 Q.    Mr. Rinder, there is a notebook there in front of you

15 with some marked exhibits.  Would you, please, open that up

16 to No. 1.

17           Do you see No. 1, Mr. Rinder?

18 A.    I do.

19 Q.    It's a declaration you filed in the Schipper case in

20 state court?

21 A.    Correct.

22 Q.    Would you look at the other exhibits in there?  There

23 are several documents.  There is a declaration filed in the

24 Garcia matter.

25 A.    You mean 1A?

1  Q.    Yes, 1A.

2  A.    The motion to strike.

3  Q.    There is a motion to strike the declaration in there?

4  A.    Yep.

5  Q.    You were present at that hearing, correct?

6  A.    Correct.

7        No, I'm not sure that I was present at this

8  hearing.  I'm not sure there was a hearing on this.

9  Q.   All right.  And, then, there is an order -- the next

10 one is an order granting the motion to strike.  You are

11 familiar with that, aren't you, Mr. Rinder?

12 A.    Yes, I am.

13 Q.   And next, on C, is this your declaration in the Garcia

14 matter?

15 A.    Correct.

16        MR. POPE:  I would offer those into evidence as

17 No. 1, Defendant's Exhibit 1.

18        THE COURT:  All right.  Any objection?

19        MR. BABBITT:  No objection, your Honor.

20        THE COURT:  Defendant's Exhibit 1 is received.

21        (*Defendant Exhibit 1 received in evidence.*)

22 BY MR. POPE:

23 Q.   Now, Mr. Rinder, I would like to go over with you --

24 would you return to the Schipper's declaration, and would you

25 agree with me the Schipper and the Garcia declarations are

1  the same?

2  A.    I would.

3  Q.    All right.  Now, you say -- or you swear, "I was a

4  senior official of the Church of Scientology International,

5  CSI" --

6  A.    What page are you on, Mr. Pope?  I'm not sure where you

7  are.

8  Q.    I'm sorry.  We are on Page 1 of the Schipper with the

9  first substantive paragraph.

10  A.    Okay.

11  Q.    Do you see it?

12  A.    Got you.  Yep.

13  Q.    "I was a senior official of the Church of Scientology

14  International, the mother church of the Scientology religion,

15  for more than 25 years.  I left church employment in June of

16  2007," true?

17  A.    True.

18  Q.    "I am very well-versed in the policies and practices of

19  the church and was a member of the board of directors of the

20  Church of Scientology International from the formation in '82

21  until I left the church in 2007," true?

22  A.    True.

23  Q.    "For the vast majority of the time between '82 and

24  2007, I was the most-senior official in the religion,

25  responsible for all external facing matters internationally.

1    This encompassed government and media relations as well as

2    all litigation and contract matters."

3              True, Mr. Rinder?

4    A.    True.

5    Q.    All right.  Now, at the time that the Schipper's case

6    and the Garcia case were pending in state court, you were

7    working, I believe, under an agreement as a consultant for

8    the Garcias' then attorney, Brian Leung of Tampa, correct?

9    A.    Correct.

10   Q.    All right.  Look at Exhibit 2, if you would,

11   Mr. Rinder.  Tell me when you've got it.

12   A.    I've got it.

13   Q.    Is that your consulting agreement with Mr. Leung?

14   A.    Yes, it appears to be.

15   Q.    All right.  Sir, under this agreement, you were

16   providing services on a pro bono basis with reimbursement for

17   your out-of-pocket expenses, correct?

18   A.    That's correct.

19   Q.    Let's look at what your obligation was under the

20   agreement in Paragraph 2.  It say, "The objective of this

21   agreement is for you to provide your expert opinion about the

22   policies, procedures, organization, management, and goals of

23   the defendants in the litigation," correct?

24   A.    Correct.

25   Q.    That's what you did when you consulted with Mr. Leung,

1   correct?

2   A.     In very broad terms, yes.

3   Q.     And Mr. Leung was representing the Garcias, the

4   plaintiffs in this action, in the state court, correct?

5   A.     That's correct.

6   Q.     All right.  And your ability to render those litigation

7   consulting services was based on your 25 years with the

8   church as, quote, the most-senior official responsible for

9   all litigation and contract matters, correct?

10  A.     No.  I would say that it was more because I had been a

11  member of the Church of Scientology since I was six years

12  old.  So I had a very, very broad familiarity with the

13  policies, the writings, the things that dictate how the

14  Church of Scientology or Scientologists act and what the

15  terminology means and how things are described and what

16  happens within the realm of Scientology.

17  Q.     And your qualifications to render this consulting

18  service to Mr. Leung are as described in the first three

19  paragraphs of your declaration, correct?

20  A.     Well, not completely.  As I just described, there is

21  more to it.

22  Q.     Okay.  Good.  And the term "mother church," which is

23  the term you used in your declaration, means that it is the

24  organization that has overall responsibility for both

25  religious and legal matters for Scientology churches

1   throughout the world, correct?

2   A.   Among other things, that's correct.

3   Q.   But it certainly has that responsibility?

4   A.   Right.  Absolutely.

5   Q.   All right.  Now, as a consequence of your position as a

6   board member of CSI for 25 years and your assigned legal

7   duties, you became very well-versed in the policies and

8   practices, the legal policies and practices of the church,

9   didn't you?

10  A.   I don't know.  That's a bit of a trick question,

11  because the legal policies and practices of the church --

12  Q.   Excuse me.

13          THE COURT:  Mr. Pope, please don't interrupt the

14  witness.  He's trying to answer your question.

15          MR. POPE:  I'm sorry.

16          THE WITNESS:  The legal policies and practices of

17  the church are dictated by the fundamental beliefs of

18  Scientology, so to make a distinction isn't really correct.

19  That's why I corrected you earlier about my experience from

20  childhood all the way to adult life as a Scientologist was

21  what really enables me to figure out and assist attorneys in

22  dealing with the complexities that come up in this

23  litigation.

24  BY MR. POPE:

25  Q.   And your responsibilities included overseeing the work

1  that you did with the church's legal staff and outside and

2  in-house counsel, correct?

3  A.     That's correct.

4  Q.     All right.  You worked with the church's attorneys to

5  develop tactical and strategic approaches to legal issues

6  that the church confronted, correct?

7  A.     Yes, that's correct.

8  Q.     And you reviewed and approved the church attorney's

9  work product, correct?

10  A.     Correct.

11  Q.     And you had confidential attorney communications with

12  church counsel, correct?

13  A.     Correct.

14  Q.     You worked with church attorneys both on litigation and

15  nonlitigation matters, correct?

16  A.     Yes, that's correct.

17  Q.     And that included the formulation of contracts as part

18  of your duties, correct?

19  A.     That's correct.

20  Q.     All right.  And handling church legal matters was one

21  of your principal responsibilities for many years, correct?

22  A.     Along with the media.

23  Q.     And you did media work as well, correct.

24          Now, throughout your time with the church, you had

25  to deal with legal claims that the activities of the church

1  were secular or commercial or fraudulent, correct?

2  A.    Yes.

3  Q.    And to defend against such claims, you worked closely

4  with the church's attorneys and sought their advice on how to

5  refute those claims and to accurately reflect the true

6  beliefs and nature of Scientologist practices?

7  A.    Yes.

8  Q.    And during your tenure with the church, you had

9  hundreds of attorney-client meetings with church counsel,

10 during which legal strategies, confidences, plans, projects,

11 programs, and facts were discussed, correct?

12 A.    That's correct.

13 Q.    And some of the church lawyers you have worked with

14 over the years, communicated with and sought advice from you,

15 and some of those are Eric Lieberman, correct?

16 A.    Communicated means sought advice from me?

17 Q.    No.  You sought advice from them.

18 A.    He sought advice from me, too, but, yes.

19 Q.    It's a mutual relationship?

20 A.    Exactly.

21 Q.    And another attorney would be Monique Yingling,

22 correct?

23 A.    Yes.

24 Q.    Lee Fugate?

25 A.    Correct.

```
 1   Q.    Michael Hertzberg?

 2   A.    Correct.

 3   Q.    Bill Drescher?

 4   A.    Yes.

 5   Q.    He was former in-house counsel, now deceased?

 6   A.    That's correct.

 7   Q.    Elliot Ableson?

 8   A.    Correct.

 9   Q.    Rick Moxon?

10   A.    Correct.

11   Q.    Bill Walsh?

12   A.    Correct.

13   Q.    Sandy Rosen?

14   A.    Correct.

15   Q.    Tom Spring?

16   A.    Correct.

17   Q.    Gerald Chaleff?

18   A.    Correct.

19   Q.    Jack Quinn?

20   A.    Correct.

21   Q.    Ron Haynes?

22   A.    Correct.

23   Q.    Paul Johnson of Tampa?

24   A.    Correct.

25   Q.    Robert Johnson of Tampa?
```

```
 1   A.    Correct.

 2   Q.    Me?

 3   A.    Correct.

 4   Q.    And that's it?

 5   A.    No, it is not.

 6   Q.    That isn't the entire list, is it?

 7   A.    No, it is not.  The church has hired many, many lawyers

 8   over that period.  I mean, you can see a bunch of them here

 9   this morning.

10   Q.    And you were heavily involved with all of them, weren't

11   you?

12   A.    No, not all of them.

13   Q.    Okay.  And among those meetings with church counsel

14   were meetings concerning the handling of refunds and refund

15   litigation, correct?

16   A.    A small -- very small amount, yes.

17   Q.    Okay.  Well, I believe in your declaration, which is in

18   evidence here, you state that you have direct familiarity

19   with the issues in this case and specifically the enrollment

20   agreements and the inclusion of an arbitration clause in that

21   agreement, correct?

22   A.    Yes, that's correct.

23   Q.    All right.  Those are your words.

24         And you have sworn that the enrollment agreement

25   was, quote, the result of your work with in-house counsel for
```

1   CSI, William T. Drescher, correct?

2   A.      I have.

3   Q.      And in the declarations that are part of Exhibit 1, you

4   describe communications with Attorney Drescher, correct?

5   A.      I did.

6   Q.      Don't you agree that these communications were

7   confidential communications between Attorney Drescher, who

8   was in-house counsel, and you, who was responsible for legal

9   affairs for CSI?

10  A.      I guess so, Mr. Pope, although those communications

11  also occurred with David Miscavige, who was not in CSI.

12  Q.      Now, as being responsible for legal affairs for CSI --

13  as the person responsible for legal affairs, you were

14  familiar with a concept of confidential attorney-client

15  communications, weren't you?

16  A.      Yes, I am.

17  Q.      And you were mindful of that privilege when you were

18  head of legal matters for CSI, correct?

19  A.      Yes.

20  Q.      And you would safeguard that information for CSI,

21  correct?

22  A.      I suppose, yes.

23  Q.      You didn't have a habit of disclosing such protected

24  information to third parties not associated with CSI or other

25  Scientology entities, did you?

1  A.    You mean when I was in the Church of Scientology?

2  Q.    Yes.

3  A.    Yes, I did, because they disclosed that to other

4  non-CSI churches all the time.

5  Q.    As a routine matter?

6  A.    Yes, as a routine matter.

7  Q.    I'm talking --

8  A.    I mean, Wally, you and I had many meetings.  I'm CSI

9  and you are representing different churches and the

10 corporation.

11 Q.    I'm talking within the Scientology family of

12 organizations.  You didn't have a habit of passing that

13 information out to people who were not part of that group,

14 did you?

15 A.    No.

16 Q.    All right.  It's fair to say, while you were affiliated

17 with the church, you were a devoted member of the church,

18 were you not?

19 A.    Oh, absolutely.

20 Q.    And you protected the church's confidences as your role

21 as chief of legal matters?

22 A.    As my role as a Scientologist I did, yes.

23 Q.    All right.  Let's look at Exhibit 3 in the book.

24 A.    Yes.

25          MR. POPE:  I'm not sure I offered Exhibit 2 into

1  evidence.  I would offer that.  That's the consulting

2  agreement, your Honor.

3            THE COURT:  Any objection?

4            MR. BABBITT:  None, your Honor.

5            THE COURT:  No. 2 is received.

6            (*Defendant Exhibit 2 received in evidence.*)

7  BY MR. POPE:

8  Q.    Exhibit 3 is a composite.  Have you found it?

9  A.    I have.

10 Q.    It's a composite of three agreements.  There is a

11 nondisclosure and release bond dated April 2, 1980, Church of

12 Scientology International, Declaration of Religious

13 Commitment and Membership in the C Organization dated August

14 17, 1998, and the Declaration and Nondisclosure Agreement

15 dated February 26, 2006.

16            Do you see those?

17 A.    I do.

18 Q.    And you signed each of them?

19 A.    I did.

20 Q.    All right.  Now, I'm not going to go over each word in

21 these agreements, but just focus for a second on the essence

22 of each.

23            The 1980 agreement says that you will, quote,

24 never, close quote, disclose internal information you learn

25 about the church.

1          You agree that "never" hasn't expired yet?

2   A.    Yes, I would agree with that.

3   Q.    All right.  The 1998 agreement is a religious

4   commitment to the C-Org, a religious order within the church,

5   correct?

6   A.    Correct.

7   Q.    And its duration was, quote, the remainder of your

8   life, correct?

9   A.    Where are you reading from?

10  Q.    Well, let's see.  You know, Mr. Rinder, the agreement

11  will speak for itself.  I'll move on to the next one.

12  A.    Okay.

13  Q.    And this agreement includes your agreement to, quote,

14  maintain the confidentiality of all communications whether

15  written or oral, all documents, all files, all mailing lists,

16  and all other material not commonly offered to the public for

17  sale or use which may come into my knowledge or possession in

18  the course of my services as a member of the C Organization.

19  A.    I presume you are reading from this, Mr. Pope.  I'll

20  stipulate to that.

21  Q.    It will speak for itself.

22  A.    Right.

23  Q.    The 2006 agreement contains similar confidentiality

24  provisions, together with an agreement that you will not,

25  quote, ever use any information disclosed to me in confidence

1    hereunder to assert any claim against, nor will I voluntarily

2    assist any person, group, or organization in any effort to

3    harass or injure CSI, RTC, or any affiliated organization or

4    group, et cetera.

5              Paragraph 6 provides --

6              THE COURT:  Mr. Pope, why are we reading from

7    documents?

8              MR. POPE:  Sir?

9              THE COURT:  Why are we reading from documents?

10             MR. POPE:  All right.  I shall --

11             THE COURT:  Let's get to the heart of the matter,

12   please.

13             MR. POPE:  Yes, sir.

14   BY MR. POPE:

15   Q.    This agreement lasts in perpetuity, doesn't it,

16   Mr. Rinder, according to its terms?

17   A.    I presume so.

18   Q.    All right.  Let's take a look at Exhibit 4.

19             MR. POPE:  First, I would offer those agreements

20   into evidence.

21             MR. BABBITT:  No objection.

22             THE COURT:  What's the relevance of these

23   agreements?  They will be received, but why are we going

24   through his nondisclosure agreement?  Why does that matter?

25             MR. BABBITT:  Your Honor, it actually becomes

1    relevant in our case that they haven't sought to enforce it

2    ever.

3          THE COURT:  Gentlemen, this is about disqualifying

4    an attorney or attorneys, not about whether he had a

5    nondisclosure agreement with the church; and whether he

6    violated it or whether it's been enforced, that has nothing

7    to do with the discrete issue.  That's why I set the tone

8    before we started.  Zero in on the issues that I have to

9    decide.

10          MR. POPE:  Your Honor, I was relying to some

11   extent on the Red Club case out of this Court which dealt

12   with --

13          THE COURT:  It's not this Court.  It's a colleague

14   of mine.

15          MR. POPE:  I'm sorry.  You are correct,

16   your Honor.  Out of the Middle District of Florida, and that

17   was the reason I included that.  So I will move on,

18   your Honor.

19          THE COURT:  I don't mean to be sharp, but this is

20   a very delicate and important issue.  I'm not interested in

21   all of these collateral matters that have no bearing on the

22   issue I have to decide.

23          MR. POPE:  All right, your Honor.  I will assure

24   the Court that this was filed only after efforts were made to

25   resolve it.

1            THE COURT:  I understand.  I don't have a problem

2   with filing.  I have a problem with delving into collateral

3   matters.

4            MR. POPE:  I understand, your Honor.

5            All right.  Let me skip over.  Let's go to

6   composite Exhibit 6.

7            Your Honor, did I get a ruling from the Court on

8   the admissibility of those agreements?

9            THE COURT:  Yes.  No. 3 was received.  Composite

10  Exhibit 3 was received without objection.

11            (*Defendant Exhibit 3 received in evidence.*)

12  BY MR. POPE:

13  Q.   Go to Composite Exhibit 6, Mr. Rinder.  Do you see

14  that?

15  A.   I do.

16  Q.   It's to Bill Drescher.  He was the in-house lawyer at

17  the time, correct?

18  A.   Correct.

19  Q.   From you?

20  A.   Yep.

21  Q.   It poses a question about modified enrollment forms,

22  correct?

23  A.   I guess.

24            MR. POPE:  Your Honor, we redacted the substantive

25  request for information to protect the privilege, but the

```
 1   first sentence is Modified Enrollment Forms.  You may recall

 2   them from some months ago.  One question has arisen.

 3            THE WITNESS:  I can see that, yes.

 4            MR. BABBITT:  Excuse me, your Honor.  This raises

 5   a problem that we have with respect to many of the church's

 6   exhibits.  They have been unilaterally redacted without any

 7   privilege log.

 8            THE COURT:  Well, let's address it when he moves

 9   it into evidence.

10            MR. BABBITT:  Thank you.

11   BY MR. POPE:

12   Q.   Look at the second part of that composite exhibit,

13   which is Mr. Drescher's answer to you, correct?

14   A.   I guess that's what that is.

15   Q.   All right.  And it's redacted.

16            MR. POPE:  Your Honor, I would offer this into

17   evidence.

18            MR. BABBITT:  I would object, your Honor, on the

19   same grounds stated.

20            THE COURT:  Sustained.

21            MR. POPE:  All right.

22   BY MR. POPE:

23   Q.   Let's turn, Mr. Rinder, to your current relationship

24   with the plaintiffs.

25            It's my understanding from the papers that you
```

1  sought out Attorney Robert Johnson and asked him to assist

2  you in finding attorneys for the Garcias, is that correct?

3  A.    That's correct.

4  Q.    All right.  And was this contact with Mr. Johnson after

5  Attorney Leung withdrew from the Garcias' case?

6  A.    I don't believe so.  No, I think it was before.

7  Q.    All right.  You knew at the time that Mr. Johnson had

8  represented FLAG and CSRT for 16, 17, 18 years, didn't he?

9  A.    Yes, I did.

10  Q.    In fact, that's how you got to know him?

11  A.    That's correct.

12  Q.    He was one of your lawyers --

13  A.    That's correct.

14  Q.    -- with whom you exchanged confidential information,

15  correct?

16  A.    I mean, I would presume so; but, I mean, I don't recall

17  any specific confidential information with Bob.  He primarily

18  dealt with transactional matters and property purchases and

19  that sort of stuff in my relationships with him.

20  Q.    Now, take a look, will you please, sir, at the

21  consulting agreement that is Exhibit 7.

22  A.    Uh-huh.  Yep.

23  Q.    That is, I believe, Mr. Rinder, the consulting

24  agreement among you, Mr. Weil's firm, Mr. Babbitt's firm,

25  Mr. Johnson's firm and, also, I think, Morgan & Morgan, who

1  appears no longer to be in the case; is that correct?

2  A.    That's correct.

3  Q.    But that is your agreement that you signed?

4  A.    That's correct.

5         MR. POPE:  I will offer Exhibit 7 into evidence,

6  your Honor.

7         MR. BABBITT:  No objection to that, your Honor.

8         THE COURT:  Exhibit 7 is received.

9         (*Defendant Exhibit 7 received in evidence.*)

10 BY MR. POPE:

11 Q.    Now, in this consulting agreement, your compensation is

12 set at $175 per hour, not to exceed 5,000 per month, correct?

13 A.    That's correct.

14 Q.    And you provide monthly billing statements to the

15 Babbitt firm on the first of each month?

16 A.    That's correct.

17 Q.    And the Babbitt firm is to remit on a monthly basis?

18 A.    That's correct.

19 Q.    And this agreement is still in effect?

20 A.    It is.

21 Q.    It has not been terminated?

22 A.    Nope, has not.

23 Q.    All right.  Let's take a look at Paragraph 5 of the

24 agreement.  It says, "Consultant represents and warrants to

25 law firms that consultant has no engagement or other

1  contractual relationship which would restrict consultant from

2  performing the duties contemplated herein."

3          My question to you, Mr. Rinder, is whether you

4  disclosed the nondisclosure agreements that are in evidence

5  to the law firms at the time you entered into this agreement.

6  A.   I don't recall.  I think that I told them about them;

7  but, you know, I also informed them that I have -- the vast

8  majority of things that I had to tell them I had already

9  spoken about publicly numerous times on the internet, in the

10 media, in other lawsuits, and et cetera, et cetera.

11         I don't think that -- I didn't have copies of

12 those agreements.  The church never gave me copies of those

13 agreements, so I didn't have any agreements to give them; but

14 I certainly -- at least with respect to Mr. Byrd, at the

15 outset, I informed him that the church has these agreements

16 that they get everybody to sign, for which there is no

17 consideration, there are no lawyers present, and I don't

18 believe that they are enforceable.  But in any event,

19 subsequently, I have disclosed enormous amounts of things and

20 nothing has ever been done about it.

21 Q.   As I understood what you just said, the information

22 that you have disclosed to counsel is information that you

23 already had publicly disclosed on your blogs, is that

24 correct?

25 A.   That's correct.

1  Q.    So your attorneys, then, were willing to pay you $175

2  an hour for information that was already a matter of public

3  record?

4  A.    Oh, absolutely.  Try wading through it, Mr. Pope.

5  You'll understand what it's like trying to wade through the

6  terminology and the policies and the writings and how things

7  get done in Scientology.  If you don't have someone that can

8  help you sort it all out, it's a mess.

