```
 1              IN THE UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                       TAMPA DIVISION

 3

 4
        LUIS A. GARCIA SAZ, and     :
 5      wife, MARIA DEL ROCIO       :
        BURGOS GARCIA,              :
 6                                  :
                Plaintiffs,         :  CIVIL   8:13-cv-220-JDW
 7                                  :  NO.:
                                    :
 8      vs.                         :  DATE:   Sept. 4, 2014
                                    :
 9                                  :  TIME:   2:30 p.m.
        CHURCH OF SCIENTOLOGY       :
10      RELIGIOUS TRUST; et al,     :  PAGES:  1 - 46
                                    :
11          Defendant.             :
        ------------------------    :
12

13

14              TRANSCRIPT OF MOTION HEARING
          BEFORE THE HONORABLE JAMES D. WHITTEMORE
15              UNITED STATES DISTRICT JUDGE

16

17

18

19
        Court Reporter: Lynann Nicely, RPR, RMR, CRR
20              Official Court Reporter
                801 N. Florida Avenue
21                    Suite 13B
                Tampa, Florida 33602
22
        Proceedings recorded and transcribed by computer-aided
23      stenography.

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3        For the Plaintiff:

 4
                  THEODORE BABBIT, ESQUIRE
 5                Babbitt, Johnson, Osborne & Leclainche, PA
                  Suite 100
 6                1641 Worthington Road
                  West Palm Beach, Florida  33409
 7

 8

 9        For the Defendant:

10
                  F. WALLACE POPE, JR., ESQUIRE
11                ROBERT POTTER, ESQUIRE
                  Johnson, Pope, Bokor, Ruppel & Burns, LLP
12                911 Chestnut Street
                  Clearwater, Florida  33757
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            COURTROOM SECURITY OFFICER:  All rise.  This

 2    Honorable Court is in session, The Honorable James

 3    D. Whittemore presiding.

 4            Be seated, please.

 5                    P R O C E E D I N G S

 6            THE COURT:  Good afternoon, we're here for

 7    argument on the renewed motion to compel arbitration

 8    filed by the defendants.  Let's get the appearances.

 9    First for the plaintiffs.

10            MR. BABBITT:  Theodore Babbitt.

11            THE COURT:  For the defense?

12            MR. POPE:  Wallace Pope and Bob Potter, Your

13    Honor.

14            THE COURT:  Good afternoon, Mr. Pope, your

15    motion, go right ahead.

16            MR. POPE:  Thank you.  May it please the

17    court.  We are now down to two defendants in this

18    matter.  I'll refer to them as Flag and Ship.  The

19    allegations are that everything was done by these

20    two defendants, that the fundraising arms have been

21    dropped as parties.

22            Our reliance for the motion to compel

23    arbitration is now solely on the agreement signed

24    with Flag.  Ms. Garcia first signed in 2002 and

25    Mr. Garcia signed in 2004 and 2007, I believe.
```

1     These are agreements for religious services and were

2     signed in Clearwater, Florida.

3          Ship is a third-party beneficiary of the Flag

4     agreements and Mr. Garcia also signed a separate

5     agreement with Ship.  The Ship agreement was signed

6     on board the ship.  I think it was in Aruba at the

7     time.  And I'd like to bring the attention of the

8     Court to *Lindo vs. NCL Bahamas Ltd., 652 F.3d 1257*,

9     Eleventh Circuit case, 2011, holding that a treaty

10    the United States entered into known as the

11    New York Convention regarding the arbitration of

12    maritime matters preempts the entire defense of

13    unconscionability.

14         I would like to bring the Court's attention to

15    two provisions in the enrollment agreements,

16    particularly the enrollment agreements with Flag.

17    First, paragraph 5(c)(IV), "Should I at any time

18    ever request a refund, repayment of donations," it

19    will happen only if I have "followed the exact

20    procedures of the Claims Verification Board and this

21    contract."

22         And then paragraph 6(d), "Should any dispute,

23    claim, or controversy arise between me and the

24    church and any other Scientology church, any other

25    organization which espouses, presents, propagates or

1       practices the Scientology religion, or any person

2       employed by any such entity, which cannot be

3       resolved informally by direct communication, I will

4       pursue resolution of that dispute, claim or

5       controversy solely and exclusively through

6       Scientology's internal ethics, justice and binding

7       religious arbitration procedures."

8            This is, Your Honor, the broadest type of

9       agreement.  It doesn't say "arising out of this

10      agreement;" it says "should any dispute arise,"

11      period.

12           *Montero vs. Carnival Corp, 523 F. Appx. 623*,

13      Eleventh Circuit, 2013, holds, "Any means any."

14           And these broad dispute resolution provisions

15      apply to any donations made before they were signed.

16      For that I cite *Zink vs. Merrill Lynch, 13 F.3d.*

17      *330*, Tenth Circuit, 1993, broad arbitration

18      provisions cover disputes even if the dealings

19      giving rise occurred before execution of the

20      agreements.

21           Here the dispute with the Garcias arose at its

22      earliest in 2009 and in their complaint they allege

23      they demanded repayment in 2012.  I call the Court's

24      attention to *B.G. Balmer vs. U.S. Fidelity, 1998 WL*

25      *764669*, Eastern Division of Pennsylvania, 1998,

1    relying on Zink, and I quote, "When an arbitration

2    clause speaks in terms of relationships and not

3    timing, a dispute arising from a relationship

4    between the parties is subject to arbitration even

5    if the dispute arose before the agreement was

6    signed."

7         Let me focus for a moment, Your Honor, on

8    the --

9         THE COURT:  Mr. Polk, just a second.

10        (Discussion off the record.)

11        MR. POLK:  I was just getting ready to focus

12   on the issue of the interstate nature of the

13   transaction.  The plaintiffs are California

14   citizens, contracting with a corporation in Florida

15   for the rendering of personal services in Florida.

16   They made payment by check or credit card from

17   California to Florida or by check and credit card

18   while they were here in Clearwater.

