```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                       TAMPA DIVISION

 3

 4
        LUIS A. GARCIA SAZ, and      :
 5      wife, MARIA DEL ROCIO        :
        BURGOS GARCIA,               :
 6                                   :
               Plaintiffs,           : CIVIL   8:13-cv-220-JDW
 7                                   : NO.:
                                     :
 8      vs.                          : DATE:   2/18/15
                                     :
 9                                   : TIME:   10:00 a.m.
        CHURCH OF SCIENTOLOGY        :
10      RELIGIOUS TRUST; et al,      : PAGES:  1 - 69
                                     :
11            Defendant.             :
        -------------------------    :
12

13

14              TRANSCRIPT OF EVIDENTIARY HEARING
            BEFORE THE HONORABLE JAMES D. WHITTEMORE
15                UNITED STATES DISTRICT JUDGE

16

17

18

19
        Court Reporter: Lynann Nicely, RPR, RMR, CRR
20             Official Court Reporter
               801 N. Florida Avenue
21                   Suite 13B
               Tampa, Florida 33602
22
        Proceedings recorded and transcribed by computer-aided
23      stenography.

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3        For the Plaintiff:

 4
                  THEODORE BABBITT, ESQUIRE
 5                Babbitt, Johnson, Osborne & Leclainche, PA
                  Suite 100
 6                1641 Worthington Road
                  West Palm Beach, Florida  33409
 7

 8

 9        For the Defendant:

10
                  F. WALLACE POPE, JR., ESQUIRE
11                ROBERT POTTER, ESQUIRE
                  Johnson, Pope, Bokor, Ruppel & Burns, LLP
12                911 Chestnut Street
                  Clearwater, Florida  33757
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          COURTROOM SECURITY OFFICER:  All rise.  This

2     Honorable Court is in session, The Honorable James

3     D. Whittemore presiding.

4          Be seated, please.

5                    P R O C E E D I N G S

6          THE COURT:  Good morning, we're here for

7     evidentiary hearing in the matter of Garcia vs.

8     Church of Scientology, et cetera.  Let's get the

9     appearances on the record.  For the plaintiff?

10         MR. BABBITT:  Theodore Babbitt.

11         MR. WEIL:  Ron Weil.

12         THE COURT:  On behalf of the defendants?

13         MR. POPE:  Wally Pope and Bob Potter, Your

14    Honor.

15         THE COURT:  Good morning.  Your motion,

16    Mr. Pope, you may call your first witness.

17         MR. POPE:  Yes, sir.  Mr. Babbitt and I have i

18    think some agreements with regard to the evidence

19    that we've had to stipulate those into admission on

20    the front end, correct?

21         MR. BABBITT:  Sure.

22         THE COURT:  All right.

23         MR. POPE:  I had three issues -- issues with

24    three of his exhibits.  Number 6 and 9 were old

25    versions, not current versions of the policy

1    letters, so I had an objection as to those.  And

2    number 27 has been -- was cancelled way back in 1970

3    and has been in effect.  So with regard to those

4    three, I do object to their admissibility.

5         THE COURT:  And the remaining exhibits?

6         MR. POPE:  Are fine.

7         MR. BABBITT:  We'll present evidence that

8    makes them relevant, Your Honor.

9         THE COURT:  I presumed that you would.  I've

10   got two exhibit lists up here and I just want to

11   make sure I'm correctly identifying which party.

12   One is styled amended exhibit list and there is a

13   check mark next to defendants.  Is that yours,

14   Mr. Pope?

15        MR. POPE:  If it says defendants, it's ours,

16   Your Honor.

17        THE COURT:  It doesn't say it, it's just

18   checked.

19        MR. POPE:  The answer is yes.

20        THE COURT:  Okay.  Then the plaintiffs just

21   has says exhibit list and the first exhibit is

22   Church of Scientology Suppressive Person Declare for

23   Luis Garcia.

24        MR. BABBITT:  That's ours, Your Honor.

25        THE COURT:  All right.  So those numbers again

1    that you're objecting to, Mr. Pope?  Let me make a

2    note of it.

3         MR. POPE:  6, 9, and 27 on plaintiff's amended

4    witness list.

5         THE COURT:  That's why I'm getting confused.

6    I don't have an amended witness list.  I have an

7    exhibit list.

8         MR. POPE:  I'm sorry, it's Plaintiff's Exhibit

9    list.

10        THE COURT:  I got you.  All right.  Call your

11   first witness.

12        MR. POPE:  Your Honor, one other matter.  We

13   made up some -- for ease of dealing with these

14   exhibits, I made up some exhibit books and would

15   like to put an exhibit book at the witness stand

16   together with a copy of Mr. Garcia's deposition in

17   case we need to refer to it.  May I do that?

18        THE COURT:  That's fine.

19        MR. POPE:  With that, we will call Mr. Luis

20   Garcia as our first witness.

21        THE COURT:  Come forward and be sworn.

22        MR. POPE:  Before that, Your Honor, we do wish

23   to invoke the rule under Evidence Rule 615.

24        THE COURT:  Mr. Babbitt, any objection?

25        MR. BABBITT:  We have no objection, Your

1      Honor.

2           THE COURT:  Instruct your witnesses, please.

3           MR. BABBITT:  We do have Mr. Rinder in here.

4      That issue has been raised before.  He's here to

5      help me and he is a witness.  And of course

6      Mr. Garcia will be a witness.

7           THE COURT:  The parties are free to stay.  Any

8      other individuals other than those designated as an

9      expert must leave the courtroom.  The rule has been

10     invoked.

11          Whoever is in this courtroom, I want you to

12     sit down, be quiet, so I can concentrate on this

13     evidence.  I don't want any moving around, talking,

14     shuffling around.  Please.  It's very distracting.

15     If you have need to confer, just step outside the

16     courtroom for me.  With that, we'll be ready to go.

17          COURTROOM DEPUTY CLERK:  Please raise your

18     right hand.

19          (Witness complies.)

20          COURTROOM DEPUTY CLERK:  Do you swear or

21     affirm that the testimony you give in this case will

22     be the truth, the whole truth and nothing but the

23     truth?

24          THE WITNESS:  I do.

25          COURTROOM DEPUTY CLERK:  Please be seated.

1      **Please state your name and spell your last name for**

2      **the record.**

3            **THE WITNESS:  Luis Alfonso Garcia-Saz,**

4      **G-A-R-C-I-A dash S-A-Z.**

5                  **DIRECT EXAMINATION**

6      **BY MR. POPE:**

7      **Q      Good morning, Mr. Garcia.**

8      **A      Good morning, Mr. Pope.**

9      **Q      Mr. Garcia, for a number of years you and your**

10      **wife owned and operated a printing company, correct?**

11      **A      Correct.**

12      **Q      And you had about 100 employees, so it was a**

13      **good-sized business?**

14      **A      Yes.**

15      **Q      And in connection with that business you**

16      **entered into written contracts?**

17      **A      Yes.**

18      **Q      And you conducted your business basically in**

19      **English although that's a second language for you,**

20      **correct?**

21      **A      Yes.**

22      **Q      And you made it a practice to read those**

23      **business-related contracts?**

24      **A      Yes.**

25      **Q      So occasionally in your business you even had**

1          to engage in litigation, correct?

2    A        Correct.

3    Q        All right.  And you and your wife ultimately

4    sold the printing business and you now own and

5    operate a yogurt store, correct?

6    A        Yes.

7    Q        All right.  Mr. Garcia, I put a notebook there

8    in front of you and a copy of your deposition

9    transcript just in case we need to refer to it.  But

10   if you would look in the notebook there under tab 1

11   which is the Defendant's Composite Exhibit 1, you

12   have seen those before, haven't you, Mr. Garcia?

13   A        Yes.

14   Q        At your deposition.  And those are some of the

15   agreements you signed while you were an active

16   Scientologist, correct?

17   A        Yes.

18   Q        And you were a member of the church from

19   April 1982 through November 2010, correct?

20   A        November 6th.

21   Q        2010?

22   A        Yes.

23   Q        All right.  You were about 23 years old when

24   you first joined the church in 1982, correct?

25   A        Yes.

1    Q       And you're now 55 years old?

2    A       Yes.

3    Q       And your wife was 25 years old when she

4    joined, correct?

5    A       Yes.

6    Q       And she's now 57 years old?

7    A       Correct.

8    Q       And all in all you were a Scientologist for

9    28 years and seven months, correct?

10   A       Yes.

11   Q       From 1982 through 1991, you were happy being a

12   member of the church, correct?

13   A       Yes.

14   Q       And except for one enrollment agreement you

15   signed in August of 1994, you were an inactive

16   Scientologist between '91 and February 2002,

17   correct?

18   A       Yes.

19   Q       That was some 10 or 11 years?

20   A       Yes.

21   Q       But this period of inactivity wasn't by

22   design, was it?

23   A       No.

24   Q       It was because you were raising a family and

25   you had a very busy business, correct?

1    A       Yes.

2    Q       A thriving business, in fact?

3    A       Yes.

4    Q       And you didn't just have the time with family

5    and business considerations to be involved in church

6    activities, correct?

7    A       Correct.

8    Q       You got active again in the church starting in

9    early 2002?

10   A       Yes.

11   Q       And you signed an enrollment agreement in

12   February 2002, correct?

13   A       Yes.

14   Q       That is part of Exhibit 1, I think you'll

15   find.  Now, between 1982 and 1991, your first period

16   of activity with the church, you were happy with the

17   church, correct?

18   A       Yes.

19   Q       And you felt that the church during that time

20   was meeting your spiritual needs?

21   A       Yes.

22   Q       And when you resumed your activity with the

23   church in 2002, you had some doubts but you thought

24   that the reward was worth the effort, correct?

25   A       Yes.

1    Q       And you felt that you were going to get some

2    value out of your relationship with the church?

3    A       I hoped that I would.

4    Q       That was your hope?

5    A       Yes.

6    Q       All right.  From 1982 through about 1991, you

7    thought that auditor training benefited you the

8    most, correct?

9    A       Yes.

10   Q       And that training allowed you to audit other

11   church members, correct?

12   A       Anybody.

13   Q       Anybody.  And when you resumed active

14   participation in the church in early 2002, you felt

15   that you got the most benefit from the courses that

16   taught you how to self audit?

17   A       Yes.

18   Q       And you found that self auditing very

19   rewarding?

20   A       Yes.

21   Q       Look at Exhibit 2 in your book, Mr. Garcia.  I

22   think I have a mix-up here on this.  Excuse me, I've

23   got a minor glitch to work out with regard to

24   Exhibit 2.  What do you have in your book as

25   Exhibit 2?

