```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                       TAMPA DIVISION

 3


 4
        LUIS A. GARCIA SAZ, and     :
 5      wife, MARIA DEL ROCIO       :
        BURGOS GARCIA,              :
 6                                  :
             Plaintiffs,            : CIVIL   8:13-cv-220-JDW
 7                                  : NO.:
                                    :
 8      vs.                         : DATE:   2/19/2015
                                    :
 9                                  : TIME:   9:00 a.m.
        CHURCH OF SCIENTOLOGY       :
10      RELIGIOUS TRUST; et al,     : PAGES:  1 - 107
                                    :
11           Defendant.            :
        ------------------------    :
12


13


14            TRANSCRIPT OF EVIDENTIARY HEARING
            BEFORE THE HONORABLE JAMES D. WHITTEMORE
15                UNITED STATES DISTRICT JUDGE

16


17


18


19

        Court Reporter: Lynann Nicely, RPR, RMR, CRR
20              Official Court Reporter
                801 N. Florida Avenue
21                    Suite 13B
                Tampa, Florida 33602
22

        Proceedings recorded and transcribed by computer-aided
23      stenography.

24


25
```

```
 1                    A P P E A R A N C E S

 2

 3       For the Plaintiff:

 4
                 THEODORE BABBITT, ESQUIRE
 5               Babbitt, Johnson, Osborne & Leclainche, PA
                 Suite 100
 6               1641 Worthington Road
                 West Palm Beach, Florida  33409
 7

 8

 9       For the Defendant:

10
                 F. WALLACE POPE, JR., ESQUIRE
11               ROBERT POTTER, ESQUIRE
                 Johnson, Pope, Bokor, Ruppel & Burns, LLP
12               911 Chestnut Street
                 Clearwater, Florida  33757
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          COURTROOM SECURITY OFFICER:  All rise.  This

2     Honorable Court is in session, The Honorable James

3     D. Whittemore presiding.

4          Be seated, please.

5                   P R O C E E D I N G S

6          THE COURT:  Good morning.  Are we ready?  Can

7     we back that video up just a tad so I can kind of

8     get back into the gentleman's testimony.

9       (Videotaped deposition of Mr. Ellis resumed)

10          THE COURT:  Is that it?

11          MR. BABBITT:  Yes, Your Honor.

12          MR. POPE:  Your Honor, I had attempted to make

13     an objection during that and you told me I could

14     bring it up in effect on redirect.  If I may, should

15     I come to the podium?

16          THE COURT:  Yes, sir.

17          MR. POPE:  Let me refresh the Court's memory.

18     This had to do with what was Exhibit 9 in the Ellis

19     deposition and I believe is part of Exhibit 20 in

20     the plaintiff's exhibit book.  It's a series of

21     emails and the issue was --

22          THE COURT:  Just a second, let me catch up

23     because that's the problem I've been having with

24     plaintiff's exhibits, the tags don't match up.  So

25     let me find -- these are the emails from Charles

1        Parselle?

2            MR. POPE:  No.  Well, he's on one of them, but

3        it's Jonathan Ramsay.

4            THE COURT:  I have to confess, gentlemen, that

5        several times during this witness's video testimony

6        I could not follow the exhibits because the numbers

7        are not in sequence and they certainly don't match

8        up with the exhibits that I have in the plaintiff's

9        package.  I'm not apologizing, I'm just letting you

10       know that if I miss something, it's because it's not

11       possible to follow these exhibits.  Right now I

12       don't know what exhibit you're talking about,

13       Mr. Pope.  I'm not blaming you, but I don't have --

14           MR. POPE:  Your Honor, in the lower right-hand

15       corner of the exhibit it says Exhibit 9, Witness

16       Ellis.

17           THE COURT:  All right.  That is in --

18       according to the exhibit tag it's Plaintiff's 23.

19       It's a one-page document?

20           MR. POPE:  It's some emails that starts out at

21       the top, "I have read the lawyer's long letter."

22           THE COURT:  Right.  It's one page?

23           MR. POPE:  Yes, sir.

24           THE COURT:  I've got it.

25           MR. POPE:  Just to set the stage for you,

1      Mr. Babbitt asked a series of questions basically

2      suggesting that Mr. Ellis had committed perjury when

3      he stated that Jonathan Ramsay was a Scientologist,

4      at least he sort of backed him into that kind of a

5      corner.  And they went through this exhibit and the

6      third paragraph from the bottom, which is

7      Mr. Ramsay's email, says, about himself, "To give

8      some background on me, I grew up exposed and active

9      in Scientology, even attending the Mohave Desert

10     School where LRH's doctrines and teachings were part

11     of the curriculum.  I have done various courses over

12     the years, although not active in recent time."

13     Just wanted to point that out, Your Honor.

14          THE COURT:  All right.  Thank you.  I have

15     read that.

16          Can you call your next witness, please.

17          MR. POPE:  Our next witness will be Mr. Lenske

18     by video deposition.

19          MR. BABBITT:  And Your Honor, we would object

20     to that.

21          THE COURT:  What's the objection, please?

22          MR. BABBITT:  Mr. Lenske's testimony is

23     limited to his having authored allegedly the

24     arbitration agreement and the only reason for it

25     being played, it's 40 minutes long, is to impeach

1          Mr. Rinder when he said he created, on his

2     declaration, the arbitration agreement.  He's not

3     going to testify to that, Your Honor.  I'm not going

4     to call him because I think it's completely

5     irrelevant who created it or whether there was good

6     thoughts in creating it or bad thoughts.  The

7     question is limited to whether or not it is

8     unconscionable or not.  If they had good thoughts,

9     they wanted it to be binding, and it's

10    unconscionable, it's still unconscionable.  If they

11    had bad thoughts, it doesn't matter.  It's

12    irrelevant and it's completely irrelevant because

13    it's not an impeachment of something that's going to

14    be put on, unless they play it, then I'll be

15    required to have Mr. Rinder explain why they're

16    wrong.

17          THE COURT:  Mr. Pope?

18          MR. POPE:  Your Honor, Mr. Rinder put in an

19    affidavit in October this past year --

20          THE COURT:  I'm not considering affidavits in

21    this factual dispute.  Unless there is a

22    stipulation.

23          MR. POPE:  The other point, Your Honor, is

24    that Mr. Lenske testified that his effort in using

25    this was to create a fair procedure and not

1    something that would be an impediment to people,

2    which is I believe something Mr. Rinder intends to

3    testify to.

4         MR. BABBITT:  No, Your Honor, he will not

5    testify.

6         THE COURT:  Mr. Babbitt, please don't

7    interject.  This isn't a free-for-all.  Sorry for my

8    tone yesterday, but it's not appropriate for lawyers

9    just to jump up and start talking.  Other judges

10   might allow it, that's fine, but I don't.  I'll give

11   you ample opportunity to respond to Mr. Pope.

12        What does it matter, Mr. Pope -- and I don't

13   mean that facetiously -- what this gentleman is

14   going to say about his intention?

15        MR. POPE:  Well, I mean, there has been a

16   contention in this matter that this whole

17   arbitration procedure was designed to frustrate

18   people who had claims and his --

19        THE COURT:  What is that -- I understand that

20   that is a contention, but what does that have to do

21   with my determination of whether or not, one, there

22   are rules in effect applicable to arbitration, and

23   two, the arbitration process is either procedurally

24   or substantively unconscionable.

25        MR. POPE:  It really goes to the credibility

1    of Mr. Rinder.

2         THE COURT:  Well, as I said, absent

3    stipulation I am not considering affidavits in this

4    evidentiary proceeding.  I am going to consider the

5    testimony, of course, and the exhibits that have

6    been stipulated to, but if the concern is about

7    affidavits and declarations submitted along the way

8    as this case progressed, like any trial, and this

9    essentially is a trial, it's rank hearsay, I'm not

10   going to consider it unless there is an agreement.

11        MR. POPE:  All right, sir.

12        THE COURT:  Does that satisfy the concern?

13        MR. POPE:  I believe so, Your Honor.

14        THE COURT:  Well, I don't mean to put you in a

15   box, but --

16        MR. POPE:  Well, may I --

17        THE COURT:  Everybody has opinions in this

18   case.  Candidly, the only opinion that matters I

19   guess is the one I'm going to have at the end of

20   this case.

21        MR. POPE:  May I do this?  If you're not going

22   to let me play the --

23        THE COURT:  Now, I didn't say that.  I just

24   asked you what the relevance is.  You can play

25   whatever you want to play.  If it has nothing to do

1    with the issues I have to decide, I'm going to

2    disregard it, like a jury would.

3         MR. POPE:  How about this, Your Honor.  May I,

4    in lieu of playing it, simply file the transcript of

5    the deposition with the Court so that I'll have it

6    in the record?

7         THE COURT:  And if I'm sitting on an Eleventh

8    Circuit panel I would ask, Mr. Pope, what difference

9    does that make?  If the judge didn't consider it,

10    it's not in evidence.

11         MR. POPE:  Would the Court allow me to take

12    that chance?  Well, it's 14 minutes long -- my

13    questions is 14 minutes long.

14         THE COURT:  We spent that much time talking

15    about it.  Look, gentlemen, my sense is, and I say

16    this in all sincerity, underlying what I think is a

17    fairly narrow issue here, and there is three issues,

18    is these contentious allegations being thrown

19    against -- the parties are throwing against each

20    other.  This isn't about the Scientology beliefs and

21    whether one witness is perjuring themself or not and

22    whether somebody's opinion about whether this

23    process is fair.  That's not part of the equation.

24         I wish you would just stick to the issues that

25    I tried to limit in the order scheduling this

1    hearing.  It's something like surgery in a sense,

2    judicial surgery.  Are there rules that apply?  Yes

3    or no.  If no, we're done, motion to compel will be

4    denied.

5         If there are rules that apply, we move to the

6    next step.  Is the process procedurally

7    unconscionable?  Yes or no.  Is it substantively

8    unconscionable?  Yes or no.

9         So this gentleman's opinion about what he

10   intended -- you can play it.  There is an objection.

11   I'll overrule it.  I'll assess whatever weight to

12   the testimony that I believe it deserves.  I'm

13   certainly not limiting your presentation of

14   evidence, I'm just trying to get you to focus.

15        MR. POPE:  All right, Your Honor, I would like

16   to play it, I'm sorry.

17        THE COURT:  Let's go.  I'll overrule the

18   objection.  Spell the witness's last name for the

19   record.

20        MR. POPE:  Lenske, L-E-N-S-K-E.

21        THE COURT:  And his first name?

22        MR. POPE:  Sherman.

23        THE COURT:  Do we have a transcript of his

24   testimony?

25        MR. POPE:  We have a transcript that we would

1        file.

2              THE COURT:  Unredacted or redacted?

3              MR. POPE:  The deposition is unredacted.  I

4        don't believe anything has been redacted from it.

5              MR. BABBITT:  Your Honor, I believe that

6        counsel will stipulate that we'll do the same thing

7        with Mr. Lenske that we did with Mr. Ellis, we will

8        file a redacted copy.

9              THE COURT:  All right.  So stipulated.  Thank

10       you.

11              [Videotaped deposition of Sherman Lenske

12       played.]

13              THE COURT:  Can we stop the video, please?

14       What exhibit, Mr. Pope, are we talking about?

15              MR. POPE:  It would be Exhibit Number 16 in

16       our book.

17              THE COURT:  All right, I have it, you may

18       resume the video, thank you.

19              [Video resumed]

20              [Video ended]

21              MR. BABBITT:  Your Honor, rather than play my

22       cross, which takes about 20 minutes, if I could just

23       read a half a page at the end, the last questions I

24       asked.

25              THE COURT:  If that's your choice, go right

```
 1      ahead.

 2           MR. BABBITT:  I'm reading from page 32, line

 3      18, beginning there.

 4           "Right, but you don't know what motivation

 5      there was, what discussion there was, what decision

 6      there was, in the hierarchy of the church, who was

 7      involved, what they decided as to transplanting if

 8      you will your arbitration procedure in the staff

 9      agreement into the declaration."

10           And his answer is, "Yes, that's correct, I did

11      not know."

12           "You don't know now?"

13           "I don't know now."

14           "Okay, can you offer any evidence -- first of

15      all, do you have anything to do with drafting the

16      Committee of Evidence rules?"

17           Answer, "No."

18           "Can you offer any evidence whatsoever -- I

19      think you said you couldn't -- as to whether the

20      Committee of Evidence rules apply to arbitration or

21      were they ever intended to apply to arbitration?"