9  Q.    Your ability to sort this all out comes from your 25

10  years of experience as the chief legal officer for CSI,

11  correct?

12  A.    No.  I have told you already.  It comes from being a

13  Scientologist for 45 years.

14  Q.    There is a reference in the agreement to you being an

15  independent contractor and having to pay your own employees.

16  Do you have any other people working for you in connection

17  with the assignment?

18  A.    No, I don't.

19  Q.    And there is a reference to amendments to the

20  agreement.  Has the agreement been amended?

21  A.    No, it hasn't.

22  Q.    All right.  So Paragraph 2 of the consulting agreement,

23  I believe, the last sentence states, "It is contemplated by

24  the parties that consultant will devote most of his business

25  time to these efforts."

1          Have you done that, Mr. Rinder?

2   A.    Until this motion to disqualify was filed, in which

3   case, there hasn't really been any action.  So prior to that,

4   I was devoting a considerable amount of time.

5   Q.    And the motion to disqualify was filed, I believe, in

6   May 2013.

7   A.    If you say so.  I mean, I -- May, that sounds about

8   right to me.

9   Q.    Have you not performed any consulting duties for June,

10  July, August, and September?

11  A.    I don't believe so.  There may be some small amounts,

12  but nothing significant.

13  Q.    Okay.  And, of course, you had to prepare for today's

14  hearing, correct?

15  A.    Correct.

16  Q.    Are you to be compensated for that?

17  A.    No.

18  Q.    Okay.  Now, in Paragraph 2, the Consulting Agreement

19  says, "Consultant agrees not to do any act that in any way

20  would constitute a violation on the part of the law firms, of

21  the rules regulating Florida Bar, including but not limited

22  to the violation of the attorney-client relationship,

23  improper solicitation of potential clients, with sharing of

24  fees with a non-lawyer."

25          My question is:  Have you read those rules

1    regulating the Florida Bar?

2    A.    No.

3    Q.    All right.  Did you have independent counsel -- your

4    own lawyer review this agreement before you signed it?

5    A.    No, I did not.

6    Q.    Let's look at composite Exhibit 8.

7          Have you found that, Mr. Rinder?

8    A.    Yes, I have.

9    Q.    That's a composite of your monthly invoices beginning,

10   I believe, in August 2012 and continuing through May of 2013,

11   correct?

12   A.    Yes, it is.

13   Q.    Now, the August, September, and October invoices are

14   addressed to Tucker Byrd of Morgan & Morgan.

15         Do you see that?

16   A.    Yes, I do.

17   Q.    Did you have a written -- separate written agreement

18   with Morgan & Morgan and Mr. Byrd?

19   A.    Yes, I did.  It preceded this one that you had before

20   or that we just went through.  Very similar.  But it was

21   adjusted to include the other law firm.

22   Q.    Okay.  So that agreement was, in effect, merged into

23   your current agreement; is that what you are telling me?

24   A.    Yes, that's correct.

25   Q.    All right.  And who paid the August, September, and

1  October invoices when you were with Mr. Byrd?

2  A.    I am actually not sure who paid those.

3  Q.    All right.  But you have --

4  A.    It was either -- it was either Morgan & Morgan or it

5  was Mr. Babbitt.  One or the other.

6  Q.    It was you who suggested that a written agreement be

7  entered into or the lawyers?

8             MR. BABBITT:  Your Honor, I don't know where this

9  is going.  Object.

10            MR. POPE:  I'll move on, your Honor.

11 BY MR. POPE:

12 Q.    Do I understand, then, that you neither submitted

13 invoices, nor have been paid for consulting work in June,

14 July, August, and September?

15 A.    Correct.

16 Q.    So did I understand you correctly that it was the

17 filing of the disqualification motion that caused you to not

18 render any additional services under this consulting

19 agreement?

20 A.    Well, that was the result of the filing of the

21 disqualification motion because there wasn't any other

22 activity in the case.

23 Q.    All right.  Mr. Rinder, I went through your bills and

24 did a little bit of addition of the numbers, and I would like

25 to review that with you.

1          My math says that they show you spent 23 hours

2     consulting with Mr. Babbitt's firm, is that correct?  Do you

3     have any reason to doubt that?

4     A.     No, I don't.

5     Q.     They show 19-and-a-half hours consulting with Robert

6     Johnson of Gray Robinson.  Any reason to doubt that number?

7     A.     No.

8     Q.     It shows seven-and-a-half hours with the Weil firm.

9     Any reason to doubt that number?

10    A.     No.

11    Q.     Ten hours of various attorneys who were not identified

12    in your invoices.  Any reason to doubt that?

13    A.     No.

14    Q.     My addition also shows that you spent a total during

15    the ten-month period from August through May of 125 hours

16    consulting, drafting, researching, communicating, et cetera,

17    correct?

18    A.     If you say so, Mr. Pope.

19    Q.     All right.  And you were compensated, I believe the

20    math is, to the tune of $21,450.

21    A.     I believe that you can add this up.

22    Q.     Okay.  Take a look --

23          MR. POPE:  Your Honor, I would offer that into

24    evidence, composite Exhibit 8.

25          MR. BABBITT:  No objection, your Honor.

1            THE COURT:  No. 8 is received.

2            (*Defendant Exhibit 8 received in evidence.*)

3            MR. POPE:  I can't remember if I offered No. 7,

4    the consulting agreement.

5            THE COURT:  It's in.

6            MR. POPE:  Thank you, sir.

7    BY MR. POPE:

8    Q.    Do you have Exhibit 8 there, Mr. Rinder?

9    A.    No. 8?  That's what we were just looking at.

10   Q.    I'm sorry.  No. 9.  Do you have No. 9?

11   A.    Yes.

12   Q.    That's a privilege log that we were provided by

13   Mr. Babbitt.

14            Have you seen this document before?

15   A.    Only yesterday when I saw what exhibits were being

16   provided.

17            MR. BABBITT:  Your Honor, I object to this line of

18   questioning on relevance.  It relates to a matter that you

19   will have to decide, not what the witness can decide.

20            THE COURT:  I don't understand the objection.

21   Let's have an evidentiary objection, please.  Relevance?

22            MR. BABBITT:  Relevance.

23            THE COURT:  What is the response, Mr. Pope?

24            MR. POPE:  Your Honor, the relevance is that in

25   the privilege log there is a description that the rules

1    require such that you can at least assess the privilege

2    without actually having access to the privilege

3    communication.  What was it about.

4            THE COURT:  Why don't you just ask him some direct

5    questions.

6            MR. POPE:  I was going to ask him questions based

7    on the descriptions of the privilege log about information

8    that he has conveyed --

9            THE COURT:  I don't think there is any dispute

10   that he's been consulting with these lawyers for months.  So

11   why are we spending so much time?

12           By the way, I want to remind you, you have an hour

13   and a half.

14           MR. POPE:  I understand, your Honor.

15           THE COURT:  I don't quite understand why we are

16   going through all these documents.

17           MR. POPE:  All right.

18           THE COURT:  You've got to show some confidential

19   communication or information went to him from the lawyers,

20   and you haven't even touched on that yet.  That is, as I

21   understand the law.

22           MR. POPE:  Well, your Honor, that was my -- that

23   was part of my purpose in the privilege log, which shows

24   direct communications of information from Mr. Rinder to the

25   lawyers.

1          THE COURT:  I'll overrule the objection.

2          No. 9 is received.

3          (*Defendant Exhibit 9 received in evidence.*)

4    BY MR. POPE:

5    Q.    Mr. Rinder, will you take a look at, first, what's on

6    the first page.  It says, "Rinder 5."

7    A.    Yes, I see that.

8    Q.    The subject of it is, without disclosing the contents,

9    "Return of funds and church IRS filing," correct?

10   A.    That's correct.

11   Q.    That was your e-mail to all the lawyers involved in

12   this matter?

13   A.    Correct.

14   Q.    Look at --

15   A.    I presume.  I didn't make this, Mr. Pope.

16   Q.    I understand.  I understand.

17         Take a look at Rinder 9 and 10.  The subject --

18   the description is, "E-Mail, financial real estate dealings

19   of CSRT," correct?

20   A.    Yes.

21   Q.    Take a look on the third page at Rinder 25-26.

22         That was your --

23   A.    Yes.

24   Q.    All right.  "E-mail church entities handling refunds

25   for services and accommodation, FSSO, as the legal entity

1   corporate status," correct?

2   A.    Yes.

3             MR. BABBITT:  Your Honor, objection.  Relevance.

4   It's in evidence.

5             THE COURT:  Overruled.

6   BY MR. POPE:

7   Q.    Rinder 32.  "Return of funds and IAS Administrations."

8   A.    Correct.

9   Q.    Rinder 35-36, "E-Mail notes regarding draft complaint,"

10  correct?

11  A.    Correct.

12            You are asking me to read these?

13  Q.    I'm just asking you, these are the subject matters of

14  information that you passed on to the lawyers for the

15  plaintiffs, correct?

16  A.    Yes.

17  Q.    Okay.

18  A.    You don't want me to tell you what they are?

19  Q.    Well, they have been alleged to be privileged.

20  A.    I understand.

21  Q.    Okay.  Let's go down to 46-48, March 8th, 2013,

22  "Subject:  E-mail arbitration and enrollment agreement,"

23  correct?

24  A.    Correct.

25  Q.    That's all that I have on that one.

```
 1          MR. POPE:  I think that's it, your Honor, for my
 2   questioning.
 3          THE COURT:  Are you, Mr. Berman -- I mean, they
 4   joined in your motion.  We don't need to necessarily prolong
 5   the questions.  Mr. Berman, are you going to pass?
 6          MR. BERMAN:  I don't have any questions of this
 7   witness, your Honor.
 8          THE COURT:  All right.  Thank you.
 9          Mr. Babbitt, any cross?
10          MR. BABBITT:  Thank you, your Honor.  Yes.
11                     CROSS-EXAMINATION
12   BY MR. BABBITT:
13   Q.    Mr. Rinder, tell us how long ago you left the church.
14   A.    I beg your pardon?  I didn't hear the question.
15   Q.    Oh.  I said, when did you leave the church?
16   A.    June of 2007.
17   Q.    Can you hear me?
18   A.    I can.  I thought you said something after "When did
19   you leave the church?"
20   Q.    I'm sorry.
21          So that was, what, six, seven years ago?
22   A.    Yes.  Six-and-a-half.
23   Q.    What was the nature of the termination?  Was it a
24   friendly termination, or what?
25   A.    No.  I left because I believed that the church was
```

1   engaged in activities that were abusive and violating

2   people's rights.

3   Q.    And what did you do about it?

4   A.    Well, I didn't do anything for a period of time; but,

5   then, in 2009 I was approached by the *St. Pete Times* and

6   asked if I would verify information that they had.  So I

7   began talking to the media; and at that point -- subsequent

8   to that, I've spoken many times to the media or I've had a

9   lot of attorneys who have contacted me.  I've been all over

10  the internet.

11          MR. POPE:  Your Honor, I object.  This is

12  irrelevant.

13          MR. BABBITT:  I would like to be heard.  It's

14  highly relevant, your Honor.

15          THE COURT:  In what respect?

16          MR. BABBITT:  The third section of the rule that

17  we are supposedly violating, which says that if the

18  information is publicly available, then --

19          THE COURT:  Ask him some questions, then, instead

20  of just getting --

21          MR. BABBITT:  I thought I was.  Mr. Pope

22  interrupted.

23          THE COURT:  Mr. Rinder, listen to the question so

24  we can move along.

25          THE WITNESS:  Yes, sir.

BY MR. BABBITT:

Q.    What kinds of things did you talk to the press about?
What kind of things are on the internet?

A.    There is almost anything you can find on the internet
these days, from all of the church's policies and writings of
L. Ron Hubbard to stories of people who have been abused to
problems that people have had getting their money back from
the church to disconnection stories, about families being
broken up.

Q.    I just want to make sure you talk about what you did.
I don't want to know what other people did.  You.

A.    I thought you said it was confined to the internet.  I
mean, I've talked about all those things, in any event,
either on the internet or in the media.

Q.    In fact, is there anything that you have learned as a
member of the church or as a higher-up in the church that you
have not disclosed other than personal information about
individuals?

A.    I don't believe so.

Q.    Is your answer, then, no, there is nothing?

A.    No, there is nothing.

Q.    With respect to the policies that counsel was asking
you about and your special knowledge and why you were hired,
are the policies of the church about disconnection, about
every other element that has been raised in this case,

1  printed and available to the public?

2  A.     Yes, they are.

3  Q.     What is this I'm holding in my hand?

4  A.     The "Introduction to Scientology Ethics Book."

5  Q.     And what does it contain?

6  A.     It contains all of the church doctrines about how to

7  deal with people who are considered to be what's called

8  suppressive persons or a potential trouble source or how the

9  church approaches the issues of ethics and morality and

10 justice.

11 Q.     Have you read the affidavits that have been provided in

12 support of this motion?

13 A.     I have.

14 Q.     Is there anything that is in those affidavits that

15 allegedly you learned in secret or is part of the playbook

16 that is not contained within the ethics provisions that are

17 publicly available to anyone by simply buying the books?

18 A.     No, there is not.

19 Q.     Now, you were asked about the nondisclosure agreement.

20 Was there ever any effort to enforce that legally?

21 A.     No.

22 Q.     Has there ever been any effort legally to prevent you

23 from divulging what you knew to the public?

24 A.     No, apart from this motion to strike.  That's the only

25 thing I'm aware of.

1   Q.    The motion to strike in the --

2   A.    In the Schipper case.

3   Q.    In the Schipper case.

4   A.    Yes.

5   Q.    Speaking of that, that relates to information that you

6   got from a Mr. Drescher, who is an attorney for Scientology,

7   who is no longer with us, right?

8   A.    That is correct.

9   Q.    And tell us what the communication was that you put --

10  that related to that affidavit that you filed in those two

11  cases.

12  A.    It was that Bill believed that the --

13  Q.    "Bill" being Bill Drescher?

14  A.    Bill Drescher believed -- and so did I at the time -- I

15  was tasked with drafting that enrollment agreement, but the

16  idea of arbitration that consists of three Scientologists in

17  good standing was not ever going to hold up in court.

18  Q.    And what happened as a result of that?  Did it go

19  forward anyway?

20  A.    It went forward anyway because Mr. Miscavige insisted

21  that regardless of that concern that it be included in the

22  enrollment agreement so that --

23          MR. POPE:  Excuse me, your Honor.  Hearsay.  He's

24  testifying to what Mr. Miscavige said.

25          MR. BABBITT:  He's accused of providing that kind

1   of information.  Certainly he can say what it was.  It

2   relates, your Honor, to fraud in that this was an attempt to

3   perpetrate a fraud on people that might seek funds from the

4   church and, therefore, would not qualify as attorney-client.

5           THE COURT:  Not offered for the truth of the

6   matter, then, correct?

7           MR. BABBITT:  That's correct.

8           THE COURT:  Objection is overruled.

9           THE WITNESS:  I'm sorry.  I lost the question.

10  BY MR. POPE:

11  Q.    You were telling us about what Mr. Miscavige said.

12  A.    He said that those -- that that clause should be

13  included in the enrollment agreement because a lot of people

14  that sign it, if they read it -- which most won't, but if

15  they do read it, they will believe it is enforceable.  And

16  even if they then challenge it, it will be a first barrier to

17  any litigant being able to pursue a claim against the church

18  and that pursuant to the very well-documented strategy of

19  scorched-earth litigation and make it as costly as possible

20  for any plaintiff to sue the church, bring every motion

21  possible, put up every barrier so that they either run out of

22  money or run out of time or determination to take the suit to

23  the end of its -- you know, to trial or to be resolved, that

24  it shouldn't stay in there.

25           I did not believe that anybody in the church would

1   even try and enforce this on a repayment claim; and when that

2   happened to the Garcias and the church moved to try and

3   enforce that, I felt like it was wrong to not speak about

4   what I knew about what had happened with that enrollment

5   agreement.

6   Q.    Now, that affidavit was filed in two cases, right?

7   Schipper and Garcia?

8   A.    Correct.

9   Q.    In Schipper, did the church move to have it removed

10  from the record?

11  A.    Yes.

12  Q.    In Garcia, did the church move to have it removed from

13  the record?

14  A.    I see there was something in here, Mr. Babbitt, when I

15  was looking through here.  It looks like they did move to

16  strike it in the Garcia case.  I don't know.  I think I saw

17  that in there.

18  Q.    Okay.  Do you know whether it was stricken or not or

19  whether it's still a matter of public record?

20  A.    It is still a matter of public record.  It was stricken

21  in the Schipper's case for being hearsay.

22  Q.    But not in the Garcia?

23  A.    Not in Garcia.

24  Q.    Have you appeared as a consultant for other attorneys

25  before our firm?

1  A.    Have I been retained?  I have.  Have I -- I haven't

2  ever appeared as a witness, no.

3  Q.    Thank you.  Have you been retained?

4  A.    Yes, I have.

5  Q.    How many occasions?

6  A.    Maybe six.  I don't know.  The church seems to have a

7  list of all these people that I am supposedly consulting.  I

8  don't know where they get their information from; but I know

9  in Texas, I have been a consultant in litigation in Texas.

10 In fact, in the case that was out there where they just tried

11 to disqualify the lawyers there and try --

12            MR. POPE:  Your Honor, I object.

13            THE WITNESS:  -- and in --

14            THE COURT:  Gentlemen.  Listen to the question and

15 answer it and move to the next question, please.  Thank you.

16            MR. BABBITT:  He was in the middle of an answer,

17 your Honor.

18            THE COURT:  Well, it was long-winded and

19 narrative, so let's move to something I can focus on in

20 deciding this important motion.

21 BY MR. BABBITT:

22 Q.    Has the Court -- excuse me.  Has the church ever, prior

23 to this case, moved to disqualify an attorney because of your

24 communications with attorneys --

25            THE COURT:  It doesn't matter.  It doesn't matter,

```
 1   Mr. Babbitt.  What's happened in the past is the past.  I

 2   have to decide the motion in this case.  I don't mean to cut

 3   you off, but, again, I'm trying to get you guys to focus.

 4           MR. BABBITT:  I'm happy to know what I'm permitted

 5   to do.

 6   BY MR. BABBITT:

 7   Q.    During your consulting with my firm or any of the other

 8   lawyers in this case, have you ever revealed to us any

 9   information that you learned from a lawyer for any of the

10   entities of Scientology?

11   A.    No, I have not.

12   Q.    Have you ever revealed to us anything of a legally

13   confidential nature that you have not revealed on the

14   internet?

15   A.    No, I have not.

16           MR. BABBITT:  One moment, your Honor?

17           Nothing further, your Honor.

18           THE COURT:  Redirect?

19                   REDIRECT EXAMINATION

20   BY MR. POPE:

21   Q.    Mr. Rinder, is your testimony that you have put out

22   confidential attorney-client communications on the internet

23   and nobody has objected to it?

24   A.    No.

25   Q.    Your testimony is that you haven't put out any
```

 1    confidential attorney-client information at all, correct?

 2    A.    No, that's not true.

 3    Q.    And you haven't -- you haven't communicated any

 4    confidential attorney-client communications that you learned

 5    in your position to the plaintiffs' lawyers?

 6    A.    That's true, yes.

 7    Q.    And you have been able, after 25 years of service as

 8    the chief legal officer, to clearly separate in your mind

 9    what is attorney-client privilege and what isn't, is that

10    correct?

11    A.    Yes, that's correct.

12    Q.    And you have carefully refrained from doing that,

13    correct?

14    A.    That's correct.

15    Q.    Except for your affidavit in which you recited what

16    Mr. Drescher advised you about the enrollment forms, correct?

17    A.    Yes, that's correct, and I explained why.

18    Q.    Yes.  And with regard to the Garcia case, don't you

19    agree that what happened in the Garcia case was that although

20    a motion to strike your affidavit had been filed, the case

21    was dismissed and refiled in this court before we could ever

22    have a hearing on it?

23    A.    I don't know.  I wasn't aware that motion had been

24    filed, as I mentioned.

25              MR. POPE:  Thank you.  I don't have anything else.

1           THE COURT:  Please, sir, you may step down.

2           Call your next witness, please, Mr. Pope.

3           MR. POPE:  Your Honor, I believe I offered the

4   privilege log.

5           THE COURT:  It's in.

6           MR. POPE:  It's in.  Good.

7           We are going to call Mr. Johnson.

8           Your Honor, I believe that one of the potential

9   witnesses, Mr. Culkin, had came into the courtroom late and

10  should be excused, per the rule.

11          THE COURT:  Whoever's witness it is, please take

12  that responsibility.

13          Where is Mr. Johnson?  Let's go.

14          MR. POPE:  I believe someone went to get him.

15          AUDIENCE MEMBER:  Mr. Johnson is in the restroom

16  and appears to be on his way back.

17                         ROBERT JOHNSON,

18  having been first duly sworn by the Courtroom Deputy,

19  testified as follows:

20          COURTROOM DEPUTY:  Please state your name and

21  spell your last name for the record.

22          THE WITNESS:  Robert Johnson, J-o-h-n-s-o-n.

23                        DIRECT EXAMINATION

24  BY MR. POPE:

25  Q.    Mr. Johnson, you've been licensed to practice law in

1  the state of Florida since 1982, some 30 years?

2  A.    Correct.

3  Q.    You've been in the Tampa Bay area practicing all that

4  time?

5  A.    Yes.

6  Q.    I believe during that entire time, although I've been

7  here for a few years longer than that, you and I have never

8  crossed paths, right?

9  A.    I don't recall.

10 Q.    All right.  You've been during that time associated

11 with several law firms.  Johnson, Paniello & Hayes, correct?

12 A.    Correct.

13 Q.    Johnson & Johnson, with the late Paul Johnson, correct?

14 A.    Correct.

15 Q.    And Broad & Cassel --

16 A.    Correct.

17 Q.    -- until 2006, at which time you joined Gray Robinson?

18 A.    Correct.

19 Q.    You performed legal services for various Church of

20 Scientology entities while you were with the first Johnson

21 firm, the second Johnson firm, and Broad & Cassel?