19        They traveled to Florida to receive the

20   religious services in Florida.  And Flag itself has

21   engaged in interstate and foreign activity or

22   commerce by virtue of providing these religious

23   services to church members throughout the nation and

24   the world.  And I'm advised that at any one time

25   there are -- at any week there are 6,000 people at

1       the facilities in Clearwater receiving religious

2       services and each week some go and some come --

3            THE COURT:  What's the relevance of that on

4       this question?

5            MR. POPE:  Interstate commerce, Your Honor,

6       the fact that Flag itself is involved in rendering

7       services to people all over the nation and the

8       world.  That's the sole purpose of my quoting it.

9            THE COURT:  Am I correct that -- did I

10      understand that the services are provided in

11      Clearwater and as I understood the record, these

12      agreements are signed by the Garcias immediately

13      preceding the administering of these services?

14           MR. POPE:  They are -- yes, sir, that is my

15      understanding that they were --

16           THE COURT:  Okay.  You said early on that one

17      of the agreements that I think you said Mr. Garcia

18      signed was on the ship.

19           MR. POPE:  That was an agreement with Ship.

20      Ship is a separate entity.  It is a corporation.

21      Its base, its headquarters, its address is basically

22      in Florida, but it travels the ocean.  But it is a

23      separate enrollment agreement with a separate

24      entity.  But it is, we contend, a third-party

25      beneficiary of the Flag agreements by the terms that

1  are within the Flag agreements.

2    THE COURT:  And when you say signed on the

3  ship, physically, geographically, where is that?

4    MR. POPE:  I believe that the ship was in

5  Aruba at the time it was signed.  But one of the

6  cases that I have cited to you or will cite deals

7  with what is called the New York Convention, which

8  is a treaty to which the United States is a

9  signatory and there is an Eleventh Circuit case that

10  I will cite or have cited that basically holds that

11  unconscionability is not a defense when you're

12  operating under that treaty.

13    So with regard to the Ship services, which

14  were religious services received on board the ship,

15  Ship is protected because it has an agreement

16  directly with Mr. Garcia and because it is a

17  third-party beneficiary of the agreements that both

18  Mr. and Mrs. Garcia signed.

19    The purpose of the interstate commerce

20  discourse is to show the Court that the Federal

21  Arbitration Act applies to all matters which I think

22  in the words of the Act "involve" interstate

23  commerce.  That means, according to the cases, all

24  matters that affect commerce.  And the Eleventh

25  Circuit case in *Jenkins vs. First American Cash*

1    *Advance of Georgia, 400 F. 3d 868*, Eleventh Circuit

2    2005, holds these three things:  One, the Federal

3    Arbitration Act defines interstate commerce as

4    broadly as possible; number two, the Federal

5    Arbitration Act was intended to reverse courts'

6    hostility to arbitration; and number three, claims

7    of adhesion and unconscionability are for the

8    arbitrator if they are directed to the contract as a

9    whole.

10       Now, having said that, the Federal Arbitration

11   Act says that you still have an opportunity to apply

12   certain state law principles.  So the question gets

13   to be "what state law applies."  And the Supreme

14   Court's holding in *Klaxon vs. Stentor Electric*,

15   which was a seminal holding back in 1941, the year I

16   was born, the district court -- and here's the

17   holding, "The district court sitting in diversity

18   must apply the conflict of law rules of the forum

19   state, Florida.  On questions of contract law,

20   Florida follows the rule of *lex loci contractus*,

21   which is the law of the place where the contract was

22   executed or the place of performance in the case of

23   services."

24       In this case the performance for the Flag

25   contracts was to be in Clearwater and they were

1    executed in Clearwater.  So Florida law is the

2    substantive law that applies to this matter.

3         And I would call your attention, Your Honor,

4    to the fact that you have written about this very

5    principle in your orders in both the Peerless

6    Insurance case, which is 2007 WL 2916383, and the

7    Gallina case, G-A-L-L-I-N-A, 2008 WL 4491539 in

8    which you cited *Klaxon vs. Stentor* for that very

9    proposition.

10        Now, for these contracts with Flag, Florida

11   law applies, as does the Federal Arbitration Act.

12   California law does not apply.  We do not seek

13   enforcement under the agreements signed in

14   California.  They are in the record only to show

15   that before the Garcias signed the Flag agreements,

16   they had a long history of signing religious

17   enrollment agreements in California and they were

18   executed with California entities that are not

19   parties to this litigation.  The Garcias had ample

20   opportunity to know and understand these agreements.

21   They signed numerous of them.

22        Now, let me turn my attention to the

23   plaintiff's attack on the enrollment agreements.

24   They have filed affidavits, all of which render the

25   legal opinion that the church's internal justice

1        system is unfair and they ask the Court to step in

2        and rule that the agreements are unconscionable.

3        They claim they are in what they call a Catch 22

4        situation because having been declared "suppressive

5        persons" they are essentially ex-communicated from

6        the organization and shunned to the extent that they

7        can have no contact with anyone in the church.

8              But Mr. Garcia attaches to his declaration,

9        his amended declaration, as Exhibit 1, a document

10       entitled Suppressive Person Declare, which in the

11       Scientology religion is basically the declaration of

12       excommunication or shunning.  And the very last

13       sentence in that document says their only

14       Scientology terminal -- which means contact -- their

15       only Scientology contact is the International

16       Justice Chief via the Continental Justice Chief.

17       The International Justice Chief is based in

18       California.  The Continental Justice Chief is here

19       in Clearwater.  They can contact that person for

20       arranging whatever procedure they want to follow

21       within the church's internal justice system and I

22       will get to that in a minute.

23             These enrollment agreements set up a

24       multilayer system of internal dispute resolution.

25       First they talk about informal communication, let's

1        see if we can work this out.  Next there is the

2        thing called the Claims Verification Board which

3        processes these claims for refunds and I'm advised

4        in the last three or four years they have approved

5        at least seven refunds by people who have gone

6        through this system.