```
 1    A        "To whom it may concern."

 2    Q        Okay, that's fine.  Thank you, Mr. Garcia.

 3    A        Glad to help.

 4    Q        Sir?

 5    A        Glad to help.

 6    Q        All right.  That is a "To Whom It May Concern"

 7    letter, correct?

 8    A        Yes.

 9    Q        Dated October 4, 2002.

10    A        Yes.

11    Q        And that's your signature on it?

12    A        Yes.

13    Q        It is addressed "To whom it may concern," and

14    it does bear your correct address, correct?

15    A        Yes.

16    Q        Except since then the zip code has changed?

17    A        Correct.

18    Q        All right.  You state, "This is to certify

19    that I became involved with the Church of

20    Scientology on or about October 1982," but I believe

21    you've indicated that the date you actually started

22    was April 1982, correct?

23    A        Right.

24    Q        So that's a mistake in that letter?

25    A        Yes.
```

1    Q       All right.  So you say, "I have since embraced

2    the doctrines and the principles of the Church of

3    Scientology as I have found them to help me improve

4    my life in general."  Correct?

5    A       Correct.

6    Q       And that was a true statement when you made it

7    back in October of 2002, correct?

8    A       Yes.

9    Q       And then you state, "But specifically I

10   attribute a much happier existence, higher moral

11   values and an understanding of my religious and

12   spiritual side to what I have learned from L. Ron

13   Hubbard and by being a member of the Church of

14   Scientology.  This goes for my family as well."

15   That was a true statement at the time you wrote it?

16   A       Yes.

17   Q       And you conclude by saying, "Everything I am

18   today and everything I will be, I owe to Mr. L. Ron

19   Hubbard and my church, the Church of Scientology."

20   Now, that's what you said, correct?

21   A       That's what I said.

22   Q       And that's the way you felt when you wrote

23   this in October 2002, correct?

24   A       Yes.

25   Q       Those feelings were coming from your heart.

1      A       Yes.

2      Q       And even today you admit that you received

3      some benefit from your relationship to the church

4      even though you now feel there was some major damage

5      as well, correct?

6      A       Correct.

7      Q       As of October 4, 2002, the date of this

8      document, you were feeling pretty good about the

9      church, weren't you?

10     A       Somewhat.

11     Q       All right.  You were feeling -- at least those

12     sentiments you expressed in Exhibit 2 were your

13     sentiments at the time.

14     A       I told you before I have no recollection of

15     ever writing this.  I would not deny that's my

16     signature.  I just don't have recollection of why I

17     wrote that, what were the circumstances behind it.

18     Q       But you don't deny that they accurately

19     reflected the way you felt at that time.

20     A       Somewhat.

21     Q       Somewhat.  Okay.  Now, sometime after you

22     signed Exhibit 2, you gradually began to become less

23     happy with the church, correct?

24     A       Yes.

25     Q       And it took around October 2009 when you

1    opened your yogurt store is about the time you began

2    an investigation that led you to become unhappy with

3    the church, correct?

4    A       Not unhappy.  I was unhappy already.  It led

5    me to come to the realization of what I was -- it

6    led me to find the truth and finally everything made

7    sense, all my observations about the things that

8    just didn't seem right made sense.

9    Q       So October 2009 was the tipping point for you?

10   A       Yes.

11   Q       That's when your whole attitude changed,

12   correct?

13   A       Yes.

14   Q       And I think Exhibit 1 shows that the last

15   enrollment agreement that you signed was a year

16   earlier in 2008, would you just verify that?

17   A       Yes.

18   Q       Now, Mr. Garcia, let's focus for a minute on

19   your church activities between your laudatory "To

20   Whom It May Concern" letter in October 2002 and late

21   2008.  Exhibit 1, I think you will note, contains 21

22   enrollment agreements that you executed between

23   October 2002 and September 2008.  Does that ring a

24   bell with you?

25   A       Yes.

1    Q     And in the single year of 2007, you were happy

2    enough with the church to execute nine enrollment

3    agreements, correct?

4    A     Yes.

5    Q     And in paragraph 10 of your declaration of

6    April 22, 2013 that you filed in this matter, you

7    swear that you actually signed over 40 or so

8    enrollment agreements, correct?

9    A     Yes.

10   Q     And there are only about 25 in the composite

11   exhibit, correct?

12   A     Yes.

13   Q     So there are another 15 or 20 out there that

14   are unaccounted for.

15   A     Correct.

16   Q     All right.  And some of those 15 or 20 that

17   are unaccounted for were signed during the period

18   2002 and 2008, correct?

19   A     I couldn't tell you.

20   Q     Okay.

21   A     I do know that I signed a lot more than 25.

22   Even 40 is a guess.  It might be more.

23   Q     And I believe you've already testified that

24   during this period beginning in 2002 you thought

25   that the rewards you would get from the church would

1 outweigh any downside, that was your hope, correct?

2 A  I would phrase it differently.  The church --

3 I felt the church had something to offer me that was

4 worth a lot of effort and money on my part.

5 Q  Okay.

6 A  I was wrong.

7 Q  Now, when you signed all of these enrollment

8 agreements, you did read them but not fully,

9 correct?

10 A  Correct.

11 Q  All right.  And you had a general idea of what

12 each of them said.

13 A  Correct.

14 Q  And I believe that you considered -- you said

15 earlier that you considered these agreements to be a

16 mere -- just a formality, correct?

17 A  Sure.  Because I got to sign them many weeks,

18 sometimes many months after I prepaid the money for

19 the service I was going to take.

20 Q  Okay.  And your aim was to receive the

21 services that the donations you made afforded you,

22 correct?

23 A  Right.

24 Q  And when you signed these agreements, you were

25 at that time a committed Scientologist, correct?

1    A      Yes.

2    Q      And you weren't under the influence of drugs

3    or alcohol when you signed, correct?

4    A      No.

5    Q      And before you can even undertake any auditing

6    in the church, you must refrain from alcohol for

7    24 hours before any auditing session, correct?

8    A      Correct.

9    Q      And any kind of mind-altering drugs, correct?

10   A      Yes.

11   Q      And you weren't mentally impaired when you

12   signed these agreements?

13   A      No.

14   Q      And you weren't delusional when you signed

15   these agreements?

16   A      No.

17   Q      No one put a gun to your head and said you've

18   got to sign this, correct?

19   A      Not a gun, no.

20   Q      Did anybody intimidate you into signing these

21   agreements?

22   A      Signing these agreements was one step in a

23   list of steps that one must go through in order to

24   finally start the service that one has prepaid,

25   again, many weeks, some cases many months before.

1    Q      And at the time you signed these agreements,

2    wasn't it your personal belief at that time that the

3    internal Scientology system of justice was fair?

4    A      Yes.

5    Q      And now in retrospect you have concluded that

6    it's not fair, correct?

7    A      Yes.  It's not fair.  And it's not used

8    properly either.

9    Q      Now, during your happier years with the

10   church, you accepted the idea that these

11   Scientologists in good standing would decide any

12   disagreements between you and the church and anyone

13   in the church, correct?

14   A      Repeat the question, please.

15   Q      When you were during your happier period of

16   time with the church, you accepted the idea that

17   Scientologists in good standing would decide any

18   disagreements that came up between you and the

19   church or between you and any other member.  That

20   was something you accepted, wasn't it?

21   A      Not exactly, not Scientologists in good

22   standing, but the church officials.  You learn that

23   if you have any dispute with other -- with another

24   Scientologist, you are to go to the church officials

25   and handle it internally, not necessarily with

1          Scientologists in good -- of course if they are

2     church officials, they would be a Scientologist in

3     good standing, so yes, you are correct.

4          Q     Okay.  So you were familiar with all of the

5     ethics procedures and justice procedures and you

6     knew that there was a system whereby Scientologists

7     could settle disputes, have hearings, and have

8     things like what they called the Chaplain's Court,

9     correct?

10    A     Yes.

11    Q     And you were aware of the Committees of

12    Evidence, correct?

13    A     Yes.

14    Q     You knew how they worked.

15    A     Yes.

16    Q     Most Scientologists know how they work because

17    they study them, correct?

18    A     Yes.

19    Q     Most Scientologists take the ethics course and

20    become well versed in how things are to work,

21    correct?

22    A     Correct.

23    Q     And you were accepting of this internal

24    justice system when you felt like you were part of

25    the organization, correct?

1    A      Yes.

2    Q      And you had good feelings about it, correct?

3    A      Yes.

4    Q      During your happier years with the church you

5    never suggested to anyone in the church that the

6    enrollment agreements were objectionable and should

7    be changed for anyone's benefit, did you?

8    A      No.

9    Q      These enrollment agreements were really a

10   nonsubject for you, weren't they?

11   A      Correct.

12   Q      In fact, because of the nature of your

13   relationship with the church, you never even

14   imagined that you would ever have any kind of

15   serious dispute with the church, correct?

16   A      That's correct.

17   Q      As you put it, never in a million years did

18   you imagine that you would have a serious dispute

19   against the church on any subject or anything at

20   all.

21   A      Right.

22   Q      In fact, you used the internal justice

23   procedures of the church a couple of times to your

24   satisfaction, yes?

25   A      Yes.

1    Q       And you had a Chaplain's Court that you have

2    described I believe as great.

3    A       Yes.

4    Q       Now, we made reference to the Scientology

5    ethics course.  Let's turn to that for a few

6    minutes, Mr. Garcia.  In the summer of 2002 the

7    church told you that you had ethical issues you

8    needed to handle, correct?

9    A       Correct.

10   Q       And you took and completed the ethics

11   specialist course in 2003, correct?

12   A       Yes.

13   Q       Now, take a look, if you would, at Exhibit 4

14   in your book.

15   A       Yes.

16   Q       That is the table of contents, isn't it,

17   Mr. Garcia, for the ethics specialist course?

18   A       It is.

19   Q       Now, take a look at Exhibit 5.

20   A       Yes.

21   Q       This is -- isn't this a check sheet for the

22   ethics course?

23   A       It is.

24   Q       49 pages long, correct?

25   A       Yes.