22           Answer, "No."

23           "Have you ever heard of an arbitration taking

24      place under the Enrollment Agreement, do you know of

25      one?"
```

1          Answer, "No."

2          "And you've been with the church how many

3     years?  Or been not with the church but associated?"

4          Answer, "1981."

5          "How many years is that?  That's 30,

6     40 years?"

7          Answer, "30.  I would not have known because I

8     was a transactional attorney, I didn't get involved

9     in the operations of the church."

10         Question, "You cannot offer to the court any

11    information as to whether three Scientologists in

12    good standing could fairly decide a case by a

13    declared Scientologist, someone who has been

14    declared, and ask him for the funds back."

15         Answer, "No."

16         That's it, Your Honor.

17         THE COURT:  All right.  Thank you.  Call your

18    next witness, please.

19         I will say, gentlemen, in respect to the

20    objection that this witness's testimony is in my

21    view completely irrelevant to the issues to be

22    determined based on his lack of knowledge concerning

23    the Enrollmen Agreement and the clauses within that

24    Enrollmen Agreement, the document that he alluded

25    to, I guess it would be Exhibit 16, has nothing to

1      do with this dispute.  So I'm assessing no weight to

2      his testimony.

3             Mr. Pope, call your next witness, please.

4             MR. POPE:  Mr. Cartwright, Allan Cartwright.

5             MR. BABBITT:  We would object to

6      Mr. Cartwright.

7             THE COURT:  Grounds?

8             MR. BABBITT:  The defendants invoked the rule

9      in this case.  Mr. Cartwright is not an employee of

10     the defendants, he is an employee of CSI which is

11     not a party to this action.  He has sat through this

12     entire case so far.  I did not know they were going

13     to call him.  I assumed, because he was sitting

14     here, they were not going until yesterday afternoon.

15     I tried to raise that objection at that time.

16            THE COURT:  I'm sorry, what do you mean you

17     tried to raise the objection at that time?

18            MR. BABBITT:  If Your Honor will recall, I

19     said I have two objections to Mr. Lenske and

20     Mr. Cartwright, but Your Honor told me that was not

21     the appropriate time to raise it.

22            THE COURT:  Well, meaning that now you're

23     raising the objection?

24            MR. BABBITT:  Yes, Your Honor.

25            THE COURT:  Mr. Pope?

1          MR. POPE:  Your Honor, Mr. Cartwright has not

2     been in the courtroom here, he's been out in the

3     witness room the whole time.  He's not here now.

4          THE COURT:  Mr. Babbitt?

5          MR. BABBITT:  He was here yesterday all day,

6     Your Honor.

7          THE COURT:  Was he, Mr. Pope?

8          MR. POPE:  No, sir.  He was out -- he was out

9     there guarding my cell phone.

10         THE COURT:  Against theft?

11         MR. POPE:  Right.

12         THE COURT:  Bring the gentleman in here.

13    Bring him up in front of me.  I'm going to put him

14    under oath and find out where he was yesterday.

15         Mr. Cartwright, come forward, please.  I'm

16    Judge Whittemore, I'm presiding over this matter.

17    If you'll stand right there, you've been called as a

18    witness.  I need to find out something before you

19    testify.  If you'll raise your right hand and be

20    sworn.

21         COURTROOM DEPUTY CLERK:  Do you swear or

22    affirm that the testimony you give in this case will

23    be the truth, the whole truth and nothing but the

24    truth?

25         THE WITNESS:  I do.

1          THE COURT:  State your name, please.

2          THE WITNESS:  Allan Cartwright.

3          THE COURT:  How are you employed?

4          THE WITNESS:  I work for the Church of

5     Scientology International.

6          THE COURT:  And have you been in this

7     courtroom during this proceeding?

8          THE WITNESS:  I was here yesterday morning for

9     a couple of minutes before Mr. Pope got up and said

10    he wanted all the witnesses to leave the courtroom

11    and that's when I left the courtroom.  I haven't

12    been in here since.

13         THE COURT:  You have not been in here since.

14         THE WITNESS:  No, sir.

15         THE COURT:  Mr. Babbitt, would you like to ask

16    Mr. Cartwright any questions about that?

17         MR. BABBITT:  No, Your Honor.

18         THE COURT:  All right.  You may take the

19    stand.  The objection is overruled.  Someone was

20    mistaken, I take it, Mr. Babbitt?

21         MR. BABBITT:  Three people told me he was here

22    all day yesterday.  Either they're obviously

23    mistaken or Mr. Cartwright is mistaken.  Mr. Rinder,

24    Mr. Garcia -- I mean, I don't know how we prove

25    whether he was there or not.  I'm certainly not

1      going to turn this into having multiple people

2      testify about this subject.

3           THE COURT:  Mr. Pope, what are we going to do

4      here?  Come on.  This is a simple matter.

5           MR. POPE:  I know it's a simple matter and I

6      know that this gentleman was not in the courtroom.

7      He left, he did not come back.

8           THE COURT:  Well, I think we have to, based on

9      his testimony, let him testify.  There is no

10     evidence to the contrary, Mr. Babbitt.

11          MR. BABBITT:  May I be allowed to go outside

12     for a moment and talk to Mr. Rinder?

13          THE COURT:  Certainly.

14          MR. BABBITT:  Thank you.

15          (Brief pause)

16          MR. BABBITT:  I think the mystery has been

17     cleared up, Your Honor.  The people that have told

18     me that he was -- with the exception of Mr. Garcia,

19     I guess, were not in the courtroom themselves.  He

20     may have been in the ante room and that's why they

21     didn't see him outside and they assumed he had

22     stayed in there.  He may have gone into the ante

23     room.  So we're going to withdraw our objection.

24          THE COURT:  You may proceed, Mr. Pope.  Thank

25     you, Mr. Babbitt.

1                          DIRECT EXAMINATION

2    BY MR. POPE:

3    Q        Where do you live?

4    A        I live in Los Angeles, California.

5    Q        What is your formal education?

6    A        Equivalent to high school education -- I went

7    through school in Australia and so it was basically

8    equivalent to that.

9    Q        What is your current position?

10   A        I'm the legal director for the Church of

11   Scientology International and also the corporate

12   assistant for the Church of Scientology

13   International.

14   Q        What are your duties?

15   A        Basically I am over all legal matters for the

16   Church of Scientology International, also I deal

17   with basically supervising legal matters for the

18   churches around the world, but mainly more of a

19   supervisory type position.

20   Q        How long have you been in your current

21   position as legal director?

22   A        Since 2006.

23   Q        And what was your position before then?

24   A        I was basically the legal director for the

25   Church of Scientology Flag Service Organization

1      which is the Church in Clearwater and basically

2      holding similar functions to what I do now, on an

3      international level.

4      Q       When did you first become associated with the

5      Church of Scientology?

6      A       Well, I became a parishioner back in 1973 and

7      then a staff member in 1974.

8      Q       Are you a member of the Sea Org?

9      A       Yes, I am.

10     Q       What is the Sea Org?

11     A       The Sea Org is a religious order that

12     dedicated Scientologists have basically made it

13     their lifelong endeavor to practice their religion

14     and spread the faith and it's a full-time activity.

15     Q       What were you doing in 1982 to 1984 in the

16     church?

17     A       I was working in the basically corporate

18     transactional area which involved licensing and

19     enrollment forms from '82 to '84 in Church of

20     Scientology International.

21     Q       Your Honor, may I provide the witness with an

22     exhibit book?

23             THE COURT:  Yes, sir.

24     BY MR. POPE:

25     Q       Would you turn to 18?

1     A       Yes, I've done that.

2     Q       What is 18?

3     A       18 is -- it's an executive directive from 29

4     August 1983 called Staff Covenants.  It's a document

5     that attaches the actual staff covenant, staff

6     agreement that staff members would sign and it would

7     have been issued back in that time, that's when it

8     would have been getting signed.

9     Q       Would you turn to 19, please?  What is 19?

10    A       It's called Flag Divisional Directive, it's

11    called Enrollmen Agreement.  It's dated 5 July 1984.

12    And this agreement -- this directive attaches to it

13    the Enrollmen Agreement that was implemented back at

14    that time.

15    Q       That would have been July 5, 1984?

16    A       That's correct.

17    Q       Is there in the Church of Scientology what we

18    might call an excommunication practice?

19    A       Yes, there is.

20    Q       What is it?

21    A       Okay.  What that is is if a person has been

22    declared suppressive, that is in effect

23    excommunication in the Scientology religion.

24    Q       And what sort of conduct merits this type of

25    religious sanction?

1    A        It would be actions like -- conduct like

2    heresy or if a person has committed a felony or has

3    publicly attacked the church, would cause -- could

4    cause a suppressive person declared.

5    Q        What avenues are available for a person who

6    has been declared to get back in good standing with

7    the church?

8    A        There is basically two avenues.  One is a

9    person can -- he can go through the steps, he can

10   contact the international justice chief and say that

11   I understand I've been declared suppressive and I

12   would like to know what I can do to make up the

13   damage, and the person would go through those steps

14   and be able to get back in good standing with the

15   church.  Or he could say I disagree with the declare

16   and I would like to have a Committee of Evidence to

17   review that and to determine whether it's correct or

18   not because I feel it's incorrect.

19   Q        Are you familiar with the instances in which a

20   person who has been declared an SP has succeeded in

21   having that decision reversed?

22   A        Yes, I have, my office reviews submissions of

23   that nature from time to time and there is

24   definitely instances where a declare is cancelled

25   because it was found that there was an injustice and

1       the person was incorrectly declared and was again

2       put into good standing again.

3       Q       Can someone who has been declared a

4       suppressive person receive a fair hearing in the

5       church despite having been declared?

6       A       Yes, they can, most definitely.

7       Q       Are you familiar with the statistics on this

8       during the past 12 years?

9       A       Yes, I had a review done and I found that

10      there was 79 instances of where a Committee of

11      Evidence was held to review whether someone was

12      correctly declared and of that we found that there

13      was 33 were actually reversed because the declare

14      was an injustice and it was cancelled and the person

15      was back in good standing.

16      Q       And so of the 79 reviewed, about what

17      percentage of that was reversed?

18      A       It's about 41 percent, a little over that.

19      Q       Are SPs in an arbitration under the Enrollmen

20      Agreement entitled to the same consideration as SPs

21      seeking the reversal of their declarations?

22      A       Yes, they are.

23              THE COURT:  Can you specific what Enrollmen

24      Agreement you're referring to, Mr. Pope?

25      BY MR. POPE:

1      Q      The Enrollment Agreements that are at issue in

2      this action, actually the one dated March 2006 with

3      between Mr. Garcia and Flag.

4              THE COURT:  Thank you.

5              THE WITNESS:  Okay.  And so -- yes, they do.

6      There is -- when a person has a Committee of

7      Evidence to review whether the person is declared or

8      whether they have an arbitration, it's always done

9      with a viewpoint that there is impartiality, that

10     the person is going to get a fair hearing and the

11     facts are going to be looked at to determine whether

12     -- what the truth is and come to a proper

13     resolution.

14     BY MR. POPE:

15     Q      Is the justice system in Scientology limited

16     to questions of ecclesiastical discipline or

17     sanctions?

18     A      No, not only that, no.

19     Q      What else can it cover?

20     A      It can cover anything.  On the Enrollment

21     Agreement, the one we're talking about here,

22     paragraph 60 makes it very clear that there is

23     language in there that says it's basically any

24     dispute, any controversy, any complaint, any matter

25     that a parishioner has with the church, they can use

1        that procedure to be able to resolve any problem or

2        dispute they may have.

3        Q        On any subject?

4        A        On any subject whatsoever, yes.

5                THE COURT:  Are you talking about the

6        arbitration process or the Committee of Evidence

7        process?

8                THE WITNESS:  No, I'm talking about, sir, if I

9        go to the policy -- can I go to the --

10               THE COURT:  Just answer my question if you

11       can, please.

12               THE WITNESS:  It means any dispute.  It could

13       involve a ComEv definitely, but 6(D) talks about

14       basically any of the justice or ethics procedures

15       could be used whether the person is declared or not

16       declared, they can take up any matter with the

17       church.

18               THE COURT:  By way of arbitration or a

19       Committee of Evidence?

20               THE WITNESS:  In both.

21               THE COURT:  How many arbitrations have been

22       conducted, to your knowledge, within the church?

23               THE WITNESS:  There haven't been any

24       conducted.

25               THE COURT:  Thank you, sir.  Go ahead,

1       Mr. Pope.

2       BY MR. POPE:

3       Q       Does paragraph 5(C) of the particular

4       Enrollment Agreement we are discussing of 2006 cover

5       disputes over refunds?

6       A       Yes, it does.

7       Q       Does paragraph 5(C) state and refer to church

8       policy with respect to refunds?

9       A       Yes, it refers to a policy from 1996 which

10      basically says that the procedure -- the refunds are

11      handled through -- it's discretionary by the claims

12      verification board and the claims verification

13      determines whether the person has correctly

14      requested the refund and has followed the procedure

15      because it's not that it's -- the money isn't just

16      given, you have to follow a specific procedure and

17      qualify for it.

18      Q       In the plaintiff's bench brief at pages 6

19      through 7 they state, "The problem is that what he

20      was signing had nothing to do with the Committee of

21      Evidence or Scientology justice system procedures."

22      Is that true?

23      A       No, it's not true.  There is -- the policy

24      that would apply here would be the justice policies

25      which includes the Committee of Evidence policy from

1     1963.

2     Q      Let me read to you paragraph 6(D) of the

3     Enrollment Agreement in question.  "I will pursue

4     resolution of that dispute, claim or controversy

5     solely and exclusively through Scientology's

6     internal ethics, justice and binding religious

7     arbitration procedures."  Correct?

8     A      Yes.

9     Q      And what does the reference to Scientology

10    internal justice procedures mean?

11    A      That means it's any --

12           THE COURT:  Mr. Pope, I'm not sure that this

13    witness's testimony is relevant to the inquiry.  Why

14    is it?  His interpretation of a document simply is

15    not in my view important.

16           MR. POPE:  Your Honor, I listened to

17    Mr. Garcia interpret what he thought the document

18    meant and I -- I will move on, Your Honor.

19           THE COURT:  Don't move on.  I'm curious.  I

20    mean, do you think that this witness's opinion is

21    determinative of the limited issues that I have

22    raised?  I understand Mr. Ellis's I'll call it

23    interpretation may arguably be relevant because he

24    is in his position speaking from a little different

25    perspective than an in-house lawyer.

1          MR. POPE:  Actually Mr. Cartwright is not an

2     in-house lawyer.  He's head of the legal department,

3     but he is not a lawyer.

4          THE COURT:  He said he was a lawyer.

5          MR. POPE:  He said his education was the

6     equivalent of high school -- high school equivalency

7     in Australia.  Just to clarify that, Mr. Cartwright,

8     are you a lawyer?

9          THE WITNESS:  No, I'm not.

10          THE COURT:  I apologize.  I didn't make a

11     note.  I'm sorry, he's the legal director.

12          MR. POPE:  He is the legal director, but not a

13     lawyer.  I could have clarified that, should have,

14     Your Honor.

15          THE COURT:  My fault.  But the same question I

16     guess begs itself.

17     BY MR. POPE:

18     Q     Now, Mr. Cartwright, has the church ever in

19     its history filed a suit on an Enrollment Agreement?

20     A     No, it has not.

21     Q     And why not?

22     A     Because we've been able to -- because

23     basically we utilize the church's policy and

24     procedures concerning the justice procedure, ethics

25     procedures to be able to resolve matters and have

1     been successful in doing that and basically there's

2     the claims verification board procedure, that's one

3     avenue that's used to deal with matters.  And also

4     there is other instances where even when an

5     individual has been declared, one example is there

6     was an individual by the name of Tsutsiana Ludwig

7     who had asked for a refund and he was a declared

8     person and I work with Mr. Ellis on responding to

9     him and attempting to work out a resolution of that

10    issue so that he would -- basically we offered him

11    some of the funds he had asked for and so that

12    was -- that's where we were trying to resolve issues

13    like that.  And that's those kind of things.

14    Q     Why has there never been an arbitration

15    proceeding under the provisions of the Enrollment

16    Agreement?

17    A     Only because we've been able to resolve

18    matters well beforehand because there are other

19    steps that are done that listed out in the

20    Enrollment Agreement as to what would be done before

21    we even need to get to arbitration.

22    Q     Was there a person named Carisa Marion who

23    obtained a refund through these methods?

24          MR. BABBITT:  Excuse me, Your Honor, I object.

25    Relevance.  Individual anecdotes.

1          THE COURT:   What rule does that come under,

2     "individual anecdotes"?

3          MR. BABBITT:   Relevance.   I'm sorry.

4          THE COURT:   Relevance.   I'm going to allow it.

5     Overruled.

6     BY MR. POPE:

7     Q     Tell me about Carisa Marion.

8     A     Carisa Marion was a parishioner of the Flag

9     Service Organization and she had -- I was involved

10    in that matter from CSI because I was advising on

11    it.   And that had to do with the fact that she had

12    donated a large amount of funds to the Flag Service

13    Organization and it was determined that she was not

14    eligible to be a member of the church in Florida and

15    so it was decided that she would be returned her

16    funds, she was declared at the time and so it was a

17    matter that was dealt with not necessarily from the

18    claims verification board level but it was dealt

19    with as an attempt to deal with any dispute or any

20    claim type of thing.

21          And there are other examples like that that

22    we've handled so that there has never been the need

23    to go to the level of an arbitration.

24    Q     Has the church pointed out the availability of

25    religious arbitration to individuals wanting a

1       refund?

2       A       Yes.  It's in the -- first off, it's been in

3       every Enrollment Agreement since 1984 and then not

4       only that, but over the last few years we've been

5       sending communications to -- letters to former

6       parishioners who wanted a refund that that's an

7       avenue that they could use.

8       Q       Is there currently an arbitration matter

9       pending?

10      A       Yes, there is.

11      Q       Who is that with?

12      A       His name is Jonathan Ramsay.

13      Q       And who is Mr. Ramsay?

14      A       He is the son of a Scientologist, his name is

15      Peter Ramsay, who is deceased.

16      Q       And Peter Ramsay was a Scientologist?

17      A       Yes, he was, he was a Scientologist for many

18      years.

19      Q       Is Jonathan Ramsay a Scientologist?

20      A       Yes, he is.

21      Q       Do you have any other information about

22      Jonathan Ramsay's status as a member of the

23      religion?

24      A       Yes, I checked into his membership and found

25      out that he's an international member of the

1        International Association of Scientologists.

2        Q        Continues to be?

3        A        Yes, he still has a membership.

4        Q        And when was the arbitration availability

5    first pointed out to Mr. Ramsay?

6        A        It was first pointed out to him in October, I

7    think October 31, 2013.

8        Q        And following that notice in October 2013, did

9    Mr. Ramsay request arbitration?

10       A        He did, he only ended up requesting it in

11   May 2014.

12       Q        All right.  And why has there been a delay in

13   the arbitration moving forward?

14       A        The reason for it is because not only did

15   Mr. Jonathan Ramsay make a request, but his father's

16   two brothers, Ian and Robert Ramsay, also made

17   requests and we had a concern about who really was

18   making a claim and so there was a bit of confusion

19   going on concerning who was -- who we should be

20   communicating with.  That was the reason for the

21   delay.

22       Q        Have there been instances where a Committee of

23   Evidence found that a church staff member did

24   something inappropriate, resulting in a refund to a

25   parishioner?