22 A.    There was one other firm in there that was Johnson &

23 Hayes, with Paniello.  Three Johnson firms.

24 Q.    All right.  You have indicated in your declaration

25 filed in this matter that you did this legal work for various

1   entities from 1982 through '88, some 16 or 17 years, correct?

2   A.    I thought -- I thought it was in '98.

3   Q.    Let me make sure I said it right.  1982 to 1998.

4   A.    Yes.

5   Q.    Now, would you take a look -- there is a book there.

6   Would you look at Exhibit 10.

7   A.    Yes.

8   Q.    Okay.  It's a composite Exhibit 10, and there are --

9   look under tab A of that exhibit.  That's tab A.

10  A.    10A?

11  Q.    Yes.  Those are statements -- I believe the first group

12  of statements is dated January 12th, 1999, correct?

13  A.    Correct, from Broad & Cassel.

14  Q.    Your firm?

15  A.    Correct.

16  Q.    To CSRT?

17  A.    Correct.

18  Q.    Your client?

19  A.    Correct.

20  Q.    And, if you will, thumb through that.  I believe you

21  will see that you continued to bill them for services up

22  through July of 2000.

23  A.    Yes, that's correct.

24  Q.    Okay.  And look at the stack of bills on top of tab A

25  if you would.

1   A.     Okay.

2   Q.     There are statements also dated -- going through July

3   12, and this is addressed to FLAG, Church of Scientology,

4   Flag Ship Service Organization, correct?

5   A.     Correct.

6   Q.     You were still billing for services up through the

7   summer of 2000, correct?

8   A.     That's correct.  Yes.

9   Q.     I'm sorry.  Go ahead.

10  A.     In my declaration, my recollection of the time when I

11  stopped doing work was just about the time of the

12  groundbreaking for the Super Power Building.  I received a

13  call from Mr. Stilo indicating that they were going to move

14  to another firm.  I believe it was your firm.  I had a

15  conversation with Guy Burns on or about that time.

16         So, essentially -- and I probably misspoke in my

17  declaration, but essentially what occurred was on or about

18  the time of the groundbreaking, all of my files were turned

19  over to Johnson Blakely.  I did tie up work that I did.  I

20  believe I was negotiating with -- there was a Ben Nelson who

21  was a friend of mine, who was the owner -- or excuse me, who

22  was the head of Red Cross.  The CSRT was purchasing the Red

23  Cross building.

24         Essentially what I did do, I sort of tied up work

25  after the groundbreaking; but, essentially, at that point in

1    time your firm took over all of the representation.

2    Q.    The only point I'm trying to establish, Mr. Johnson, is

3    that your attorney-client relationship both with FLAG and

4    CSRT continued until mid-summer 2000?

5    A.    I would disagree with that statement.  My understanding

6    from my looking at the bills, that it probably was tied up in

7    1999.  Now, maybe I did something when he asked me to

8    dissolve a corporation, but it was only a few hours' worth,

9    and I may have done those few hours' worth of work.

10   Q.    Don't you agree with me that an attorney-client

11   relationship could be based on three minutes of work?

12   A.    I agree.

13   Q.    So you had -- you were phasing out, but you had an

14   attorney-client relationship that lasted to mid-summer of

15   2000?

16   A.    I don't recall specifically, but if you point me to a

17   bill, I would be happy to look at it.  But I do agree that my

18   relationship did go beyond 1998.

19   Q.    Okay.  And you were billing them right up to -- the

20   last bill in there is July 2000, I believe.  Very last one

21   under tab A.  It's a small amount of money, but it says,

22   "Current Services," a few hundred dollars, correct?

23   A.    Correct.  Yes.

24   Q.    All right.  Now, in the complaint in this matter, at

25   Paragraph 31 -- and you've read the complaint in this matter,

1  haven't you?

2  A.    Yes, I have.

3  Q.    And in the complaint, which is Exhibit 11 in your book,

4  the Garcias are seeking to recover for contributions to CSRT

5  for the Super Power Building, and here are the allegations.

6  I believe they are on 31B, the next page.  Paragraph 31 --

7  not page, but Paragraph 31B.

8              They seek to recover these sums:  35,000 donated

9  in October of '98; 35,000 in December of '98; 30,000 in May

10 of '99; 10,000 in July of '99; 30,000 in November of '99; and

11 four-and-a-half thousand in March of 2000.

12             Do you see that?

13 A.    Yes.

14 Q.    That's a total of $144,500 in '98, '99, and 2000,

15 correct?

16 A.    Correct.

17 Q.    All right.  Mr. Johnson, you are now representing the

18 Garcias in their attempt to recover money, on fraud and other

19 theories, that they donated to CSRT while you had an

20 attorney-client relationship with CSRT, correct?

21 A.    Correct.

22 Q.    Now, Mr. Johnson, I interrupted the order of witnesses

23 so I could get to you before my time runs out; but we did a

24 little addition, and over the period of time that you

25 represented CSRT and FLAG, we discovered that you had been

1    paid -- or you or your various firms had been paid about

2    $1.8 million.

3           Does that -- do you have any reason to doubt that

4    number?

5    A.    Absolutely.

6    Q.    You do?

7    A.    That is false, inaccurate, and incorrect.  I'm basing

8    it on -- I don't know if we have the tab here, but there was

9    an exhibit where you sort of outlined the time that we were

10   talking about.  Do we have that number here?  It's a document

11   that was entitled "Payments to Robert Johnson."

12   Q.    I believe that's tab 16 or 17.  Tab 17.  Take a look at

13   tab 17.

14   A.    So what I did, again, looking in 19 -- I don't really

15   recall.  For example, in '83, I was an associate back then

16   with Paul Johnson.  Paul was the one -- although no relation

17   to me, Paul was the one handling the church matters.  In '84

18   we may have been paid that.  I didn't have any information

19   regarding that.

20          But when we go to 1997 when I was with Broad &

21   Cassel, the numbers that had been included in here are over

22   600,000.  Broad & Cassel is a very interesting firm in what

23   they do is they track all originations.

24          The Church of Scientology origination -- and I

25   never approached 600,000 in originations.  That year my

1   entire originations were $300,000, so it's impossible that I

2   would have been paid the 600,000 that's represented here.

3            I've also gone through and looked at the bills

4   that you have attached; and in going through those bills, I

5   do have a calculation for that particular year in the bills

6   that were attached and --

7   Q.    Those were not all the bills.  That was a sample.

8   A.    Okay.

9   Q.    With regard to the attached bills, what was the number

10  that you came up with?

11  A.    The attached bills that I had for CSRT for that year

12  was 49,000 in fees billed, and FSO, it was fees billed of

13  19,000.  There is a little difference, though.  The payments

14  were 39,000 from FSO that year, and the payments on CSRT that

15  year were 57,000.

16  Q.    Mr. Johnson, if $1.8 million is not the number, do you

17  have an idea about what it is?

18  A.    It was certainly a substantial amount of money over the

19  time period that I represented them.  I would say that in

20  1997 it would have been somewhere in the neighborhood of a

21  hundred thousand dollars.

22  Q.    And you were one of the main attorneys handling refund

23  claims for FLAG Church, weren't you?

24  A.    I would disagree with that statement.  We are talking

25  about refund claims.  Typically the procedure would be that

1   these would be handled in-house.  If we go back to the bills,

2   which I think there was a Bowles & Moxon who was working

3   in-house out in California.

4           There was always a pressure that you don't want to

5   pay the outside attorney, as with any client.  So most of the

6   refund, repayment, all those issues, they try to handle

7   in-house.  Only time I ever got involved is if there was an

8   instance where someone was threatening a suit in Florida, and

9   those instances were few and far between.

10  Q.   Weren't there at least a dozen lawsuits over refunds

11  that you were involved in?

12  A.   No, I really don't recall a dozen.  In looking at the

13  material that you've provided in your exhibits, I didn't see

14  a dozen lawsuits there.  I only saw Williams, and I think it

15  was Toby Plevin filed one in California.

16  Q.   You worked a lot, did you not, with Judy Fontana, who

17  was a member of FLAG staff at the time, correct?

18  A.   Correct.

19  Q.   And do you recall that she was a member of the staff

20  from about 1984 to 1996?

21  A.   I don't know the time frame.  I know she was there

22  quite a bit of the time.  There were times when she wasn't

23  there.  So she would have been referred to as a terminal, so

24  sometimes I would deal with her.  Sometimes I would deal with

25  Mr. Stilo, Mary Story, Betty Roush.

1  Q.    And you developed --

2  A.    And Sean.

3  Q.    -- developed a fairly close relationship with

4  Miss Fontana, didn't you?

5  A.    Yes, I did.

6  Q.    In fact, you came to her wedding with your children,

7  didn't you, back in the early '90s?  Didn't you come to her

8  wedding with the children?

9  A.    No, I don't think so.

10  Q.    You don't think so?

11  A.    No, I don't think I even had -- I don't recall.  I know

12  her husband was Umberto, but I thought --

13  Q.    You were in contact with her, generally, on a weekly

14  basis and sometimes even on a daily basis, weren't you?

15  A.    There would be times where we were in contact on a

16  daily basis.  There would be times where we wouldn't speak

17  for weeks.

18  Q.    And you were provided with attorney-client information

19  about FLAG Church's procedures for dealing with refund

20  requests, correct?

21  A.    We certainly discussed the procedures for refund

22  requests, yes.

23  Q.    The Claim Verification Board, you discussed that with

24  her?

25  A.    Yes.

1  Q.    All right.  And the church's efforts before 1993 to

2  have donations recognized as charitable contributions, you

3  were briefed on that, weren't you?

4  A.    I don't recall that.  That would have been something

5  that would be handled by Monique Yingling's office out of

6  Washington.  That was certainly above my pay grade.

7  Q.    You drew up a lot of releases for refund claims, didn't

8  you?  You prepared the settlement documents?

9  A.    Well, I did on occasion when there was a resolution,

10  and I did have releases drafted.  I actually -- it was a

11  standard form release, which I should have a copy of from a

12  form file that I had.  I looked in my form files, and there

13  was one back from 1995.  I brought it with me if you want to

14  see it.

15  Q.    Mr. Johnson, would you look at Exhibit 12, please.

16  A.    I have it.

17  Q.    You got it?

18  A.    Yes.

19  Q.    You recognize that as the complaint in the Williams

20  case, correct?

21  A.    Correct.

22  Q.    And wouldn't you say that the Williams case was the

23  biggest refund case you were involved in while you were

24  counsel for the FLAG Church?  Didn't it stretch over three,

25  four, five years, and there was an appeal?

1   A.    And I think -- I'm not sure how we would characterize

2   it as a refund case, but it was a big case.  There was no

3   question, and I don't recall --

4   Q.    You worked closely with Judy Fontana on the case?

5   A.    Correct.

6   Q.    And the case was in Lake County, Florida?

7   A.    Correct.

8   Q.    And the case that was pending in was Tavares-Leesburg,

9   in the Circuit Court there?

10  A.    One of those.  I don't recall.

11  Q.    Didn't you have at least 10 or 15 different hearings up

12  there?

13  A.    I would indicate my best recollection is, no, there

14  were not 10 or 15 hearings before the court there.  There

15  were very few, and I don't believe there was any discovery

16  taken in the case.

17  Q.    Didn't --

18  A.    Excuse me, depositions taken in the case.  I apologize.

19  Q.    Yes, there was a whole appeal about discovery, wasn't

20  there?

21  A.    Correct.  And my recollection, the focus of the case

22  was there was a request for information which the court

23  required to be produced.  Again, I believe it dealt with the

24  punitive damage issues.  I think a punitive damage claim was

25  asserted and Mr. Lieberman and I handled the appeal in this

1    case to the Fifth District Court of Appeals.

2            MR. POPE:  Your Honor, I would offer into evidence

3    the complaint in the Williams case, Exhibit 12.

4            MR. BABBITT:  No objection.

5            THE COURT:  No. 12 is received.

6            (*Defendant Exhibit 12 received in evidence.*)

7    BY MR. POPE:

8    Q.   Take a look, would you, Mr. Johnson, at the mediation

9    summary contained at tab 13, Exhibit 13, and the second

10   memorandum of law at 14 in the book.

11   A.   Yes, I have that.

12   Q.   Now, Mr. Johnson, the mediation summary has your name

13   on it, correct?

14   A.   Correct.

15   Q.   The last page, it was signed in your absence by your

16   partner, Paul Johnson, correct?

17   A.   Yes.

18   Q.   The second memorandum of law was signed by you,

19   correct?  Page 32.

20   A.   Yes, that's my signature.

21   Q.   Okay.  So those --

22            MR. POPE:  I would offer those two into evidence,

23   your Honor.

24            MR. BABBITT:  No objection.

25            THE COURT:  No. 13 and No. 14?

1          MR. POPE:  Yes, sir.

2          THE COURT:  Those are received.

3          (*Defendant Exhibits 13 and 14 received in*

4  *evidence.*)

5  BY MR. POPE:

6  Q.    All right.  Mr. Johnson, would you agree with me that

7  your mediation summary, which I happen to have read recently,

8  is a very nice, excellent, well-written piece of legal

9  analysis?  Would you agree with me?

10  A.    I haven't -- I haven't read it in a long time.  I'm

11  happy that you would say that.  If, in fact -- I don't recall

12  what part of this I authored.  Often these things were done

13  in conjunction with Mr. Lieberman's office, and Mr. Lieberman

14  is an excellent writer.

15  Q.    But it's the document you adopted and signed?

16  A.    That's certainly correct, yes.  That is a document that

17  I -- even though my partner Paul signed it, I'm sure we were

18  both involved in it, and I'm certain that I had read it and

19  approved it.

20  Q.    Now, with regard to the current complaint that the

21  Garcias filed in this court, you had input into the drafting

22  of that complaint, correct?

23  A.    No.

24  Q.    No?

25  A.    I don't want to -- I'm not sure about going into the

1   role that I played with the Garcias.  In the Garcia case, I

2   was nothing more, in that particular case, than sort of the

3   referring attorney.  I have not been involved in any

4   discussions regarding what to put in the complaint.  I

5   haven't been involved in collecting matters from the Garcias.

6   I played almost a nonexistent role in the case other than, as

7   you, the referring attorney.

8   Q.    You would agree with me that the legal representation

9   agreement that you signed and the side agreement with

10  Mr. Babbitt's firm would define what your role is in the

11  case?

12  A.    If you are referring to, I think -- I don't have --

13  Q.    We are not going to get to that yet, but would you

14  agree?

15          MR. BABBITT:  Can we have an answer and then --

16          THE COURT:  Gentlemen, it's also important that we

17  not all talk at the same time.  Let's go back to the question

18  and let's get an answer, and we will have the next question.

19  BY MR. POPE:

20  Q.    Mr. Johnson, the question is:  You signed a legal

21  representation agreement, correct?

22  A.    With the Garcias, yes.

23  Q.    Yes, with the Garcias and with the Weil firm and with

24  the Babbitt firm.  You are all on it, correct?

25  A.    Correct.  However, if I might clarify, that agreement

1  that -- and I don't have it in front of me, the number, but

2  if you look at the top of it, it does not talk about the

3  Garcia case.

4  Q.    All right.

5  A.    It talks about Scientology, I think.  I don't recall.

6  Scientology litigation or something to that effect.  So my

7  role in the Garcia case is certainly extraordinarily limited,

8  and I did not -- I believe that I met the Garcias once at my

9  office and never spoke to them again before the filing of the

10  complaint.

11  Q.    Mr. Johnson, would you look at tab 20, Exhibit 20.

12  A.    Uh-huh.

13  Q.    It's the legal representation agreement.

14  A.    Yes, sir.

15  Q.    Take a look at the signature page on that, and there is

16  a statement of the client rights appended to it, which is the

17  last thing, but the representation agreement is four or five

18  pages long.

19          Do you see your signature on that?

20  A.    Yes.

21  Q.    That's the agreement you signed?

22  A.    Yes, it is.

23  Q.    Let's look at the introductory paragraph.  It says,

24  This letter will acknowledge that Babbitt and Weil have been

25  retained to represent Garcia Saz and Maria Garcia in this

1   matter.

2           This agreement does apply to the Garcia case, does

3   it not?

4   A.    I apologize.  I wasn't speaking to the legal

5   representation agreement.  I was referring to this -- I think

6   it was the letter of agreement.

7   Q.    That's Exhibit 21.

8   A.    Exhibit 21.  Yes, that's the one I was talking about

9   and where it refers to Scientology cases in general.

10  Q.    All right.  So you identify that as the agreement you

11  have about fee division and responsibilities?

12  A.    Correct.  And that does apply to -- the fee division

13  does apply to the Garcia case.

14          MR. POPE:  Your Honor, I offer 20 and 21 into

15  evidence.

16          MR. BABBITT:  No objection.

17          THE COURT:  No. 20 and No. 21 are received.

18          (*Defendant Exhibits 20 and 21 received in*

19  *evidence.*)

20  BY MR. POPE:

21  Q.    Let's go back to the Williams case, Mr. Johnson.

22          You have stated in Paragraph 26 that the claims in

23  the Williams case were substantially different from those

24  being asserted in this Garcia action, correct?

25  A.    Correct.

1    Q.    Walk with me through that for just a second,

2    Mr. Johnson.

3            You agree that Florida's Unfair and Deceptive

4    Trade Practices Act, Chapter 501, broadly prohibits unfair

5    and deceptive trade practices in the sale of consumer goods

6    and services, correct?

7    A.    Correct.

8    Q.    Okay.  And whether that act applies to a religious

9    organization in connection with the solicitation of donations

10   is an issue in this present case, is it not?

11   A.    I don't know if that's been raised or not.

12   Q.    Well, wasn't that a major issue in the Williams case?

13   In your mediation summary and your memorandum of law, did you

14   not thoroughly go into that?

15   A.    If it's in there, I will -- whatever is in those

16   particular documents.  I would agree that those would have

17   been arguments that I have made on behalf of -- and I think

18   in that case it was FSO, is who I represented, I believe.

19   Q.    I believe so.

20           So, Mr. Johnson, this case involves claims of

21   fraud, correct?

22   A.    Correct.

23   Q.    And the Williams case involves claims of fraud,

24   correct?

25   A.    That's correct.

1   Q.    And this case involves the enrollment forms that the

2   Garcias signed, correct?  I mean, we have moved to compel

3   arbitration based on it.  It does involve that, does it not?

4   A.    I'm certain that has been raised, yes.

5   Q.    And that was the enrollment forms.  You write about the

6   enrollment forms and their provisions, and the enrollment

7   forms were an issue in the Williams case, correct?

8   A.    They were enrollment forms that I am sure the

9   Williamses signed, and those would have been an issue, yes.

10  Q.    And in Williams -- in the Williams case and in your

11  work in the mediation summary and in your second legal

12  memorandum you argue against application of the U.S. Supreme

13  Court's case in Hernandez on the issue of whether donations

14  for services are commercial, correct?

15  A.    Whatever was in there, that would be an argument.

16  Q.    It will speak for itself.

17          And that's an issue in the present case, is it

18  not?  Isn't the Hernandez case specifically pled in this

19  matter?

20  A.    I don't recall.  It may be.  But in my response on all

21  that, the Hernandez case is a published decision.  There is a

22  Florida statute, and the enrollment forms are contracts that

23  may or may not be enforceable under Florida law.  So there

24  are claims being made that are similar; however, the facts

25  are vastly different in the two cases.

1   Q.   And one of the subjects of your mediation summary and

2   your second memorandum of law is the applicability of the

3   First Amendment, its religious provisions to the facts of

4   that case, correct?

5   A.   Whatever is in there, I will -- I will agree with you

6   that those are arguments that I put forth.

7   Q.   In our motion to compel arbitration and any answer we

8   might ultimately file in this matter, do you agree there are

9   First Amendment issues that will be involved in this case?

10   A.   I don't know the answer to that. Again, I'm not

11   involved in the intimate details of the Garcia case.

12   Q.   All right. Let me just sum it up like this. Both

13   cases involved attempts to apply the Florida Deceptive and

14   Unfair Trade Practices Act of fundraising activities of a

15   religious organization, correct?

16   A.   If that's, in fact, what's in here, yes.

17   Q.   Both involved claims of fraud in fundraising, correct?

18   A.   I thought the Williams case involved --

19   Q.   Are you able to answer that question?

20   A.   I would disagree, because the Williams claim was based

21   on the fact that -- Williams was a dentist up in Lake City.

22   He was then approached by a Weiss organization, Sterling,

23   where they came in and said we are going to improve your

24   dental practice and may allow you to make more money if you

25   follow these technologies that we have.

1          Williams then claimed as a result of this approach

2     by Weiss, they were then deceptively brought in to services

3     being provided.   There were claims that the personality tests

4     they were given were used as a ruse to drag them in.

5          So I don't see the -- you know, the Garcias -- as

6     I understand it, the Garcias are practicing Scientologists

7     who enjoyed and appreciated the services that were provided

8     to them, and that's distinct from what we had in the Williams

9     case.

10          The Williamses said, we think we have been

11     defrauded by this huge conspiracy involving Sterling.   I

12     think it was Emery Wilson.   I don't recall all the other

13     defendants.

14     Q.     Would you agree, Mr. Johnson, that the best way to

15     arrive at an answer of the similarity or dissimilarity of the

16     two cases would be to compare your mediation summary and

17     legal memorandum with the allegations that are in the Garcia

18     case?   Wouldn't that be the best way to do it?

19     A.     I think you're pulling sort of a -- maybe

20     cherry-picking certain pleadings that you think might

21     describe the case in Williams and maybe looking at what we

22     have in the Garcia case.

23          I see it as a substantial distinction in the

24     claims that are being asserted; and, again, I -- and I've

25     tried to look at this issue in terms of my ethical

1   obligations under the rule, which is 4.19, and the comments

2   that are under it, and I see this as substantially different.

3   They are distinct claims based on distinct frauds.

4   Q.    All right.  Let me move on to another subject,

5   Mr. Johnson.

6           Paragraph 26 of the present complaint says that

7   "In 1990 CSRT purchased an entire block of land adjacent to

8   other church facilities in Clearwater and began the process

9   of developing and construction of a Scientologist facility

10  which would later become known as the Super Power project."