7              If that doesn't work, there is a thing called

8        a Committee of Evidence, or, alternatively, a formal

9        arbitration, both are set up through the

10       International Justice Chief of the organization.

11             The difference is that in a formal

12       arbitration, the claimant gets to pick an

13       arbitrator, whereas a Committee of Evidence involves

14       the International Chief Justice picking a chair of

15       the committee, who selects the members which can be

16       up to as many as seven to consider whatever the

17       particular matter is.

18             Now, the procedures for the Committee of

19       Evidence and for the arbitration panel are the same

20       and are spelled out in a policy letter dated

21       September 7, 1963.  This information is also

22       contained in the book, *Introduction to Scientology*

23       *Ethics*.  I think we have a copy of that somewhere

24       here.

25             But what I'd like to do, if I could, Your

1      Honor, we filed a five-page memo some while back,

2      over a year, about the procedures and basically it

3      was a summary of this policy letter and I would like

4      to offer up the policy letter if I may.

5           THE COURT:  It's not in the record at this

6      point, is it?

7           MR. POPE:  Well, a summary of it is.  It is

8      in --

9           THE COURT:  Well, that's your summary, but the

10     document itself is not in evidence.

11          MR. POPE:  The document itself is not in the

12     record.

13          THE COURT:  Well, I can't consider it unless

14     it's authenticated by some person with knowledge.  I

15     don't doubt that it exists, but the substance of it,

16     for purposes of this motion, I wouldn't have any

17     basis to find that it's reliable or authentic.

18          MR. POPE:  Well, Your Honor, there is a person

19     here available who could authentic it.

20          THE COURT:  This isn't an evidentiary hearing.

21          MR. POPE:  All right.  Well, at any rate, it

22     is clear and we have given a summary of this to the

23     Court and it is clear that this particular document

24     that is summarized, and we did refer I believe to

25     the book.  This is a copy of the book, Your Honor,

1    that is available widely, Amazon and book stores.

2    It makes it clear that these are procedures that

3    apply to all Scientology internal justice

4    procedures.

5        Now, let me get to the claim of

6    unconscionability.  The Garcias claim that the

7    enrollment agreements are unconscionable because

8    they are contracts of adhesion and they had no

9    bargaining power, and they claim this under

10   California law which we argue doesn't apply.

11       THE COURT:  Is there any significant

12   difference between California and Florida law?

13       MR. POPE:  Yes, sir.  California law is very

14   hostile to arbitration.  Florida law and the Federal

15   Arbitration Act are very liberal in promoting

16   arbitration.

17       THE COURT:  Well, that's an interesting

18   characterization, but I want to know what the

19   significant distinctions are between the two.

20   "Liberal" and "favorable" are a bit too general.

21       MR. POPE:  What the plaintiffs argue in their

22   memo is that the principles that they cite of

23   California law mean that this is an unconscionable

24   agreement and we say under Florida law it cannot be

25   considered unconscionable and there is another

1    reason for that as well.  And I have outlined that

2    actually -- I think the parties' positions are

3    outlined in their respective legal memoranda as

4    between what California law applies and what Florida

5    law says on that point.

6         Now, under Florida law there is a heavy

7    burden; first, to show unconscionability.  First you

8    have to show procedural unconscionability, and only

9    if that is established does one move to the question

10   of substantive unconscionability.

11        Let's look at the lack of bargaining power

12   issue and the ability to know and understand the

13   contract terms and the contract of adhesion issues.

14   I would like for the Court to assume for a moment

15   that I have had a sudden religious conversion and I

16   have decided to embrace Catholicism and I want to

17   explain to the Court what I do not do if I do this.

18   I don't go to the parish house and dicker with the

19   priest and the bishop and anybody in the chain of

20   command about the terms of the religion.  What are

21   the terms of the deal?  I don't take the Nicene

22   creed and tell them which parts I accept and which

23   parts I don't.

24        THE COURT:  Well, that's an ecclesiastical

25   matter.  We're talking about a contract.  You have

1    to acknowledge that rules of contract apply in

2    determining unconscionability.  You have an

3    arbitration clause in an agreement that the Garcias

4    were required to sign before they could participate

5    in these services.  So applying contract principles,

6    not ecclesiastical theories or philosophies, let's

7    focus on that.

8         MR. POPE:  But Your Honor, I am because there

9    is a First Amendment component to this and the point

10   is that when you embrace a particular religious

11   philosophy, it really is an adhesive process.  You

12   don't bargain about the basic principles of it; you

13   either accept them or you don't.  And they're saying

14   well, this is a terrible contract of adhesion.  All

15   religious arrangements are contracts of adhesion.

16        THE COURT:  I don't follow that.  I understand

17   what you're saying, but we're talking about a

18   contractual provision which under Florida law must

19   be construed by applying contract principles,

20   specifically the sliding scale in determining

21   whether it's unconscionable or not.  It has nothing

22   to do with the religious tenets that may stand

23   behind the beliefs of the parties.

24        MR. POPE:  Well, Your Honor, the contract

25   provision itself sets forth basic religious tenets.

1       So generally if I'm going to become a Catholic

2       convert, I'm probably not going to sign a contract,

3       but I would have to embrace the doctrine.  Here the

4       principles --

5            THE COURT:  Well, why couldn't the Garcias

6       just have participated in the services without

7       having to sign a written agreement?

8            MR. POPE:  Because that's the way they

9       operate.  In fact, they did this for years, Your

10      Honor.  In fact, let me quote from paragraph 3 of

11      their amended complaint.  It says of the plaintiffs,

12      "They concluded that the church had lost its

13      spiritual, moral and financial compass under the

14      leadership of David Miscavage."  They are

15      complaining that the church is not being run the way

16      they want it to be run.  That is their complaint.

17      And in paragraph 7 they say, "The Church of

18      Scientology has strayed from its founding principles

19      and morphed into a secular enterprise whose primary

20      purpose is taking people's money."

21           And Your Honor, I don't think that you can

22      divorce the religious services agreement from the

23      First Amendment.  There are First Amendment

24      overtones to this that I don't think the Court can

25      overlook.  That's why I'm saying that when you

1      embrace a religion, you embrace it as it exists.