```
 1      Q       You filled it out as you progressed through

 2      the course, correct?

 3      A       Yes.

 4      Q       And that is your handwriting on -- and

 5      signature on the check sheet, correct?

 6      A       Yes.

 7      Q       And it shows everything you did, all the study

 8      you did, correct?

 9      A       Yes.

10      Q       And it shows the essays you wrote, correct?

11      A       Yes.

12      Q       And it shows every practical exercise that you

13      did, correct?

14      A       Correct.

15      Q       You began this course on January 13, 2003,

16      correct?

17      A       Yes.

18      Q       And you concluded on April 22, 2003, about

19      three and a half months later, correct?

20      A       Yes.

21      Q       Would you refer to page 43 of Exhibit 5.  The

22      pages are at the top of the exhibit.

23      A       Okay.

24      Q       Look at paragraph 4 at the very top of the

25      page.
```

```
 1    A       Yes.

 2    Q       It says, "Do a large diagram showing the role

 3    or function of each of the following:   Convening

 4    authority, chairman of the committee, secretary,

 5    member, evidence, interested party, witness, bill of

 6    particulars, findings, endorsement, publication."

 7    Do you see that?

 8    A       I do.

 9    Q       Now, if you would refer to Exhibit 6.

10    A       Okay.

11    Q       In Exhibit 6 this is your diagram that that

12    particular question in paragraph 4 called for, isn't

13    it?

14    A       Yes.

15    Q       And that's your handwriting it's in, correct?

16    A       Yes.

17    Q       And you have in the middle of it you see it

18    says "evidence"?

19    A       Yes.

20    Q       "Spoken word, documents, tapes," correct?

21    A       Yes.

22    Q       "Collected from interested party," correct?

23    A       Yes.

24    Q       Which could be either a plaintiff or a

25    defendant.
```

1    A       Yes.

2    Q       And it goes on to outline the general

3    structure.   This is for the Committee of Evidence,

4    correct?

5    A       Correct.

6    Q       All right.   Now, we'll refer to Exhibit 5

7    again, page 43, paragraph 5.

8    A       Okay.

9    Q       You're ahead of me.   It says, "Sketch.

10   Diagram out the following and show a specific

11   example of each.   A, the basic procedure of a

12   Committee of Evidence; B, the actions of the

13   convening authority."   Correct?

14   A       Correct.

15   Q       If you would look at Exhibit 7.

16   A       Yes.

17   Q       That is your sketch in compliance with that

18   request, correct?

19   A       Yes.

20   Q       That was your understanding about the

21   convening authority, the committee, and how it

22   functioned, correct?

23   A       Yes.

24   Q       All right.   Now, if you would go to paragraph

25   42 of Exhibit 5.

```
 1    A        You mean page 42?

 2    Q        I'm sorry, you're right, page 42, paragraph 12

 3    of Exhibit 5.

 4    A        Okay.

 5    Q        Do you see that?

 6    A        Yes.

 7    Q        It says there, "Essay.  Reviewing all the

 8    issues you have read so far in this section, explain

 9    why Scientology justice procedures are a new hope

10    for justice as opposed for the justice system in use

11    in the society today.  Give specific examples that

12    you have personally seen or experienced which show

13    how the Scientology system compares with the current

14    justice system and how this is thus a new hope for

15    justice."

16             Take a look, if you would, at Exhibit 8.

17    A        Yes.

18    Q        Exhibit 8 -- this is your essay in compliance

19    with that paragraph 12, correct?

20    A        Yes.

21    Q        Written in your hand?

22    A        Yes.

23    Q        Dated April 13, 2003.

24    A        Yes.

25    Q        And it states, "The current justice system is
```

```
1    not too worried about establishing the truth about

2    something.  While that may be the apparentcy, the

3    practical reality is different.  Even in courts

4    where juries are present, one is subject to their

5    view of the incident as influenced by their banks

6    and smart attorneys...."  now, "banks" is a term of

7    art, isn't it?

8    A     A term of what?

9    Q     Banks.  You didn't mean a financial

10   institution there, did you?

11   A     No, it's also a Scientology term.

12   Q     Which means?

13   A     Means reactive mind.

14   Q     Okay.  "Smart attorneys who make full use of

15   technicalities.  The Scientology's SEN system is a

16   sane one.  It's true justice and its object is not

17   to suppress or punish but to rehabilitate, it's just

18   great."

19         Those were your true sentiments at that time,

20   were they are not?