```
 1     A        Yes, there was, there has been.   One example

 2     was there was a parishioner in California who one of

 3     our staff members from one of the California

 4     churches had contacted her and had encouraged her to

 5     loan a large amount of money to another individual

 6     and with the agreement that he would then donate

 7     that money to the church.  He donated half of it to

 8     the church and then absconded with the other half.

 9     And so there was a Committee of Evidence held to

10     look into the matter to find out what happened and

11     it was determined that the staff member's act was

12     inappropriate and that he shouldn't have done that

13     and so the funds were returned back to the

14     parishioner so that she received not only the funds

15     that was donated but also the funds that this other

16     individual absconded with.

17     Q        Mr. Cartwright, how many donors were there to

18     the Flag building project?

19     A        There is over 17,000 donors.

20     Q        From where?

21     A        All over the world, from many different

22     countries around the world and many different

23     states.

24     Q        Now, Mr. Cartwright, although you haven't been

25     in the courtroom for the proceedings, you did attend
```

1       the deposition of Mr. Ellis in California on

2       January 29th, correct?

3       A       I did.

4       Q       And you heard Mr. Ellis testify about speaking

5       to Leanna Wyland about having discussed the

6       procedures for arbitration?

7       A       Yes, I did.

8       Q       What is your relationship to Leanna Wyland?

9       A       She is -- I'm her superior.

10      Q       And are you familiar with the conversation

11      that Mike Ellis described?

12              MR. BABBITT:  Excuse me, Your Honor, object.

13      Hearsay.

14              THE COURT:  Sustained.

15              MR. POPE:  Your Honor --

16              THE COURT:  Sustained.

17      BY MR. POPE:

18      Q       Did you assign a task to her regarding the

19      Enrollment Agreement?

20      A       I did assign a task to her.  I asked her to

21      review the Enrollment Agreement a number of years

22      ago to review it for purposes of verifying the

23      policy -- the church policy connected to it.

24      Q       And did she report back to you?

25              MR. BABBITT:  Objection, Your Honor, hearsay.

1          MR. POPE:  I'm not asking him what she said,

2     just that she reported back.

3          THE COURT:  Overruled for that purpose, for

4     that particular question.

5          THE WITNESS:  Yes, she did.

6          MR. POPE:  May I have a moment, Your Honor?

7          THE COURT:  Yes, sir.

8     BY MR. POPE:

9     Q     One last question about your conversation, not

10    going into the substance of it with Ms. Wyland.

11    When did that take place?

12    A     That was I believe five or six years ago.  I

13    think Mr. Ellis had the date probably a little wrong

14    because it was five or six years ago because that's

15    when Leanna Wyland started working for me.

16    Q     Thank you.

17         THE COURT:  Cross-examination?  Let's take 5.

18    You may step down, Mr. Cartwright.

19         (Recess taken at 10:13 a.m. until 10:30 a.m.)

20         THE COURT:  Mr. Babbitt, you may proceed.

21                    CROSS EXAMINATION

22    BY MR. BABBITT:

23    Q     Mr. Cartwright, while you're not a lawyer, you

24    have been legal director of the Church of

25    Scientology between the years 2000 and 2006, right?

1    A        For the Flag Service Organization, yes.

2    Q        Since 2006 you've been legal director of the

3    Church of Scientology International, right?

4    A        That's correct.

5    Q        And as such, you've been directly involved in

6    legal affairs of the Church of Scientology

7    International in the Office of Special Affairs

8    International, correct?

9    A        I have been from 2006 to the present.

10   Q        You've supervised all corporate and legal

11   matters for the Church of Scientology International,

12   correct?

13   A        That's correct.

14   Q        And you are also a corporate officer of the

15   church, correct?

16   A        That's correct.

17   Q        You live in Scientology quarters, you're a

18   member of what's called the Sea Org, you said that?

19   A        That's correct.

20   Q        And the Sea Org, in order to be in that, you

21   had to devote not just your lifetime but a billion

22   years to the Church of Scientology, right?

23   A        That's right, it's a covenant that's signed

24   that we dedicate a billion years towards the faith.

25   Q        And like Mr. Ellis, do you work 13 hours a

1    day, seven days a week for $50 a week?

2    A       About similar hours, yes.

3    Q       The Church of Scientology is considered the

4    mother church of Scientology, right?

5    A       That's correct.

6    Q       And as legal director you work directly with

7    counsel in cases against Scientology, correct?

8    A       That's correct.

9    Q       You would be involved in every single case

10   that the church is involved in, correct?

11   A       I don't know about every single case, but I

12   would have some supervising or knowledge type thing.

13   Q       In fact, you work directly with counsel in

14   this case, correct?

15   A       I have, yes.

16   Q       You've attended the depositions of Mr. Rinder,

17   Mr. Lenske, of course your own deposition, Christie

18   Collburn, Mr. Ellis, right?

19   A       That's correct.

20   Q       You came all the way from California to attend

21   Mr. Rinder's, for example, to Florida?

22   A       That's correct.

23   Q       You discuss strategy with counsel?

24   A       Yes.

25   Q       You've even hired private detectives through

1    counsel, haven't you?

2    A        When necessary, counselors retain

3    investigators to gather information, yes.

4    Q        And you told the court there has never been,

5    to your knowledge, in all the years you've been with

6    the church since you were 15 years old, an

7    arbitration under this Enrollment Agreement so far

8    as you know?

9    A        I've never testified to that.  Oh, you mean

10   whether I've ever heard of one.  No, I've never --

11   there hasn't been one, no.

12   Q        Yes.  To the best of your knowledge there has

13   never even been a request for arbitration until

14   Mr. Ramsay was contacted five months after denying

15   his claim and six days after the judge entered the

16   October 24th order, right?

17   A        Six days after -- well, actually it was -- I

18   looked at that order last night, it was five days

19   after.

20   Q        Sorry, five days.  Excuse me.

21   A        But there was --

22            THE COURT:  Well, let me ask you,

23   Mr. Cartwright, how did you know to look at that

24   order?

25            THE WITNESS:  Because I was studying the -- I

1      was preparing myself for my testimony.

2            THE COURT:  How did you hear anything about

3      the order?

4            THE WITNESS:  I didn't.  I already knew about

5      the order, sir.

6            THE COURT:  You just decided to look into the

7      order?

8            THE WITNESS:  No, sir, I was going through it

9      because I know that one of the issues that had come

10     up earlier was concerning Mr. Ramsay because I was

11     reading Mr. Ellis's deposition and in Mr. Ellis's

12     deposition it came up the fact that this whole issue

13     concerning whether Mr. Ramsay was a Scientologist or

14     not was sort of like I was quite surprised that that

15     was such an issue.  And so I -- when I read that, I

16     actually looked into the matter to determine whether

17     he was a Scientologist or not, that's how I found

18     that out.  And then as part of that I was going

19     through the documents concerning it.  That's how.

20           THE COURT:  How does my order concern

21     Mr. Ramsay?

22           THE WITNESS:  I'm sorry?

23           THE COURT:  I'm curious, sir, how does that

24     order have anything to do with Mr. Ramsay?

25           THE WITNESS:  The only reason why that order

1          had to do with Mr. Ramsay was because when I was

2          going through the facts of the Ramsay matter, I

3          noticed that it was September 24th, last year, I

4          believe, or the year -- let me see, last year -- and

5          -- actually the year before, I think it was.  No,

6          last year, sorry.  And so I was going through the

7          testimony to see -- the documentation to see when

8          was the request made and when was it -- when was the

9          request made to Mr. Ramsay because I was going for

10         the timeline concerning -- because he asked for --

11         he asked the arbitration in May and then what has

12         occurred afterwards type of thing.  And so I noticed

13         that it was -- that Mr. Soter had sent a letter to

14         Mr. Ramsay on 24 September and it was 25 September

15         that your order was issued.

16                 THE COURT:  Okay.

17                 THE WITNESS:  That's all.

18                 THE COURT:  All of a sudden my order came to

19         light?  Who have you talked to about the testimony

20         in this case yesterday -- that occurred yesterday?

21         You are under oath, sir.

22                 THE WITNESS:  No, sir.

23                 THE COURT:  Yes, you are under oath.

24                 THE WITNESS:  I understand, sir.

25                 THE COURT:  You have talked to somebody about

1    the testimony in this case that occurred yesterday,

2    otherwise you would have no reason to look at an

3    order of the court that had nothing to do with

4    Mr. Ramsay.

5         THE WITNESS:  Sir, I looked at all that

6    material a couple of days ago because I was planning

7    on testifying concerning the Ramsay matter.

8         THE COURT:  And again, my order has nothing to

9    do with the Ramsay matter.  So why are you even

10   looking at that order?  I'm being accusatory, sir,

11   because it's pretty obvious to me that you were

12   privy to the testimony yesterday, some of the

13   exchange that occurred.  Doesn't take a scientist or

14   a judge to see that.

15        THE WITNESS:  Okay, sir, I did not -- I'm just

16   saying what happened was a couple of days ago I was

17   going through the Ramsay material and also last

18   night in preparation of my testimony because I was

19   trying to understand the effects of the matter as to

20   why there was a delay because it was one of the

21   issues the other side had been raising.  That's all.

22        THE COURT:  Go ahead, Mr. Babbitt.

23   BY MR. BABBITT:

24   Q    When you testified that the Committee of

25   Evidence rules apply to arbitration, did you say

1      that today, this morning?

2      A      Sorry, sir?

3      Q      Was that part of your direct this morning?

4      A      What was, sorry?

5      Q      That the Committee of Evidence rules applied

6      to arbitration.

7      A      Yes, yes, I did say that.

8      Q      You're relying entirely on the September '63

9      doctrine to support that statement, aren't you?

10     A      Yes.

11     Q      Because there has never been an arbitration,

12     right?

13     A      No, there has not.

14     Q      And the arbitration provision in the

15     Enrollment Agreement doesn't use the words Committee

16     of Evidence, does it?

17     A      No, it does not, all it uses there is the

18     justice procedure and ethics procedures.

19     Q      And there is very little difference, isn't

20     that true, that between the different Enrollment

21     Agreements through the years, all that's been added

22     is a little constitutional language, right?

23     A      That's correct, there is the language in

24     paragraph 60, I think it is, included that language.

25     Q      But the procedure for choosing arbitrators has

1     stayed the same.

2     A       That's correct.

3     Q       There has never been, to your knowledge, a

4     Committee of Evidence hearing where someone wanted

5     to get their money back for a donation, has there?

6     A       A Committee of Evidence hearing?

7     Q       Yes.

8     A       Well, I mentioned one earlier which was this

9     matter in California involving someone wanting to

10    get their money back because it was taken by this

11    other person.

12    Q       Do you remember when your deposition was taken

13    on January 28, 2015?

14    A       Yes.

15    Q       Did you give these answers to these questions?

16            "Has there ever been to your knowledge a

17    Committee of Evidence hearing with respect to

18    someone wanting to get their money back for a

19    donation?"

20            Answer, "For a donation?"

21            "Yes."

22            Answer, "A Committee of Evidence want to

23    get -- I'm not aware, no."

24            Did you give those answers to those questions?

25    A       I thought I did, but I thought I said

1       something else further on because I had that Germany

2       matter I mentioned that it came up concerning a

3       Committee of Evidence involving a German.  And since

4       then I researched and found this matter in

5       California.

6       Q       There was a time, was there not, when

7       Mr. Rinder essentially had what your job is, right?

8       A       Yes.

9       Q       He was in a position of some control, wasn't

10      he, within the Scientology corporate organization?

11      A       Yes, he was.

12      Q       It would fall within his purview to discuss

13      strategy concerning these Enrollment Agreements and

14      the arbitration procedure, isn't that true?

15      A       Yes, it would have been.

16      Q       That includes whether they should be used at

17      all, doesn't it?

18      A       Yes, it could involve that.

19      Q       You know of no hearings that have ever been

20      held of your own knowledge over what is called a

21      civil Committee of Evidence, have you?

22      A       No, I'm not aware of any.

23      Q       That's all the questions I have.