11          That's an allegation in the Garcia complaint,

12  correct?

13  A.    Yes.  I don't have it in front of me.  I agree that

14  sounds right.

15  Q.    All right.  Now, you were the lawyer for that purchase,

16  weren't you, for CSRT?

17  A.    I was involved in acquiring the underlying property for

18  the building, yes.

19  Q.    And you represented CSRT off and on in various matters,

20  including the Super Power Building, up until about mid-2000,

21  correct?  Yes?

22  A.    Yes.  I think in trying to acquire the Red Cross

23  building.  I think that was it.  The final piece of property

24  in the puzzle.

25  Q.    Now, Paragraph 32 of the complaint says that "CSRT

1  persistently maintained the project in an incomplete state to

2  use it as a shield to induce further payments from members,

3  just as they did with plaintiffs."

4          Do you remember that allegation?

5  A.    Correct.

6  Q.    Okay.  And plaintiffs say they wouldn't have made the

7  contributions if they had known the ongoing delay was

8  intentional, correct?

9  A.    Yes.

10 Q.    And in Paragraph 93, there is an allegation that CSRT

11 had no intention at the time these unfair deceptive practices

12 were made to timely complete the project, et cetera.

13         Okay.  Would you agree that these allegations had

14 been injected into this preceding the question of the delay

15 that has accompanied the Super Power Building, correct?

16 That's an issue?

17 A.    Yes.

18 Q.    Okay.  Good.

19         Now, the Garcias made donations to the project, as

20 you've already gone over, starting in October of '98 and

21 finishing up -- well, there were more beyond that, but while

22 you are still CSRT counsel, they made donations of 144,500

23 through March of 2000.

24         We have gone over that already, have we not?

25 A.    Yes.

1  Q.    You, as the lawyer for CSRT, were personally involved

2  in some of the issues regarding the delay that the project

3  was encountering.

4         For example, Mr. Johnson, the City of Clearwater

5  proposed to amend its parking ordinance.  You remember that,

6  don't you?  And that you had to go to a city council meeting

7  back in 1994 and argue that they were targeting this building

8  and that there was going to be a delay problem?

9         Do you remember doing that, Mr. Johnson?

10  A.    No.

11  Q.    You have no memory of that?

12  A.    I don't remember that.

13  Q.    How about the development of regional impact law that

14  the State of Florida tried to apply to the project?  You

15  fended that off, did you not?

16  A.    Again, that was a little bit -- that was out of my

17  expertise, but my firm did.  We had Kathy Castor, who was the

18  DIR expert, who was -- I think she was an associate at the

19  time of the firm, so she handled the DIR matter.  But, yes, I

20  do recall Kathy, and I think Ted Todd also worked on that DIR

21  matter.

22  Q.    So you and your then law firm have personal knowledge

23  regarding some of the elements of the claim of delay,

24  correct?

25  A.    I would disagree in terms of a claim of delay.  I think

1  in terms of putting together the project, we moved

2  expeditiously to obtain all of the properties so that the

3  building could be built and clear any issue regarding

4  development of regional impact.

5           Refresh my recollection, but I think the argument

6  was it didn't apply and didn't end up applying.  So I don't

7  recall.

8  Q.   The state ultimately wrote a letter saying they weren't

9  going to apply the DIR, but it was a matter that you had to

10  deal with, correct?

11  A.   Yes.  That would have been something that my firm dealt

12  with, yes.

13  Q.   And you were seeking to avoid delay in the project,

14  were you not?

15  A.   I don't know if development of regional impact means

16  delay, but we were certainly looking to acquire the property

17  so that a building could be built, yes.

18  Q.   All right.  Mr. Johnson, it's been alleged that this

19  was an intentional delay.  You have some knowledge regarding

20  the issue of delay.  Has it occurred to you that you might be

21  a witness in this case on the delay point in this matter?

22  Have you thought about that?

23  A.   My role essentially ended at the groundbreaking.

24  That's when everything was turned over to your office.

25           Now, is there any allegation that there was a

 1    delay prior to the groundbreaking?  I don't know.  I don't

 2    believe that there is.  Certainly, you know, the work that I

 3    did was merely acquiring property.  So to the extent that I

 4    would be a witness, I would testify that I assisted Tom

 5    DeVocht; Leo Harrell, who was the church's Realtor; Terrence

 6    McCarthy, who was also the church's Realtor, in acquiring

 7    properties.  That was the extent of my role.

 8    Q.    And if you were called by the defendants to testify

 9    about your efforts to prevent delay of the project, would

10    that not put you into a conflict situation with your clients,

11    the Garcias, who are alleging it was an intentional delay?

12    A.    The issue --

13    Q.    Can you answer that question?

14              THE COURT:  Mr. Babbitt, is your client claiming

15    intentional delay before the property was acquired or after

16    the property was acquired and building began?

17              MR. BABBITT:  Actually, neither, your Honor.

18              THE COURT:  What is the client claiming?

19              MR. BABBITT:  Our client is not claiming they are

20    entitled to their money back because the building took too

21    long.  What our client is claiming is that the church

22    intentionally used the building as a shill, and the gravamen

23    of our --

24              THE COURT:  Building meaning structure?

25              MR. BABBITT:  That's right, your Honor.  And that

1    after the groundbreaking, what they did was they pretended

2    they needed money in order to build the building when, in

3    fact, they had collected many times over the amount of the

4    building.

5            So there is no allegation here that the Garcias

6    are entitled to their money back because there was a delay.

7    That is merely descriptive to explain that what the church

8    did was pretend they needed money in order to build the

9    building when, in fact, they collected three times the

10   amount.  He had nothing to do with any of that.

11           THE COURT:  Mr. Babbitt, thank you.  You answered

12   my question.

13   BY MR. POPE:

14   Q.   All right.  Mr. Johnson, because I'm running short of

15   time, I would like to have you identify some exhibits in the

16   book.

17           Would you first take a look at 15.  It's a

18   composite exhibit of a series of e-mails between you and

19   Brian Culkin, a potential plaintiff, is that correct?

20   A.   I think -- are these the ones that were attached to my

21   declaration?

22   Q.   Frankly, I don't know where they came from, but can you

23   identify those as e-mails from you and your office to

24   Mr. Culkin?

25   A.   I believe that these were the ones that were attached

1   to my declaration.  What I tried to do was attach all my

2   communication; and if these are the same ones as my

3   declaration, yes, I would.

4           MR. POPE:  I would offer 15 into evidence,

5   your Honor.

6           THE COURT:  Any objection?

7           MR. BABBITT:  None.

8           THE COURT:  No. 15 is received.

9           (*Defendant Exhibit 15 received in evidence.*)

10  BY MR. POPE:

11  Q.   Take a look at 16, which is a letter dated May 22,

12  1998, from you to Attorney Michael Liebgold.  Can you

13  identify that as a letter you sent to Mr. Liebgold?

14  A.   I don't have a recollection of sending a letter to

15  Mr. Liebgold, but that certainly looks like my signature, and

16  this appears to be on the Broad Cassel letterhead.  So I

17  would suggest that this is an accurate copy of a letter that

18  was sent by me to Mr. Liebgold.

19          MR. POPE:  I will offer it into evidence,

20  your Honor.  It's Exhibit 16, a two-page letter dealing with

21  the refund claim.

22          MR. BABBITT:  Letter of May 22nd, 1998?

23          MR. POPE:  Yes.

24          MR. BABBITT:  No objection.

25          THE COURT:  All right.  No. 16 is admitted.

1              (*Defendant Exhibit 16 received in evidence.*)

2    BY MR. POPE:

3    Q.    Look at tab 17, Mr. Johnson.  This is a sampling of

4    your bills with a cover sheet.  It states Robert Johnson.

5    You've already taken issue with the cover sheet, correct?

6    A.    Correct.

7    Q.    We won't offer that, but you can identify these as your

8    bills, can you not?

9    A.    You know, it's a little bit strange in that I see bills

10   and then I see redactions from the bills.  I'm not sure

11   what -- I mean, it looks certainly like there is a Johnson

12   Paniello -- first one is a Johnson, Paniello & Hayes bill.

13   It appears to be.  But it appears that some things are

14   missing from the bills.  I'm not sure what the -- what was

15   there.  The reason -- again, I haven't looked through these

16   to determine what goes with what.

17   Q.    Mr. Johnson, did you have access to these bills before

18   this hearing, this notebook and these bills?

19   A.    Yes.

20   Q.    Did you look at them, then?

21   A.    Yes, I did.

22   Q.    Okay.  In fact, you said you went through and added

23   them all up, didn't you?

24   A.    I went through and added up on the 1998 -- I tried to

25   look in and see what bills you put in for 1998, and I added

1  those up, yes.

2  Q.    Mr. Johnson, do you have any reason to believe that any

3  of these bills are just not authentic?

4  A.    In looking at the bills, I would say that they are

5  probably -- they are probably authentic.  I don't know why

6  the change.  What the changes are.

7  Q.    Would you agree, Mr. Johnson, from time to time

8  attorney-client privilege matters crop up in attorney's

9  bills?

10  A.    Yes.

11         MR. POPE:  Okay.  Your Honor, I would offer them

12  into evidence.

13         MR. BABBITT:  Your Honor, we have the same

14  objection.  This was redacted unilaterally.  We have no idea

15  what's redacted.  There is no privilege log.

16         THE COURT:  Mr. Pope?

17         MR. POPE:  Well, your Honor, to be quite honest

18  with you, I'm really unaware of any redactions in here; but

19  if there have been a few --

20         THE COURT:  I see some.  I don't know what they

21  are.  It looks like identification of individuals that were

22  redacted, names.

23         What about the handwritten notes, Mr. Johnson?

24  Are those yours?

25         THE WITNESS:  In going through them, Judge, I

1   don't think any of those are my notes.  I don't know what --

2   it doesn't look like my handwriting on any of the bills that

3   I see.

4           THE COURT:  You don't deny that you represented

5   these institutions and billed them and were paid for your

6   services, right?

7           THE WITNESS:  That's correct, Judge.

8           THE COURT:  I'll let it in.  I don't see any

9   prejudice to plaintiffs.

10          (*Defendant Exhibits 18 and 19 received in*

11  *evidence*.)

12  BY MR. POPE:

13  Q.   Mr. Johnson, take a look at No. 18 and No. 19.

14          Mr. Johnson, 18 is a timeline that was prepared,

15  not by you, but out of the records of your clients -- former

16  clients.  It's called "Timeline Involvement in the Church

17  Legal Matters."

18          Did you have a chance to review that before you

19  came in here today?

20  A.   I really have not reviewed that, no.

21  Q.   Do you take issue with it?

22          MR. POPE:  Your Honor, I have a witness who can

23  identify this very briefly.  So I'll move on to the next

24  item.

25  BY MR. POPE:

1   Q.   Mr. Johnson, look at No. 19.  No. 19 is a summary of

2   refund repayments and other litigation in which you were

3   involved.

4         Can you look at that.  It's just a page and a half

5   or a page and a quarter.  Do those cases ring any bells with

6   your memory?

7   A.   If we look under the heading "Refund/Repayment Suits,"

8   we talked about the Williams case.  I believe that you've put

9   in some documents regarding Halverson.  So I think I was

10   involved in that.

11   Q.   Were you involved in these others?  There are 12

12   repayment suits.

13   A.   So, if we look, I don't recall Mogul.  I don't recall

14   12.  I don't recall 11.  I don't recall 9.  I recall 8.

15   Q.   All right.

16   A.   I don't recall 7.

17   Q.   Mr. Johnson, that's fine.  I will get another witness

18   to authenticate that if the Court will allow it.

19         Let's go to No. 20.  I believe 20 and 21 are

20   already admitted into evidence.

21         MR. POPE:  I believe that's correct.  Is it,

22   your Honor?

23         THE COURT:  Yes.

24   BY MR. POPE:

25   Q.   Look at 21, Mr. Johnson.

1   A.     Okay.

2   Q.     Second paragraph.  Do you have 21?

3   A.     Yes.

4   Q.     All right.  "It's understood that Gray Robinson" --

5   that's your firm, correct?

6   A.     Correct.

7   Q.     -- "will handle all client intake and client contacts,

8   including obtaining all information from the client relative

9   to their claims, assisting the client in answering

10  interrogatories, questionnaires, or other written

11  documentation, obtaining all documents from the clients and

12  any other matters relating to client control."

13          That's your job, correct?

14  A.     That is my job in reference to the Scientology cases.

15  Q.     All Scientology cases, correct?

16  A.     Yes.

17  Q.     And the fee agreement is 25 percent of recovery to your

18  firm, correct?

19  A.     Correct.

20  Q.     And 35 percent to Mr. Weil's firm?

21  A.     Correct.

22  Q.     And 40 percent to Mr. Babbitt's firm?

23  A.     Correct.

24  Q.     And this governs them all.

25          Now, look at Paragraph A1 of Exhibit 20.  Do you

1   see that one?

2   A.    Yes.

3   Q.    It talks about what you are supposed to do.  First,

4   conducting a thorough investigation of possible claims that

5   would be brought against the Church of Scientology, correct?

6   A.    Correct.

7   Q.    Now, wouldn't you consider yourself to be a natural to

8   do that, based upon your 16, 18, 19 years of representation

9   and your knowledge of how the church functions, how it deals

10  with refund claims, policies and procedures, the confidences

11  that were exchanged between you and the church over the

12  years?

13  A.    No.  I would disagree with that, but I am in a position

14  where over the years I have represented the church.  I have

15  very good friends who are Scientologists, and I have

16  represented the Scientology public and I think that I can

17  communicate with someone like the Garcias and talk to them.

18  But as far as any information or any confidence that I might

19  have received from the church, I don't recall any of that,

20  and it's not going to be helpful to me in preparing a claim

21  such as the Garcias.

22          Again, I wasn't involved in the preparation of

23  that claim, but were looking potentially at new clients that

24  may come in.

25  Q.    Mr. Johnson, are you able -- do you believe you are

1  able in your mind to separate out all of the confidential

2  attorney-client communications you had with your clients over

3  the almost 18-, 19-year period and nonconfidential

4  information?  Are you able to do that, do you think?

5  A.    To be candid with you, I don't recall confidential

6  communication that I may have had with Judy or Glenn.  This

7  was 15 -- we are going back 30 years.  I don't recall any of

8  those --

9  Q.    It all blends together?

10  A.    -- conversations that --

11  Q.    Doesn't it all blend together?

12          MR. BABBITT:  Can the witness finish his answer?

13          THE COURT:  Yes, Mr. Pope.  Finish the answer.

14  BY MR. POPE:

15  Q.    Go ahead, Mr. Johnson.

16  A.    What I am trying to express to you is that there is

17  nothing I recall which was given to me in a confidential

18  manner from the church.

19  Q.    Are you suggesting, Mr. Johnson, that during this

20  entire period of time, there was never attorney-client

21  privileged information exchanged between you and your

22  clients?

23  A.    No, absolutely not.  There was absolutely

24  attorney-client privileged communication regarding things

25  like documents.  Do we have a document that needs to be

1   produced?  Do we -- you know, do we go to this hearing

2   together?  Do we drive in the same car?  Those are all

3   general communications, but there is no -- there is no secret

4   information that isn't available to everyone else in the

5   public that I possess to the detriment of the client.

6   Q.    Wouldn't you agree that over a long period of

7   representing a client, when you are in touch with them on a

8   very regular basis, that after all those years you really

9   cannot distinguish between matters that were imparted to you

10  in confidence and routine matters that were not?

11  A.    I would disagree with that.  The information that I

12  have --

13  Q.    All right.

14  A.    -- is regarding the policy and procedures, which is

15  generally available and published.  We are looking at FDUTPA

16  claims.  We are looking at claims under the enrollment

17  agreement.  All of these are published matters, and

18  Mr. Hubbard published all these matters and the churches

19  generally follow those, and those are published.  The Garcias

20  know those far better than I do.

21         MR. POPE:  Your Honor, may I have just one second

22  to confer with my co-counsel?

23         THE COURT:  Yes, sir.

24         MR. POPE:  Your Honor, I have exceeded my time.

25         THE COURT:  Well, what else do you have, Mr. Pope?

1          MR. POPE:  I had three staff members.

2          THE COURT:  What in the world are they going to

3    help us with?

4          MR. POPE:  Their interaction with Mr. Johnson and

5    the communications they made to him.  And they are not

6    lengthy.

7          THE COURT:  Those are the same people who have

8    filed affidavits in the case?

9          MR. POPE:  I believe, yes, your Honor.

10         THE COURT:  That's what I'm trying to avoid.  I've

11   read all the affidavits.  So what we are doing is replowing

12   everything.  I understand with Mr. Johnson and Mr. Rinder you

13   want to have them testify, but I don't see there was any

14   dispute -- Mr. Babbitt, was there -- that Mr. Johnson

15   represented these entities for 16, 17 years and that he

16   sometime, perhaps in the summer of 2000, necessarily received

17   attorney-client privileged communications, right?

18         MR. POPE:  Yes.

19         MR. BABBITT:  There is no dispute.

20         MR. POPE:  Your Honor, since I'm not going to

21   replow the ground that is in the affidavits, I thought the

22   Court might have thought there was a fact conflict when you

23   ordered the hearing.  So I don't want to replow that ground,

24   and I will turn the examination over to Mr. Johnson.

25         THE COURT:  Let's take a comfort break until

1  11 o'clock, please.

2              (*Recess taken from 10:50 a.m. to 11:04 a.m.*)

3              COURT SECURITY OFFICER:  All rise.

4              This Honorable Court is now in session.

5              THE COURT:  Mr. Babbitt.

6              MR. BABBITT:  Thank you, your Honor.

7                        CROSS-EXAMINATION

8  BY MR. BABBITT:

9  Q.    Mr. Johnson, is it your understanding that in this case

10  the plaintiffs are seeking a refund of services, that is,

11  they were dissatisfied with the services they received?

12  A.    No.

13  Q.    And how does that differ from the Williams case?

14  A.    Again, as I tried to explain in the Williams matter,

15  the Williamses felt this was a fraud being perpetrated upon

16  them by Emery Wilson, Sterling.  And what they were seeking

17  in that case was all of the money back for the services that

18  had been rendered, and I think the services were rendered

19  primarily to the wife; but I believe that the husband was

20  also seeking his money back for whatever services he paid,

21  not only for the religious donations, but I think to Sterling

22  itself.

23  Q.    Is the Williams case, in your opinion, the same or

24  substantially the same matter as being claimed here?

25  A.    No.

1  Q.    Why not?

2  A.    It's distinct.  The claims being asserted here by the

3  Garcias for fraud involve completely different factual

4  circumstances.

5         The Garcias are not seeking their money back from

6  the church for services that they have taken with the church.

7  They are seeking money back from donations they have made to

8  the Super Power Building.

9         The only overlap that I see here is there is a

10 claim in both cases for a -- I'm not sure what the correct

11 word is.  Either refund or repayment of monies that they had

12 on account.

13 Q.    So, in other words, money that they had given to the

14 church which they didn't use the services, that they paid for

15 services which they didn't use?

16 A.    Correct.

17 Q.    I was asking --

18 A.    The Williamses made that same claim; but, again, that's

19 a contract claim that the Williamses made, and the factual

20 circumstances of those are, again, different.

21 Q.    Counsel pointed out that you had been actively

22 representing the church or its entities at the time that the

23 Garcias had made donations which they are now seeking to get

24 back.

25         Do you remember that line of questioning?

1   A.    Yes.

2   Q.    Did you have anything at all to do with the Garcias,

3   what they got, what they didn't get, what they -- anything

4   like that at the time you were representing the church?

5         Did you even know the Garcias?

6   A.    No.  My representation at that time was primarily

7   limited to the acquisition of property.

8   Q.    And the claims of the Garcias was made some 14 years

9   after you stopped representing the church?

10  A.    Correct.

11  Q.    And so, like, out of nothing -- with respect to those

12  claims, you had nothing to do with that while you were

13  representing the church?

14  A.    Correct.

15  Q.    With respect to this issue of the delay in the

16  construction of the Super Power Building, are the Garcias

17  claiming that they are entitled to their money back because

18  it took too long?

19  A.    Not to my knowledge.

20  Q.    Are they claiming, instead, that the building or the

21  noncompletion of the building was used as a shill to obtain

22  money that had been collected, in fact, many times over and

23  that the money wasn't needed for that building?

24  A.    Right.

25  Q.    Did you have anything to do, in the representation of

1  the church, with the collections of money or know how much

2  money was collected or know anything about that?

3  A.     No.

4  Q.     Or get any communications about that?

5  A.     No.

6  Q.     Is it your understanding that this claim that we should

7  be disqualified based upon your possibly being a material

8  witness, was that even raised in this claim?

9  A.     Not to my knowledge.  That was the first I heard of

10 that.

11 Q.     And, in fact, you talked about the fact that after

12 groundbreaking you no longer represented the church?

13 A.     After the groundbreaking, there were certain matters

14 that I did to tie things up in terms of completing the

15 purchases of properties, because not that the Johnson Pope

16 firm wasn't capable of doing that, but I had the contacts

17 with, for example, General Nelson.

18 Q.     If the delay in construction were, in fact, an issue in

19 this case, who would be a more material witness with respect

20 to that, you or Mr. Pope?

21 A.     I don't really know what Mr. Pope knows about any of

22 that, but I know -- I know nothing about that.  I don't know

23 what Mr. Pope knows.

24 Q.     Mr. Pope represented the church from then on,

25 throughout the time that the building was being constructed.

1    You didn't, right?

2    A.    Correct.  And, again, I don't know -- I know Mr. Potter

3    did.  I'm not sure who else at the firm did.  I think the

4    firm of Johnson Blakely did.

5    Q.    Was there anything that you learned in confidential

6    communications with the church dealing with the policies and

7    procedures?  What happens when somebody gets disconnected.