2      You don't come in there and pick and choose and

3      bargain about what it's going to be.

4           THE COURT:  Does that mean that the rules of

5      conscionability or unconscionability simply are

6      preempted because this happens to be a religious

7      institution?

8           MR. POPE:  Not necessarily.

9           THE COURT:  That's more or less what you're

10     saying, that all bets are off because this is

11     religious.

12          MR. POPE:  Well, I am saying that their

13     argument that it's unconscionable because they

14     didn't have any bargaining power and they --

15          THE COURT:  That didn't have to do with faith

16     or services.  It had to do with the contract they

17     were required to sign.

18          MR. POPE:  And the contract is an expression

19     of a whole bunch of the beliefs of the organization.

20          THE COURT:  So that's my point.  You're

21     suggesting that because this has to do with a

22     religious organization, that religion preempts any

23     principles of --

24          MR. POPE:  I'm saying that you can't be

25     declared unconscionable on the basis of a theory

1      that it's a contract of adhesion.  Because

2      inherent -- the relationship between a religion and

3      the people who practice it is inherently a

4      relationship of adhesion.  There is no bargaining.

5           THE COURT:  What authority do you have for

6      that?

7           MR. POPE:  Your Honor, history, common sense.

8           THE COURT:  I've got to have something more

9      than that.  Do you have a case?  Do you have a case

10     that's authoritative that says that?  I don't think

11     you do.

12          MR. POPE:  Well, no, I don't.  But if you

13     think about it, I mean, if you think about it --

14          THE COURT:  That's why it's called an adhesive

15     contract because you can't think about it.  You sign

16     it or else.  That's the plaintiff's argument.  He

17     didn't have any choice in the matter.  We want to

18     participate in the religious services but before we

19     can, even though we've paid for them, we've got to

20     sign this document.

21          MR. POPE:  His choice in the matter -- Your

22     Honor, this wasn't the first document they signed.

23     They signed a whole series of these documents over

24     28 years.  This wasn't anything new.  This was the

25     way this was handled with these folks.  They knew

1      what they were doing.

2          The problem is they disagree with how the

3      organization is being run now.  That's what their

4      complaint says.  So -- and all I'm saying is that

5      every religion involves an adhesive relationship and

6      when it comes to a religious relationship, I don't

7      see how you can say that this is a contract of

8      adhesion because they're all that way.  And what was

9      their choice?  Their choice was another religion.

10     If they don't like this one, try another one, there

11     are plenty of them out there.

12         And they had many opportunities to know and

13     understand the terms of the religious enrollment

14     agreements because they executed many of them over

15     the years.

16         Now, let me talk about for a second the claim

17     of partiality and unfairness.  The cases cited on

18     pages 23 and 24 of our motion to compel arbitration

19     hold that agreements providing for the application

20     of Christian Biblical principles and policies do not

21     render arbitrators inherently biased.  In the case

22     of *BDO Seidman vs. Bee, 970 So. 2d 869*, Fourth

23     District, 2007, holds that an agreement providing

24     that an ousted partner in an accounting firm was to

25     arbitrate before a panel of regular BDO partners who

1    were from the very firm that ousted him, that was

2    not unconscionable.

3         Closer to home, the case of *Johnson Polk vs.*

4    *Forier, 67 So. 2d. 315*, Second District, 2011, holds

5    it is not void as against public policy for an

6    agreement with a law firm to provide for arbitration

7    of malpractice claims before a panel of lawyers from

8    the Hillsborough County Bar Association and the

9    Clearwater Bar Association.  The trial court had

10   found that the agreement was neither procedurally

11   nor substantively unconscionable, but found that it

12   was void against public policy.  The Second District

13   reversed and found that it was fully enforceable.

14        In the Pinellas Circuit Court there was a

15   case, *Shippers vs. Flag*, and in an order entered

16   March 7, 2012 the Florida State Court upheld the

17   religious enrollment agreement against the claim of

18   unconscionability.  Shippers appealed it, but before

19   briefing in the Second District they dismissed the

20   appeal and the underlying suit.  I would like, if I

21   may, to give the Court a copy of that order from the

22   sister court.

23        THE COURT:  It's a Circuit Court of Pinellas

24   County?

25        MR. POPE:  Yes, sir.

1          THE COURT:  I'll certainly consider it.  It's

2     obviously not authority.

3          MR. POPE:  I understand it's not authority.

4          THE COURT:  If you'll share it with opposing

5     counsel, please.  In that case was the entire

6     agreement being challenged or in arbitration clause?

7          MR. POPE:  As I recall, the whole agreement

8     was being challenged, Your Honor.  And I will say

9     this.  At the time of that case, the Shippers case,

10    there was a separate case by the Garcias pending

11    against the church in the Pinellas County Circuit

12    Court.  After that order was entered, the Garcias

13    changed counsel, dismissed that case, and filed this

14    case.

15         Now, let me say that the cases hold that there

16    is no authority under the Federal Arbitration Act

17    for a court to allow a challenge to the fairness of

18    the arbitration process or the partiality of the

19    arbitrators before the issuance of the arbitral

20    award.  Gulf Guaranty Life vs. Connecticut General

21    Life, 304 F.3d 476, Fifth Circuit, 2002.

22         So the challenge to fairness is premature.

23    Those courts hold that you don't get into the

24    fairness question until after an arbitral award.

25         And let me go back to the internal justice

1    procedures, a summary of which -- we filed a

2    five-page summary of which about a year ago pursuant

3    to your order.

4        There is -- let me give you this background.

5    The founder of the Scientology religion was L. Ron

6    Hubbard.  He was a United States naval officer for a

7    number of years.  There is a remarkable similarity

8    between the procedures outlined in what we filed and

9    the procedures that are set forth in that book,

10   which are the same, and the policy letter he wrote

11   to the Uniform Code of Military Justice.  And let me

12   explain how that works.