21   A     Yes.

22   Q     And you continued to believe that the

23   Scientology justice system was true justice as you

24   signed these many enrollment agreements, didn't you?

25   A     As time progressed from 2002 to 2010, that
```

1      belief waned and I had more and more doubts about

2      the fairness of the ethical systems and about a lot

3      of other issues.

4      Q      But you kept signing the agreements, correct?

5      A      I did.

6      Q      Because you kept believing that you were going

7      to derive a benefit from it?

8      A      That's right.

9      Q      And it was only until October of 2009 that you

10     reached what I've called the tipping point and

11     became extremely unhappy, correct?

12     A      Correct.

13     Q      If you would go to page 46, paragraph 8, of

14     Exhibit.  5?

15     A      Okay.

16     Q      You got it?

17     A      Got it.

18     Q      It says, "Essay.  Give a real example of how

19     you will ensure that in taking ethics actions you

20     apply the following datum.  Be specific and actually

21     write out what you will do.  "No matter how stiff

22     the ethics action is you have to apply to keep the

23     show on the road, remember this, 'You must keep the

24     door open only if it's just a crack.""  Correct?

25     A      Correct.

1    Q       And if you would go to I believe Exhibit 9.

2    A       Okay.

3    Q       In the book that's your handwritten compliance

4    with that essay request, correct?

5    A       Yes.

6    Q       And it is an example of how I will ensure that

7    in taking ethics action, I apply the "keep the door

8    open" policy, correct?

9    A       Yes.

10   Q       And you write, "Let's say that I'm in charge

11   of justice with Joe.  He has committed harmful acts

12   that warranted a ComEv --" that means Committee of

13   Evidence?

14   A       Yes.

15   Q       "And the course of ethics has taken place.

16   The decision was to declare him an expulsion.  I'll

17   also make sure he knows that should he change his

18   ways and recant, the AEHCOPL will be applied and he

19   could be re-admitted eventually," correct?

20   A       Correct.

21   Q       So that there are procedures available to

22   someone, even if they have been excommunicated from

23   the church, for them to have that sanction lifted,

24   correct?

25   A       And rejoin the church if that's what they

1    decided to do.

2    Q      Correct.  Okay.  And you were basically, when

3    you finished this ethics course, you were very happy

4    with it, weren't you?

5    A      Yes.

6    Q      Okay.  Take a look at Exhibit 10.  That's an

7    email from you, you sent that mail on April 23,

8    2003, correct?

9    A      Yes.

10   Q      The day after you finished the course?

11   A      That was a different course, though.

12   Q      Different course?

13   A      Yes.

14   Q      This success story, doesn't that relate to the

15   ethics matter?

16   A      No.  Different course.

17   Q      Which course does this relate to?

18   A      Right on the email it says PTS/SP course.

19   Q      Okay.  Well, when did you complete that

20   particular course?

21   A      Oh, never mind, sorry, I misread it.

22   Q      Oh, okay.  So we are dealing with the ethics

23   course.

24   A      Yes.

25   Q      Okay, thank you.  So this is your success

1    story about the ethics course, correct?

2    A       Yes.

3    Q       Let's just take -- you wrote this and I

4    believe signed it on the 22nd, was it, of -- is

5    there a signature on your copy?

6    A       My copy there is no signature, no date.

7    Q       Okay.  But you did prepare this success story.

8    A       Yes.

9    Q       All right.  You ask in the first paragraph,

10   "Why didn't I do this course before, I ask myself

11   often and finally conclude that not having done it,

12   I did not know what I was missing or how much I

13   really needed it.  Once again I must thank those who

14   steered me in the right direction and had me do it."

15           And down at the fourth paragraph from the

16   bottom, beginning with "although it's only," do you

17   see that?

18   A       Yes.

19   Q       "Although it's only taken me a few months to

20   complete this course, I feel as if I graduated from

21   some very lengthy and complete learning process sort

22   of like finishing a master's degree on some subject.

23   I truly feel a good product of this course having,

24   regained my ability to be ethical which will prevent

25   me from falling into traps because what possible

```
 1      trap a Thetan could fall into but the one he creates

 2      himself."

 3             And your final statement, "As to the wisest

 4      and most compassionate being in the universe, my

 5      deepest gratitude, sir," and you were referring to?

 6      A      L. Ron Hubbard.

 7      Q      All right.  Now, when you finished this

 8      course, your feeling was that it was incredible,

 9      isn't that the term you used?

10      A      Yes.

11      Q      Had a lot of good information in it.

12      A      Yes.

13      Q      I understand your view today may be different,

14      but at the time, Mr. Garcia, you were pretty

15      impressed with this course, weren't you?

16      A      Yes.

17      Q      And you wrote that success story about the

18      personal benefit to you of that course, correct?

19      A      Yes.

20      Q      Now, after you completed this ethics course in

21      April 2003 and wrote your success story, it was

22      about six and a half years until you reached the

23      tipping point in October 2009 when you became

24      unhappy?

25      A      Right.
```

```
 1    Q       But as you said, it was a gradual decline?

 2    A       Yes.

 3    Q       All right.  And I believe Exhibit 1 shows that

 4    you signed 19 different enrollment agreements and

 5    you've already testified that you signed another 15

 6    or 20 that are unaccounted for.  So can we conclude,

 7    Mr. Garcia, that during that period of time after

 8    the ethics course, you signed between 30 and 40

 9    enrollment agreements?

10    A       How many?

11    Q       30 and 40?

12    A       I'm not sure.

13    Q       Can't confirm that?

14    A       No.

15    Q       And you remained a committed Scientologist

16    until October 2009, correct?

17    A       Yes, gradually less committed from that time

18    period.

19    Q       All right.  Now, take a look at Exhibit 11.

20    A       Yes.

21    Q       That's a policy letter of September 7, 1963,

22    called "Committees of Evidence Scientology

23    jurisprudence administration of."  Do you see that?