24              THE COURT:  Redirect, Mr. Pope?

25                      REDIRECT EXAMINATION

1    BY MR. POPE:

2    Q       Mr. Cartwright, you indicated under the

3    judge's questioning about how you knew about his

4    order, that you had read the Ellis deposition,

5    correct?

6    A       Yes, sir.

7    Q       And you also sat through that deposition in

8    its entirety, didn't you?

9    A       Yes, I did.

10   Q       And wasn't there a point made by Mr. Babbitt

11   in there that the letter that was sent out to

12   Mr. Ramsay was contrived somehow as a response to

13   the judge's order that you referenced?

14   A       Yes, I did.

15   Q       Is that how you connected the Ramsay and the

16   judge's order?

17   A       Yes, I did, that's how -- that's where I had

18   the idea of looking at the facts and I would notice

19   that Mr. Soter had written to Mr. Ramsay the day

20   before, telling him give me your address and -- give

21   me your mail address so that Mr. Ellis could send

22   his letter to you concerning your arbitration.  And

23   I happened to notice that it was the day before,

24   that's all.

25   Q       All right.  And you were concerned about that

1    because of the claim that this had somehow been

2    contrived to respond to the judge's order?

3    A       That's correct, yes.

4    Q       Did you and Mr. Cartwright yesterday or the

5    day before have any conversations with me,

6    Mr. Potter or anybody else in this room with respect

7    to the judge's order and the Ramsay matter or

8    anything regarding your testimony?

9    A       No, I have not.

10   Q       Thank you.

11           THE COURT:  Thank you, sir, you may step down,

12   please watch your step.

13           Call your next witness.

14           MR. POPE:  We have no more witnesses, Your

15   Honor.

16           THE COURT:  Mr. Babbitt, call your first

17   witness, please.

18           MR. BABBITT:  Mr. Hayden James, please.

19           MR. POTTER:  Your Honor, if I might, we do

20   object to the calling of Hayden James, he is going

21   to testify to his opinion as to whether or not three

22   Scientologists in good standing can be fair.  That's

23   goes to exact issues that you've already explained

24   to us today is irrelevant.

25           THE COURT:  Well, you presented a boat load of

1    testimony through Mr. Ellis and through the lawyer,

2    Lenske, which I don't accept they can be fair.  So

3    is it understandable that Mr. Babbitt can put on

4    counter evidence?  I mean, I'll just assess it

5    whatever the weight it deserves.  I don't know this

6    witness, I don't know what his background is.  I

7    suspect Mr. Babbitt will lay a foundation, so I

8    overrule the objection.

9           COURTROOM DEPUTY CLERK:  Please raise your

10   right hand.

11          (Witness complies.)

12          COURTROOM DEPUTY CLERK:  Do you swear or

13   affirm that the testimony you give in this case will

14   be the truth, the whole truth and nothing but the

15   truth?

16          THE WITNESS:  I do.

17                    DIRECT EXAMINATION

18   BY MR. BABBITT:

19   Q      Give us your name, please.

20   A      Hayden John James.

21   Q      And where do you live?

22   A      I live in Parker, Colorado.

23   Q      Are you a practicing independent

24   Scientologist?

25   A      Yes, sir.

1     Q       What does that mean?

2     A       I'm no longer a member of the church, but I do

3     see merit in the subject of Scientology and still

4     practice it with reservations about the church,

5     but --

6     Q       And how do you practice it?

7     A       Well, it boils down to either training in the

8     subject matter of Scientology or in delivering

9     counseling.

10    Q       How long were you with the church?

11    A       I was a practicing Scientologist for 34 years

12    and I worked for the Church of Scientology in

13    various capacities for 31 years.

14    Q       Were you a member of Sea Org?

15    A       Yes, sir.

16    Q       And for how long?

17    A       25 years.

18    Q       In what capacities did you work for the

19    church?

20    A       I worked for their legal department for seven

21    years from approximately 1977 to 1984.  I worked for

22    their management including the international finance

23    office and the international liaise office which is

24    upper management and runs all the organizations.

25    And approximately half of those 31 years, maybe a

1    little over half, I worked at the lower levels of

2    Scientology in service organizations dealing

3    directly with parishioners.

4    Q      Did you work for the church's Office of

5    Special Affairs?

6    A      I did, sir, yeah, the legal department.

7    Q      What does that mean?

8    A      I worked in the litigation department dealing

9    with various legal suits that were ongoing at the

10   time.  I started life as a clerk in England to an

11   in-house solicitor and went on from there.  I

12   finished my stint in the legal office in Los Angeles

13   in the Office of Special Affairs Legal Department in

14   late '84.

15   Q      Under what circumstances did you leave the

16   church?

17   A      I left the church in 2006 under a cloud.  I'm

18   not sure what your question means.

19   Q      Tell us what happened.

20   A      Well, my daughter joined us in the Sea Org,

21   she was a young teenager at 13 and she didn't wish

22   to be there and the church wanted me to get rid of

23   her, send her off somewhere and my wife and I

24   refused.  So we left employment at that point.  I

25   left -- I no longer became a member a couple years

1      later, maybe that's the question you're asking.

2      Q        Were you declared?

3      A        Pardon?

4      Q        Were you declared?

5      A        A couple years later I was, in 2009.  I was

6      working for a dental practice and the owner -- I was

7      managing the practice along with my wife and my

8      youngest daughter was working there as well.  And

9      the owner of the practice was a Scientologist and

10     during a work day at the office he requested that I

11     donate money to the International Association of

12     Scientologists and I refused, so did my wife, and we

13     expressed our disagreement with the existence of the

14     organization.  And he wrote a report on me to church

15     officials and a few weeks later we were all fired.

16         And I then filed a complaint with the EEOC,

17     the Equal Employment Opportunities Commission, in

18     San Antonio, effectively I filed suit and at that

19     point I believe I was declared.

20     Q        As a result of your being declared, what we're

21     interested in is whether Scientologists in good

22     standing could fairly hear from a declared person.

23     Have you had personal experiences concerning the

24     depth of feeling of Scientologists concerning a

25     declared person?

1    A        Well, certainly there is two aspects to that.

2    There is what the individual Scientologist feel

3    obviously and then there is the church policy and

4    the way that they apply it.

5          The moment I filed suit, the Office of Special

6    Affairs -- we were in America at the time, but my

7    eldest daughter was living in England and the Office

8    of Special Affairs immediately intervened to have my

9    daughter disconnect from myself and my wife.  And

10   they were present at the meeting between her and her

11   common law husband and they pressured him and her to

12   disconnect from us.  She refused and so her common

13   law husband, who was also a Scientologist,

14   disconnected from her and they left her abandoned in

15   a hotel in London.  She got an email to us and we

16   had to get a flight so she could come stay with us

17   in America.

18   Q        Has he ever come back to your daughter?

19   A        No.

20   Q        Have you had any other experiences where you

21   personally have been involved or you know of

22   situations where disconnection is a common practice?

23   A        Yes, sir.  In the summer of 2000 my wife and I

24   were executives in a church in England about

25   200 miles north of the headquarters there, the

1      Scientology headquarters, and we were both summoned

2      to the headquarters and shown a communique from the

3      international justice chief's office, Mr. Ellis's

4      office, that my mother-in-law, my wife's mother, a

5      long-term American Scientologist, had obtained a

6      lawyer, requested a refund, and obviously threatened

7      to sue.  And we were immediately ordered to

8      disconnect from her and we weren't allowed to leave

9      those premises until we did.  We were there for a

10     number of days and browbeat basically into

11     disconnecting.  Sadly, we did.

12     Q      You did disconnect from her?

13     A      We did disconnect from her.  Because the

14     penalties for not disconnecting from someone guilty

15     of a suppressive act is dire.

16     Q      What do you mean "dire"?

17     A      Well, you are then guilty of a suppressive act

18     if you don't disconnect from them.  It's covered in

19     the book.  If someone commits a suppressive act and

20     you don't disavow them or handle them or disconnect

21     from them, then you're also tainted and guilty and

22     it rolls on from there.  So we did disconnect

23     because consequences for us at that time would have

24     been very difficult.

25     Q      Are you familiar with the tenets of

1       Scientology?

2       A       Yes, sir.

3       Q       Have you studied them?

4       A       Yes, sir.

5       Q       For how long?

6       A       Obviously as an ongoing process for 31 years,

7       but I did do the big organizational policy course

8       that pretty much contains all their policy, takes

9       months to do.

10      Q       Can you envision any circumstance under which

11      three Scientologists in good standing could find

12      against the church on behalf of a declared person

13      seeking their money back because they claim that the

14      church had defrauded them?

15              MR. POTTER:  Your Honor, we object on the

16      basis that this witness is being asked for opinion

17      testimony; he's not an expert.

18              THE COURT:  Mr. Potter, how is this any

19      different from the opinions that have been expressed

20      by your witnesses?

21              MR. POTTER:  Your Honor, this witness I think

22      is trying to come in under Rule 701, trying to

23      testify to common knowledge.  He does not have

24      common knowledge.

25              THE COURT:  That's not really my question.

1          How is this any different from the testimony that

2     your witnesses have --

3               MR. POTTER:  Your Honor, I'm not sure that it

4     is.  But you've made it clear that this is

5     irrelevant and it's wasting the Court's time and I

6     think it's an appropriate objection at this time.

7     The next witness is going to be the same, Your

8     Honor.

9               THE COURT:  Well, it may be.

10              MR. POTTER:  I guess the other distinction is

11    that the other witnesses we called were church

12    officials trying to explain what church policies

13    are.

14              THE COURT:  Well, an opinion about fairness is

15    not a church policy.

16              MR. POTTER:  With all due respect, Your Honor,

17    there is a 1963 policy letter which states on its

18    face that it's applicable to all justice actions and

19    that's what this case goes back to is that 1963

20    policy letter.

21              THE COURT:  Well, that's different from

22    someone's opinion about whether an arbitrator can be

23    fair.  I understand what the policy statement says

24    and that is relevant, but somebody's opinion about

25    whether an arbitrator can be fair is in my view

1        irrelevant.

2               I'm going to allow the testimony, gentlemen,

3        but I will tell you now that I'm not putting any

4        weight on the opinions of any witness as to whether

5        these arbitrators could or could not be fair.  There

6        is simply no basis for such an opinion, whether they

7        testify as an expert or not, or even an informed

8        member of the church.  Since there has never been an

9        arbitration, there is no basis to express an opinion

10       about whether an arbitrator would or would not be

11       fair.  But Mr. Garcia has his opinion, this

12       gentleman has his opinion, Mr. Ellis has his

13       opinion, and he think there was at least one other

14       witness who talked about this.

15              I'm going to let it in because I don't want to

16       be accused of not allowing you to put on your

17       evidence, but I will tell you that the weight I will

18       give to this type of testimony is not likely to be

19       what you might expect.

20              MR. BABBITT:  Your Honor, may I be heard on

21       this just for a moment to avoid -- because I've got

22       two other witnesses.

23              THE COURT:  Well, let me tell you what's going

24       to happen at about midday.  We're going to be done.

25       So if you want to talk and use up your time, that's

1   fine, Mr. Babbitt, go ahead.

2           MR. BABBITT:  Well, I'm just trying to get

3   some direction, Judge.

4           THE COURT:  I've given you direction.  We'll

5   be done at noon with evidence.

6   BY MR. BABBITT:

7   Q      Mr. James, I simply want to know if you have

8   knowledge concerning how the policies of the church

9   might affect a potential arbitrator who is a

10  Scientologist in good standing?

11  A      With all my knowledge and experience over 30

12  odd years, I can't see how they could be fair.

13  Q      Why?

14  A      Based on the rules and based on the attitudes

15  and the policing of the disconnection system by the

16  church, which I've only spoken of briefly, there is

17  much more evidence.  But it's part of their security

18  system.  They police the behavior of individual

19  Scientologists by these rules and they're written in

20  this book and Scientologists study them quite early