8    What happens -- how you make a claim.  How the arbitration

9    procedure works.  Was there anything that you learned that is

10   not public information, published by the church and actively

11   sold by the church to anyone that has the money to buy the

12   book?

13   A.    That's an accurate statement.

14   Q.    Now, obviously, when you undertook to represent the

15   Garcias, you didn't forget that you had represented the

16   church for some 14 or 15 years.

17   A.    That's correct.  I carefully reviewed my obligations

18   under the applicable rule, which is 1 point -- excuse me,

19   4.19.

20   Q.    4-19?

21   A.    The comments under that, as well as the applicable case

22   law.  And I felt comfortable, after undertaking that

23   analysis, that I was not running afoul of the rules.

24   Q.    Did you -- excuse me.

25   A.    Because I had been practicing for over 30 years.  I've

1  never had a disciplinary matter.  I think I enjoy a good

2  reputation in the community, and I don't want to besmirch

3  that.

4  Q.    What did -- excuse me.  Were you given notice of the

5  intent of the church to file this motion?  That is, were you

6  sent a letter that said we think you ought to recuse yourself

7  because of the following reasons, before the motion?

8  A.    When you are referring to "you," no, not to me.

9  Q.    Your firm.

10 A.    However, it did go to the managing partner of my firm,

11 Mr. Marshall, who then turned it over to my law partner Rick

12 Zabak, who is here in the courtroom.

13 Q.    Did you take that lightly, that there was an allegation

14 that you violated 4-1.9 in those letters?

15 A.    No.  Mr. Zabak responded.  I believe there were several

16 letters that Mr. Zabak sent to either Mr. Potter or Mr. Pope

17 outlining the position that I took, as well as the Gray

18 Robinson firm.

19 Q.    And did you and your firm do research, make certain

20 that there was no chance that you would be violating the

21 4-1.9 by representing the Garcias in this case?

22 A.    Correct.  Both before we engaged in this representation

23 and then in response to -- I believe there was certain

24 exchanges between Mr. Zabak and Mr. Pope and Mr. Zabak

25 requesting certain information from Mr. Pope.

1          We then looked at the information that Mr. Pope

2     provided and continued to do an evaluation, because as I

3     testified earlier, there is some of these I simply don't

4     recall.  There are several cases they have listed there, and

5     we asked for whatever details they might have.

6          Once we had those details, we analyzed those

7     details and concluded that it was not violative of the

8     ethical rules.

9          MR. BABBITT:  Your Honor, I would like to approach

10    the witness and hand him 4-1.9.

11         THE COURT:  All right.

12         MR. BABBITT:  Would your Honor like to have a copy

13    as well?

14         THE COURT:  No, thank you.  I had a copy up here.

15    Thank you.

16         (*Document tendered.*)

17    BY MR. BABBITT:

18    Q.   Take a look at the comments section of the Florida Bar

19    on the rule and specifically the second paragraph.  Do you

20    see where it says, "On the other hand, a lawyer who

21    recurrently handled a type of problem for a former client is

22    not precluded from later representing another client in a

23    whole distinct problem of that type even though the

24    subsequent representation involves a position adverse to the

25    prior client."

```
1              Do you see that?

2    A.    Yes, I do.

3    Q.    Did you consider that?

4    A.    Yes.

5    Q.    In what way do you think that applies to this case?

6    A.    This is a wholly distinct issue that's being presented

7    by the Garcias from any of the matters I've previously

8    represented the church on.

9              Again, in trying to get some guidance, I also --

10   we have also looked at -- the case that we were looking at

11   was the Morgan Stanley case, which was cited to the Court,

12   and Morgan Stanley involved very similar-type allegations

13   that are being made by the church where Mr. Solomon had

14   represented Morgan Stanley over a number of years and then

15   Mr. Solomon began pursuing Morgan Stanley on behalf of

16   clients of Morgan Stanley.

17             The issue was raised that these were substantially

18   similar; the Court ruled that they are not because each case

19   turns on its own facts.

20             The knowledge that I acquired in representing the

21   church over the years is no different than the knowledge that

22   Walt Logan acquired or what's the -- Ken Dandar, the opposing

23   counsel.

24             It's all matters of public record that are out

25   there in terms of the litigation involving the church.  There
```

1   is nothing that I have that would give me an unfair advantage

2   in litigation with the church.

3   Q.    Is the allegations -- or the allegations that are being

4   made on behalf of the Garcias in this case, are they fact

5   specific?

6   A.    Absolutely.

7   Q.    So, for example, do we have to prove what was told to

8   the Garcias?  Who told it to them?  What they understood it

9   to be?  Does all of that have to be proved?

10  A.    That's right.

11  Q.    Do you know anything about that -- or did you know

12  anything about that as a result of your representation of the

13  church?

14  A.    No.

15  Q.    And by the same token, do we have to prove that the

16  representations that were made were false and that they, in

17  fact, were relied upon?

18          Do you know anything at all -- or did you know

19  anything at all about that while you were representing the

20  church?

21  A.    No.  Again, that was all 15 years ago.

22  Q.    Is it any different than a lawyer who represents State

23  Farm in a rear-end collision, maybe for 20 years and

24  thousands of cases, and then turns around and sues State Farm

25  for a rear-end collision for another client?  Is that

 1  prohibited by this rule?

 2  A.    No.  My reading of the rule and the applicable case law

 3  does not prohibit that representation.

 4  Q.    And is that because each case depends upon their facts?

 5  Was there a sudden stop?  Were there other factors that go

 6  into defending that kind of case and prosecuting?

 7  A.    Absolutely.

 8  Q.    Go to the next paragraph.  It reads -- do you see where

 9  it says, "Matters are substantially related for purposes of

10  this rule if they involve the same transaction or legal

11  dispute or if the current matter involves a lawyer attacking

12  work that the lawyer performed for the former client."

13          Do you see that?

14  A.    Yes.

15  Q.    Is this case, the Garcia case, the same transaction or

16  legal dispute that you represented the church on at any time?

17  A.    No.  And I tried to explain that the only case that

18  really involved, as I think Mr. Pope pointed out, a lengthy

19  litigation was the Williams case.  And the facts in the

20  Williams case distinctly revolve around their own fraud.

21  Here, in this case, the Garcias are making allegations which

22  are, again, fact specific to their claim.

23          Nothing -- I see very little parallel between the

24  Williams case and the Garcia case other than the fact that

25  there is a FDUTPA claim that's being asserted.  But, again,

1  that's a legal interpretation rather that factual

2  interpretation.

3  Q.    This is clearly not the same transaction or dispute

4  that would relate to if you represented the church against

5  the Garcias, right?

6  A.    Absolutely.

7  Q.    As to the second part of that definition of what is

8  substantially related, is this case in any way attacking the

9  work that you performed on behalf of the Church of

10  Scientology?

11  A.    No.

12  Q.    Why not?

13  A.    None of the work that I've performed for the church,

14  for example, in acquiring property or in handling any zoning

15  matter is being attacked in this particular case by the

16  Garcias.

17          As I read the case law, it's similar to situations

18  where, if I had prepared an expert witness on behalf of the

19  Church of Scientology to defend in the case and then I turned

20  around and represented someone in a claim attacking the work

21  of that expert witness, that would disqualify me.

22          There is case law that we were relying upon which

23  talks about a lawn mower company where the lawn mower company

24  was represented by Mr. Smith.  I don't recall the name.

25  Mr. Smith prepared the expert witness.  Mr. Smith then later

1  turned around and sued the lawn mower company, attacking that

2  expert witness.

3          Here, there is nothing that I can think of --

4  no -- nothing that -- no work that I performed for the church

5  that is being attacked by the Garcias.

6  Q.    And in the event, as you understand the law, that the

7  Court finds that this matter is not substantially related to

8  anything that you represented the church on, does the inquiry

9  end?  Is that it?  We don't go into the next question of

10  whether there was any communication?

11  A.    Yes.

12  Q.    And by going to the next question, in the event the

13  Court disagrees, has there been any communication with my

14  firm, the Weil firm, any of the firms that have previously

15  represented or currently represent the plaintiffs, that

16  relates to any confidential or attorney-client information

17  that you learned as a lawyer on behalf of the church?

18  A.    No.  No, there is not.

19  Q.    And the third paragraph, if you will read with me, does

20  it say, "Information that has been widely disseminated by the

21  media to the public or that typically would be obtained by

22  any reasonably prudent lawyer who had never represented the

23  former client should be considered generally known and

24  ordinarily will not be disqualified."

25          Does that apply to this case?

1   A.   Yes.

2   Q.   In what way?

3   A.   All of the matters in terms of the ecclesiastical

4   policies within the church are widely disseminated.  They are

5   relying upon the writings of L. Ron Hubbard, and those are

6   widely available to the Garcias.  To anyone.  To Mr. Ortega.

7   Anyone that wants to obtain that information.  So all of this

8   is published.  There is nothing that isn't published, isn't

9   widely available to the public.

10  Q.   And you mentioned that the Garcias know far more than

11  you about that.  What did you mean by that?

12  A.   The Garcias have been involved with the church for -- I

13  don't recall how many years.  My belief is around 20 years,

14  where they certainly know all of the policies and procedures

15  that have been disseminated by Mr. Hubbard.

16  Q.   In fact, the information that you received from an

17  attorney-client standpoint, or information, was that largely

18  provided to you by Mr. Rinder and Mr. Rathbun when they

19  worked for the church?

20  A.   Mr. Rinder and Mr. Rathbun, Mr. DeVocht.  There are a

21  number of people who have subsequently left the church, and

22  there are ongoing battles between Mr. Rinder and Mr. Rathbun,

23  Mr. DeVocht and the church which are widely reported by

24  people like Mr. Ortega and others.  So this is -- although I

25  don't follow it that closely, it is certainly available for

1  anyone that wants to read it on blogs, on websites, and

2  publications.

3  Q.    The next paragraph, and the last paragraph, actually,

4  of this rule, says, "Information acquired in the prior

5  representation may have been rendered obsolete by the passage

6  of time.

7           "In the case of an organizational client, general

8  knowledge of the client's policies and practices ordinarily

9  will not preclude a subsequent representation.  On the other

10 hand, knowledge of specific facts gained in a prior

11 representation that are relevant to the matter in question

12 ordinarily will preclude such representation."

13          Does that paragraph apply to this case?

14 A.    Yes.  All of the material that I have is widely

15 disseminated, generally available.  I mean, I certainly do

16 have knowledge of the general practices of the church, but

17 that knowledge of the general practices of the church is

18 something that Mr. Garcia has and Mr. Ortega has and is

19 widely published.

20          The passage of time -- I'm getting a little older.

21 I'm -- I don't have as good a recollection of what happened a

22 month ago as I might when I was younger, but something that

23 happened 20, 30 years ago I don't have a recollection of.

24 Q.    Are you listed as counsel of record in this case?

25 A.    No.

1   Q.     And why not?

2   A.     Gray Robinson's typical practice is hourly billing,

3   representing larger companies and clients.  It's not a firm

4   that really handles contingency-type cases.  The firm's

5   general policies and procedures are to refer matters out to

6   other law firms so that they would handle the work and,

7   again, get back a referral fee.

8            Again, my role in this is limited.  I have a very,

9   very full plate, and this is not something that I can really

10  be devoting time to.  I love coming to court and being here;

11  but I get daily reports as to the amount of time that I spend

12  on cases, and I've got to be making sure that I'm billing on

13  an hourly basis.

14           So that's why our role here in this particular

15  case is limited.  It's really limited to referral and then,

16  again, in having any discussions with the clients, sort of

17  easing the clients through the process.  Very similar to any

18  referral attorney in another case.

19  Q.     Was your interest in the outcome of this case made

20  known to the court?  Was it hidden in any way?

21  A.      I believe that there is required disclosure when we

22  filed the case, and that disclosure was filed because we did

23  have an interest.

24           MR. BABBITT:  I don't have anything else.  Thank

25  you.

1          THE COURT:  Mr. Johnson, if you will, look at

2    Exhibit 21, please.  That's the letter from Mr. Babbitt to

3    you and Mr. Weil.

4          THE WITNESS:  Yes, sir.

5          THE COURT:  The second paragraph outlines

6    responsibilities for Gray Robinson that, obviously, are far

7    more than simply referral.

8          THE WITNESS:  Yes, your Honor.

9          THE COURT:  Is there something in the Garcia

10   matter that distinguishes your role and Gray Robinson's role

11   in the Garcia case from this general fee-splitting letter?

12         THE WITNESS:  The fee-splitting letter, it's the

13   25 percent, but the way that this litigation came about was

14   Mr. Rinder and the Garcias approached me and asked me to

15   assist them in finding a law firm to represent them.

16          I made several inquiries.  Ultimately an inquiry

17   was made to John Morgan.  John Morgan became interested.  He

18   assigned Tucker Byrd to this matter, and Mr. Byrd handled all

19   of what we talked about, the client intake, the contact, the

20   obtaining information from the Garcias relative to their

21   claim.  So certainly preliminary matters would have been

22   handled by someone other than me in that case.

23          As I understand this agreement, this contemplates

24   that Gray Robinson is going to take a more active role to the

25   extent that there are additional clients that would be

1    seeking to file claims similar to the Garcias against the

2    Scientology entities.  If that makes sense.

3              THE COURT:  I'm not sure you answered my question.

4              This letter suggests that you are going to be

5    involved in answering interrogatories.

6              THE WITNESS:  Yes.

7              THE COURT:  Assisting the clients in doing that,

8    obtaining documents from the clients, and any other matters

9    relating to client control.  Whatever that means.

10             Is that your responsibility in the Garcia case, or

11   is your responsibility less?

12             THE WITNESS:  No, that would be my responsibility

13   in the Garcia case.  So to the extent that they would be

14   propounding interrogatories to the Garcias, I would be

15   assisting the Garcias in answering those interrogatories.

16             To the extent that they were requesting documents

17   from the Garcias, I would certainly be assisting the Garcias

18   in collecting those damages and making a determination as to

19   what to produce in the case.

20             THE COURT:  So your responsibilities are

21   consistent with the fee-splitting letter.

22             THE WITNESS:  Yes.

23             THE COURT:  That's fine.

24             THE WITNESS:  It's just that prior to filing suit,

25   this was a little bit different than maybe some of the other

1    cases that may come in later on.

2            THE COURT:  All right.  Any redirect, Mr. Pope?

3            MR. POPE:  Yes, your Honor.

4            Your Honor, I think I failed to offer Exhibit 10

5    into evidence.  Those were the billings from Broad & Cassel

6    that Mr. Johnson identified.  They cover the period '99 and

7    into 2000.  I would like to offer those into evidence.

8            MR. BABBITT:  Actually, your Honor, they were

9    offered.  I objected and you sustained.

10           THE COURT:  I sustained the objection because of

11   redactions, unilateral redactions without explanations.

12           MR. POPE:  I thought that was -- okay.  All right.

13   Then I will --

14           THE COURT:  But the substance of his testimony was

15   that he did perform services and billed for those services as

16   late as July 2000; however, that invoices reflected simply a

17   second billing.  But I think the point was made.  His

18   representation spilled over into '99 as well as perhaps 2000.

19           MR. POPE:  Thank you, your Honor.

20                    REDIRECT EXAMINATION

21   BY MR. POPE:

22   Q.   On the question of delay that you testified about,

23   would you refer to paragraph 36 of the Garcias' complaint.

24   Paragraph 36.  And that is in the book.  It's Exhibit 11.

25   Exhibit 11.

1  A.    Exhibit 11.  Paragraph what?

2  Q.    Paragraph 36, on Page 12.

3  A.    Okay.

4  Q.    And it starts out "On each occasion specified above" --

5  and it refers back to the various payments that the Garcias

6  made, starting in December of '98 and ending, for the

7  purposes of this question, in March of 2000 -- "Defendant

8  CSRT fraudulently induced plaintiffs to make contributions

9  specifically for the Super Power project based on false

10  representations that defendant needed money immediately to

11  fund the completion of the Super Power project."

12        Then skip down a few sentences.

13        It says, "Plaintiffs' contributions would not have

14  been made had plaintiffs known the ongoing delay in

15  completion of the building was intentional and that

16  explanations for the delay in completion were false."

17        That's the allegation, correct?

18  A.    Correct.

19  Q.    And those allegations relate to payments made December

20  '98 through March 2000, when you were still representing

21  CSRT, correct?

22  A.    Correct.

23  Q.    All right.  Now, you mentioned that there is all of

24  this public information, correct?  All this information you

25  have is public information?  That's what you said,

1    Mr. Johnson?

2    A.    Yes.

3    Q.    You don't deny that there were confidential

4    attorney-client communications to you while you represented

5    CSRT and FLAG, correct?

6    A.    Correct.

7    Q.    Now, you are not contending that those confidential

8    attorney-client communications are published somewhere, are

9    you?  Can you answer that yes or no?

10   A.    Depending on what the subject matter is.  I mean, those

11   are -- my discussions with individuals at the Church of

12   Scientology could have been discussing matters that are of

13   public record and it could have been matters discussing

14   personal things.  There is a variety of them.  So some would

15   certainly not be published.  Others would be published.  So

16   I'm not quite clear.

17   Q.    Well, the question was:  Are you contending that the

18   confidential attorney-client information that passed between

19   you and your clients is published somewhere and is a matter

20   of public knowledge?

21   A.    Yes.  Generally, yes.

22   Q.    So all of these confidences are just available for the

23   public now?

24   A.    No, I'm not saying that all of them are; but I'm

25   saying, generally, yes, all of that is available to the

1    public.

2    Q.    Now, you did testify --

3              THE COURT:  I'm sorry, Mr. Pope.  Let me interrupt

4    and make sure I understand the testimony.

5              Are you distinguishing between the actual

6    conversations which would be attorney-client communications

7    and the subject matter of the conversations?

8              THE WITNESS:  Yes.

9              THE COURT:  Your conversations with one of the --

10   Mr. Rinder, for example, attorney-client communication,

11   that's not published somewhere?

12             THE WITNESS:  Correct.

13             THE COURT:  As far as you know?

14             THE WITNESS:  Correct.

15             THE COURT:  All right.  Sorry, Mr. Pope.

16             MR. POPE:  Thank you, your Honor.

17   BY MR. POPE:

18   Q.    Mr. Johnson, you mentioned that there had been an

19   exchange of correspondence back and forth between me and your

20   managing partner about the conflict issue, correct?

21   A.    Correct.

22   Q.    You can see we made an effort to work this matter out

23   before we filed this motion, correct?  We brought it to your

24   attention before we filed the motion, correct?

25   A.    Correct.

1    Q.    Okay.  Now, you were talking about your 31 years as a

2    lawyer; and I would like to know, you've had clients, I

3    presume, whom you have represented for 10, 15 years or

4    longer?  You have clients like that?

5    A.    I'm not certain.

6    Q.    How about five years?

7    A.    Yes.

8    Q.    Clients you've been representing for five years?

9    A.    Yes.

10   Q.    Can you think of any other client in your stable of

11   clients who you no longer represent and against whom you are

12   now asserting an adverse position other than this matter?

13   A.    I would think it may have been governmental entities,

14   so I would be taking an adverse position to a governmental

15   entity that I had represented previously.

16   Q.    Okay.  I did want to -- since you relied on the

17   comments rule, one part that you didn't quote -- wasn't

18   quoted to you, that was in the fourth paragraph down.

19   A.    In the comments?

20   Q.    In the comments.  You got it?

21   A.    Yes.

22   Q.    "Lawyers owe a confidentiality obligation to former

23   clients and, thus, information acquired by the lawyer in the

24   course of representing a client may not subsequently be used

25   by the lawyer to the disadvantage of the client without the

1   former client's consent."

2              You agree with that proposition, don't you?

3   A.    Correct.

4   Q.    Thank you.

5              MR. POPE:  Your Honor, that's all that I have for

6   this witness, and I would ask the Court to indulge me in this

7   one request.

8              I would like to call a witness who will simply

9   identify and authenticate the summaries that are at

10  Exhibits 18 and 19, unless counsel wants to stipulate them

11  into evidence.

12             MR. BABBITT:  I ordinarily would, but the witness

13  contested some of that.  That's why I can't stipulate to it.

14             THE COURT:  All right.  Mr. Johnson, you may step

15  down.

16             MR. POPE:  Your Honor, may I -- I asked my

17  partner, Mr. Potter, to do this technical witness, and this

18  will not take but a few minutes.  May he do it?

19             THE COURT:  Are you up to the task, Mr. Potter?

20             MR. POTTER:  Your Honor, I am.

21             THE COURT:  Call your next witness.

22             THE WITNESS:  Judge, may I remain in the

23  courtroom?

24             MR. BABBITT:  We are not going to recall him,

25  your Honor.

1          THE COURT:  Yes, you may.

2          THE WITNESS:  Thank you.

3          MR. POTTER:  Peter Mansell.

4                    PETER MANSELL,

5    having been first duly sworn by the Courtroom Deputy,

6    testified as follows:

7          COURTROOM DEPUTY:  Please be seated.

8          MR. BABBITT:  Your Honor, this gentleman has been

9    sitting in the courtroom the entire time.

10         MR. POTTER:  This gentlemen is a corporate

11   representative of the Flag Services Organization, your Honor.

12   He may remain in the courtroom.

13         THE COURT:  It would have been appropriate to

14   identify him, then, so that he could be considered a

15   representative of the party at the time the rule was invoked,

16   correct?

17         MR. POTTER:  I apologize.  Yes, your Honor.

18         THE COURT:  What is his capacity with that entity,

19   please?

20         MR. POTTER:  He is a long-term staff member and he

21   is a director of the corporation.  He's also currently

22   director of the OSA or special affairs office.

23         THE COURT:  Mr. Babbitt?

24         MR. BABBITT:  I guess it depends upon what he's

25   being offered for.  If all he's going to do is identify an

 1  exhibit, I don't have a problem with that.  I mean, I need a

 2  little direction, your Honor, because all of these witnesses

 3  have provided declarations, which we have not been able to

 4  cross-examine on.