13       Under the UCMJ if a member of the military is

14   charged, a military officer is put in charge.  That

15   officer selects a group of other officers to serve

16   as the hearing panel.  A military officer is the

17   prosecutor.  The defendant has an opportunity to

18   either hire private counsel or have a military

19   officer.  So it's a completely within the system

20   system of justice, and the Scientology internal

21   system of justice is modeled to a large extent on

22   that.

23       I would point out that there is a Supreme

24   Court case called *Solorio vs. U.S., 483 U.S. 535*,

25   which basically -- it's a 1987 case, and it

1    overruled an earlier case called O'Callahan which

2    had held that nonservice-related matters would be

3    tried in a civilian court.  Solorio abolished that

4    and nonservice matters now can be tried in a

5    military court.  And there has been -- this brings

6    to mind, there has been quite a bit of discussion

7    lately about the problem of sexual aggression in the

8    military and one of the efforts has been to take

9    that out of the UCMJ system and back into some other

10   system unconnected with the military.  But in large

11   measure the Scientology internal justice procedures

12   and system are based on -- are derived in large

13   measure from the UCMJ.

14        I wanted to point out a couple of other cases,

15   miscellaneous cases.  One is *AT&T Mobility vs.*

16   *Concepcion, 131 Supreme Court 1740*.  The Supreme

17   Court preempted California case law that was hostile

18   to arbitration in the class action realm and said

19   that these -- you could force people into

20   arbitration in matters that otherwise would be

21   handled by class suits.

22        In Hosanna-Tabor, U.S. Supreme Court 2012, a

23   Lutheran teacher was considered a schoolteacher.

24   There were two kinds, a lay teacher and a "called"

25   teacher.  If you were a "called" teacher, you were

1      considered a minister in the Missouri synod of the

2      Lutheran church, if you taught even though a lot of

3      what you did was secular teaching.  The Lutheran

4      church had an internal policy of internal dispute

5      resolution.  There is no indication that there was a

6      specific agreement by which the teacher agreed to

7      internal dispute resolution; it was just church

8      policy.  She threatened to sue and she was fired.

9      And the Supreme Court basically said that the EEOC

10     could not get involved in it because it was a

11     decision to fire a person that the church considered

12     a minister even though the minister duties were

13     rather limited.

14         Let me also point out the Serbian Eastern

15     Orthodox Diocese case, 1976, state court held that a

16     church improperly removed a bishop in internal

17     proceedings that were arbitrary.  The Court held,

18     "There is no arbitrariness exception to the First

19     Amendment.  The civil courts are bound to accept the

20     decisions of the highest judicatories of a religious

21     organization or hierarchical policy on matters of

22     discipline, faith, internal organization or

23     ecclesiastical rule, custom or law."

24         So Your Honor, for all of those reasons, we

25     would respectfully ask the Court grant our motion to

1       compel arbitration.

2            THE COURT:  That last case you cited, I

3       listened to your list of matters that are to be

4       resolved within the church; I did not hear contract

5       disputes or fraud.  Do not those claims divorce

6       themselves, for lack of a better word, from the

7       ecclesiastical tenets of Scientology?

8            MR. POPE:  The claim is that there was fraud

9       in the soliciting of money to build what amounts to

10      the Scientology cathedral and there was a huge delay

11      in the matter and that the reason there was a delay

12      was that they were reconfiguring that building for

13      religious purposes.  It's all wrapped up together.

14           To me the First Amendment cases are rather

15      strict in preventing involvement in the government

16      including the court system in these sorts of

17      internal matters.

18           THE COURT:  All right.  Thank you, Mr. Pope.

19           Mr. Babbitt?

20           MR. BABBITT:  Theodore Babbitt.  May it please

21      the Court.  I would like to first talk about a few

22      things that the Court had questions about.

23           There is no difference between California and

24      Florida law on the issues that we're here today,

25      notwithstanding counsel's conclusion that California

```
 1    is more liberal.  The law is essentially the same

 2    and the issue for the Court to decide is

 3    conscionability and whether or not both procedurally

 4    and substantively this contract is unconscionable.

 5         It's not a First Amendment issue, as the Court

 6    has pointed out.  This is a secular issue.  No one

 7    has even suggested that even the Church of

 8    Scientology believes that fraud is a proper vehicle

 9    for obtaining donations.  This is purely a secular

10    issue.

11         There were many things that were brought up in

12    argument that are not in the record.  Certainly the

13    UCMJ is not.  But that's a good example of a

14    complete procedure for resolving disputes that one

15    signs into when one joins the military.  Here, in

16    fact, there is no procedure, as I will point out

17    from the defendant's own brief.

18         The seminal question before this court is

19    whether or not Scientology has effectively usurped

20    this court's Article III jurisdiction to hear not

21    only the claim of Luis and Rocio Garcia, but in fact

22    every claimant that could ever bring a claim against

23    Scientology because make no mistake, this Court's

24    decision on this issue will have far reaching

25    consequences.
```

1          A decision enforcing arbitration would not

2     only effectively end this dispute, it would grant

3     immunity to Scientology on every possible dispute --

4     contractual, personal injury -- if the defendant's

5     briefs are upheld and that is on the basis of an

6     agreement that is not worthy of the name

7     arbitration.

8          Our position is that this agreement is both

9     procedurally and substantively unconscionable.  It

10     is procedurally unconscionable because not only is

11     it a contract of adhesion -- which it clearly is; as

12     the Court pointed out, it is brought forth only

13     after payment for services and as a condition for

14     providing those services -- but there in fact is no

15     procedure mentioned within the contract other than

16     the naming of arbitrators.  There is no reference to

17     the AAA arbitration rules or the ICC or any other

18     rules, nor are any attached.  Because we know they

19     don't exist.

20          On the question of substantive

21     unconscionability, the question is can three

22     Scientologists in good standing possibly provide a

23     fair and impartial set of arbitrators, and the

24     answer to that is no.

25          It is unquestionable and undisputed that these

1      plaintiffs have been declared by Scientology as

2      suppressive persons and what that means is that

3      every member of the Scientology organization,

4      including the three potential arbitrators, must

5      believe that they are not permitted -- under penalty

6      of being themselves excommunicated -- to even speak

7      with the plaintiffs, let alone hear their case and

8      decide it favorably.  How could three Scientologists

9      who believe that they themselves, their own ability

10     to continue on in this organization, could possibly

11     fairly hear the claim of somebody?