24    A       I do.

25    Q       And you studied this policy letter at great
```

1     length during the ethics course, correct?

2     A       Correct.

3     Q       Those diagrams that you made were based upon

4     your understanding of how these Committees of

5     Evidence functioned, correct?

6     A       Correct.

7     Q       And did you by any chance notice the first

8     sentence in parentheses up at the top, it says,

9     "This system is for use in all matters of justice in

10    Scientology."

11    A       I did.

12    Q       And it says, I believe, that justice should

13    serve as a means of establishing guilt or innocence

14    and awarding damages to the injured, correct?

15    A       Yes, I see that.

16    Q       So the justice system has to do not only with

17    discipline but also with financial claims, correct,

18    according to the words of the policy letter itself.

19    A       I don't see it that way.

20    Q       You don't see it that way.  Okay.  But that's

21    what it says.  You don't argue with what it says.

22    A       Your interpretation, my interpretation.  I

23    was, like you said, studying this very, very deeply

24    and was supervised in studying this and I tell you

25    also in 28 years that I was Scientologist, I don't

1    know of any Committee of Evidence that awarded any

2    financial damages.

3    Q      Did you ever actually appear before a

4    Committee of Evidence?

5    A      No.

6    Q      Were you ever a member of a Committee of

7    Evidence?

8    A      No.

9    Q      And you read everything there was to read on

10   justice and ethics in this -- when you took this

11   ethics course, correct?

12   A      In the course, yes.

13   Q      Take a look, if you would, at Exhibit 13.

14   A      Yes.

15   Q      The last page.  In bold print.

16   A      Yes.

17   Q      It says, "I have carefully read this contract

18   and fully understand its contents and consequences.

19   I also understand that I am not eligible for any

20   Scientology religious services unless I sign this

21   contract," et cetera.

22          Now, the part about carefully read the

23   agreement, I think what you've said is you really

24   didn't carefully read it, you didn't read it fully,

25   wasn't that the way you --

1    A        That's correct.

2    Q        But you basically understood what it stood

3    for?

4    A        Yes.  I was aware that if I didn't sign this

5    contract, I would not be able to take this service

6    which I had paid months earlier.  And I wanted to

7    take the service, it was a very, very deep dilemma

8    and catch-22.

9    Q        Okay.  Let's take a look at Exhibit 12,

10   please.

11   A        Yes.

12   Q        Exhibit 12 is your letter of resignation from

13   the church, correct?

14   A        Yes.

15   Q        And it's dated November 6, 2010.

16   A        Correct.

17   Q        About a year after you reached what we've

18   called the tipping point in October of 2009,

19   correct?

20   A        Yes.

21   Q        You wrote this letter entirely on your own

22   without assistance from anyone, correct?

23   A        Correct.

24   Q        And it took you a couple of weeks to write the

25   letter?

1   A       Yes.

2   Q       And you put a lot of thought and effort into

3   this letter.

4   A       Yes.

5   Q       And you sent this letter, I believe you

6   indicated, to several hundred of your Scientology

7   friends and acquaintances, correct?

8   A       The letter is addressed to Mr. David

9   Miscavige.  I sent it to him first.

10  Q       But afterwards you sent it to several hundred

11  of --

12  A       My acquaintances and friends, yes.

13  Q       -- your colleagues, fellow religionists,

14  correct?

15  A       Yes.

16  Q       All right.  And you did this because you knew

17  that the church could ask those friends and

18  acquaintances to disconnect from you, correct?

19  A       Correct.

20  Q       All right.  Now, let's just take a couple of

21  -- look at a couple of items on the first page of

22  your letter.

23  A       Yes.

24  Q       First page, first paragraph, second sentence.

25  You got it?

1    A       Yes.

2    Q       "From the very first moment I developed an

3    intense interest in reading, studying, learning and

4    applying the teaching of Mr. L. Ron Hubbard, I

5    wanted to go up the bridge and I wanted to help

6    others do so as well."  Correct?

7    A       Correct.

8    Q       And that was true as of at least November 6,

9    2010, and at the time you first started being a

10   Scientologist, correct?

11   A       Correct.

12   Q       And it was true for many of the 28 years you

13   were a Scientologist, correct?

14   A       That's the one that really kept me going.

15   Q       Okay.  Third paragraph from the top.  "I have

16   learned much and I have had great gains from my

17   involvement with Scientology.  I have the utmost

18   respect and gratitude to LRH and to all the staff

19   across the globe that selflessly dedicate their

20   lives to help others and the many devoted public who

21   have helped so much."  Now, that was a true -- that

22   was your true thought as of November 6, 2010?

23   A       Correct.

24   Q       But today you're divided on that issue,

25   correct?

1   A       Yes.

2   Q       And there are certain aspects of the religion

3   and certain staff members around the globe that you

4   still approve of, correct?

5   A       Yes.

6   Q       But you do not approve of the core management

7   of the church today.

8   A       No, just as I didn't back in November 6, 2010.

9   Q       Would you go to the next to the last page of

10  your letter of resignation.

11  A       Okay.

12  Q       Fourth paragraph from the top.  Got it?

13  A       Okay.

14  Q       "I am not, however, resigning from

15  Scientology.  I am a firm believer of the philosophy

16  and in fact I am applying it here now.  I will

17  forever be a staunch defender of Scientology and

18  will do my best to keep KSW in."  Now, KSW means

19  keeping Scientology working, correct?

20  A       Correct.

21  Q       And what that stands for is the proposition

22  that the Hubbard writings must be kept pure and

23  applied with no alterations and deviations; is that

24  correct?

25  A       No alteration or deviation whatsoever.  None

1      at all.

2      Q      Okay.  And for years you were accepting of

3      that view.

4      A      Yes.

5      Q      And in fact, you said you would do your best

6      as of November 6, 2010, to keep KSW in, correct?

7      A      Yes.

8      Q      Now, let's go to the fifth paragraph down.

9      You say -- you got it?

10     A      Oh, yes, sorry.

11     Q      "I am joining the group of independent

12     Scientologists which is in fact thriving and truly

13     expanding and where delivery of LRH standard tech is

14     a reality, so like many others before me I go."

15     Correct?

16     A      Correct.

17     Q      And so as of November 6, 2010, you were still

18     a committed Scientologist, correct?

19     A      Yes.

20     Q      But you were going to affiliate with an

21     independent group of Scientologists and not the

22     group you had been with -- the official church you'd

23     been with, correct?

24     A      Correct.

25     Q      You still believed in the technology, correct?

1    A       At that time I did.

2    Q       And the religion, correct?

3    A       Yes.

4    Q       At that time in November 2010, but not in the

5    church's management.

6    A       Correct.

7    Q       All right.  Now, you didn't know Mark Rathbun

8    or Mike Rinder while you were active with the

9    church, did you?

10   A       No.

11   Q       But you've developed a close relationship with

12   them since November 2010, correct?

13   A       With Mr. Rathbun one month earlier than

14   November.

15   Q       You met him a month earlier than your

16   resignation.

17   A       We just talked to the phone.

18   Q       Okay.  But for all those years in Scientology,

19   it wasn't until October of 2010 that you had any

20   contact with Mr. Rathbun.

21   A       Correct.

22           THE COURT:  Mr. Pope, let me interrupt you for

23   a moment, please.  The purpose of this hearing was

24   limited to two issues.  I'm beginning to have some

25   curiosity as to why we are going down this path.

1            MR. POPE:  I am right at the --

2            THE COURT:  Well, you spent the better part of

3      45 minutes giving us background which I don't think

4      has anything to do with the issues.

5            MR. POPE:  Your Honor, the reason I did this

6      was the law seems to be that you judge

7      unconscionability as of the date the agreement is

8      signed and I was trying to establish what his

9      attitude was and his thoughts were surrounding the

10     execution of those enrollment agreements.

11           THE COURT:  Well, I think you've accomplished

12     that.  Let's take a very short comfort break;

13     five minutes.  Please be back in place.  Remember

14     the rule has been invoked, your witnesses are not to

15     discuss this matter among themselves.  Make sure

16     that rule is adhered to.  Thank you.

17           (Recess taken at 11:00 a.m. until 11:08 a.m.)

18           THE COURT:  You may proceed.

19     BY MR. POPE:

20     Q    Mr. Garcia, in regard to your challenge to the

21     Enrollment Agreements, are you challenging the

22     entire agreement, you want the whole thing

23     disregarded, or are there some parts of it that are

24     acceptable to you?

25     A    I don't truly understand your question.  I'm

1    not I don't think legally qualified to make that

2    designation.

3          MR. POPE:  I don't have any more questions,

4    Your Honor.

5          THE COURT:  Cross-examination?

6          MR. BABBITT:  Logistically I have a number of

7    exhibits.  May I put those on the witness stand?

8          THE COURT:  Yes, sir.

9                 CROSS EXAMINATION

10   BY MR. BABBITT:

11   Q    Mr. Garcia, if you could turn to Exhibit 3

12   which is a copy of the same enrollment agreement

13   that we've been discussing for the last 45 minutes.

14   A    Okay.

15   Q    If you turn to page 4 of that agreement,

16   please.  First, tell the court what does the term

17   "enrollment agreement" relate to?

18   A    To me what it means is that I was there to do

19   a course and I'm enrolling to do the course and this

20   is a formality, some paperwork that I have to do to

21   get on the course.

22   Q    So does it deal with anything about the

23   donations you are claiming here, anything to do with

24   donations, or is it limited to services, i.e.,

25   courses that you're taking?

1    A       I always understood that this was just related

2    to the one course that I was going to take at that

3    very time and nothing else.

4    Q       And you signed these only with respect to

5    courses that you're going to take?

6    A       Courses and auditing actions, processing.

7    Q       This claim, this lawsuit that we've brought,

8    have we asked for those services, the money you paid

9    for those services to be returned, is that part of

10   our claim?

11   A       No.

12   Q       If you turn to page 4 of that enrollment

13   agreement and you look at paragraph 6(e), it says,

14   does it not, "Any dispute, claim, or controversy

15   which still remains unresolved after review by the

16   IGC shall be submitted to binding religious

17   arbitration in accordance with the arbitration

18   procedures of the Church of Scientology

19   International which provide that," and then it's got

20   some rules as to you pick one arbitrator, they pick

21   one arbitrator, and the two pick an arbitrator,

22   correct?

23   A       Correct.

24   Q       It specifically says that those are the rules

25   that apply, right, "which provide that," that those