21  on and the rules are quite clear.  You can't sit in

22  judgment on Scientology, you can't be connected to

23  or favor someone who has committed a suppressive act

24  or you're guilty of a suppressive act yourself.  I

25  could read the rules, but -- they're covered in the

1    basic book.

2    Q       Well, the judge can read the rules, too.   I

3    don't really want you to tell us what the rules say

4    because we can all read those.   I'm interesting in

5    knowing from your own personal experience, 31 years

6    with the church, if you can testify about whether

7    all Scientologists or the vast majority of them

8    would hold beliefs -- let me rephrase it in a

9    different way.

10       Do you know what the attitude is, what the

11   attitude is --

12   A       Right.   The average --

13   Q       Let me finish my question, please.

14       THE COURT:   All right, guys, look, Mr. James,

15   this is not a forum to fight with the church.   I

16   don't want to hear it.   It's not relevant to this

17   proceeding.   So please listen carefully to the

18   question.

19   BY MR. BABBITT:

20   Q       What the attitude is of the average

21   Scientologist or every Scientologist concerning

22   declared individuals having a legal battle or an

23   arbitrable battle with the church?

24   A       Quite simply they consider them an enemy and

25   they consider the action an enemy action to sue.

1      It's that simple.

2              MR. BABBITT:   That's my questions, Your Honor.

3              THE COURT:   Cross-examination, Mr. Potter?

4                        CROSS EXAMINATION

5      BY MR. POTTER:

6      Q      Mr. James, it's fair to say that you have an

7      ax to grind against the Church of Scientology, isn't

8      it?

9      A      I'm sorry, sir, I heard the word ax, I didn't

10     hear the rest.

11     Q      Yes.  Do you have an ax to grind against the

12     Church of Scientology, sir?

13     A      I have certain disagreements with their

14     practices, having experienced them at first hand.

15     Q      Are you trying to get even with the Church of

16     Scientology, sir?

17     A      No, sir.

18     Q      Sir, after you left the Church of Scientology,

19     you went to work for a dentist in Texas somewhere,

20     correct?

21     A      Yes.

22     Q      And some Scientology friends helped you get

23     that job, correct?

24     A      A consultant at a chiropractic office who was

25     also a Scientology helped me get the job, that's

1       correct.

2       Q       And the dentist himself was a Scientologist?

3       A       Yes, sir.

4       Q       And while you were there, you started posting

5       on an anti-Scientology blog, correct?

6       A       Under a pen name, yes, sir, not under my name.

7       Q       Under a T. Payne, I believe it was.

8       A       That's correct, sir.

9       Q       And shortly after that, you got fired, did you

10      not?

11      A       You're leaving out some things that occurred

12      in between that, but yes.

13      Q       The dentist fired you, did he not, sir?

14      A       And my wife and my daughter as well.

15      Q       While you were blogging against Scientology,

16      this dentist was actually paying some of your debts

17      back to the church on your behalf, wasn't he?

18      A       Not my debts, no, sir.

19      Q       Okay.  After you got fired, you blamed the

20      church for that, didn't you?

21      A       The church were involved in the firing because

22      he -- yes.

23      Q       You blamed the church, did you not, sir?

24      A       I believe they were involved in my firing,

25      yes.

1    Q      Did you go out and hire a lawyer and write a

2    letter to the church and threaten them?

3    A      I did hire a lawyer.  My lawyer did write a

4    letter to the church.

5    Q      And that letter said please pay me $350,000 or

6    I'm going to sue you, correct?

7    A      I don't remember sir, I didn't write the

8    letter.

9    Q      Would you like me to show you a copy of the

10   letter?

11   A      If that's what the letter says, I'm sure it

12   did.

13   Q      You know your lawyer wrote a letter to the

14   church accusing them of causing your termination.

15   A      Yes.

16   Q      And you demanded money in exchange.

17          MR. BABBITT:  Your Honor, objection,

18   relevance.

19          MR. POTTER:  Goes to motive and bias, Your

20   Honor.

21          THE COURT:  It does go to bias.  Overruled.

22   BY MR. POTTER:

23   Q      All that stuff happened, did it not,

24   Mr. James?

25   A      And more.

1    Q        You have an ax to grind, don't you?

2    A        I have a legal suit.

3    Q        Thank you, sir.  No further questions.

4             THE COURT:  Any redirect?

5             MR. BABBITT:  No, Your Honor.

6             THE COURT:  Thank you, sir, you may step down.

7             Call your next witness.

8             MR. BABBITT:  Christie Collburn.

9             COURTROOM DEPUTY CLERK:  Please raise your

10   right hand.

11            (Witness complies.)

12            COURTROOM DEPUTY CLERK:  Do you swear or

13   affirm that the testimony you give in this case will

14   be the truth, the whole truth and nothing but the

15   truth?

16            THE WITNESS:  I do.

17            MR. POTTER:  Just for the record, Your Honor,

18   we have the same objection with this witness, she's

19   going to offer the same opinion testimony.

20            THE COURT:  Thank you, sir.  Same ruling.

21            COURTROOM DEPUTY CLERK:  Please be seated.

22   Please state your name and spell your last name for

23   the record.

24            THE WITNESS:  Christie Collburn.

25            THE COURT:  Spell your last name, please.

| | |
|---|---|
| 1 | THE WITNESS:  C-O-L-L-B-U-R-N. |
| 2 | DIRECT EXAMINATION |
| 3 | BY MR. BABBITT: |
| 4 | Q      Ms. Collburn, are you married? |
| 5 | A      Yes. |
| 6 | Q      To whom? |
| 7 | A      Mike Rinder. |
| 8 | Q      And have you been a member of the Church of |
| 9 | Scientology? |
| 10 | A      Yes. |
| 11 | Q      What age did you join? |
| 12 | A      I grew up in Scientology, but I joined the Sea |
| 13 | Org when I was 16. |
| 14 | Q      When you say you grew up -- |
| 15 | A      I was born into a Scientology family. |
| 16 | Q      As a member of Sea Org, did you dedicate |
| 17 | yourself to the life of the church in fact to a |
| 18 | billion years? |
| 19 | A      Yes. |
| 20 | Q      And did you work all day long, seven days a |
| 21 | week for $50 a week? |
| 22 | A      Yes. |
| 23 | Q      How old were you -- excuse me, were you |
| 24 | declared a suppressive person by the church? |
| 25 | A      Yes, I was. |

1    Q        When was that?

2    A        2009.

3    Q        What were the circumstances?

4    A        I had basically become friends with Marty

5    Rathbun.  Because he was considered a bad person by

6    the church, they declared me a suppressive person as

7    well.

8    Q        Because you didn't disconnect from him?

9    A        Yes, because I didn't disconnect from him.

10   Q        Did you as a member of the Sea Org study

11   church policies?

12   A        Yes, I did.

13   Q        What did you study?

14   A        Policies about ethics, policies about

15   administrative technology, all kinds of different

16   policies.

17   Q        Did you in fact serve on the Committee of

18   Evidence from time to time?

19   A        Yes, I did.

20   Q        How did that come about?

21   A        As a staff member oftentimes you're just

22   chosen and you're assigned to be a member on a

23   committee, so I was picked at least 5 to 10 times.

24   Q        Can you tell us what a Committee of Evidence

25   does?

1    A       Committee of Evidence basically reviews

2    charges that a person is being accused of, ethical

3    offenses, high crimes and crimes, to determine

4    whether they are guilty or innocent and then submit

5    their findings and recommendations to the convening

6    authority who can then approve them or reject them.

7    Q       Is a Committee of Evidence designed to handle

8    people who want refunds from the church because of

9    donations?

10   A       No.

11   Q       Has that ever happened, to your knowledge?

12   A       Not that I know of.

13   Q       Are you familiar with the rules of the

14   Committee of Evidence?

15   A       Yes.

16   Q       Are you familiar with the Enrollment

17   Agreement?

18   A       I'm not that familiar with it, actually.

19   Q       The arbitration process in the Enrollment

20   Agreement?

21   A       No.

22   Q       Have you had personal experience concerning

23   the depth of feeling of Scientologists as it would

24   relate to being able to hear the claim of someone

25   seeking a refund from the church?

1      A      Yes.

2      Q      Tell us what your personal experience has

3      been.

4      A      Well, I've been -- I've been shunned, my

5      family doesn't talk to me, my parents don't talk to

6      me, they haven't met my son.  So if my own family

7      will not speak to me and they're in good standing

8      with the church, you know, that's just an example of

9      how suppressive people are treated.  We're treated

10     like we're very bad people and we should not be

11     associating with Scientologists in good standing at

12     all.

13     Q      Were you close to your family before you

14     became declared?

15     A      Very.

16     Q      And how long ago was it since you've talked to

17     your mother or father?

18     A      It's been eight years.  I think it was 2009

19     when they stopped talking to me.

20     Q      And they have met their grandchild?

21     A      No, they have never met my son, my

22     two-year-old son, never.

23     Q      Have you made an effort to try to reconcile

24     with them, to go to their home or try to get them to

25     see you and see your son?

1    A        Yes, I have.

2    Q        What efforts have you made?

3    A        I visited their house two times, I left notes,

4    I left my phone number, I've written them letters,

5    I've called them.  They won't talk to me.

6    Q        Do you know why?

7    A        Because I'm declared a suppressive person and

8    therefore I'm an enemy of the church and they want

9    to remain in good standing, so they won't talk to

10   me.

11   Q        Is that a common belief throughout the church?

12   A        Yes.

13   Q        How common?

14   A        Extremely common.  Everybody -- most people --

15   I can't think of anyone I know of that's a

16   Scientologist that doesn't know about that policy.

17   Q        How about your brother and sister, will they

18   speak to you?

19   A        No.

20   Q        Are they Scientologists?

21   A        Yes.

22   Q        For the same reason?

23   A        Yes.

24   Q        Did you have a good relationship with them

25   before you became declared?

1    A      Very good.

2    Q      Have you done anything else other than get

3    declared to cause your family to disconnect with

4    you?

5    A      No.  It was immediately after that that they

6    disconnected from me.  Prior to that they didn't.

7    Q      You understand the Garcias have sought a

8    judgment against the church.

9    A      Yes.

10    Q      What does that mean from the standpoint of a

11    Scientologist in good standing?

12    A      It means they're an enemy immediately.

13    They're a bad person, they're suppressive, they're

14    committing a high crime, so they're immediately

15    kicked out of the church and no longer your friend,

16    no longer somebody you're going to associate with in

17    any way.

18    Q      Is that the same policy that causes

19    disconnection?

20    A      Yes.

21    MR. BABBITT:  Your Honor, we would offer into

22    evidence the exhibits that we have had marked and in

23    lieu of asking her to testify about that, we would

24    like to simply offer them in evidence.

25    THE COURT:  Which exhibits, please?

1          MR. BABBITT:  The entire list of exhibits that

2    we have.  There are three that have been objected

3    to.  I don't think there is any objection -- perhaps

4    we can offer all except those three and then deal

5    with that afterwards.

6          THE COURT:  I understood the stipulation was

7    that all exhibits of the parties are received except

8    with respect to the three that Mr. Pope objected to.

9    Am I incorrect?

10          MR. BABBITT:  They're already in evidence,

11    Your Honor.

12          THE COURT:  That's what I understood.

13          MR. POPE:  Yes, sir, that was my understanding

14    as well.

15          THE COURT:  I've assumed that.  So there were

16    three that were objected to and you'll have to give

17    me the exhibit numbers again.

18          MR. POPE:  6, 9, 27 of his list, assuming that

19    that is a correct list.

20          THE COURT:  Well, that's a big assumption.

21    Are you moving 6, 9, and 27 in at this time,

22    Mr. Babbitt?

23          MR. BABBITT:  I won't move them in at this

24    time.

25          THE COURT:  I'm sorry?

1          MR. BABBITT:  I won't move them in at this

2     time.  We'll deal with that subsequent to this.

3          THE COURT:  The other exhibits are in evidence

4     then.

5          MR. BABBITT:  That's all the questions I have.

6          THE COURT:  Cross?

7                    CROSS EXAMINATION

8     BY MR. POTTER:

9     Q    Ms. Collburn, while you were on the staff of

10    the Church of Scientology you did on occasion serve

11    on Committees of Evidence, did you not?

12    A    Yes, I did.

13    Q    And when you served on those committees, did

14    you understand that your purpose was to listen to

15    the evidence, look for the truth, and try to be

16    fair?

17    A    Yes.

18    Q    And when you sat on those committees, did you

19    in fact do that, listen to the evidence, look for

20    the truth, and try to be fair?

21    A    I would say on the majority of cases yes, but

22    I would also say that there are times where I felt

23    executives had ordered Committees of Evidence to be

24    done with sort of a stated objective in mind of what

25    they already wanted the outcome to be, and I felt