 5          For example, there are things in there that I

 6  would like to talk to him about if the Court is going to

 7  consider the declarations.  Then, we are in a position where

 8  we would like to cross-examine those declarations; and if all

 9  he's going to do is identify an exhibit and he's not going

10  to -- the Court is not going to consider his declaration

11  absent cross-examination, I don't have a problem.

12          THE COURT:  Well, both sides have filed

13  affidavits, and I've read them, as I indicated, unless I've

14  overlooked one or two, but I intend to rely on those

15  affidavits.

16          The purpose of this hearing, of course, is to

17  afford both sides the opportunity to do exactly what you say,

18  but not to try this case.  I don't know of any prohibitions

19  of my considering affidavits in a motion to disqualify

20  counsel.  So the issue is whether this gentleman -- spell

21  your last name for the record, please.

22          THE WITNESS:  Mansell, M-a-n-s-e-l-l.

23          THE COURT:  Thank you.

24          -- whether Mr. Mansell should be excluded.  I'll

25  allow it under Rule 615.  It's probably an oversight on

1   Mr. Potter's part when questioned about invoking the rule.

2          So in terms of direction, Mr. Babbitt, do whatever

3   you think you need to do to respond to the motion to

4   disqualify.  I don't mean that in any way other than I was

5   trying to restrict the time we spent on this motion because

6   it did seem we didn't need more than three hours.

7          MR. BABBITT:  Okay, your Honor.

8                    DIRECT EXAMINATION

9   BY MR. POTTER:

10  Q.    Mr. Mansell, will you please tell us what your position

11  is with the Church of Scientology, Flag Service Organization,

12  Inc.?

13  A.    Yes.  I'm a director of the corporation and I am the

14  head of the Office of Special Affairs, which runs all of our

15  external activities, which covers our legal matters and our

16  public relations matters.

17  Q.    How long have you been a director of the corporation?

18  A.    Since 2008.

19  Q.    How long have you been a director of the external [sic]

20  affairs office?

21  A.    Since 2008.

22  Q.    Are you a custodian of records for Flag Service

23  Corporation?

24  A.    Yes, I am.

25  Q.    Were you asked to search those books and records to

1    find invoices submitted to FLAG by Robert Johnson and/or the

2    firms with which he was employed?

3    A.    Yes.

4    Q.    Did you do that?

5    A.    Yes.

6    Q.    Did you find within those books and records the

7    documents that we see at tab 17 of the exhibit book there in

8    front of you?

9    A.    Yes.  That's correct.

10   Q.    And there is a one-page summary at the beginning of

11   Exhibit 17.  Did you create or cause that document to be

12   created?

13   A.    Yes, I did.

14   Q.    Can you, please, tell the Court how you went about

15   preparing that document.

16   A.    I had several staff go through all of our records and

17   collect all of the billing statements that we could locate

18   for Mr. Johnson or the firms that he worked for, and then

19   those were summarized.

20         The bills that are included in the book here are

21   not the complete packet of bills because it was very

22   substantial.  This is a summary, and it contains several

23   bills from each of the years we could find bills for.

24   Q.    How did you go about picking the actual samples that

25   are put into the notebook?

1   A.    Somewhat randomly.  They were chosen so we have a

2   couple of bills for each year.

3   Q.    Did you look for bills in which Mr. Johnson himself had

4   done work for the church?

5   A.    Yes.  If we did find a monthly bill for one of

6   Mr. Johnson's firms where he himself wasn't billing that

7   month, that bill wasn't included.  So all of these bills have

8   Mr. Johnson's work on them.

9        MR. BABBITT:  Your Honor, please, in the interest

10  of time, I'm not sure what the relevance of any of this is.

11  Whether Mr. Johnson made $10 from this or whether it's $2 or

12  a million eight, it doesn't matter.

13        THE COURT:  Well, I question that as well.

14        Mr. Potter, can we go through this quickly?

15        MR. POTTER:  Yes, your Honor.  The degree of the

16  relationship between Mr. Johnson and Flag Service is

17  relevant.  This was not just a minor representation on

18  transactional matters and some real state, which I believe is

19  what Mr. Johnson has tried to testify to.

20        This witness went through and tried to find the

21  bills that are directly relevant to Mr. Johnson's work, and

22  he has summarized those and we are offering them into

23  evidence.

24        THE COURT:  The dollar amount is the question.  It

25  doesn't matter whether he made a hundred dollars or a million

1    dollars.  It's his work.

2              MR. POTTER:  But the degree of the relationship, I

3    believe, is significant, your Honor, and that's what we are

4    trying to prove.

5              THE COURT:  Go ahead.

6              MR. POTTER:  I'll move on.

7    BY MR. POTTER:

8    Q.    Mr. Mansell, did you summarize the bills that came from

9    Mr. Johnson or his firms, and did it add up to the number we

10   see in the center column of the document, Page 17,

11   Exhibit 17?

12   A.    Yes, that's correct.

13   Q.    And how much is that?

14   A.    One million and 63,000.

15   Q.    Now, if you would, sir, flip over to tab 18, and can

16   you tell the Court if that is a document that you also

17   prepared or caused to be prepared?

18   A.    Yes, it is.

19   Q.    Can you tell the Court how you went about creating this

20   document?

21   A.    Yes.  You asked me to locate any records that we could

22   find of legal work that Mr. Johnson was involved in, whether

23   it was litigation or not litigation, and look for anything

24   where he had been involved with refund cases, in particular,

25   and anything where there were enrollment forms involved.  All

1   of those documents were gathered; and, then, this is a

2   summary of those cases and the subject matters he worked on.

3   Q.    Did it take you some seven pages to describe all the

4   various matters that Mr. Johnson had handled during his

5   course of representation of Flag Service Corporation?

6   A.    That's correct.

7          MR. POTTER:  Your Honor, we would offer Exhibit 18

8   into evidence at this point.

9          MR. BABBITT:  No objection, your Honor.

10          THE COURT:  No. 18 is received.

11          (*Defendant Exhibit 18 received in evidence.*)

12   BY MR. POTTER:

13   Q.    If you can, go over to tab 19, please, sir.  I'm sorry.

14   Exhibit 19.

15          Is this a document that you created or caused to

16   be created?

17   A.    That's correct.

18   Q.    Can you tell us how you created it?

19   A.    While looking through the documents that we found

20   during our search, we looked for cases that were physically

21   refund or repayment cases, and that's the first of 12.  Those

22   were all cases that Mr. Johnson was involved in.

23          Then, the other matters on the rest of the page

24   and continue over the page are 18 other nonlitigation -- or

25   other litigation matters, but not refund matters that

1   Mr. Johnson was involved in.

2   Q.    On the first 12 items there, the refund and repayment

3   suits, were you able to find evidence within your books and

4   records indicating that Mr. Johnson had worked on each and

5   every one of those refund claims?

6   A.    Yes.  There are the letters or court documents that he

7   signed, some evidence that he was involved in all of those

8   cases.

9   Q.    And each and every one of these 12 claims were claims

10  that actually went into litigation, is that correct?

11  A.    That's correct.

12  Q.    And, then, were there some additional repayment matters

13  that he worked on that did not go into litigation?

14  A.    That's correct.

15  Q.    Do you remember how many of those there were?

16  A.    I believe there were a total of -- I think it was 34

17  altogether.  So the 12 went to litigation and the other

18  repayment matters were -- 34 minus 12.  I guess it was 22.

19  Q.    Okay.  Then, the other litigation matters, 1 through

20  18, those were all matters that went into litigation, correct?

21  A.    That's correct.

22  Q.    And were you able to find evidence that Mr. Johnson had

23  worked on each and every one of those litigation matters?

24  A.    Yes.

25          MR. POTTER:  Judge, I think 17 is in evidence, but

```
 1   I'm not sure that we ever specifically moved the first page

 2   of 17 into evidence.  That's the summary page.  So we would

 3   specifically move that page into evidence, if the Court will

 4   allow us to do so.

 5              MR. BABBITT:  No objection.

 6              THE COURT:  No. 17 is received; that is, the

 7   summary, because the invoices are already received.

 8              (Defendant Exhibit 17 received in evidence.)

 9              MR. POTTER:  No further questions, your Honor.

10              THE COURT:  Cross-examination?

11              MR. BABBITT:  Yes, your Honor.

12                          CROSS-EXAMINATION

13   BY MR. BABBITT:

14   Q.   Actually, I only have a couple of questions about your

15   affidavit that you filed in this case.

16              As part of your affidavit you include a picture of

17   a lady that you described as Laura Flynn.  Do you remember

18   that?

19   A.   Yes.

20   Q.   She's holding up a sign with my name on it and

21   Mr. Johnson's name, I believe, and his phone number and

22   urging people to contact us for litigation, right?

23   A.   Correct.

24   Q.   Do you have -- and it's been represented in this case

25   that that was done at my instance and at Mr. Johnson's
```

1    instance and that is how we have been trying to get

2    additional clients.

3              Do you know that representation was made?

4    A.    I don't recall that exact representation, no.

5    Q.    Do you have any information whatsoever to indicate that

6    I know Miss Flynn, have talked to Miss Flynn, have asked her

7    to do that, or Mr. Johnson has in any way suggested that she

8    carry around a sign with our names on it?

9    A.    I don't know that, no.

10   Q.    Okay.  And do you have any information to indicate

11   there had been some way that we could control Miss Flynn and

12   prevent her from doing that?

13   A.    I don't have any information on that, no.

14   Q.    Your affidavit talks about the question of

15   Mr. Johnson's role and question of whether donations are tax

16   deductible.

17             Is it a fair statement to say that his briefs and

18   the case itself are all a matter of public record?

19   A.    I'm not sure what you mean.

20   Q.    The briefs relative to the Hernandez case and any

21   filings that he made in that case, if he did any --

22   A.    I would assume the briefs and filings would be public

23   record, yes.

24   Q.    Yes.  And as far as the procedures regarding expulsion

25   of members, you talk about that in your affidavit.  The

1  procedures regarding expulsion of members is a part of the

2  books that Scientology sells, aren't they?

3  A.    I think there would be reference to that subject.

4  Whether the -- I think -- I would not think there would be a

5  difference between the things that you would read in

6  published materials and the things that, if I was talking

7  with our attorneys about those procedures, discussing how

8  those procedures would be applied and how they might be

9  applied in different circumstances, those legal questions

10  wouldn't be something that would be published in books.  It

11  would be different.

12        That, I think, would be stuff that I would be

13  discussing with my attorneys that would be attorney-client

14  privileged; and I would make a distinction, if I was talking

15  about that subject with somebody, that would be very

16  different from what would be published in the writings of

17  Mr. Hubbard.

18        Mr. Hubbard had the legal questions or legal

19  ramifications or how things might apply in different

20  situations and different circumstances.  That would be me

21  talking to my attorneys and that would be attorney-client.

22  Q.    But the books of Mr. Hubbard would describe the

23  procedure for expulsion, what the result of expulsion means,

24  what you are allowed to talk about to people who are

25  expelled.  All of that is in the books.  Not only in the

1   books, but on the internet, right?

2   A.    Well, no.  When you say, "all of that," all of that

3   is --

4   Q.    What I just described.

5   A.    Everything?  No.

6           There are things that are covered in the books and

7   policies that explain how a person might be expelled from the

8   church, why a person might be expelled from the church.  But

9   if that is something that's being discussed in a legal

10  situation, how things might be done if there was litigation

11  involved or if there is a legal case, nothing like that would

12  be written in the policies of L. Ron Hubbard and published.

13  Q.    As between what a lawyer would say to you about how he

14  thinks that should be applied and what's written in the book,

15  what takes precedence as far as how the church applies

16  expulsion, isn't that set forth in the book, and the church

17  is obligated under the church's doctrines to follow the book,

18  what L. Ron Hubbard has said, as opposed to what a lawyer

19  might say?

20  A.    Well, if I could say, that seems like a hypothetical

21  question; but I think I can tell you what I think the answer

22  is, is that in the writings of L. Ron Hubbard, he, for

23  instance, makes it very clear that in anything we do, in

24  applying the policies of the church or anything, you follow

25  the laws of the land.  That's one which is in the book that I

1  think you have in front of you.

2          So the laws of the land are different in different

3  states, obviously, and in different jurisdictions.  So when

4  Mr. Hubbard says this is the way you should act, if that's

5  being applied in the state of Florida or in the state of

6  California or in some other country, you would discuss that

7  with the attorney to discuss how those things should be

8  applied in that particular circumstance.  So --

9  Q.    Do you know of anything that deals with the law -- the

10  question of expulsion that is relevant to this case?  Is

11  there any allegation in this case that the Garcias should get

12  their money back because they were expelled from the church?

13  A.    I'm sorry.  I don't quite understand that question.

14  Q.    Is there any allegation, as you understand the

15  allegations in this case, that the Garcias are claiming they

16  should get their money back that they gave to the church

17  because they were expelled or because somebody won't talk to

18  them or because of anything that relates to them?

19  A.    Well, I don't mean to be difficult.  Honestly, I don't

20  understand your question.

21  Q.    There is a distinction between refund and repayment,

22  isn't there?

23  A.    Yes.

24  Q.    And refund is, broadly, if you take a service from the

25  church and you are not satisfied with it, you say you didn't

1   get your money's worth, that's the attempt to get a, quote,

2   refund, right?

3   A.    Correct.

4   Q.    Okay.  On the paperwork that's been filed here, they

5   are put together, refund and repayment.  They are not the

6   same, are they?

7   A.    No.

8   Q.    Repayment, on the other hand, is monies that were

9   placed on account with the church and for services and never

10  utilized and people are saying, I didn't get -- I didn't use

11  all the money that I gave you.  I paid in advance, but I

12  never got it.

13          That's a completely different thing, right, than

14  refund?

15  A.    Well, there is a difference, but I don't want to just

16  agree with what you are saying because you are talking about

17  things -- talking about money on account and things which

18  are --

19  Q.    Let me make it simple.

20  A.    -- characterizations that I would disagree with, but if

21  you are --

22  Q.    Let me take out some of the hyperbole.

23          A repayment is where a claim for repayment is a

24  claim for services that were not provided, that were paid in

25  advance, but not provided, correct?

1   A.    Correct.

2   Q.    That's the difference between those?

3   A.    Correct.

4            MR. BABBITT:  Nothing more.

5            THE COURT:  Redirect?

6            MR. POTTER:  No further questions, your Honor.

7   Thank you.

8            THE COURT:  Thank you, sir.  You may step down.

9   Please watch your step.

10            Mr. Pope?

11            MR. POPE:  Your Honor, I think that concludes our

12   presentation of the live witnesses.

13            MR. BABBITT:  We have a motion, your Honor.

14            THE COURT:  We have a motion to disqualify.  This

15   isn't a trial, gentlemen.  It's 12 o'clock.  We are going to

16   take a lunch break.  We will see you back at 1:15.

17            (*Recess taken from 12:00 p.m. to 1:18 p.m.*)

18            COURT SECURITY OFFICER:  All rise.

19            This Honorable Court is now in session.

20            THE COURT:  Mr. Babbitt.

21            MR. BABBITT:  Your Honor, both Mr. Weil and I are

22   present in the courtroom.

23            THE COURT:  I can't hear you.

24            MR. BABBITT:  I apologize.  Maybe if I stand up

25   here.

1          Mr. Weil and are present in the courtroom.  We are

2   prepared to be examined if you want to determine our

3   credibility.  We have made declarations.  Our testimony would

4   be essentially the same as our declarations.

5          Mr. Culkin has been brought down here.  He's in

6   the courtroom.  We are not planning to call him, but we were

7   told by the magistrate that you wanted to ask him some

8   questions.  He's here.

9          Apart from repeating what is in the declarations

10  that are already in before the Court, we don't have anything

11  else to put on.  So we are making ourselves available, and we

12  will also examine each other, if you want to hear us, and

13  judge our credibility.  But other than that, we have no other

14  testimony.

15          THE COURT:  So you are relying on your affidavits

16  essentially?

17          MR. BABBITT:  We would rely on our affidavits,

18  again, unless the Court wants to see us live and judge our

19  credibility on the stand, which we are happy to do.  If the

20  Court thinks that will be helpful, there is not an issue.

21  That, we will do.

22          THE COURT:  I don't have a preference one way or

23  the other.  It's your case and your response to Mr. Pope's

24  motion.  That's it.

25          MR. BABBITT:  Our first witness will be me.

1              THE COURT:  All right.

2              MR. POTTER:  Can I take care of one housekeeping

3   matter?  I failed to move Exhibit 19 into evidence.

4              THE COURT:  Yes, you did.

5              Any objection to 19?

6              MR. BABBITT:  I don't know what it is, Judge.

7              MR. POTTER:  A summary of the cases handled by

8   Mr. Johnson.

9              MR. BABBITT:  No objection.

10              THE COURT:  All right.  No. 19 will be received.

11              (*Defendant Exhibit 19 received in evidence.*)

12                    THEODORE BABBITT,

13   having been first duly sworn by the Courtroom Deputy,

14   testified as follows:

15              COURTROOM DEPUTY:  Please state your name for the

16   record and spell your name for the record.

17              THE WITNESS:  Theodore Babbitt, B-a-b-b-i-t-t.

18                    DIRECT EXAMINATION

19   BY MR. WEIL:

20   Q.    Mr. Babbitt, you are an attorney, licensed in Florida,

21   sir?

22   A.    I am.

23   Q.    And how long have you been so licensed?

24   A.    Forty-eight years.

25   Q.    Can you tell us for the record the name of your law

 1  firm, please.

 2  A.    Babbitt, Johnson, Osborne & LeClainche in West Palm

 3  Beach, Florida.

 4  Q.    Can you give the Court a little benefit of your

 5  background as a lawyer, please.

 6  A.    I've been practicing for 48 years.  I've been

 7  privileged to be chairman of the grievance committee,

 8  appointed by the Supreme Court, on at least three occasions

 9  to statewide commissions, including with respect to senior

10  judges, with respect to the handling of cases, complex

11  litigation, other matters.  I've been president of my bar.

12         In that 48 years, I've never been found

13  responsible for any grievance matter.  And so far as I know,

14  in 48 years I've never knowingly violated any ethics

15  provision of the Florida Bar.

16  Q.    You are the lead attorney representing the plaintiffs

17  in this matter?

18  A.    I am.

19  Q.    Along with my firm, as well?

20  A.    That's correct.

21  Q.    Now known as Weil, Quaranta & McGovern.

22         How long have you been representing plaintiffs?

23  A.    I don't know.  About a year and a half, I would say.

24  Q.    In that capacity, have you spoken with Robert Johnson?

25  A.    Yes.

1  Q.    You've also reviewed the allegations that are made in

2  this motion to disqualify, correct?

3  A.    I have.

4  Q.    Okay.  As you understand them, what are they?

5  A.    Well, that we received confidential information,

6  attorney-client information from Mr. Johnson which gives us

7  an advantage over the defendants and gives us, in their

8  words, the playbook; that we have received similar kinds of

9  information from Mr. Rinder and Mr. Rathbun and that that

10 gives us an advantage that a lawyer, other than someone who

11 has talked to them, would have in the prosecution of this

12 case.

13 Q.    Have you received any confidential information from --

14 let's start with Mr. Johnson.

15 A.    No, I have never spoken with Mr. Johnson about anything

16 that he has talked to his former clients about.

17         Our communications have been almost entirely

18 ministerial and dealing with clients, new clients, current

19 clients, and he has -- if he had said to me, listen, I

20 know -- by talking with someone in the church while I was

21 representing them, I know something that can help us, or he

22 began to say that, I would have stopped him.

23         For me to do that, to conspire with a lawyer who

24 formerly represented a client is so out of character for me,

25 and I think for Mr. Johnson as well, as to be just

1    extraordinarily untrue.

2            I take great offense.  I had to wait 48 years to

3    be accused of an unethical violation; but an ethical

4    violation like this, it is so incredible that to say that I

5    would conspire with another lawyer to take advantage in a

6    case -- I mean, it's akin to destroying evidence or something

7    along that line.  I've never been accused of that.  I've

8    never, and I would never do it.

9    Q.    How about Mr. Rinder?  You met Mr. Rinder in the course

10   of, first, representing the Garcias, is that correct?

11   A.    I have.

12   Q.    Has Mr. Rinder imparted, given to you, disclosed to

13   you, provided to you any information which he has told you

14   was privilege, confidential, or otherwise came from his

15   client or from lawyers representing the Church of

16   Scientology?

17   A.    He has not.  Mr. Rinder's contact with me has almost

18   exclusively been essentially the same thing as any paralegal

19   in my office would do, with the exception that he has a vast

20   knowledge of Scientology.

21           He hasn't been a member for -- I don't know how

22   many years.  Since he was six years old.  I have read things

23   on the internet that he has posted, and everything that he

24   has told me about the church is contained in the documents

25   that we have received.  He has been able to, for example,

1    pinpoint in a vast sea of documents a document that is

2    relevant to a particular issue that I'm interested in that

3    he's done; but he has never said to me, I talked with

4    Mr. Drescher, or I talked with Mr. Pope, or I talked with

5    some other lawyer and here's how they are going to defend

6    this case or here's the playbook.  That's never happened.  If

7    it had happened, if he tried to do that, I would have

8    immediately stopped the conversation.

9    Q.    Has he even referred to or shown you or said he had

10   possession of what could be considered private client

11   privileged communications between the attorney and the Church

12   of Scientology?

13   A.    I don't think he's shown me anything other than in the

14   documents that we have.

15   Q.    What do you understand Mr. Johnson's role to be in this

16   lawsuit?

17   A.    Well, he referred the case initially to

18   Morgan & Morgan.  Morgan got us involved, assembled the team,

19   if you will.  We met in Mr. Johnson's office.  He was there

20   when we met with him and, I think, maybe ten potential

21   plaintiffs to go through the facts of the case and --

22            I'm sorry.  I lost the thread.

23   Q.    His role in the case.

24   A.    Yes.  Oh, Mr. Johnson's role.  Yes.  And so he was the

25   referral lawyer.

1          What actually happened was that initially

2    Morgan & Morgan was supposed to do the job of dealing with

3    the clients and such.  We had inquiries of upwards of a

4    hundred people that want to bring litigation against the

5    church.