12           Now, the defendants have attempted to borrow

13     the rules of the Committee of Evidence and put them

14     in response to your order asking them to tell you

15     what rules of arbitration they have.  But in fact

16     their own statement belies the fact that these are

17     arbitration rules.  What they said was the Church of

18     Scientology International Justice Chief "has ruled

19     that the procedures and rules governing the

20     Committee of Evidence apply in arbitration

21     procedures."

22           Now, when did that happen, where did it

23     happen, is there any evidence that it in fact

24     happened, did it happen before this agreement was

25     entered into, before any of these agreements, or was

1     this something that happened after the briefs were

2     written?  There is no evidence whatsoever if, when,

3     or where that happened.  And in fact, we know it did

4     not happen because we know in the very same page of

5     the very same brief that cites that exact quote I

6     just read, it is said that those rules are designed

7     solely for refunds, refunds that we do not seek

8     here.  This is a case of fraud.  That is what we are

9     claiming.  It has nothing to do with refunds for

10    services.

11         In fact, we know based upon the declarations

12    that have been made and have not been disputed by

13    Scientology, that there has never ever in the

14    history of this organization ever been an

15    arbitration.  It's never even been started.  Why

16    not?  Because it would be a waste of time to go

17    before three people who have to have the beliefs

18    that they are not even permitted to believe anything

19    you say, they are not permitted to even speak to you

20    even if they are related to you.  How could three

21    people like that possibly give a fair hearing?

22         This agreement was never even contemplated for

23    this kind of question that we're here before.  It

24    was an enrollment agreement for religious services

25    and it doesn't say anything about fraud or anything

1    about donations and we are not seeking refunds for

2    services provided.  We are seeking, as a small part

3    of the claim, refunds for services that weren't

4    provided, which have nothing to do with the

5    enrollment agreement.

6         If the arbitration clause were in fact applied

7    as the defendants say that it should be to every

8    type of case, it would apply to contract, personal

9    injury -- it wouldn't matter what it was.  It

10   wouldn't matter how heinous the conduct.  It

11   wouldn't matter whether it was intentional or not.

12   An agreement that would be interpreted in that way

13   would be unreasonable, overreaching, and in fact

14   unconscionable.

15        There is no mention, no mention whatever, in

16   this agreement of the chief justice or the justice

17   chief saying anything about these rules being

18   applied.  Those rules are not mentioned in the

19   contract because there are no arbitration rules.

20        How could an arbitrator who himself is at risk

21   possibly hear this case?  It would be like a person

22   suing their doctor for medical malpractice having an

23   arbitration procedure composed of the doctor and two

24   of his partners.  And these arbitrators have to

25   believe, in order to be in good standing as required

1    by the contract, that people like the plaintiffs,

2    suppressive people, have relinquished all of their

3    rights, are not entitled to any ethics proceedings,

4    are insane, are to be deprived of their property and

5    injured by any means without any repercussions, and

6    are likened to Napoleon and Hitler.  How could an

7    arbitrator who believes that possibly listen to

8    someone and hope to find something factually fairly?

9         As was stated by the Supreme Court in *Hines*

10   *vs. Anchor Motor Freight, 424 U.S. 554*, Congress has

11   put its blessing in a private dispute settlement --

12   on private dispute settlement arrangements, but it

13   was anticipated, we are sure, that the contractual

14   machinery would operate within some minimum levels

15   of integrity.

16        That's what's missing here, Your Honor.  There

17   are no -- they could have easily put into the

18   contract this -- there would be a procedure where

19   people would choose three arbitrators from the

20   American Arbitration Association.  But no, they have

21   to be people who believe these things about the

22   person they are about to hear.

23        The arbitration agreement is in fact illusory.

24   It is, as one court said, unless we close our eyes

25   to the realities, the agreement here becomes not a

1   contract to arbitrate but an engagement to

2   capitulate.  It is a sham system, unworthy of the

3   name arbitration.

4         Whether you apply California or Florida law,

5   both states say that you have to put within your

6   contract some reference to the rules that apply.

7   And here we have no reference.  In fact, under

8   California law you have to actually attach those

9   rules.  But the purpose of that, the purpose of

10  having a reference to rules is so that a person will

11  make a knowing waiver.  So the Garcias, faced with

12  this contract, how could they look up the rules?

13  They didn't exist.  The church could go make up the

14  rules as they go.

15        Imagine an arbitration proceeding in which

16  you're before three arbitrators who say okay, put in

17  your evidence.  Oh, I'm sorry, you're not going to

18  have that evidence, we now have a rule that says

19  this, we're going to create a rule that says that.

20  That's not anything less than procedurally

21  unconscionable.

22        There is no evidence that the Church of

23  Scientology condones fraud.  There is no evidence

24  whatsoever --

25        THE COURT:  Let me stop you.  I don't want to

1    blur the lines between procedural and substantive

2    unconscionability.  You just used the word

3    procedural in describing the internal aspect of a

4    hypothetical arbitration.  Let's separate the two.

5    Take me through your contention that the process

6    contemplated by the enrollment agreements was

7    procedurally unconscionable.

8         MR. BABBITT:  It basically is, Your Honor;

9    first that it's a contract of adhesion, and second,

10   that there are no rules.  That's really all that we

11   have with respect to procedural unconscionability.

12        The question of whether a fair hearing could

13   be heard within the hearing itself of course posits

14   that there have to be rules in order for you to have

15   any kind of a substantively fair hearing.  So

16   without any rules, you get first to the question of

17   procedural unconscionability and you have to indeed

18   find first that it is procedurally unconscionable

19   before you get to the question of substantive

20   unconscionability.  But there have to be rules.