1    are in fact the arbitration procedures of the Church

2    of Scientology, right?

3    A      It would read it seems that way, yes.

4    Q      Is there a word in any of the enrollment

5    agreements that says anything about the Committee of

6    Evidence rules?

7           MR. POPE:  Objection, Your Honor, he's asking

8    the witness to interpret a contract that speaks for

9    itself.

10          THE COURT:  Overruled.

11          THE WITNESS:  I've read this at length by now

12   of course and I have not found that term in any of

13   the agreements.

14   BY MR. BABBITT:

15   Q      And is the word -- you've talked about how

16   much you studied the Committee of Evidence.  Is the

17   word "arbitration" used in the Committee of Evidence

18   anywhere?

19   A      It's not, no, it's not only not on the

20   Committee of Evidence policy, I've never came across

21   that word in any of the materials that I've read

22   over 28 years.

23   Q      Have you ever heard of anybody ever requesting

24   for arbitration in your 41 years with the church?

25   A      28 years.

1    Q      Sorry, 28 years.

2    A      No.

3    Q      Now, when you signed that agreement or all of

4    the agreements, did you ever in your wildest

5    imagination believe that the arbitration procedure

6    applied to anything other than the agreement you

7    were signing, the enrollment agreement?

8    A      No.

9    Q      Did you believe that the arbitration procedure

10    applied to an accident if somebody was driving a

11    Church of Scientology truck and ran you over, that

12    you would have to use arbitration?

13    A      No, of course not.

14    Q      Did you ever imagine that if you were asking

15    for a refund of your donations at some point, that

16    the rules of arbitration would apply in an

17    enrollment agreement?

18    A      No, I didn't because that is senior policy and

19    all of us knew at the time if you wanted a refund,

20    all you had to do was ask for it.

21    Q      I don't understand.  Tell me what was the

22    policy of the church when you joined it and while

23    you were in it with respect to returning donations

24    if you were dissatisfied with the church.

25    A      In Scientology what you need to understand is

1        the word of L. Ron Hubbard is it and he even writes

2        a policy, KSW, which Mr. Pope referred to, in which

3        he relays very, very clearly there is to be no

4        deviation, no alteration from what he says.  What he

5        says is what's to be done and that's it, there is no

6        other way.

7              No Scientologist can find any fault or

8        disagree with any of the words or concepts or ideas

9        that he ever wrote.  So throughout your studies you

10       come across a number of policies in which

11       Mr. Hubbard says we just want to keep a house happy.

12       If you don't want to be here, leave.  We give you

13       the money back, just for the asking, but don't ever

14       come back.  That's just me paraphrasing, but that's

15       the concept.  So that is the senior policy that

16       every Scientologist is very well aware of.

17             So that's why this conflict when you are

18       offered these agreements to be signed, they're

19       really meaningless to a Scientologist because we

20       have this senior policy from L. Ron Hubbard

21       ingrained in us and he says if you want your money

22       back, all you have to do is ask for it.

23       Q      And then what happens if you ask for your

24       money back, are you allowed to stay in the church?

25       A      No.  The condition is you are now no longer a

1     member of the church and you cannot take any more

2     services or courses.

3     Q      Pull out Exhibit 11 for me, please.  And this

4     is the Committee of Evidence rule, is it not?

5     A      Yes, this sets down the procedures and the

6     rules for the Committee of Evidence.

7     Q      And the first thing it says is, "This system

8     is for use in all matters of justice in

9     Scientology," right?

10    A      Yes.

11    Q      And in fact, Mr. Pope just asked you that very

12    question, were you aware that these rules applied to

13    every system of justice in Scientology, right?

14    A      I was aware, yes.

15    Q      Is justice --

16           THE COURT:  Excuse me, did you mean

17    Plaintiff's Exhibit 11?

18           MR. BABBITT:  Yes, Your Honor.  I'm using

19    plaintiff's exhibits.  It's the same as the one that

20    was used --

21           THE COURT:  Well, the book I have has -- this

22    is a suppressive acts document, Exhibit 11.

23           MR. BABBITT:  Uh-oh.

24           THE COURT:  Yeah, uh-oh.  I'll send it back to

25    you.  If you can direct me to the -- maybe these

1      were re-numbered when you amended your list?

2           MR. BABBITT:  Let's find out, Judge.

3           THE COURT:  I know the document you're

4      speaking of.  I just want to be looking at it as we

5      --

6           MR. BABBITT:  Are you look at their binder or

7      my binder, Judge?

8           THE COURT:  That would be yours, right?  The

9      white one, says Plaintiff's Exhibit.

10          MR. BABBITT:  Yes.  Let me just look at my

11     exhibit list here.

12          THE COURT:  The document I think you're

13     referring to is actually under tab 12, HCO policy

14     letter of 7 September.

15          MR. BABBITT:  Yes, Your Honor.  7 September,

16     re-issued January -- yes.

17          THE COURT:  All right.  The book itself --

18     I'll let you -- at the break maybe you could have

19     someone straighten that out.

20          MR. BABBITT:  Yes, Your Honor.

21     BY MR. BABBITT:

22     Q     Can you turn to that HCO policy letter,

23     please, is it 11 in your package?

24     A     It was 11, yes.

25     Q     Okay.  It says, "This system is for use in all

1      matters of justice in Scientology," and the question

2      was, "Is justice defined in Scientology?"

3      A      Yes.

4      Q      Do you have the green book, Hubbard, I think

5      it's Exhibit 3?

6      A      Yes.

7      Q      Would you turn to page 6 of Exhibit 3?

8      A      Okay.

9      Q      And read for us what justice is defined as.

10     A      It reads, "Justice.  When the individual fails

11     to put in his own ethics, the group takes against

12     him and this is called justice."

13     Q      And what does a Committee of Evidence deal

14     with?  What kind of justice do they deal with?

15     A      With crimes.  People or staff members commit

16     some kind of crime or a goof and they are to gather

17     the evidence and they are to pass judgment.

18     Q      You don't mean a crime in the sense of

19     burglary or robbery; you mean a crime within

20     Scientology, a high crime.

21     A      It could be any kind of crime, but yes, within

22     Scientology, according to the Scientology moral

23     codes.

24     Q      Mr. Pope had you read from -- I'm sorry, now

25     I've lost which exhibit it is, I think it's 12 with

1      the court and 11 in my package, but it's the same

2      HCO policy letter of September 7, 1963.   The

3      paragraph that says, "Justice should serve as a

4      means of establishing guilt or innocence and

5      awarding damages to the injured."

6      A       Right.

7      Q       Are the damages they are talking about damages

8      in the sense of I want my money back or you need to

9      give me a judgment against the church, or is it

10     damages in reputation, damages of position, damages

11     of standing in the church?

12     A       Damages of reinstating cancelled certificates,

13     damages of taking back a Suppressive Person

14     Declaration, yes, that's how it's interpreted.

15     Q       Are you familiar enough with the rules of the

16     Committee of Evidence to know whether they could

17     possibly apply to your situation, to a situation

18     where somebody is asking for their money back?

19     A       Yes, I'm very familiar with them.

20     Q       And can they possibly apply to that?

21     A       No.   Absolutely.   I mean, there is all kind

22     of -- just don't fit, it just doesn't fit.

23     Q       What's the difference between them?

24     A       Well, for example, in the enrollment agreement

25     it says that the church would choose one arbitrator

1        and I would get to choose another arbitrator and

2        then the two of them would choose a third one.  I

3        can't get past that.

4        Q        What about the Committee of Evidence, how are

5        people chosen on the Committee of Evidence?

6        A        The Committee of Evidence, the convening

7        authority chooses four people, sometimes more, to be

8        on the panel.  He chooses them.

9        Q        Who is the convening authority, where does

10       that person come from?

11       A        It could be -- it's anyone of person from HCO

12       department, but in my case I guess it would be the

13       IJC that would choose.

14       Q        So it's an employee of the church that's the

15       convening authority.

16       A        Yes.

17       Q        And the convening authority, unlike the

18       arbitration where each side chooses one and they

19       choose a third, he or she chooses who is going to be

20       on the Committee of Evidence, right?

21       A        That's right.

22       Q        Completely inconsistent with an arbitration

23       under the enrollment agreement.

24       A        It's two different things.

25       Q        With respect to the arbitration, is it

1    binding, is it supposed to be binding arbitration?

2    A      It's supposed to be binding per the agreement.

3    Q      Whereas in a Committee of Evidence, isn't it

4    true that all the Committee of Evidence can do is

5    make a suggestion, a recommendation to the convening

6    authority and he or she has to approve or disapprove

7    or mitigate whatever the result is.

8    A      That is correct.

9    Q      Again, completely inconsistent with an

10   arbitration procedure as set forth in the enrollment

11   agreement.

12   A      Correct.

13   Q      In fact, it's impossible, isn't it, to apply

14   the Committee of Evidence rules to an arbitration

15   proceeding?

16   A      I think completely possible.  The Committees

17   of Evidence, I can tell you as a Scientologist for

18   many years, it's a discipline action, somebody

19   commits a goof or a crime or whatever and that's

20   what's convened to pass judgment.

21   Q      Was there anything in the enrollment agreement

22   to give you fair warning that the church was going

23   to apply the Committee of Evidence rules to this

24   arbitration proceeding?

25   A      No.

1    Q       No matter how many times you signed it, could

2    you have envisioned that that was the case?

3    A       No.

4    Q       Have you ever heard of a Committee of Evidence

5    being utilized for the purpose of refunds or getting

6    a judgment against the church?

7    A       No, it's impossible, it's an internal

8    procedure, it would not apply.

9    Q       In fact, the Committee of Evidence is set up

10   to enforce the religious tenets of the church with

11   respect to whether or not someone has violated those

12   tenets, isn't that true?

13   A       Exactly.

14           MR. BABBITT:  That's all I have, Judge.

15           THE COURT:  Any redirect?

16           MR. BABBITT:  I'm not sure technically whether

17   I need to offer those at this point or wait for my

18   case.

19           THE COURT:  It's fine to offer them now.  Have

20   they not been stipulated or is this one of the ones

21   that was --

22           MR. BABBITT:  No, I think -- well, I'll take

23   care of that in a break.

24           THE COURT:  Well, to the extent we have

25   duplicate exhibits, gentlemen, I'll consider the