```
 1       the pressures of those and that if I tried to find

 2       something other than what they wanted, that I might

 3       be in trouble.

 4       Q       But when you yourself were sitting on the

 5       committee, you would listen to the evidence, would

 6       you not?

 7       A       Yes, I would.

 8       Q       And you would look for the truth?

 9       A       Yes.

10       Q       And you would try to be fair?

11       A       Yes.

12       Q       And as far as you knew, your fellow committee

13       members were trying to do the same thing.

14       A       For the most part, yes.

15       Q       That's what Committees of Evidence do,

16       correct?

17       A       Yes.

18       Q       Thank you, ma'am, no further questions.

19               THE COURT:  Any redirect?

20               MR. BABBITT:  Yes, Your Honor, just one.

21                       REDIRECT EXAMINATION

22       BY MR. BABBITT:

23       Q       Is there a difference between someone that has

24       been declared or has suffered some penalty with the

25       church, asking a Committee of Evidence to hear
```

1    whether they should have been declared, should have

2    been called a potential trouble source, should have

3    been penalized in some way, and someone who is

4    declared and is asking for their money back because

5    the church defrauded them?

6    A       There is a huge difference because the person

7    who is already declared is already guilty of

8    violating church policies and therefore will not be

9    treated fairly because they're already assumed to

10   have been a bad person.

11   Q       But someone who has been declared can ask the

12   church -- excuse me, ask the Committee of Evidence

13   to un-declare them, right?

14   A       Yes, they can.

15   Q       So they can be heard, right?

16   A       Yes, they can be heard.

17   Q       Is there a difference between being heard

18   because you want to stay in the church and being

19   heard because you are trying to get money back

20   because the church has defrauded you and you're

21   declared, you have no interest in being back in the

22   church?

23   A       Yes, there is a huge difference.  You have now

24   this status that you're coming in with that you're a

25   declared person and you're not asking to change

1      that, you're just asking for your money back or

2      whatever you're asking, and you've going to be

3      tainted because you've been labeled a specific thing

4      by the church so they will see you in that way.

5      Q      Every single member of the church would do

6      that?

7      A      Yes.

8      Q      No further questions.

9             THE COURT:  Thank you, ma'am, you may step

10     down.  Please watch your step.

11            MR. BABBITT:  Can I have just a moment, Your

12     Honor?

13            THE COURT:  Yes, sir.

14            MR. BABBITT:  We rest.  I'm going to invite

15     Mr. Rinder to come in.

16            THE COURT:  I'm sorry, I didn't hear you.

17            MR. BABBITT:  We rest.  And is it all right if

18     I let Mr. Rinder come back in now since he's not

19     going to be called?

20            THE COURT:  Mr. Pope?

21            MR. POPE:  What was the question?

22            THE COURT:  He wants to let Mr. Rinder come

23     back in.

24            MR. POPE:  If he's concluded his case, that's

25     okay with me.

1              THE COURT:  All right, that's fine.  It seems

2      to me, gentlemen, that the plaintiff's contention

3      that there is no way that -- Mr. Rinder, if you'll

4      step back into the witness gallery, please, you're

5      not a member of this court -- I'm sorry, you're not

6      Mr. Rinder.  I'm sorry, I didn't have these on.  Now

7      I can see you.  Thank you.

8              As I was about to say, it seems to me that the

9      plaintiff's contention that this arbitration process

10     is all a big sham because no Scientologist in good

11     standing can ever be fair to a declared person like

12     Mr. Garcia and his wife, however persuasive that

13     evidence is because of disconnect, labeling of

14     suppressed people by the church as evils and enemies

15     of the church, and what I just heard from the last

16     witness who made I think a fairly definitive

17     distinction between suppressed person or one accused

18     of being suppressive who seeks a Committee of

19     Evidence proceeding to get back into the church and

20     one who like Mr. Garcia simply wants money back

21     without any interest of returning to the church,

22     that's pretty compelling and persuasive evidence

23     that this process is not going to go the way that

24     Mr. Garcia hopes it will.

25              That said, this Court is constrained not to

1   delve into the fairness of that process based on the

2   First Amendment.  It's simply of no moment to the

3   judiciary and I have no authority to delve into the

4   beliefs, the doctrines, the tenants of this

5   organization that calls itself a church.  The First

6   Amendment prohibits that.  That is a component of

7   the plaintiff's claim of substantive

8   unconscionability.  So I don't want you to spend

9   time on that.

10       What's definitive in this case, it seems to

11   me, is whether there are indeed rules and procedures

12   in effect that govern this process of arbitration

13   and I'm very interested to hear from both of you

14   from a legal perspective -- not the opinions of

15   various witnesses -- as to what the binding

16   religious arbitration procedures are as well as what

17   the arbitration procedures of Church of Scientology

18   International are, other than, of course, the

19   selection of the arbitrators which is set forth in

20   the Enrollment Agreement.

21       Distilling this all down, Mr. Pope, what is

22   the nexus or connection between the arbitration

23   provision and the Enrollment Agreements, and the

24   defendant's contention that the Committee of

25   Evidence constitutes those rules and procedures

1          underlying arbitration?  A component of that inquiry

2          is why should I be bound by an opinion of Mr. Ellis

3          that the Committee of Evidence constitutes the rules

4          applicable to arbitration?

5               It seems to me that this is a factual inquiry,

6          not a matter of opinion, and this is not a matter of

7          church doctrine, it's a matter of whether or not

8          these rules and procedures actually exist as a

9          component of the arbitration process.

10              So that being said, I certainly would be

11         interested in your comments, your argument, because

12         I think that issue is the one that carries the day

13         one way or the other.

14              And while Mr. Pope is getting up to the

15         podium, I will also say to those who are here that

16         have a great interest in this case that this is not

17         the forum for airing disputes between suppressed

18         individuals and the church, or former members of the

19         church.  I don't think the judiciary should have nor

20         do I have any interest in that because the First

21         Amendment precludes any interest that I may have in

22         that.

23              So to the extent, Mr. Babbitt, Mr. Pope,

24         Mr. Potter, I have been sharp in my commentary

25         during this process, it is because you have both

1    delved into matters that I think are proscribed by

2    the First Amendment from being considered by the

3    Court and it's frustrating.  I'm not going to be

4    dragged into these disputes.

5         So the limited purpose of this hearing again I

6    reiterate as set forth in the order is do these

7    rules exist and if so, show me convincingly how the

8    arbitration clause is connected to these rules.

9    Mr. Pope?

10        MR. POPE:  May it please the court.  I would

11   like to start with the case of *Premier Real Estate*

12   *Holdings Inc. vs. Butch, 24 So.3d 708*, Fourth

13   District, 2009.  I had made reference to this case

14   at the conclusion of our first hearing on the motion

15   to compel arbitration that led ultimately to this

16   evidentiary hearing.  And here is what the Fourth

17   District held, and let me just read the arbitration

18   clause here.  "Any controversy or claim arising out

19   of or related to this contract or the breach thereof

20   shall be settled by a neutral binding arbitration in

21   Dade County, Florida, in accordance with the rules

22   of --" blank.  There is nothing filled in there.

23   And then it says under that, "Name of organization

24   and not by any court action except as provided by

25   Florida law for judicial review of arbitration

1          proceedings."

2              Now, that's about as loosey-goosey an

3      arbitration clause as you can ever imagine.  It

4      doesn't even say in accordance with what.

5              THE COURT:  Just blank?

6              MR. POPE:  Just blank.  It's right there, just

7      a blank, they forgot to fill in the blank.  And the

8      contention was both that it was unconscionable and

9      that it didn't spell out the rules.  And in this

10     particular case the Court said well, we'll just plug

11     in whatever the Florida Arbitration Code says.

12             So here what you have here is you have the

13     man, Mr. Ellis, who is charged with deciding these

14     internal matters, and this is a matter of procedure,

15     and you do have an arbitration provision that tells

16     you what the subject matter is to be of the

17     arbitration, and tells you how the arbitrators are

18     to be selected.  And then you have Mr. Ellis saying

19     the compatible rules that govern a Committee of

20     Evidence are the rules that would apply to this.

21     And those are the rules that call for a bill of

22     particulars, they are call for interviewing

23     witnesses, they don't call for legal representation,

24     although a lawyer can come and counsel with the

25     person, and they call for impartiality and getting

1    to the truth of the matter.  That was what he turned

2    to time and time again.

3         So there is a framework here for deciding this

4    and it's a framework that the guy in charge of

5    deciding these sorts of has testified to and it's in

6    there --

7         THE COURT:  Let me stop you for a moment.  If

8    I understand the *Premier* case, the court

9    incorporated the Florida statutes on arbitration

10   procedures, right?

11        MR. POPE:  Yes, sir.

12        THE COURT:  In this case you're asking me to

13   incorporate the opinions of Mr. Ellis.

14        MR. POPE:  Actually I'm not asking you to do

15   that.  I'm asking you to acknowledge that there is

16   an existing policy letter, dated September 7, 1963,

17   that sets forth the procedures that apply not only

18   to a Committee of Evidence but also to an

19   arbitration.

20        THE COURT:  But that policy letter does not

21   mention arbitration, does it?

22        MR. POPE:  No, it does not because that policy

23   letter was written in 1963 and the evidence is that

24   the Enrollment Agreement did not come about until

25   1984 that had the agreement in it.  So -- but the

1        policy letter says that it applies to all

2        Scientology justice matters and it even mentions in

3        there on the first page "refunds."

4              So you have the international justice chief

5        who says it's my job to apply these things and that

6        is how he has applied it.

7              THE COURT:  Well, he hasn't applied it.  An

8        arbitration has never been conducted.

9              MR. POPE:  True.  But if an arbitration goes

10       forward, he has said this is how it will take place.

11             THE COURT:  Didn't you or someone say

12       yesterday, might have been Mr. Potter, that the

13       conscionability or unconscionability of an

14       arbitration agreement has to be determined as of the

15       time it was entered into?

16             MR. POPE:  Yes, procedural.  And what

17       Mr. Ellis said was essentially this -- all you've

18       got to do is read the first page of the 1963 policy

19       letter which is required reading for everybody in

20       this religion.  I walked you through or I walked

21       Mr. Garcia through this elaborate course that he

22       compared to a master's degree in which he dissected

23       this whole procedure.

24             So if it applies to all Scientology justice

25       matters, it seems to me, and the theory within the

1          church is that of LRH infallibility, it applies to

2          any justice matter that comes along later, including

3          arbitration.

4               THE COURT:  Is justice matter defined in the

5          religious tenets of this organization?

6               MR. POPE:  Well, there were a couple of

7          definitions I recall.  One was on page -- where was

8          the -- in part of the book--  it basically has to do

9          with fairness and impartiality.  But it has to do

10         basically in -- on the front page of the 1963

11         letter, policy letter, it talks about the various

12         sorts of things that are considered subject to the

13         Scientology justice system and one of those things

14         mentioned in there is refunds.

15              THE COURT:  I'm curious still, though, where

16         is the definition of justice -- matters of justice

17         that you rely on.  Is it in the book?

18              MR. POPE:  Well, on page 370 there is this

19         concept.  "Most people do not even know that justice

20         means fair and equitable treatment for both the

21         group and individual."  And in the policy letter

22         itself, have you got the policy letter, the policy

23         letter itself, Your Honor, on page 1, which is

24         Exhibit 11 in our book, speaks about justice.

25         "There can be no personal security without easily

1    accessible, swift and fair justice.  The

2    jurisprudence employed must be competent, acceptable

3    to the members, the group, and effective, in

4    accomplishing good order for the group.  Justice

5    used for revenge, securing advantages for

6    [inaudible] increases disorder.  Justice should

7    serve as a means of establishing guilt or innocence

8    and awarding damages to the injured."  "And awarding

9    damages."  Which would be refunds for people who are

10   aggrieved.

11         THE COURT:  Well, that's your interpretation,

12   right?

13         MR. POPE:  Well, I think it -- yes, sir.

14         THE COURT:  And that may be.  But I think the

15   First Amendment prohibits me from interpreting this

16   I will call it a tenet -- I hope that's a correct --

17         MR. POPE:  Your Honor, I'm not asking you to

18   interpret it.  I'm asking you to accept the

19   interpretation that Mr. Ellis gave to it.

20         THE COURT:  No, I don't, I don't, because it's

21   irrelevant.  My mission, as I understand it, is to

22   determine whether these rules apply to arbitration.

23   His opinion that they do is not determinative.  And

24   unless you can cite some case law that tells me I

25   should accept his opinion, I have to rely on the

1    documents, the Enrollment Agreement and the

2    arbitration clause and what you contend are the

3    applicable rules and procedures vis-à-vis the

4    Committees of Evidence.

5         You may be right; all I'm saying is that's a

6    matter of his religious interpretation or his

7    interpretation of this policy letter.  Am I bound by

8    that?

9         MR. POPE:  Sir?

10        THE COURT:  Am I bound by that?

11        MR. POPE:  I believe that you are under the

12   First Amendment.

13        THE COURT:  Give me case law that tells me I'm

14   bound by that.

15        MR. POPE:  That's what I'm digging into right

16   this minute.

17        THE COURT:  It's not his interpretation of the

18   Committees of Evidence that I'm talking about, it's