6          I simply don't have the time to, and we have not

7    filed any -- we just filed one case, to begin with, because

8    there are issues that would affect all those cases.  So this

9    would be the lead case, if you will; but I did not have the

10   time to deal with potential clients, with current clients,

11   and so Morgan & Morgan was supposed to do that.

12         John Morgan made the decision not to stay in this

13   case because he was afraid that the litigation tactics that

14   have been used by the church in the past would impact his

15   personal life, that they would get into his personal life,

16   that they would harass him.  And he just said, I don't need

17   this, and so Tucker wanted to stay in the case.  John

18   overruled him and got out.

19         At that point, we had no one to do that job.  I

20   didn't want to do it.  You didn't want to do it.  Originally

21   Johnson was purely a referral lawyer.

22         There was a time when we considered not bringing

23   the case because there just was too much work, and then Bob

24   indicated he had talked with his firm and he would take over

25   that job.

1        I think the thing he was trying to explain to the

2  Court is that in this particular case, Tucker had already

3  done that, so he didn't need to do it.  That doesn't mean he

4  won't do it in the future.  I don't think any of us want to

5  come back here on every case, if we continue to be lawyers

6  here, to face this same motion.  So there is no question but

7  Mr. Johnson's responsibility includes exactly what is in the

8  written fee-sharing agreement.

9  Q.    You referred to Tucker.  You are referring to Tucker

10  Byrd, who is at Morgan & Morgan, correct?

11  A.    Yes.

12           MR. WEIL:  No further questions.  Thank you.

13           THE COURT:  Mr. Pope?

14                    CROSS-EXAMINATION

15  BY MR. POPE:

16  Q.    Mr. Babbitt, I believe the evidence shows Mr. Rinder

17  was with CSI as the highest --

18  A.    I can't hear you.

19  Q.    I'm sorry.  Is this better?

20  A.    Yes, probably.

21  Q.    All right.  Mr. Rinder was with CSI as what he

22  described as the senior-most legal official for 25 years,

23  correct?

24  A.    You are asking me if he described himself that way?

25  Q.    Yes.

1   A.     I don't know, but probably.

2   Q.     And Mr. Johnson was an attorney for CSRT and FLAG for

3   17, 18 years or so, correct?

4   A.     I thought it was 14 or 15, but he was definitely there

5   for some of the Scientology organizations.

6   Q.     And you would think as a lawyer of some 48 years'

7   standing that during the course of their relationship with

8   the two entities, CSRT and FLAG, that there were exchanges of

9   confidential information between the lawyers and Mr. Rinder

10  and between Mr. Johnson and his client?  Wouldn't that

11  naturally follow, from your experience, that there were such

12  confidential exchanges?

13  A.     Sure.  Of course.

14  Q.     Now, how are you able to tell, Mr. Babbitt, when

15  somebody just comes to you and provides you with information

16  and doesn't attribute it to a particular source -- how are

17  you able to tell whether that is based on an attorney-client

18  confidence or something else?

19  A.     It's very, very easy.  If they come to me and say, A

20  lawyer told me this, or I overheard this from a lawyer, I

21  know that it had something to do with that.  If they come to

22  me and say, Here's the document you are looking for; it's in

23  the book, I know that it didn't come from there.

24         Now, is it possible that they would hide that from

25  me somehow?  I don't see how.  Not in this case.  I guess

1   that's theoretically possible.  It didn't happen here.

2   Q.    Well, what about if Mr. Rinder says, Well, let me just

3   tell you about what I know about these enrollment agreements,

4   and he doesn't attribute that to any particular source and,

5   yet, he's divulging all sorts of information that is based

6   upon his communications with his lawyers?  I mean, do you

7   imagine that scenario could happen?

8   A.    I don't understand why I would care what he -- for him

9   to say, Here's everything I know about an enrollment

10  agreement, why would I even have that discussion with a

11  witness?  I mean -- excuse me, with a person.

12  Q.    Would -- sorry.

13  A.    In other words, there is a legal issue involving those

14  enrollment agreements.  There is a legal issue as to whether

15  they are enforceable or not.

16           My contact with Mr. Rinder was not, tell me

17  everything you know about an enrollment agreement.  I don't

18  care about that.  Here's what I want to know:  Do you know

19  any people that used to be with the church that are out there

20  that might be willing to sign an affidavit saying how awful

21  this would be to -- you know, we have to prove a certain

22  thing.  That's what I would be asking him about.  I wouldn't

23  ever say to him, just tell me everything you know about a

24  particular subject.

25  Q.    Mr. Babbitt, when a lawyer -- when a client confides

1   information to a lawyer, is there a statute of limitations on

2   that such that after a certain number of years the lawyer is

3   free to blab it to third parties?

4   A.    No, unless the client waives it.

5   Q.    Okay.  Would you look at Exhibit 9 in that book,

6   please, sir.  This is your -- what you call the initial

7   privilege log.

8   A.    Okay.  I didn't create this, but I'll do the best I can.

9   Q.    Okay.  Let's start with the top page.  I want to ask

10  you a few questions about a few of the entries.

11          On the left, it says Rinder 5.  Do you see that on

12  Page 1?

13  A.    Yes.

14  Q.    And it says it's an e-mail from Mike Rinder to all the

15  lawyers in the case.  Johnson, you, Mr. Weil, correct?

16  A.    Right.

17  Q.    And the description is, "E-Mail.  Return of funds and

18  church IRS filing."

19          Now, can you tell us, Mr. Babbitt, to a certainty

20  that there was no confidential information, attorney-client

21  confidential information in that communication to you?

22  A.    I can't tell you anything about it because I don't know

23  what it is.

24  Q.    Let's look over, then, on the next page, Rinder 9 and

25  10 on the left.  From Rinder to all the lawyers, and it says,

1   "E-Mail.  Financial real estate dealings of CSRT."

2              Are you able to -- would your answer be the same

3   as to that when you're just not able to tell if it contained

4   any confidential information?

5   A.   Well, let me try to save you some time.  I won't be

6   able to tell you what any of these contain from that.  It's

7   highly unlikely anyway, unless there is something that rings

8   a bell with me, about a document I've actually seen.

9              I did not create this.  My associate did, or

10  couple of associates actually.  I can tell you this, that if

11  there were confidential information in a document that I

12  received, I would follow the rules, which are that if there's

13  been an inadvertent disclosure and I provide it to you, I get

14  rid of it as quickly as I could.  But as to what this

15  contains, what any of this contains, it's highly unlikely I

16  would know that.

17  Q.   Mr. Babbitt, do you concede that when you get an e-mail

18  like this from somebody who has had this kind of a long

19  relationship and been in charge of legal affairs that it

20  might be difficult to figure out what part of it is based on

21  confidential information and what part of it isn't?

22  A.   Well, it depends.  If all he said was -- I'm trying to

23  think of an example.

24             There is some stuff that helps us here with

25  something, you know, I suppose it's possible that I couldn't

1   tell and I would try to find out.  But it never happened that

2   I've got any e-mail from Mike Rinder or from anybody else

3   that disclosed some confidential information between an

4   attorney and Mike Rinder.  It just didn't happen.

5          There's never been a time when -- you are asking

6   me is it possible it could be in there, and I don't know

7   that.  I guess.  I can't think of a scenario, but I don't

8   know of any.

9   Q.   Mr. Babbitt, now, I'm under the impression that your

10  practice has been plaintiff personal injury oriented, but let

11  me ask you this question anyway:

12          Have you had clients with whom you have had a

13  10-year relationship or a 15-year relationship or a 20-year

14  relationship of regular attorney-client dealings?  Have you

15  had those kinds of situations in your practice?

16  A.   No.  I mean, most of my work -- unfortunately, I'm in

17  federal court in New York on a case that's been pending for

18  about four-and-a-half years, and I guess I've had a

19  relationship with those clients for about five-and-a-half

20  years.

21  Q.   But you would say your practice is not the kind of

22  institutional practice that Mr. Johnson described where he's

23  representing corporations over years and years and years.

24  That's not your practice, is it?

25  A.   Actually, we do corporate contingency, but not for --

1  it's a one off.

2  Q.    A one-shot deal?

3  A.    Yes.

4        MR. POPE:  All right.  May I have one second,

5  your Honor?

6        THE COURT:  Yes, sir.

7        MR. POPE:  I have nothing further, your Honor.

8        THE COURT:  Any redirect?

9        MR. WEIL:  Nothing further, your Honor.

10       THE COURT:  Thank you, sir.  You may step down.

11  Watch your step, please.

12       MR. BABBITT:  Ron Weil.

13                       RONALD WEIL,

14  having been first duly sworn by the Courtroom Deputy,

15  testified as follows:

16       COURTROOM DEPUTY:  Please state your name for the

17  record and spell your last name.

18       THE WITNESS:  Ronald Weil, W-e-i-l.

19                   DIRECT EXAMINATION

20  BY MR. BABBITT:

21  Q.    What's your profession, Mr. Weil?

22  A.    I'm an attorney.

23  Q.    Who is your employer?

24  A.    Weil, Quaranta & McGovern.

25  Q.    You are licensed to practice in the state of Florida?

1    A.    I am.

2    Q.    For how long?

3    A.    I was just thinking you were going to ask me.  I

4    realized it's 40 years, which is unbelievable.

5    Q.    You are an attorney representing the plaintiffs in this

6    case?

7    A.    I am.

8    Q.    In that capacity, have you spoken to Mr. Johnson?

9    A.    I have.

10   Q.    Do you understand the allegations of the motion that's

11   been made in this case?

12   A.    I do.

13   Q.    What do you believe those allegations are?

14   A.    My understanding is that, through Mr. Johnson, we have

15   obtained information that is confidential, attorney/client,

16   which is just plainly not true; and that through Mr. Rinder

17   we have also somehow -- although, as I read the Florida cases

18   on it, have spoken with a control person who somehow had

19   confidential, privileged information.  And to my best

20   knowledge, that never happened.

21        Even reviewing the privilege log that you just

22   went through with Mr. Pope, I know of no privileged,

23   confidential information that Mr. Rinder has provided to us.

24   Q.    Has there ever come a time when even Mr. Rinder or

25   Mr. Johnson have tried to communicate with you anything that

1    they heard or spoke to the church about?

2    A.    No, sir, there has been no time.  And I think, as you

3    put it, the issues in this case don't involve what anybody's

4    legal strategy was because those were all self-evident from

5    what we could all read in prior pleadings.  The answer to

6    your question is no.

7    Q.    Would you do that?  If a lawyer said, Hey, I have some

8    inside dope here, or even a witness said, I've got some

9    inside information here that is directly out of the mouth of

10   the attorneys that represented them, I know from my own

11   personal experience with those attorneys, here's the way they

12   are going to defend this because they do this and this, and

13   they have told me that, what would you do?

14   A.    Well, I don't want to say that there is perfection in

15   everything I've done, but I would say that, like you, I've

16   never had a grievance, a bar grievance filed regarding any

17   matter that I've ever handled for a client in 40 years.

18           The answer to your question is, no, of course not.

19           MR. BABBITT:  I don't have any other questions.

20           THE COURT:  Mr. Pope?

21                        CROSS-EXAMINATION

22   BY MR. POPE:

23   Q.    Mr. Weil, I noticed that of the various lawyers when we

24   did the summary of the hours, I think that Mr. Rinder had

25   logged 23 hours with Mr. Babbitt and his colleagues,

1   19-and-a-half of Mr. Johnson and his colleagues, and you were

2   bringing up the rear with maybe seven-and-a-half hours or so,

3   correct, of meetings with Mr. Rinder?

4   A.     I don't have any independent way of verifying that, but

5   I take your word that it's seven hours.

6   Q.     But you did meet with Mr. Rinder from time to time?

7   A.     I did.  And I also spoke with him on the phone.

8   Q.     And you met with him with the clients present sometimes

9   and other lawyers present?

10   A.     I did.

11   Q.     Okay.  His time summaries or his invoices are at tab 9.

12   No, that's -- 8, I think.  Tab 8 in the book.

13   A.     Yes, sir.

14   Q.     So take a look.  Find November.  It's maybe three or

15   four pages into the deal.

16   A.     Okay.

17   Q.     6 November and 7 November.

18   A.     Yes.

19   Q.     Okay.  On 6 November, Mr. Rinder spent seven hours in a

20   conference with Ted.  I presume that's Mr. Babbitt, correct?

21   A.     I would assume that.

22   Q.     And SL, is that one of Mr. Babbitt's partners?

23   A.     I'm not sure.  I think so, but I'm not sure.

24   Q.     And AR and TB.  I'm not sure.  And AR is one of

25   Mr. Babbitt's -- or is that one of your colleagues?

1  A.    No, sir, it's not one of my colleagues.

2  Q.    So you weren't involved in that one?

3  A.    I was not.  But it looks like TB is also mentioned, so

4  I assume that's --

5  Q.    So at any rate, since you weren't there, you have no

6  idea whether there was any confidential information passed on

7  to anybody or not, do you?

8  A.    Well, not exactly true.  What I know is happening at

9  that point in time is the complaint was being formulated, and

10 I'm fairly certain that was the work product that was being

11 done at that time.

12        Nothing that went into the formulation of the

13 complaint had anything to do with other than the legal issues

14 supported by facts that are alleged.

15 Q.    And with regard to Exhibit 9, which is the privilege

16 log that I asked Mr. Babbitt a few questions about showing

17 quite a bit of e-mail traffic from Mr. Rinder to all of the

18 lawyers, including you -- do you remember that?

19 A.    I do.

20 Q.    How is it that when you got a communication from

21 Mr. Rinder about something that you were able to tell that it

22 was not based upon attorney-client information that he gained

23 in his 25 years as a senior-most legal officer, how could you

24 tell that?

25 A.    Because in the usual case, what Mr. Rinder would supply

1   us with is information about other Scientologists who have

2   similar experiences and will be collaborative in the form of

3   evidence.  Nothing that would be confidential would be of any

4   real interest to us putting together a complaint or creating

5   a list of potential witnesses.

6           Mr. Rinder was, in part, addressing those issues.

7   I suppose we could speculate about what Mr. Rinder's sources

8   were, but since they all actually were disclosed -- i.e.,

9   witnesses, names, parties -- that hypothetical just never

10  came up.

11  Q.    Mr. Weil, on this privilege log, just about everything

12  on it is an e-mail involving Mr. Rinder, some from you and

13  others.  But when you would have these meetings with

14  Mr. Rinder that lasted a long time, or phone conferences with

15  him, did anybody make handwritten notes of what was said

16  during these things?

17  A.    I'm sure some of us made some notes with Mr. Rinder.  I

18  should just say that I don't believe I ever had a long

19  meeting with Mr. Rinder after I came on board in this case.

20  I think most of my dealings with Mr. Rinder were over the

21  telephone, and it related to creating a response to the

22  motion to compel arbitration and identifying other declarants

23  if we needed any.

24  Q.    Do you have any idea why there are no handwritten notes

25  identified in the privilege log here as being withheld based

1   on privilege or work product?

2   A.   Well, in my own case, I don't believe I have any

3   handwritten notes of anything that Mr. Rinder provided to us,

4   but I can't tell you a hundred percent without looking at

5   what you've just represented.

6           MR. POPE:  Okay.  May I have just one second,

7   your Honor?

8           THE COURT:  Yes.

9           MR. POPE:  I have no further questions,your Honor.

10          THE COURT:  Mr. Babbitt?

11          MR. BABBITT:  Nothing.

12          THE COURT:  Thank you, Mr. Weil.  You may step

13  down.  Watch your step, please.

14          Mr. Babbitt?

15          MR. BABBITT:  Rest, if that's appropriate.

16          THE COURT:  Well --

17          MR. BABBITT:  We are not in trial.

18          THE COURT:  You have nothing further?

19          MR. BABBITT:  I have nothing further.

20          THE COURT:  Mr. Pope, anything else from you?

21          MR. POPE:  No, your Honor.

22          THE COURT:  Well, let's discuss this.

23          First, let me clarify one thing, Mr. Pope.

24          As I read the motion, your objective is to

25  disqualify all of plaintiffs' lawyers of record, correct?

1          MR. POPE:  Yes, sir.

2          THE COURT:  You're not seeking to disqualify

3    Mr. Johnson, however?

4          MR. POPE:  Well, your Honor, he is not counsel of

5    record in this case.

6          THE COURT:  That was my point.  It might seem

7    overly technical, but I can't disqualify somebody that's not

8    on the record in front of me.

9          MR. POPE:  I thought about that, but one could

10   enjoin the other lawyers from utilizing that pipeline or

11   enjoin him from further participation in the matter, it would

12   seem to me, but that's just off the top of my head.

13         THE COURT:  I don't know of any authority.  That

14   would be somewhat like delving into an attorney-client

15   relationship outside the -- I hate to use words like

16   jurisdiction, but he's not counsel of record in this case.

17   So I don't think I have any authority to even consider

18   disqualifying him from doing anything.

19              On the other hand, of course, Mr. Babbitt and

20   Mr. Weil and their firms are of record.  So I think your

21   theory necessarily has to be, does it not, that whatever you

22   contend Mr. Johnson gained from his years of representation

23   of your clients was imputed to Mr. Babbitt and Mr. Weil and

24   their firms and, therefore, the subject of disqualification

25   is necessarily their firms and themselves.

1          MR. POPE:  Yes, sir.

2          THE COURT:  All right.  Go ahead.  I just wanted

3    to make sure that I understood the objective of the motion.

4    It actually occurred to me this morning that you're not

5    seeking to disqualify Johnson because he's not a lawyer of

6    record.  Brilliant moment, I'm sure.

7          MR. POPE:  Well, do you want me to just make a

8    brief summing up?

9          THE COURT:  If you would like to make some

10   arguments, now would be the time.

11         MR. POPE:  Your Honor, we filed a rather detailed

12   motion, and in it we cited a number of cases from around the

13   country and, I think, including a Florida case that seems to

14   suggest that a lawyer can have such a longstanding,

15   deep-seeded relationship with the client, that the lawyer is

16   just prohibited, as long as that client is basically on the

17   same track and doing the same thing, from opposing the

18   client.

19         We have cited many of the cases in our memo, and I

20   don't want to insult the intelligence of the Court by going

21   over all that again.

22         But, you know, your Honor, let me just paraphrase

23   my favorite quotation about the law from Felix Frankfurter.

24   He said something along the lines, As fragile as law is and

25   as limited as it is in the institutionalized meaning of

1    reason, that's all we have standing between us and the

2    tyranny of mere will and the undisciplined, unbridled field.

3              So the law is our protection.

4              The attorney-client privilege is one of the

5    bedrocks of the Anglo-American system of law.  It's to

6    encourage clients to spill the beans to their lawyer with the

7    assured knowledge that the lawyer can't use that information

8    against them ever.

9              The conflict rule is really a corollary to that,

10   and it is, we are not going to let a lawyer who has acquired

11   a massive amount of confidential information to, down the

12   road, use it to the detriment of the client in a matter that

13   is the same or substantially similar.  And I've tried to

14   point out the similarities here regarding refund claims of

15   the Williams case and this case.

16             Your Honor, it would not dawn on me to -- I know

17   I've represented these same two -- well, the FLAG institution

18   now since 1999, off and on.  I don't think I've had as much

19   to do with them as Mr. Johnson did, but I have so much

20   information in my head that they have given me that it would

21   be very difficult for me to separate what is it that's

22   privileged and what is it that's not.

23             So I can suggest that if they fire me today, I'm

24   certainly not going to turn up, even any number of years down

25   the road, and try to be adverse to them.  And the problem

1   here is that we have got Mr. Rinder, who is a legal insider;

2   we have Mr. Johnson, a lawyer legal insider; and I don't see

3   how in the world they can possibly sit down and meet for

4   hours and hours and hours and not reveal privileged

5   information that they have absorbed over the years.  I just

6   don't see how it's possible.

7           Finally, I would just conclude, your Honor, that

8   it appears that the standard of appearance of impropriety is

9   still alive in Florida.

10          Certainly it's very difficult to prove -- when

11  privileges are asserted and we don't know exactly the

12  substance of the communication, it's very difficult to prove,

13  well, that was obviously attorney-client protected.

14          We do have one example where Mr. Rinder filed two

15  affidavits in the state court proceeding, and in it he

16  recites his dealings with these enrollment agreements, which

17  are involved in this case, too, with the in-house lawyer,

18  Mr. Drescher, now deceased.

19          Your Honor, for all those reasons, we think that

20  Mr. Johnson's and Mr. Rinder's inside information,

21  confidential information, is imputed to the current counsel

22  and they should be disqualified.

23          Thank you.

24          THE COURT:  Thank you.

25          Mr. Babbitt.

1          MR. BABBITT:  Well, your Honor has on more than

2    one occasion admonished all of us of the burden that these

3    defendants have to take away the legal representation that

4    was chosen by this plaintiff.  That's a high hurdle.  But I

5    would think that the allegation that lawyers of this many

6    years have committed a very serious violation of the Florida

7    Bar rules would require an even higher burden.

8          To suggest that I and Mr. Weil have conspired with

9    a lawyer or a former employee to learn information about

10   lawyer-client relationships is so incredible and such a

11   terrible thing to say about someone that you really need to

12   not do that lightly.  You need to do that with some real

13   evidence that that has occurred, and it's a two-step process

14   here, as your Honor, I'm sure, is aware.

15         The first step is to determine were the cases that

16   Mr. Johnson handled for this defendant or these defendants

17   substantially related to the case before you.  The second is,

18   if that is the case, and only if that is the case, then the

19   second step is -- and the burden shifts -- to show that we

20   didn't receive confidential information.

21         To me, the key to this case is the wording of

22   Rule 4-1.9 and the comments that are attached, because there

23   is no question under that rule, under the definition that it

24   has to be the same transaction or the same legal dispute or

25   attacking work that the lawyer previously did, that it

1    doesn't fit within that definition.

2              There is no -- they have presented no evidence to

3    that effect, that this is the same transaction.  That's what

4    the rule was designed for.  You can't represent someone, for

5    example, on the Garcia claim and then turn around, even as an

6    associate that had nothing to do with the case, or very

7    little to do with the case, and be hired by the other side on

8    the very same case.