21   Under California law, under Florida law, in fact I

22   believe under any state law, there have to be rules

23   that precede the entrance into the contract.  You

24   can't simply say, okay, our chief justice has now

25   ruled that these other rules that weren't mentioned

1        in the contract apply to this.  That's what the

2        procedural aspect of it is.

3            When you get into the substantive argument is

4        simply this:  Three Scientologists in good standing

5        could not possibly be fair arbitrators in this case.

6        The definition of an unfair arbitrator is someone

7        who has a personal interest in the outcome.  And

8        unquestionably these three arbitrators would have a

9        personal interest in the outcome because if they

10       were to dare to even listen to the evidence, they

11       become, by the tenets of this organization,

12       "declared persons."

13           The parties should not be compelled to use an

14       arbitration procedure that exists only in the mind

15       of Scientology, Your Honor.  We contend that this

16       agreement is unconscionable both substantively and

17       procedurally because it is.

18           THE COURT:  What is your response to

19       Mr. Pope's argument that these agreements could not

20       be contracts of adhesion because they are

21       essentially religious or ecclesiastical, for lack of

22       a better word, components of Scientology?

23           MR. BABBITT:  Because this is not a claim that

24       reaches the religious tenets of Scientology.  They

25       themselves in their briefs said they haven't even

1        filed a motion to dismiss on that basis.

2            We're not arguing about the tenets of

3        Scientology.  This is a fraud claim.  It's a secular

4        claim.  That's why.  It has nothing to do with the

5        religious tenets of Scientology.

6            THE COURT:  So as I understand this record --

7        and this is a question for both of you, when

8        Mr. Pope gets back up -- am I correct to understand

9        that with respect to the particular enrollment

10       agreements that the defendants rely on, the Garcias

11       would pay for whatever services they desired to

12       participate in and then at the time of these

13       services in Clearwater before they could

14       participate, they were required to sign these

15       enrollment agreements?  Is that the sequence of

16       events?

17           MR. BABBITT:  That's correct, Your Honor.

18       That's stated in the declarations; it hasn't been

19       disputed.

20           THE COURT:  And if they declined to sign them,

21       they were not permitted to participate?

22           MR. BABBITT:  That's correct, Your Honor.

23           THE COURT:  And then you would be in a refund

24       situation, I presume, as opposed to a claim of fraud

25       or breach of contract?

1          MR. BABBITT:  I'm sorry, I missed that.

2          THE COURT:  In that situation we would be

3     talking about a refund claim as opposed to fraud or

4     breach of contract.

5          MR. BABBITT:  Hypothetically if that had

6     happened, I suppose we would, although I don't know

7     that that's even been an issue here.

8          There is a refund claim here for services that

9     were deposited but never provided, but in those

10     cases there was no agreement signed because they

11     never got to the point of signing it.

12          THE COURT:  I understand.  And then your

13     position is because they were required to sign this

14     literally as they were walking in the door to

15     participate in whatever service it was, they didn't

16     have an adequate opportunity to appreciate the

17     arbitration clause and in fact could not have

18     because the rules of whatever the arbitration

19     procedure was were not referenced in the agreement.

20          MR. BABBITT:  Not only not referenced, but not

21     existing.  But really it wasn't a situation that

22     they didn't have a chance to because they were

23     rushed into it, that's not really our claim.  Our

24     claim is the question of unconscionability doesn't

25     rise or fall on that issue.

```
 1              If the agreement is unconscionable, the fact

 2      that they didn't have time to go see a lawyer --

 3      which by the way was the question in the Shipper

 4      case that we're not raising, in the Shipper case the

 5      entire question of unconscionability takes up all of

 6      a half of a page, one paragraph, and the claim there

 7      was they didn't have a chance to talk to a lawyer

 8      and therefore it was unconscionable.  That's not the

 9      question here.

10           The question here is if you have a contract

11      and it is a contract of adhesion, you have to look

12      more closely at it.  That's all the adhesion

13      question really relates to.  You can look more

14      closely at it and find that it's perfectly correct.

15      For example, one of the cases that they relied upon

16      was an issue where there was a complete procedural

17      question, it was a contract adhesion but there was a

18      complete procedural system that mimicked the

19      American Arbitration Association and the Court found

20      that was sufficient; the fact that it was a Lutheran

21      organization didn't matter.

22           But here it's completely divorced from that

23      because we have a contract that, yes, was an

24      adhesive contract, and yes, they didn't have time to

25      do much about it, or choice, but I can hardly make
```

1        the claim that that's the basis of our argument

2        because they did it many times over many years.

3              The question is this contract that is

4        adhesive, you must look at it and say okay, is it

5        procedurally unconscionable.  And if it has no

6        rules, which in fact it doesn't, how can you cross

7        this river?  I mean, what is the bridge that gets

8        you through arbitration?  There is no procedure.

9        The church can simply make things up as they go.

10       And that by definition is an unconscionable

11       contract.

12             THE COURT:  All right.  Thank you,

13       Mr. Babbitt.  Mr. Pope, your response?

14             MR. POPE:  Your Honor, on the question of

15       rules, the first thing I would like to do is

16       represent to the Court that the rules that we filed

17       in here, which are rules that apply both to the

18       Committees of Evidence and to the arbitration

19       procedures, that is my stipulation, those are the

20       rules that apply.

21             But apart from that, let's just assume there

22       weren't any rules.  I would like to call your

23       attention to *Premier Real Estate Holdings LLC vs.*

24       *Butch, 24 So. 3d. 708*, Fourth District, 2009, in

25       which the claim was made there are no rules.  The

1    Court said similarly, the failure to designate the

2    rules under which the arbitration would be governed

3    did not invalidate the arbitration clause in the

4    instant case.  The contract states that it will be

5    considered under Florida law and the Florida

6    Arbitration Code, which does not require an

7    arbitration clause to set forth the rules governing

8    the arbitration, fills in the gaps or missing

9    procedures.

10        THE COURT:  There was a reference to the

11   Florida Arbitration Code though?

12        MR. POPE:  Well, no -- well, let's see.

13        THE COURT:  That was a question, not argument.

14        MR. POPE:  I don't believe the court just said

15   as a matter of law that's what the arbitration code

16   does.  But Your Honor --

17        THE COURT:  Well, then are you willing to

18   agree that the Florida Arbitration Code applies to

19   this arbitration process?