```
 1      exhibits as introduced.  I don't know what to do

 2      about this misnumbering, whether that's our fault or

 3      your fault or -- doesn't matter about fault, but we

 4      want to get it straightened out so that I'm not

 5      looking at something that this the witness is not

 6      referring to.

 7              MR. BABBITT:  Can I do that over a lunch

 8      break?

 9              THE COURT:  Sure, that's fine.

10              Mr. Pope, any redirect?

11              MR. POPE:  Yes, Your Honor.

12                      REDIRECT EXAMINATION

13      BY MR. POPE:

14      Q       Do you have the policy letter from 1963 there

15      before you?

16      A       Yes.

17      Q       I think I've got one in my book.  Do you have

18      the one you were referring to?  Do you have it?

19      A       I have a copy here.

20      Q       Is that Exhibit 11 of my book or is that the

21      one you were referring to?

22      A       That was the wrongly assigned Exhibit 11 by

23      Mr. Babbitt.

24      Q       Would you look on page 2 of that?

25      A       Okay.
```

1    Q        And under the heading at the bottom "HCO Area

2    Committee of Evidence," do you see that?

3    A        Yes.

4    Q        Go down to the fifth line up from the bottom,

5    do you see that?

6    A        Yes.

7    Q        Do you see the word "refunds" in there?

8    A        Yes.

9    Q        As part of the subject matter of a Committee

10   of Evidence?

11   A        Yes.

12   Q        Now, I believe you testified that in 28 years

13   you had never come across the word arbitration,

14   correct?

15   A        Not contained in the Scientology materials.

16   Q        Okay.  You came across it very frequently in

17   the enrollment agreements you signed, the 40-plus

18   enrollment agreements you signed, didn't you?

19   A        Correct.  That's not part of Scientology

20   materials.

21   Q        You think that's something outside of

22   Scientology materials?

23   A        Well, yeah.  Anything that was not written by

24   L. Ron Hubbard is not part of Scientology materials.

25   Q        With regard to the definition of justice --

1      let me get the book.  Would you go -- do you have

2      the book there still?  If you would go to page 370.

3      A      370?

4      Q      Yes, sir.  Page 370.

5      A      Okay.

6      Q      Second paragraph from the bottom.

7      A      Okay.

8      Q      Let me read that to you.  "Most people do not

9      even know that justice means fair and equitable

10     treatment for both the group and the individual."

11     That's a little bit different definition from the

12     one you read on page 6, isn't it?

13     A      Yes, that's the common English definition.

14     There are other places where justice is defined as

15     discipline.

16     Q      When you were an active Scientologist you knew

17     that there was a position called the international

18     justice chief, correct?

19     A      Correct.

20     Q      The IJC?

21     A      Yes.

22     Q      Is it not the responsibility of the IJC to

23     apply all facets of the Scientology internal justice

24     system?

25     A      Yes.

1    Q       And to make decisions about how to proceed

2    within that system?

3    A       Yes.

4    Q       Now, with regard to the enrollment agreement

5    you were asked a question or two I think -- do you

6    have enrollment agreement there or you can go to tab

7    13 in my book.

8    A       Okay.

9    Q       In paragraph 6(e)(5).

10   A       Okay.

11   Q       You got that paragraph, Mr. Garcia?

12   A       Yes.

13   Q       It says, "Consistent with my intention that

14   the arbitration be conducted in accordance with

15   Scientology principles, and consistent with the

16   Ecclesiastical nature of the procedures and the

17   dispute, claim or controversy to which those

18   procedures relate, it is my specific intention that

19   all such arbitrators be Scientologists in good

20   standing with the mother church," correct?

21   A       That's what it says.

22   Q       That was part of these enrollment agreements

23   you signed on 40-plus different occasions, correct?

24   A       Correct.

25   Q       Thank you.  That's all I have, Your Honor.

1          THE COURT:  Thank you, sir, you may step down.

2     Watch your step, please.  You can just leave those

3     exhibits right there.

4          Call your next witness, please.

5          MR. POPE:  Your Honor, our next witness will

6     be Mr. Ellis by video and there is kind of a time

7     issue with this.  My piece of the testimony is about

8     45 minutes.  Mr. Babbitt's piece is two hours and

9     8 minutes and that's -- I'm just bringing that to

10    the Court's attention.

11         THE COURT:  Well, we're going to be in session

12    until 3:30, gentlemen, so use your time as best you

13    can.  You can step down, sir.  Are we ready to play

14    the video?

15         MR. POPE:  Yes, we are, Your Honor.

16         THE COURT:  We need to discuss whether the

17    court reporter is to take this down or is there a

18    transcript that has been filed, I don't recall.

19         MR. POPE:  We have not filed one yet, but we

20    can.

21         THE COURT:  Well, I need to have either an

22    agreement of the parties or Lynann will take it

23    down.

24         MR. POTTER:  We will cause to be filed, Your

25    Honor, a redacted portion of the transcript which

1          mirrors exactly what we're playing.

2                  THE COURT:  All right.  Is that an agreement,

3      Mr. Babbitt?

4                  MR. BABBITT:  Yes.

5                  THE COURT:  That's fine, thank you.

6      (Videotaped deposition of Mr. Ellis played. )

7                  MR. BABBITT:  Excuse me, Your Honor.

8                  THE COURT:  Pause the video, please.

9                  (Video paused).

10                 MR. BABBITT:  I think we're wasting time here.

11     Mr. Rathbun is not going to testify in this case, so

12     impeaching him doesn't make a lot of sense.

13                 MR. POPE:  May I respond to that, Your Honor?

14                 THE COURT:  Are we wasting time?

15                 MR. POPE:  I don't think so because

16     Mr. Rathbun asserted in his deposition a number of

17     positions that they continue to assert today even

18     though they are not calling him as a witness and I

19     used his assertions as a basis because at the time I

20     thought he was going to be called, I used it as the

21     basis for the questions and I don't think this takes

22     more than about 5 to 8 minutes.

23                 THE COURT:  We're probably wasting more time

24     talking about it.  I'll overrule, it'll go to the

25     weight of the admissibility.  Let's back it up a

 1      little bit, please, so I get the full question.

 2              (Video deposition resumed.)

 3              THE COURT:  This is going to start a new line

 4      of inquiry, is it not?  Why don't we break for lunch

 5      then.

 6              MR. BABBITT:  Before we do that --

 7              THE COURT:  Let's break for lunch,

 8      Mr. Babbitt, please.  I want you back at 1:15 by the

 9      courtroom clock.

10              (Lunch break.)

11              THE COURT:  Mr. Babbitt, did you have

12      something you wanted to raise before we broke?

13              MR. BABBITT:  I just wanted to know when it

14      was going to be my turn.

15              THE COURT:  It will be your turn when it's

16      your turn.  That's a sarcastic response, but I don't

17      mean it other than in the spirit of when Mr. Pope is

18      finished, Mr. Potter, it will be your turn.

19              MR. BABBITT:  Judge, could we divide the time

20      evenly?

21              THE COURT:  No.  I'll manage the proceeding,

22      Mr. Babbitt.  You may resume the video.  If you'll

23      dim the lights a little bit, please.

24              (Video deposition resumed)

25              MR. POPE:  That's the end of my direct of this

1        witness, Your Honor.

2              THE COURT:  I thought I heard Mr. Babbitt

3        asking questions.

4              MR. BABBITT:  He parsed out some of my

5        questions.

6              THE COURT:  Do you want to go ahead and play

7        your portion now?

8              MR. BABBITT:  I can't.  I don't have two hours

9        to do that.

10             THE COURT:  Well, use whatever time you have.

11       I would like to hear it in continuity, however.

12             MR. BABBITT:  I would like to read out of the

13       deposition sections of it.  That will save a couple

14       hours.

15             THE COURT:  I'm not worrying about saving a

16       couple hours.  Do whatever you need to do.

17             MR. BABBITT:  It's not possible for me to

18       reformat the video and play just the portions I

19       have, so I have no alternative but to read it.  I

20       can't -- this was constructed by the defendants for

21       me at my request when I told them which portions I

22       wanted to read, but it came out to be two hours and

23       obviously we don't have time for that.

24             THE COURT:  Well, don't be constrained by

25       today's calendar.  If it's your turn to put on

1        testimony, put it on.  I'm not going to stop this

2        proceeding at 3:30.  We're going to end today at

3        3:30.  If we haven't finished, we'll pick up

4        wherever we leave off at another time.  That's what

5        I meant by my reference to your question earlier.

6            MR. BABBITT:  I see.

7            THE COURT:  I would rather let you put your

8        evidence on as you intend to put it on.  While this

9        gentleman is on video and I'm in tune with his

10        testimony, it would be helpful to me as the trier of

11        fact to hear whatever portions of his deposition the

12        plaintiff wants to present now.  If we don't finish

13        by 3:30, then we adjourn and come back at a

14        different time -- tomorrow or Friday, depending on

15        calendars.  Or you can call him back as part of your

16        case.  Matters not to me.

17            MR. BABBITT:  Well, what I was going to do is

18        just read portions of his deposition, which I think

19        would be just as effective.

20            THE COURT:  That's entirely up to you,

21        Mr. Babbitt.

22            MR. BABBITT:  But if the court prefers to hear

23        it, we'll play it.

24            THE COURT:  Well, do whatever you wish to do

25        on behalf of your client.  Matters not to me.

1          MR. BABBITT:  Okay, Your Honor, let's play the

2     video.

3          THE COURT:  Can we queue it up?

4          (Videotaped deposition of Mike Ellis played.)

5          MR. POPE:  Your Honor, may I interrupt?

6          THE COURT:  Yes, sir.

7          MR. POPE:  The document that he just asked the

8     witness to read from is part of Plaintiff's

9     Exhibit 20 and it's a letter from Jonathan Ramsey

10    and Mr. Ellis was just accused of committing

11    perjury --

12         THE COURT:  What's the objection?

13         MR. POPE:  The objection is that he left out

14    the key language in the second paragraph.  May I

15    publish it?

16         THE COURT:  No.  You can do that as part of

17    your redirect.  I want to hear the witness's

18    testimony as presented by the plaintiff in the

19    context in which it's presented.

20         MR. POPE:  Your Honor, it shows --

21         THE COURT:  Mr. Pope, I've ruled.

22         MR. BABBITT:  Judge, we have one witness from

23    Denver --

24         THE COURT:  Mr. Babbitt, I'm not concerned

25    with that.  Let's finish this witness's testimony.