19   his opinion that these are the rules of arbitration.

20        Sir, could you please sit down?  Gentleman,

21   hello, if you want to carry on a conversation, go

22   outside, please.  Thank you.  It's distracting and I

23   apologize for raising my voice.  Mr. Pope is trying

24   to make a point here and if I'm distracted, I'm not

25   going to get it.

1          MR. POPE:  Let me start -- let me start with

2     *Watson vs. Jones, 80 U.S. 679*, 1871 U.S. Supreme

3     Court case.  "All who unite themselves to a church

4     do so with implied consent to its government and are

5     bound to submit to it.  We cannot decide who ought

6     to be members of the church.  The judicial eye

7     cannot penetrate the veil of the church for the

8     forbidden purpose of vindicating the alleged wrongs

9     of excised members.  When they became members, they

10    did so upon the condition of continuing or not as

11    they and their churches might determine and they

12    thereby submit to the ecclesiastical power and

13    cannot now invoke the supervisory power of the civil

14    tribunals."

15         Let me also call your attention to a case that

16    came to my attention after the last hearing we had.

17    It's called -- this is a mouthful -- *Bible Way*

18    *Church of Our Lord Jesus Christ of the Apostolic*

19    *Faith of Washington, D.C., 680 Atl.2d 419, D.C.*

20    *Court of Appeals 1996*.  The court pointed out to the

21    plaintiffs in this case the "primacy of church

22    tribunals for deciding such matters consistent with

23    the Fourth Amendment" and then held, "Absent an

24    effective church tribunal or adoption of standards,

25    a civil court can decide without crossing an

1       ecclesiastical line a church member's only remedy

2       for perceived financial irregularity appears to be

3       cutting one's losses by leaving the membership."

4              That opinion in that case is a scholarly one

5       and I commend the attention of the church to it.

6       But the point is, Your Honor, that you have an

7       internal religious justice system and you have a

8       fellow come in here and testify to you that this is

9       how it works, this is what it means.

10             THE COURT:  Isn't that different from my

11      responsibility to determine if this arbitration

12      clause is enforceable?

13             MR. POPE:  Well, I think that if you defer to

14      Mr. Ellis's --

15             THE COURT:  Why are we here then?  If I have

16      to defer to him, we shouldn't even be here.

17             MR. POPE:  Well, I think that that's the

18      issue.

19             THE COURT:  I don't think that's correct.

20      That's my point.  If he wants to tell me what

21      disconnect means and what a suppressive person is,

22      and all of those things, absolutely, I'll defer.

23      But I don't think he can tell me that these are the

24      rules that apply to arbitration unless that opinion

25      is supported by a reference to arbitration or vice

1        versa to the rules in the arbitration clause.  And

2        that's distilled down just to this issue.

3              So if you say forget Mr. Ellis's opinion, just

4        look at the phraseology in the September 1963 policy

5        letter, I'm with you on that, this system is for use

6        in all matters of justice in Scientology.  Okay.

7        All right.

8              Segue into arbitration from that statement.

9        Definitions or -- I do see the reference to refunds,

10       I mean that's there.

11             MR. POPE:  It's in there.  And I don't see --

12       the reference to refunds occurs on the second page

13       under the headings HCO Area Committee of Evidence.

14             THE COURT:  Yes, sir.

15             MR. POPE:  So the -- when you have as the lead

16       off sentence, "This system is for use in all matters

17       of justice in Scientology," it seems to me that

18       justice has to do with the internal dispute

19       resolution process of the church and arbitration is

20       necessarily a part of that.

21             And here's what paragraph 6(D) of the

22       Enrollment Agreement says:  "I will pursue

23       resolution of that dispute, claim or controversy

24       solely and exclusively through Scientology's

25       internal ethics justice and binding religious

1       arbitration procedures."

2           So --

3           THE COURT:  I understand that's what it says.

4   Where are they?

5           MR. POPE:  They're in the Committee of

6   Evidence.

7           THE COURT:  That doesn't say anything about

8   arbitration.

9           MR. POPE:  I understand that, Your Honor, and

10  neither did the case -- the Premier Property case or

11  whatever the name of that case was.  It didn't say

12  anything.  As a matter of fact --

13          THE COURT:  Well, do you want me to fill in

14  the blank here and say you guys go arbitrate

15  according to the Florida Arbitration Code?  I'll be

16  happy to do that.

17          MR. POPE:  You could do that.  You could do

18  that.

19          THE COURT:  You really think I can do that?

20  When I said I would be happy to do that, it was for

21  the sake of argument.

22          MR. POPE:  Well, I was going to say --

23          THE COURT:  I think I would be reversed in a

24  nanosecond.

25          MR. POPE:  In the average arbitration

1    agreement there is a reference that says we're going

2    to arbitrate this pursuant to the AAA and its rules.

3    There is nothing spelled out in the agreement

4    whatsoever.  You've got to go and look it up and

5    research.

6         THE COURT:  But there is an express reference

7    to the AAA rules which are known to exist.

8         MR. POPE:  Well, Your Honor, the cases have

9    made it clear in Florida that you don't have to have

10   Rules of Civil Procedure like detail to have enough.

11   The cases really have said it's enough if you know

12   how the arbitrators are selected, what the subject

13   matter is to be, that's basically what several of

14   these cases have held including I believe the most

15   recent one, let me get it, Voicestream Wireless

16   case, 912 So.2d 34, deals with that subject and

17   basically says that you don't have to have a huge

18   amount of detail for it to pass muster.  And we've

19   got detail here supplemented by the rules of the

20   Committee of Evidence that the IJC says apply to

21   arbitration.

22        THE COURT:  Let me ask you a hypothetical.  If

23   I agree with you and compel arbitration and it

24   happens, although it's never happened in the history

25   of this organization, and then one of you is unhappy

1      with the result, where do you turn?

2            MR. POPE:  I believe that you would have the

3      right of any court that compels arbitration to do a

4      review limited to those areas that courts are

5      limited to and that is partiality, unfairness and

6      partiality and corruption and that sort of stuff.

7            THE COURT:  Mr. Babbitt is happy to hear that

8      is.  There going to be a record of it?

9            MR. POPE:  Your Honor, there is the

10     complicating factor of the First Amendment in this.

11     And you've already said where you can't go on the

12     fairness issue.

13           THE COURT:  Well, I've said that, but if

14     something happens in arbitration and it becomes

15     apparent that one of the arbitrators has been bought

16     off, paid off, I think there might be appropriate

17     judicial scrutiny of that.

18           MR. POPE:  I would have to agree, I believe.

19           THE COURT:  Will there be a record of the

20     proceeding if I'm asked to review it by you on

21     behalf of your client or Mr. Babbitt on behalf of

22     his?  What am I going to review?

23           MR. POPE:  Well, as I understand the process,

24     it is less formal than would be required under the

25     Florida Arbitration Code.  There are -- the

1      witnesses are interviewed, the facts are gathered

2      from them over a period of time, documents are

3      looked at.   In this case he's got a claim for fraud.

4      He comes in, he puts out, he brings whatever

5      witnesses, he testifies himself or gets interviewed

6      on the subject, and a report is written up with a

7      binding decision and that's what would come back to

8      you as the court compelling the arbitration.

9            THE COURT:   So you do contemplate that there

10     would be some memorialization of whatever the

11     arbitrators decide?

12           Please, people.   Mr. Potter, tell them to

13     relax.   Thank you.   Mr. Pope has the floor.

14           Am I going to get something in writing signed

15     by these three arbitrators saying here are the

16     facts, here's our conclusions, and we agree or

17     disagree with the Garcias?

18           MR. POPE:   That was the import of what

19     Mr. Ellis said.   There is a report that comes out of

20     the process.

21           THE COURT:   But they haven't filed this

22     voucher thing yet.

23           MR. POPE:   Bill of particulars?

24           THE COURT:   No, voucher.   Remember the witness

25     yesterday told us that before you can get an

1     arbitration, you have to submit this voucher thing.

2     And if you don't do that --

3          MR. POPE:  No, Your Honor, that actually

4     doesn't apply to persons who are declared.  You mean

5     the, what do you call it, claims verification board.

6     That process does not apply to people who are

7     declared.

8          THE COURT:  So we can bypass that.

9          MR. POPE:  You bypass that.  You go straight

10    to the international justice chief.  And first they

11    pick an arbitrator, the church picks one, the two of

12    them pick a third, and those people get together and

13    form the process that is compatible with arbitration

14    under the Committee of Evidence, interviewing --

15    it's an informal process, but it does result in a

16    final report and decision.

17         THE COURT:  Binding on the church?

18         MR. POPE:  That is binding on the church.

19         THE COURT:  Not subject to the review by

20    Mr. Ellis?

21         MR. POPE:  That's exactly what he said.  It is

22    not subject to review by him, it is binding on the

23    church.

24         THE COURT:  Let's let Mr. Babbitt take his

25    shot.  The case that you cited, the *912 So.2d 34*,

1        let me get the name of that again, please.  I'm

2     sorry.

3              MR. POPE:  I think it's Voicestream, Your

4     Honor.  And there is another case I want to point

5     out to you.

6              THE COURT:  Voice?  Speaking voice?

7              MR. POPE:  Voicestream, as in a phone company

8     or something.  It's one word, Voicestream with

9     capital V, capital S, I believe.

10             THE COURT:  What was the other case you wanted

11    to cite?

12             MR. POPE:  I'll have to go look for it, Your

13    Honor, there are a couple of them.

14             THE COURT:  This is on the point of what is

15    required by way of rules and procedures to meet the

16    test of enforceability.  And you're saying not much.

17             MR. POPE:  That's correct.

18             THE COURT:  Mr. Babbitt.

19             MR. BABBITT:  Thank you, may it please the

20    court.  Your Honor, what is the Enrollment

21    Agreement?  What is it at bottom?  It's a contract,

22    right?  This court can't put things into the

23    contract or take things out of the contract.

24             THE COURT:  Well, apparently the Fourth DCA

25    thought it could.

1          MR. BABBITT:  Well, that's because they

2     applied the Florida Arbitration Code.  But you asked

3     Scientology, Mr. Potter, last hearing, whether he

4     would concede that and apply the Florida arbitration

5     and they specifically said no, we will not.  So that

6     can't be done in this case.

7          But Your Honor, there is nothing in this

8     agreement, there is zero in this arbitration

9     agreement that applies any rules at all.  So that's

10    why you're asking these questions and you're getting

11    these responses, we're just taking it as it goes,

12    we're making it up as we go along.  There is nothing

13    in there about the CBV form doesn't apply, that's in

14    the rules it does, but it's Mr. Ellis's opinion that

15    we're going to change this contract by adding that

16    in there.  But you can't do that.  There are no

17    rules.  There is not a mention of these rules in the

18    arbitration agreement and that's the bottom of what

19    procedural unconscionability is because it's at the

20    time the man signs the agreement, he has to know

21    what applies.  And there is nothing that says that

22    it does.  Zero.  There is nothing in the Committee

23    of Evidence rules that says anything about

24    arbitration because it's impossible, it is

25    impossible to apply those rules to an arbitration.

1        They're mutually inconsistent.

2            On the one hand there are three arbitrators,

3    on the other hand there are four to six members of

4    the Committee of Evidence rule.  On the one hand the

5    arbitrators are chosen by the parties, on the other

6    hand they are chosen by an official of Scientology.

7    It's impossible.  There are at least 10 different

8    things in the Committee of Evidence that simply are

9    inconsistent, are polar opposites to the arbitration

10   proceeding.  The arbitration proceeding is supposed

11   to be binding, it says it's binding, yet the

12   Committee of Evidence rule says it's not binding,

13   that a finding of the Committee of Evidence is

14   merely a suggestion to this employee of Scientology

15   who can then change it.

16            You can't have both.  Judge, the circumstances

17   under which Mr. Ellis supposedly ruled that the

18   Committee of Evidence rules apply to arbitration

19   simply don't pass the smell test.  I mean,

20   supposedly six days after this Court's order there

21   is this contact with a man who they have denied his

22   claim six months before and you entered an order

23   which said tell me, Scientology, where the IJC has

24   ruled that these rules apply.  They file an

25   affidavit of Mr. Ellis and in that affidavit he

1    doesn't say a word about this thing that happened

2    nine years ago in a hallway where somebody said what

3    rules apply and he says oh, it be the Committee of

4    Evidence rule.

5        I mean, this was an order that said tell me

6    when it happened.  And there is not a thing in his

7    declaration that says that it happened nine years

8    ago when I was talking to this Leanna lady who by

9    the way they don't call, they don't even have her

10   deposition, they don't do anything to say that this

11   really happened.  I mean, it just doesn't pass the

12   smell test.

13       Besides which, whether he ever ruled or not,

14   if it doesn't fit, you must acquit.  It cannot

15   possibly apply to an arbitration in which three

16   people are chosen.  It's impossible.  There are no

17   rules.  And that's dispositive of this Court's

18   ruling.

19       Now, you asked about where justice is defined.

20   It's defined on page 6 of Exhibit 3 in which it

21   says --

22       THE COURT:  You mean the book itself?

23       MR. BABBITT:  I am, the book itself.

24       THE COURT:  Page --

25       MR. BABBITT:  6.

1          THE COURT:  Number 3 or III?

2          MR. BABBITT:  I'm sorry, it's Exhibit 3, page

3     6.

4          THE COURT:  I got you.  The basics of ethics?

5          MR. BABBITT:  The definition of justice.  You

6     asked where is it defined.  It's defined on page 6

7     of Exhibit 3, this book.  This book that Mr. Ellis's

8     declaration said was the *sine qua non* of Scientology

9     and contains all the ethics of Scientology, it says

10    when the individual fails to put his own ethics, the

11    group takes action against him and this is called

12    justice.  It's defining what justice is.

13         The definition of justice that Mr. Pope