9              That's what the rule was designed to prevent.  Not

10   what we have here, which falls directly under the beginning

11   of the rule of the same type of case but different facts,

12   completely different parties, nothing that this lawyer,

13   Johnson, had anything to do with at the time.

14             The inquiry ends there.  If it's not the same or

15   substantial, there is nothing else to ask about what was

16   communicated.  But the second step, which we have the burden

17   and accept the burden, they have presented zero evidence as

18   to what we received from Mr. Johnson that we were able to

19   utilize.  And on the contrary, we have presented our

20   testimony to the effect that never happened.  Mr. Johnson has

21   testified that never happened, and that's the only evidence

22   before your Honor.  That's the only evidence.

23             In addition, the overwhelming evidence is, as the

24   rule provides, that if the information is publicly known, it

25   doesn't count.  And that's been the overwhelming evidence,

1   that the information about how this entity does its business

2   is provided in books and articles that are freely available

3   on the internet and elsewhere.

4           The last element is, have things changed in 14

5   years, and it is specious to say in 14 years we haven't

6   changed a thing.  It's exactly the same.  So on every one of

7   the four elements, they have failed to meet their burden.

8           We are talking about 14 or 15 years intervening

9   between Mr. Johnson's representation.

10          This motion has been an extraordinary distraction.

11  We have spent literally hundreds of hours on it.  The Court

12  has spent the better part of today, and the magistrate has

13  spent a good bit of time.  And this is precisely the kind of

14  tactic that keeps lawyers, other than us, from representing

15  plaintiffs like this, because every time there is going to be

16  a stonewalling, something to get away from the meat of this

17  case.  But in this case, it is allegations of misconduct -- I

18  take it to include myself -- against two fine lawyers --

19  three fine lawyers that they simply have failed to prove.

20          THE COURT:  Mr. Pope, any response?

21          MR. POPE:  Your Honor, I want to clarify one

22  thing, and that is that it has never been our assertion that

23  Mr. Weil and Mr. Babbitt conspired to do this or somehow

24  plotted to extract this information.  It has been our theory

25  all along that Mr. Rinder and then Mr. Johnson have so much

1  information that is confidential and attorney-client

2  protected that it was inevitable, even if they didn't

3  identify it as such, that they provided to these two really

4  fine first-class lawyers.  I have no problem.

5       I don't think -- I think that they have been given

6  a bunch of stuff, without any clear identification from

7  whence it came, and so I just want to make it clear that we

8  have never, ever claimed that Mr. Weil and Mr. Babbitt are

9  conspiring to grab confidential information.

10       (*Brief pause.*)

11       THE COURT:  Well, in not any particular order,

12  I'll make some general observations.

13       First, I want to point out on this record that but

14  for the professionalism and civility of the lawyers who have

15  addressed the Court today, and their reputations, I would not

16  have conducted this hearing.

17       So to your credit, gentlemen, you have done what

18  you should do as professionals on behalf of your respective

19  clients.  And I appreciate that, Mr. Pope and Mr. Potter,

20  Mr. Babbitt and Mr. Weil, and those of you who are here --

21  Miss Tomassi and the rest of the lawyers that I know,

22  Mr. Berman.  I don't know if Mr. Fernandez is here.  I didn't

23  see him back there.  Mr. Fugate.  I know all of you well.

24  You are good lawyers and enjoy fine reputations, and over the

25  years you have all appeared in front of me numerous times.

1  In fact, I remember arguing an appeal against Mr. Pope, and

2  he soundly whipped my fanny.  I think Mr. Fugate and I have

3  even shared a couple co-defendants on occasion.

4           So you have presented this rather unpleasant and

5  distracting matter in a way that I would have expected, and I

6  do thank you for that.  Whether your clients appreciate it or

7  not is of no moment to me.

8           In the entire course of this hearing, but for the

9  last few moments of Mr. Babbitt's comments, other than

10  referencing them as the plaintiffs, no one has mentioned

11  Mr. and Mrs. Garcia.

12           Are they even present?  All right.  Good.  They

13  are present, the record should reflect.

14           It is their case and these are their lawyers and

15  they chose these lawyers to represent them.

16           I don't want it to be overlooked that that is the

17  starting point in this entire analysis because those two

18  plaintiffs are entitled to choose their lawyers, and the

19  disqualification of those lawyers is, indeed, as both sides

20  acknowledged, a drastic remedy which should be resorted to

21  sparingly.

22           I agree, Mr. Babbitt, that this is a distraction,

23  and it has occupied you, Mr. Pope, and the lawyers in this

24  case, the magistrate judge, and now me, but that's the

25  business of litigation.

1          To the extent I have by my comments and admonition

2     restricted the scope of this hearing, I did so knowing well

3     that, if I had not done so, we would be here for days on end.

4     But the nature of the matter does not require that.  It's a

5     very discrete inquiry, not from the perspective of a client

6     or former client, but from the perspective of the rules of

7     professional conduct and the facts.

8          There is no dispute that Mr. Johnson more than 13

9     years ago last represented two of the entities that are

10    defendants in this case.  I start first with that

11    observation, that we are dealing, at the very latest,

12    sometime in early 2000 was the last time he performed any

13    legal services.  But the bulk of what he did -- and I think

14    this is the point of his affidavit -- had to do with a much

15    earlier point in time, and that is the bulk of the services

16    that he performed, and performed between 1982 and 1998.

17         So there is no dispute that he represented these

18    entities and performed legal services and not only litigation

19    matters but nonlitigation matters, and there is no

20    question -- and he acknowledged -- that during the course of

21    that representation he would have necessarily learned through

22    the process of confidential attorney-client communications

23    matters which are to this day protected under the

24    attorney-client privilege.

25         I think Mr. Pope's examination of the lawyers

1  bears that out, obviously.  Any lawyer understands that

2  within that relationship there will be confidential

3  communications that are not intended to be shared with the

4  outside world; but that does not necessarily mean that years

5  and years later those confidences are, one, disclosed to

6  someone else or, two, used to the disadvantage of the former

7  client.  Otherwise, the rule would simply prohibit a lawyer

8  from representing a former client.  It doesn't.

9          Rule 4-1.9 contemplates circumstances in which the

10  lawyer may represent someone in an adverse capacity to a

11  former client.

12          Now, that may be something foreign to most lay

13  people, but it happens.  So there is nothing in and of itself

14  wrong or unethical with Mr. Johnson having an attorney-client

15  relationship with the Garcias against a former client that he

16  represented, even for the number of years that he did.

17          So certainly the defendants have demonstrated the

18  first part of the test, that is, that there was an

19  attorney-client relationship between Mr. Johnson and the

20  former clients.  And all of this assumes that ultimately the

21  defendants must impute any confidential information --

22  violations, I should say, to the current lawyers.

23          So it seems to me that given that the

24  attorney-client relationship existed -- it's undisputed --

25  there arises from that a presumption that's not refutable,

1    but confidences were disclosed during that relationship.  And

2    I think Mr. Babbitt acknowledged that first hurdle is

3    undisputed.

4              Am I correct, Mr. Babbitt?

5              MR. BABBITT:  I would put it in a different order

6    but, yes, sir.

7              THE COURT:  I'm reading from the cases.  And,

8    again, I'm just making comments at this point.  I'm

9    deliberating out loud, if you will, at some risk that I

10   misspeak.

11             The second part of the test, if you will, is that

12   the manner in which Mr. Johnson now represents Mr. and

13   Mrs. Garcia is the -- quote-unquote -- same or substantially

14   related to his prior representation of these two entities.

15             Clearly it is not.  Different facts, different

16   claims.  Nothing about the Garcia representation involved

17   anything that he did on behalf of these two entities.

18   Certainly there may be some common issues, legal issues that

19   arise in this case that he may have encountered in prior

20   representations.  For example, in the Williams case.

21             But the comment of Rule 4-1.9 clearly instructs us

22   that the mere similarity in legal issues is not sufficient

23   because these cases have distinct facts which are different.

24             The Williams litigation, as I understand it from

25   the presentation and the documents I've reviewed, is nothing

1  remotely similar to the Garcia claims, other than there was a

2  lawsuit against the church entities to recover money and

3  there might have been a couple of legal theories that remain

4  that are the same.

5          As Mr. Johnson pointed out, and Mr. Babbitt, the

6  fraud claims of the Garcias are distinct and substantially

7  different from the claims that the Williamses had against

8  those defendants.

9          The test is not -- and the lawyers know this, but

10 I say this for the benefit of those who are interested.  The

11 test is not whether the lawyer can represent an adverse

12 client, adverse to a former client.  He clearly may do so, so

13 long as he does not violate Rule 4-1.9.  And neither is the

14 test whether or not he happened to represent the former

15 client with respect to refunds or repayments, because you may

16 clearly do so, so long as the prior representation was not

17 the same or substantially related to the Garcia litigation.

18         There's been no evidence presented that those

19 prior representations which are set forth in the summaries

20 that have been introduced have anything to do with the Garcia

21 case.

22         The fact that labels such as refund/repayment is

23 used by the defense to categorize these prior representations

24 is not adequate, nor sufficient to meet the same or

25 substantially similar or related tests under 4-1.9 in the

1   comments.

2          So the prior representations in those litigation

3   and nonlitigation matters that are summarized in the exhibit

4   prepared by the defendants do not prevent Mr. Johnson from

5   representing the Garcias.

6          I'll read from the comment to Rule 4-1.9.

7          "On the other hand, a lawyer who recurrently

8   handled the type of problem for a former client is not

9   precluded from later representing another client in a wholly

10  distinct problem of that type even though the subsequent

11  representation involves a position adverse to the prior

12  client."

13         So it can be a problem of the same type so long as

14  it is wholly distinct, and clearly the Garcia litigation is

15  whole distinct from any prior representation.

16         This is not a case of the lawyer simply changing

17  sides.

18         There is no proof that anything Mr. Johnson did on

19  behalf of these entities is being attacked in the Garcia

20  litigation.  Simply, his representation does not fall within

21  the substantially related language of Rule 4-1.9.

22         Certainly, Mr. Johnson owed a duty of

23  confidentiality to his former clients, and I've seen no

24  evidence that he breached that duty, nor is there any

25  evidence that any information he may have acquired that was

1    confidential in nature has been or is being used to the

2    disadvantage of the former client.

3            To the extent there's been a substantial amount of

4    testimony and averments in the affidavits that all of these

5    matters are just out there on the internet and have been made

6    public, the comment in 4-1.9 is instructive, and I'll read

7    from it.

8            "However, the fact that a lawyer once served a

9    client does not preclude the lawyer from using generally

10   known information about that client when later representing

11   another client.

12           "Information that has been widely disseminated by

13   the media to the public or that typically would be attained

14   by any reasonably prudent lawyer who never represented the

15   former client should be considered generally known and

16   ordinarily will not be disqualified."

17           And I think instructive is Mr. Weil's testimony

18   that litigation tactics and things of that nature are of no

19   interest to Mr. Weil and Mr. Babbitt because they can learn

20   all about that reading other cases and experiencing it

21   firsthand in this case.  So they had no interest in learning

22   from Mr. Rinder or Mr. Johnson about litigation tactics.

23           We also have the situation where whatever

24   information that was acquired by Mr. Johnson in his prior

25   representation more likely than not has been rendered

1    obsolete by the passage of time.  The comment to the rule is

2    instructive, and I'll read from it.

3          "Information acquired in a prior representation

4    may have been rendered obsolete by the passage of time.  In

5    the case of an organizational client, general knowledge of

6    the client's policies and practices ordinarily will not

7    preclude a substantive representation, with the caveat, on

8    the other hand, knowledge of specific facts gained in a prior

9    representation that are relevant to the matter in question

10   ordinarily will preclude such a representation."

11         There's just been no evidence of that in this

12   case.

13         To the extent that the defendants want to imply

14   that Mr. Johnson's transactional representation in acquiring

15   the property on which the Super Power Building is or was

16   intended to be constructed, that has nothing to do with the

17   claims of the Garcias.  There's been a lot of effort focused

18   on the delay in construction of that building.

19         Nothing Mr. Johnson did in his representation that

20   I've heard here today has anything to do with the claim of

21   the Garcias that money was solicited by the church

22   ostensively to build that building and there was an

23   intentional delay in the construction of that building so

24   they continue to generate more and more money.

25         Mr. Johnson had nothing to do with any of that.

1    His representation ended when they broke ground, as I recall

2    his testimony.   It was related solely to the acquisition of

3    the properties.

4           The *Morgan Stanley versus Solomon* case that has

5    been reported out of the Southern District at 2009 Westlaw

6    413519 certainly is instructive on the question of

7    substantially related.

8           In other words, the facts in this case alleged in

9    the complaint by Mr. and Mrs. Garcia are unique to them and

10   do not involve the facts from prior litigations in which

11   Mr. Johnson was involved.

12          Certainly there may be a document or documents

13   here and there that Mr. Johnson may have seen in these prior

14   litigations such as releases or -- I want to say enrollment

15   forms, whatever those things are, the arbitration agreements

16   that may be encountered.   But, again, the facts in this case

17   are unique.   The fact that those documents may surface again

18   does not rise to the level of requiring disqualification.

19          *Hernandez versus Royal Caribbean Cruises* at 2010

20   Westlaw 352210, another Southern District decision, written

21   by a magistrate judge, included this commentary:

22          "Courts are skeptical of motions to disqualify

23   counsel because these motions are sometimes filed for

24   tactical reasons or to harass the other party."

25          I certainly can't disagree with that, and I

1   certainly would expect that there could be motions filed for

2   tactical reasons or to harass.  There's been a suggestion of

3   that by Mr. Babbitt's comments.  It's not necessary for me to

4   go there.  I'm confident Mr. Pope would not have filed a

5   motion that he did not feel had a good-faith basis.

6          Certainly from the client's perspective, I can

7   certainly understand their concerns.  Whether or not I am

8   skeptical about motions such as this is of no importance

9   whatsoever.

10          In this case, given the longstanding relationship

11  of Mr. Johnson enjoyed with the former client, any skepticism

12  I may have had when I first read this motion has dissipated

13  because I understand the former client's concern, but that's

14  not the test, as I said.  Simply put, the defendants have not

15  shown that any of Mr. Johnson's prior legal work for his

16  former clients was substantially related to the Garcia case.

17          If Mr. Johnson was the target of a motion to

18  disqualify, it would be denied.

19          There's been no evidence of disclosure presented,

20  which as the cases have acknowledged and Mr. Pope

21  acknowledged, is difficult, if not impossible, to do absent

22  some smoking gun.  We don't have that here.

23          In order to impute any conflict of interest

24  Mr. Johnson may have had to these current lawyers, as I

25  understand the cases, there must be more than a small actual

1  risk of confidential information spreading from the

2  conflicted attorney to the associating firm.

3        Well, I've said already that I don't see any

4  conflict and no evidence supports a conflict of interest.

5  But even if by virtue of the long-term relationship and his

6  handling of the various refund matters gives rise to some

7  inference that he has an unfair advantage, given the

8  precautions he has taken with Mr. Babbitt and Mr. Weil, I

9  cannot find -- and I do find, of course, that there is not

10  anything more than a small actual risk of confidential

11  information being exchanged.

12        Therefore, there is not a basis to impute any

13  alleged conflict to Mr. Babbitt and Mr. Weil by Mr. Johnson's

14  prior representation.

15        I don't think there is an appearance of

16  impropriety here.  To the extent that that remains a

17  consideration, there is a Florida Supreme Court decision in

18  *State Farm Mutual versus K.A.W.*, 575 Southern 2d 630,

19  certainly there is no actual wrongdoing that's been

20  established on the part of Mr. Johnson, and there is not even

21  a showing that some specifically identifiable impropriety

22  occurred.

23        A closer question arises with respect to

24  Mr. Rinder because of his long-term relationship with the

25  church entities and his position for some 25 years.  It seems

1  to me that considering his acrimonious departure and

2  relationship thereafter with the church and its entities,

3  there is no appearance of impropriety.  He's adverse to them

4  and has been for a long time.  He's being paid as a

5  consultant on an hourly basis and not as a fact witness.

6         Certainly he was privy to confidential and

7  proprietary information and documents belonging to his former

8  employer/church, but there's been no showing that any of that

9  has been communicated to Mr. Johnson, Mr. Babbitt, and

10  Mr. Weil.  In fact, those three lawyers have made it clear

11  that they would safeguard against any such disclosure and

12  stop it if it was attempted.

13         Ultimately, in this matter, as in any motion to

14  disqualify based on an alleged conflict of interest, the

15  lawyer is the starting point in avoiding conflicts of

16  interest, and I'm satisfied that based on the testimony that

17  these three lawyers have taken steps from before the

18  representation and throughout their representation of the

19  Garcias to guard against the inadvertent or intentional

20  disclosure of confidential attorney-client matters through

21  either Mr. Rinder or Mr. Johnson's past representations.

22         I recall a state case, and I cannot quote it for

23  you or cite it, but it was something to the effect that while

24  certainly the court is charged with the responsibility of

25  resolving allegations of conflict of interest, the first

1   protection or bar is a lawyer's ethical responsibility to

2   avoid it.  I'm satisfied that they have fulfilled those

3   responsibilities, recognizing how easy it could be to have

4   alleged that there was a conflict.

5          Mr. Johnson's testimony on the manner in which his

6   firm handled the inquiry, if you will, from Mr. Pope

7   fortifies and corroborates my conclusion that these lawyers

8   are mindful of their ethical responsibilities, have guarded

9   against any violation or any conflict of interest, and have

10  conducted themselves in a manner consistent with Rule 4-1.9.

11         Certainly there is nothing unethical about these

12  lawyers having ex parte contact with Mr. Rinder.  The

13  question is only whether or not confidential information has

14  been exchanged or disclosed through them or there is some

15  appearance of impropriety; and as I've indicated, I find no

16  evidence to support that, to the extent that the defendants

17  have alleged that.

18         There's been nothing mentioned about Mr. Rathbun,

19  but I've, obviously, read the affidavits, and I don't find

20  any basis, based on his relationship with the church, to

21  support the disqualification motion or appearance of

22  impropriety.  In fact, he had very, very little contact with

23  these lawyers, as I recall.

24         Again, from what I've read in this file,

25  Mr. Rathbun as well as Mr. Rinder have been vocal critics of

1    the church through the media, apparently on the internet,

2    which I'm not privy to and don't intend to become privy to,

3    but I've read the affidavits and listened to the testimony.

4         I am aware of the *St. Pete Times* coverage and the

5    articles that were written last year.  I don't recall the

6    sources, but apparently it was Mr. Rinder.  It could have

7    been Mr. Rathbun, but those are matters of public knowledge.

8         Let me just cite a couple of authorities for my

9    initial finding that prior representation of Mr. Johnson is

10   not substantially related to the Garcia matter.

11        The Morgan Stanley case at 2009 Westlaw 413519,

12   2009 Southern District case; as well as *Health Care versus*

13   *Bradley* at 961 Southern 2d 1071, a Fourth DCA case out of the

14   state courts; and to some degree *Smalley Transport versus*

15   *Prime Computer, Inc.*, at 137 FRB 397 out of this Court; and

16   *Herrera-Shorthouse versus La Cubana Bail Bonds, Inc.*,

17   Southern District decision reported at 1999 Westlaw 33266031,

18   standing for the same general propositions that mere facial

19   similarities or dissimilarities are not important in terms of

20   comparing current representation to the prior focuses on the

21   precise nature of the subject matters presented in the two

22   representations.

23        There is a completely different unrelated set of

24   circumstances.  Representation falls outside of the

25   substantially related prohibition.

1          So even those prior litigation representations

2     involving refund claims does not support disqualification as

3     substantially similar because those claims and this claim in

4     the Garcia case present wholly distinct problems of the same

5     type.

6          I began by acknowledging Mr. and Mrs. Garcia's

7     right to counsel of their choice.  In re: *BellSouth Corp.* at

8     335 Fed. 3d 941, Eleventh Circuit decision in 2003 recognizes

9     that that entitlement to counsel of choice may not be

10    overridden except when compelling reasons exist, and there

11    are no compelling reasons in this case.

12          Mr. Pope, are there any arguments or legal issues

13    which I have not touched upon in my oral pronouncement?

14          MR. POPE:  Your Honor, your oral ruling seemed

15    pretty clear to me.

16          THE COURT:  You may not agree with it, but the

17    point is, I don't want to overlook an argument that you've

18    made.

19          MR. POPE:  I can't think of one at the moment.  I

20    guess this leaves a little bit in limbo your referral to the

21    magistrate the issue of incomplete production of documents,

22    but --

23          THE COURT:  You know, one of the nicest things

24    about being a United States District Court Judge -- and I

25    think Mr. Zabak certainly said this before -- I don't deal

1  with discovery anymore unless I have to.

2          You are correct.  It leaves it in limbo.  I will

3  defer to Judge McCoun since he entered the original order.  I

4  don't want to presume to understand his directives, his

5  thinking.  It may be that this renders those issues moot.

6  I'll leave that to the two lawyers, meaning the lawyers on

7  each side, to discuss.  I'm sure he would not mind, meaning

8  Judge McCoun, if you remove that from his docket.

9          Mr. Babbitt, any issues, arguments that you think

10  I may have overlooked or not addressed in my oral

11  pronouncement?

12          MR. BABBITT:  No, your Honor.

13          THE COURT:  Again, gentlemen, thank you.  Let's

14  move forward and get to the merits.

15          The motion will be denied.  I'll simply rely on my

16  oral ruling on the record as opposed to authoring some

17  lengthy written order.

18          Thank you.

19          (Proceedings concluded at 2:45 p.m.)

20

21

22

23

24

25

UNITED STATES DISTRICT COURT   )
                               )
MIDDLE DISTRICT OF FLORIDA     )


# C E R T I F I C A T E

   I certify that the foregoing is a correct transcript from

the stenographic notes taken in the above-entitled matter by

the undersigned.


/S/Scott Gamertsfelder, RMR, FCRR
Official Court Reporter              Date: October 16, 2013

                         - - -