20        MR. POPE:  You know, there is a First

21   Amendment issue here, really, as to can the Court

22   force the Florida Arbitration Code on to a religious

23   organization.  I don't know the answer to that.  But

24   this case does suggest that the absence of rules in

25   the arbitration agreement is not fatal.  And what

1        I'm saying is that we do have rules and we have

2   filed them with you and these are the rules that are

3   to be followed.

4        Let me say something else about this business

5   about they paid their money and then they had an

6   agreement stuck in their nose and had to sign it.

7   This is something that went on with them for

8   28 years.  They did this for --

9        THE COURT:  Well, Mr. Babbitt just

10   acknowledged that he's not in a position to contend

11   that they were rushed or forced to sign something

12   because of that very point.  So I'm moving on.  I

13   thought that was a component of the plaintiff's

14   position, but apparently not.

15        MR. POPE:  Let me just look over my notes here

16   for one second.

17        THE COURT:  Was this, from your perspective,

18   this arbitration clause, one-sided or one-way?

19        MR. POPE:  Your Honor, it seems to me that on

20   its face it's fair.  On its face it's fair.

21        THE COURT:  That's not what I asked.

22        MR. POPE:  Well, let me put it this way.  It

23   is no more one-sided than the arbitration clause

24   that required people to select lawyers from the

25   Hillsborough County and Clearwater Bar Association

1      to judge a malpractice claim against my firm, and

2      it's no more one-sided than the BDO Seidman case in

3      which an ousted CPA had to be judged by three of his

4      former partners, and it's no more one-sided than the

5      Uniform Code of Military Justice which picks a bunch

6      of military people to judge a military defendant.

7           THE COURT:  Well, perhaps I'm not making

8      myself clear.  My question is was Scientology bound

9      to arbitrate any dispute with their member?

10          MR. POPE:  No, because they have multiple

11     layers of dispute resolution.

12          THE COURT:  So it's essentially one-sided.

13     The member, or ex-member in this case, from your

14     perspective is required to arbitrate, but

15     Scientology is not under any reciprocal obligation.

16          MR. POPE:  It is if the person goes through

17     the process that we have outlined here with the

18     Claims Verification Board and if they want to try a

19     Committee of Evidence.  And if they reach an

20     impasse, they have the right to demand arbitration,

21     notify the International Chief Justice, and yes,

22     we're obliged to arbitrate.  We are obliged, if they

23     invoke it.  It is their right to --

24          THE COURT:  Let me give you a hypothetical

25     then.  If the Garcias embezzled money from the

1       church and the church sought to pursue them in

2       civil -- in circuit court, was the church required

3       to arbitrate that contention, that claim?

4            MR. POPE:  The church, I don't believe, could,

5       but it could opt to arbitrate and resort to an

6       internal resolution of the matter if it so chose.

7            THE COURT:  Well, using the particular

8       paragraph 6 in the enrollment agreement that we

9       really have to focus on, as I read it it's

10      essentially a one-way arbitration clause.  There is

11      no reciprocal responsibility on the part of

12      Scientology to arbitrate any dispute.

13           MR. POPE:  There is if they invoke the right

14      to arbitration.  Scientology can't just say you

15      don't get to arbitrate, I'm not going to do it.  If

16      they get in touch with the chief justice and say I

17      invoke the arbitration procedure, the Scientologists

18      have to go through with it.  They don't have the

19      right to say no, we're not going to do it.

20           In fact, D indicates that everybody is bound

21      by the discipline, faith, internal organization and

22      ecclesiastical rule, custom and law of the

23      Scientology religion.

24           THE COURT:  And does that mean that

25      arbitration is part of the discipline, faith,

1        internal organization, custom and law of the

2        Scientology religion?

3              MR. POPE:  I'm sorry, I didn't understand the

4        question.

5              THE COURT:  Does that mean that arbitration is

6        part of that?

7              MR. POPE:  The arbitration procedure is part

8        of the rules, custom and law of the Scientology

9        religion.  It's the final step, if all else fails,

10       if the person has exhausted all internal avenues and

11       all else fails, the person has the right to compel

12       arbitration.  And we have the right to compel

13       arbitration.  And unless the Court has something

14       further, Your Honor, I'm finished.

15             THE COURT:  Thank you very much.  Thank you,

16       gentlemen, I appreciate your efforts.  I'm not going

17       to promise a ruling any time soon.  I have a trial

18       starting Monday that's supposed to be at least two

19       weeks and a criminal trial scheduled immediately on

20       its heels, so bear with me.  There is some

21       interesting and comprehensive arguments have been

22       presented.

23             I assume, Mr. Babbitt, that since there was no

24       response to the renewed motion to compel

25       arbitration, you're relying on the response -- your

1      response to the original motion.

2              MR. BABBITT:  That's right, Your Honor.

3              THE COURT:  That's what we presumed.  Thank

4      you, we'll be in recess.

5              (The proceedings adjourned at 3:33 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3      STATE OF FLORIDA            )

4      COUNTY OF HILLSBOROUGH   )

5          I, Lynann Nicely, RMR, CRR, Official Court

6      Reporter for the United States District Court, Middle

7      District, Tampa Division,

8          DO HEREBY CERTIFY, that I was authorized to and

9      did, through use of Computer Aided Transcription,

10     report in machine shorthand the proceedings and

11     evidence in the above-styled cause, as stated in the

12     caption hereto, and that the foregoing pages,

13     numbered 1 through 46, inclusive, constitute a true

14     and correct transcription of my machine shorthand

15     report of said proceedings and evidence.

16         IN WITNESS WHEREOF, I have hereunto set my hand in

17     the City of Tampa, County of Hillsborough, State of

18     Florida, September 24, 2014.

19

20

21              _/s/ Lynann Nicely_____
                        Lynann Nicely, RMR, CRR
22                   Official Court Reporter

23

24

25
```