```
 1              (Videotaped deposition resumed.)

 2          THE COURT:  Mr. Potter, we're going to have to

 3      conclude the session.

 4          Mr. Pope, how many other witnesses do you

 5      have?

 6          MR. POPE:  I have Mr. Lenske by video.  My

 7      piece of it is about 15 minutes, I think

 8      Mr. Babbitt's piece is 15 minutes, so that's about a

 9      30-minute video.  And then I have a live witness,

10      Mr. Cartwright, and I believe his testimony, my

11      piece of it might be 30 minutes.

12          MR. BABBITT:  I have two objections, Your

13      Honor, to those.

14          THE COURT:  I didn't ask that, Mr. Babbitt.

15      If you'll listen carefully, I'm trying to manage

16      this case and you're making it increasingly

17      difficult by interrupting me.  And you can tell from

18      the tone of my voice I've had enough of it.

19          MR. BABBITT:  Apologize.

20          THE COURT:  How many do you have other than

21      the conclusion of Mr. Ellis's deposition?

22          MR. BABBITT:  Me, Your Honor?

23          THE COURT:  Yes, sir.

24          MR. BABBITT:  Three, Your Honor.

25          THE COURT:  All right.  The point I'm making,
```

1       gentlemen, when we statused this case back on

2       January 22nd, both of you represented you only

3       needed an hour and a half each.  We have been in

4       session for more than four hours.  Four hours and

5       15 minutes to be exact.

6            I'm going to continue the hearing until

7       tomorrow morning, we're going to finish it, but I

8       remind you that when we have a status to determine

9       length of the hearing, we rely on that.

10           Can you be here at 9 o'clock in the morning to

11      resume the presentation?  Mr. Pope?

12           MR. POPE:  Yes, Your Honor.

13           THE COURT:  Mr. Babbitt?

14           MR. BABBITT:  Yes, sir.

15           THE COURT:  All right.  I will endeavor to be

16      here by at 9.  Sometimes it's tough from where I

17      live, but that's our target.  I don't have a hearing

18      until 1:30, so we would have the rest of the morning

19      at a minimum to finish up.

20           Mr. Babbitt, I need you to redo your exhibit

21      list.  The problem is not so much the labelling of

22      exhibits, it's the exhibit list form that you gave

23      to the clerk.  If you'll look at the list of

24      exhibits in the package that you submitted to the

25      court, those exhibits do seem to correspond with

1    exhibit numbers you've been referencing in the

2    deposition and during the hearing.  I don't know who

3    prepared this, it doesn't really matter.  That

4    seemed to be the source of the mix-up on the

5    exhibits.

6           For example, when you were going through in

7    your examination of Mr. Ellis, the emails and

8    letters concerning the Ramsey matter, those numbers

9    didn't correspond with this list I had, and I had a

10   very difficult time finding them as the witness was

11   discussing them with you.

12          So I think it's just a matter, if you have the

13   ability to resubmit the exhibit list -- if I said

14   witness list, I meant exhibit list -- to correspond

15   with the package that you submitted, that will help

16   me.  Does that make sense to you?  I'm sorry if it

17   doesn't.

18          MR. BABBITT:  Are you asking me, Your Honor?

19          THE COURT:  Yes, sir.

20          MR. BABBITT:  During Mr. Ellis's deposition we

21   didn't use the same numbers as -- we just used the

22   numbers seriatim that came up.

23          THE COURT:  I understand that, I understand.

24   But this is your exhibit list, right?

25          MR. BABBITT:  Yes.

1          THE COURT:  You probably can't see it.  These

2     numbers don't correspond with the -- I'll tell you

3     what, I'll just work it out.

4          MR. BABBITT:  I can correlate them by just

5     taking the deposition and renumbering them.

6          THE COURT:  It's not necessary.  Okay.  We

7     will see you in the morning at 9 o'clock, gentlemen,

8     thank you.

9          (The proceedings adjourned at 3:32 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  C E R T I F I C A T E

 2

 3     STATE OF FLORIDA            )

 4     COUNTY OF HILLSBOROUGH   )

 5         I, Lynann Nicely, RMR, CRR, Official Court

 6     Reporter for the United States District Court, Middle

 7     District, Tampa Division,

 8         DO HEREBY CERTIFY, that I was authorized to and

 9     did, through use of Computer Aided Transcription,

10     report in machine shorthand the proceedings and

11     evidence in the above-styled cause, as stated in the

12     caption hereto, and that the foregoing pages,

13     numbered 1 through 69, inclusive, constitute a true

14     and correct transcription of my machine shorthand

15     report of said proceedings and evidence.

16         IN WITNESS WHEREOF, I have hereunto set my hand in

17     the City of Tampa, County of Hillsborough, State of

18     Florida, May 13, 2015.

19

20

21             /s/ Lynann Nicely
                   Lynann Nicely, RMR, CRR,
22               Official Court Reporter

23

24

25
```