14    referred to was the common Webster definition of

15    justice, it's not what Scientology defines as

16    justice.  And that's why the Committee of Evidence

17    rules don't apply.  They're a criminal procedure.

18         THE COURT:  To be fair, Mr. Babbitt, the

19    question should be where is the phrase "matters of

20    justice" defined.

21         MR. BABBITT:  Well, they're not.  The word

22    justice is defined, but the word "matters" -- and

23    this issue of refund being in the Exhibit 11, my

24    Exhibit 11, which is the Committee of Evidence

25    rules, it was there in 1963 when it was passed, the

1        word "refund," but it related, if you read it, it

2        relates to a committee called the HCO Committee

3        which the evidence shows does not exist anymore.  It

4        was merged into the other functions of Scientology,

5        it doesn't exist anymore.  So when this book came

6        out, the book that has been testified by everyone as

7        the book, the words of L. Ron Hubbard, that was

8        taken out.  That word doesn't exist in this book

9        anymore, nowhere does it exist with relation to the

10       Committee of Evidence.  So that is not applicable

11       anymore.

12            Now, on the subject -- as I understand it,

13       Your Honor, you want me to talk about the First

14       Amendment issue; is that correct?

15            THE COURT:  No.

16            MR. BABBITT:  I thought you said you wanted to

17       hear from me about that.  Because I want to talk

18       about the cases that Mr. Pope has cited which

19       specifically say that this Court does have

20       jurisdiction to consider the secular issue of

21       whether this contract is enforceable or not.

22            THE COURT:  That point, yes, I was interested

23       in your comments.  I think what I was trying to --

24            MR. BABBITT:  So if you look at one of the key

25       cases that he cites is *Meshel vs. Ohev Sholom Talmud*

1    *Torah*, that case on page 343 says -- and this

2    Justice Brennan, excuse me, before Justice Brennan

3    in his concurring opinion but in the opinion of the

4    court, "Specifically civil courts may resolve

5    disputes involving religious organizations as long

6    as the court is applying neutral principles of law

7    and their decisions are not premised upon their

8    consideration of doctrinal matters, whether the

9    ritual and liturgy of worship were the tenets of the

10   faith," and they cite several cases.

11        Then Justice Brennan in concurring says, "Even

12   where the civil courts must examine religious

13   documents in reaching their decisions, the mutual

14   principles approach avoids prohibited entanglement

15   in questions of religious doctrine, polity and

16   practice by relying exclusively on objective

17   well-established concepts of law that are familiar

18   to lawyers and judges.  The neutral principles

19   approach is thereby completely secular in operation.

20   We are fully satisfied that a civil court can

21   resolve appellant's action to compel arbitration

22   according to objective, well-established neutral

23   principles of law."

24        THE COURT:  What's the cite on that, please?

25        MR. BABBITT:  That cite is *869 Atl.2d 343*,

1          District of Columbia Court of Appeals in 2004,

2     December 15th of 2004.  Decided 2005.  And then in

3     the other cases --

4          THE COURT:  I was just curious, you have

5     referenced Justice Brennan.  Is that a

6     different Justice Brennan than --

7          MR. BABBITT:  It must be.  It's Justice J.

8     Brennan.

9          THE COURT:  That's what threw me off.  I

10    thought you were talking about a Supreme Court case.

11         MR. BABBITT:  I did, too, when I first read

12    it, Judge.

13         The case of *Church of Scientology Flag Service*

14    *Organization vs. City of Clearwater*, the cite is *62*

15    *USLW 2218*, it's *2 F.3d 1514*, a 1993 case.  In that

16    case essentially what the court held is that

17    Scientology is not above the law.  "Generally

18    applicable penal laws that proscribe extortion,

19    burglary, kidnapping and the like, are inadequate to

20    address other asserted interests in controlling the

21    alleged illegal and coercive conduct of charitable

22    and religious organizations."  They cite this Sun

23    Myung Moon case, and they talk about false

24    documents -- the point is, Judge, we're not asking

25    you to look into the Church of Scientology and

1    decide whether their doctrines or right or wrong.

2    You can't do that.  That First Amendment prohibits

3    that if they're a religion.  That issue has never

4    been decided, by the way, in this case, they have

5    the burden of showing that.

6        But even assuming that they are, we're not

7    asking you to do that.  This court has inherent

8    jurisdiction to decide its own jurisdiction and

9    we're not telling the court what to believe or what

10   Scientologists believe.  The question is have they

11   set up a system of arbitration that is so unfair

12   that they have set up in essence a kangaroo court.

13   They have said there is no way that anyone under the

14   circumstances of this case could ever get any

15   fairness because of the inherent beliefs of what

16   every Scientologist believes in, which is that a

17   person who is declared is at war with Scientology

18   and they could never find for that person.

19        That is what deals with the issue of

20   unconscionability, so it's not substantive

21   unconscionability.  The fact that there is no

22   reference to the Committee of Evidence, the fact

23   that there has never been an arbitration, the fact

24   that this agreement, this Enrollment Agreement,

25   deals only with services, it doesn't deal with -- if

1      a Scientologist runs somebody over in a truck in a

2      truck that belongs to Scientology, that you have to

3      arbitrate things.  That doesn't make any sense.  And

4      that's the logical extension of their argument that

5      we're going to apply this to everything, no matter

6      that it's mentioned or not.

7          The agreement itself, if you read it,

8      specifically says the rules that apply are as

9      follows.  And then it lists choosing an arbitrator,

10     one, and the other.  It doesn't give notice to

11     Mr. Garcia or his wife that we're going to apply the

12     Committee of Evidence rules that apply to a criminal

13     or a quasi criminal issue.  That just isn't in

14     there.  And it can't happen.  It would be

15     impossible.  Just think if you order us to

16     arbitration, what happens once the arbitrators are

17     chosen?  There is nothing there about how it's run,

18     who makes decisions, what rules apply, nothing.

19         Now, the church could have easily made an

20     arbitration proceeding that was enforceable.  They

21     could have said let's -- you know, if you have a

22     problem with what we've charged you for your

23     services and you want to be heard, go to the

24     American Arbitration Association, let them pick some

25     arbitrators.  The Florida Arbitration, JAMS,

1        whatever you want.  But instead they said it's got

2        to be three Scientologists in good standing who by

3        every doctrine that you could read yourself, you

4        don't need anybody to tell you what it says, says

5        you can't believe anything that this person says,

6        you can't grant adherence to them, you can't sit in

7        judgment of Scientology.  All of these things make

8        it impossible for someone to have an enforceable

9        arbitration hearing.

10            I think I've covered everything, Judge.  If

11        you read this Committee of Evidence rule on

12        Plaintiff's Number 11, you find that not only is it

13        completely incompatible, but it specifically says

14        the only findings that can come out of this are

15        penal findings.  Is this person guilty, not guilty,

16        or are we going to reduce his sentence.  That's it.

17        It's impossible to apply that procedure to this and

18        it wasn't in the agreement, it's never been in the

19        agreement, it's never been used, they can't cite one

20        example of when it has been used, and it's just

21        impossible to apply those rules to this procedure.

22            THE COURT:  All right, thank you, Mr. Babbitt.

23        Mr. Pope, your last chance.  Looking at the policy

24        letter of 7 September 1963, your Exhibit 11, tell us

25        where in that document it tells us how the three

1    arbitrators are to make a ruling in a particular

2    arbitration.

3          MR. POPE:  I believe that -- well --

4          THE COURT:  It doesn't.  It doesn't.  I mean,

5    in fairness to you.

6          MR. POPE:  It doesn't use the word

7    arbitration, that's true.  But may I finish what I

8    -- give you the cases that I wanted to give.

9          THE COURT:  Well, let's go back to my

10   question.  Yes, sir, I do want to get that cite

11   down.  Go right ahead.

12         MR. POPE:  First, the language I was looking

13   for appears also in the *Premier Real Estate Holdings*

14   case which says, "Provisions in a contract providing

15   for arbitration must be definite enough so that the

16   parties at least have some idea as to what

17   particular matters are to be submitted to

18   arbitration and set forth some procedures by which

19   arbitration is to be affected."

20         To the same extent is the case of *Malone*

21   *Hyde Inc. vs. RTC Transportation*, which is at *515*

22   *So.2d 365*, Fourth District, 1987, and *GN*

23   *Construction Company vs. Kirpatofsky, 181 So.2d 664*,

24   Third District, 1966.

25         So the law of Florida is pretty clear that you

1     really don't have to have a whole lot of detail and

2     the Premier Property case is probably the premier

3     case because that had virtually no detail.

4          Now, with regard to the Committees of

5     Evidence, Your Honor, it speaks in terms of bills of

6     particulars, of interviewing witnesses,

7     deliberating, coming to a conclusion, reaching a

8     decision which is binding.  And at least according

9     to the man who is charged with deciding these

10    matters -- and let me just conclude with this, Your

11    Honor.  The Court -- we have made representations to

12    the Court about how this would proceed and you could

13    certainly hold our feet to the fire if it doesn't

14    proceed in that fashion.  I mean, we have said that

15    there is a bill of particulars and how the

16    arbitrators are to be picked and what's the subject

17    of arbitration.  We've certainly provided enough

18    detail for this internal informal process to run its

19    course and you're entitled to hold our feet to the

20    fire to make sure that we in fact did follow the

21    procedures that we said we would.

22         I think that that's a fair -- that would be a

23    fair concession to make if you compelled

24    arbitration.  And with that, Your Honor, I'm not

25    sure I have anything else to add.

1          THE COURT:  Well, I glean from your comment --

2     apparently Potter has something to add.  What's he

3     found?

4          MR. POPE:  He has found in the Committee of

5     Evidence on page number 453, they have those

6     numbers, page 453 under Types of Bills, "A committee

7     may here any civil or criminal matter or dispute

8     within the realm of Scientology whether the parties

9     are connected with the organization or not.  Liable,

10    estranging marital partners, dismissals, debt,

11    theft, mayhem, violations of codes, deprivation of

12    income, or any dispute or harmful improper action of

13    any kind may be heard."

14         That's pretty sweeping.  And now I'm ready to

15    sit down and be quiet, Your Honor.

16         THE COURT:  Well, on a positive note,

17    gentlemen, I am happy to have the lawyers here who

18    have been participating in this matter because you

19    have kept it professional, you have stayed above the

20    fray for the most part, and I appreciate that.  So

21    thank you for your efforts on behalf of your

22    respective clients.

23         Whatever I decide -- and I am still

24    deliberating -- it's certainly not a comment and

25    should not be construed as a comment on any beliefs

1    of this organization.  I will try to apply, as

2    Mr. Pope calls it, completely secular, neutral

3    principles of law.  In doing that, it necessarily

4    requires that I look at the September 7th, 1963

5    policy letter to determine if indeed the arbitration

6    clause incorporates that as the procedures

7    applicable to arbitration.

8         And I think the *Premier* case may be

9    instructive, I'm not hearing any disagreement from

10   Mr. Babbitt, that to be enforceable the arbitration

11   rules and procedures must be definite enough to put

12   the parties on notice.  That is, there must be some

13   procedures.

14        I hear the plaintiffs loud and well that we're

15   trying to fit a square into a circle because there

16   are inherit inconsistencies in this Committees of

17   Evidence policy statement and the arbitration

18   clauses at issue.  And it's problematic perhaps, but

19   I will have to look at it.

20        I don't promise when I will decide or how I

21   will decide.  I will do it as soon as possible as I

22   possibly can.  I don't want any additional briefing.

23   If you file something without leave of court, it

24   will be stricken.  And if you were here, you would

25   do the same thing.  If you find authority on point

1      that has not been cited to the court, you are

2      certainly free to file a notice of supplemental

3      authority without argument, giving us a citation, we

4      will certainly read that case.  But I trust you've

5      given us everything you could find.

6              Anything else from the defendant, Mr. Pope?

7              MR. POPE:  No, Your Honor.

8              THE COURT:  Mr. Babbitt, on behalf of your

9      clients?

10             MR. BABBITT:  No, Your Honor.

11             THE COURT:  All right.  If what one of the

12     witnesses said is actually correct, it would seem to

13     me that now would be a great opportunity for the

14     parties to try to resolve their differences.

15     Because once I rule, it will be too late.  Perhaps

16     not too late, but later than now.  And I think it

17     was the testimony of Mr. Cartwright who says we

18     haven't had any arbitrations because the preliminary

19     steps involved resolve all of the claims or resolved

20     all of the claims to refunds.  I presume that means

21     to the satisfaction of the parties.

22             So if Mr. Cartwright's testimony is accurate,

23     maybe we should give some thought to that.

24     Otherwise I'll make a difficult decision one way or

25     the other.  And I appreciate your efforts.  We will

1        be in recess.

2               (The proceedings adjourned at 12:06 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3      STATE OF FLORIDA            )

4      COUNTY OF HILLSBOROUGH    )

5          I, Lynann Nicely, RMR, CRR, Official Court

6    Reporter for the United States District Court, Middle

7    District, Tampa Division,

8          DO HEREBY CERTIFY, that I was authorized to and

9    did, through use of Computer Aided Transcription,

10    report in machine shorthand the proceedings and

11    evidence in the above-styled cause, as stated in the

12    caption hereto, and that the foregoing pages,

13    numbered 1 through 107, inclusive, constitute a true

14    and correct transcription of my machine shorthand

15    report of said proceedings and evidence.

16          IN WITNESS WHEREOF, I have hereunto set my hand in

17    the City of Tampa, County of Hillsborough, State of

18    Florida, May 13, 2015.

19

20

21              _/s/ Lynann Nicely_
                  Lynann Nicely, RMR, CRR,
22                Official Court Reporter

23

24

25