[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 18-13452

_____

MARIA DEL ROCIO BURGOS GARCIA,
LUIS A. GARCIA SAZ,

Plaintiffs-Appellants-
Cross Appellees,

*versus*

CHURCH OF SCIENTOLOGY FLAG SERVICE
ORGANIZATION, INC.,
a Florida nonprofit corporation,
CHURCH OF SCIENTOLOGY FLAG SHIP SERVICE
ORGANIZATION, INC.,
a foreign corporation doing business in Florida,
d.b.a. Magestic Cruise Lines,

2                    Opinion of the Court                    18-13452

Defendants-Appellees-
Cross Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:13-cv-00220-JDW-TBM

_____

Before WILLIAM PRYOR, Chief Judge, ROSENBAUM, and LUCK, Circuit Judges.

LUCK, Circuit Judge:

The main issues in this appeal are whether the district court correctly compelled arbitration of a dispute between two former members of the Church of Scientology and two church entities and whether it correctly denied a motion to vacate the resulting arbitration award. Luis and Maria Garcia filed this action to recover funds they donated to the church when they were Scientologists. But because they agreed to submit any disputes with the church to religious arbitration, the district court compelled arbitration before a panel of Scientologist arbitrators. After the arbitrators awarded the Garcias about $18,000, far less than they sought, the Garcias moved to vacate the award based on evident partiality and arbitrator misconduct. The district court denied the motion. The Garcias appeal the orders that compelled arbitration and denied their

motion to vacate.  The church entities cross-appeal, arguing that the district court lacked subject-matter jurisdiction over this action and that it erred by granting leave to amend the complaint.  We affirm because the district court had jurisdiction, did not abuse its discretion by granting leave to amend, correctly compelled arbitration, and correctly rejected the grounds for vacating the award.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Luis and Maria Garcia are former members of the Church of Scientology.  As Scientologists, the Garcias donated to projects and causes that the church promoted, and they paid to receive religious services.  They also agreed to resolve any disputes with the church through binding religious arbitration.  The Garcias later left the church, which led its leadership to declare them "suppressive persons"—a term that refers to people who have been expelled from Scientology.  After their expulsion, the Garcias unsuccessfully sought refunds of their donations and payments.

The Garcias filed a complaint in the district court against five entities associated with the Church of Scientology.  They alleged claims of fraud, breach of contract, and unfair and deceptive trade practices under state law and sought more than $400,000 in damages.  In addition to two nonprofit corporations—Church of Scientology Flag Service Organization, Inc., and Church of Scientology Flag Ship Service Organization, Inc.—the Garcias named as defendants two religious trusts and a nonprofit corporation that served as

the official membership organization of Scientology.  They alleged that all five entities "acted in concert either as agents or principals of one another, partners, joint venturers, or co-conspirators."

Three of the Scientology entities—the two trusts and the membership organization—moved to dismiss the complaint for lack of diversity jurisdiction.  The entities argued that the district court lacked diversity jurisdiction because they and the Garcias were all citizens of California.

The Garcias moved for leave to amend their complaint to drop the three nondiverse defendants.  They explained that they had since determined that Flag Service spearheaded the activities underlying their complaint and that the nondiverse entities were dispensable parties.  The amended complaint attributed to Flag Service and Flag Ship much of the conduct that the original complaint attributed to the nondiverse parties.  It also alleged that Flag Service and Flag Ship "acted in concert either as agents or principals of one another, partners, joint venturers, or co-conspirators."

Over the objection of Flag Service and Flag Ship, the district court granted leave to amend and denied the pending motion to dismiss the original complaint as moot.  Flag Service and Flag Ship then moved to dismiss the amended complaint for lack of diversity jurisdiction, but the district court denied that motion too.

After Flag Service and Flag Ship moved to compel arbitration and stay the proceedings, the Garcias responded that the arbitration agreements they signed were unenforceable.  They argued

the agreements were procedurally unconscionable because they were contracts of adhesion and provided no procedures to govern an arbitration. And they contended the agreements were substantively unconscionable because Scientology doctrine regards suppressive persons as enemies of the church who have no rights. According to the Garcias, this doctrine would prevent them from receiving a fair hearing before arbitrators who were "Scientologists in good standing," as the arbitration agreements required.

The district court held an evidentiary hearing on the motion to compel arbitration. It found that the Garcias signed multiple enrollment applications for religious services during their time as Scientologists that contained broad arbitration agreements. The agreements covered "any dispute, claim or controversy" between the Garcias and "the Church, any other Scientology church, any other organization which espouses, presents, propagates or practices the Scientology religion, or any person employed by any such entity." The Garcias agreed to resolve any disputes that could not be settled informally "solely and exclusively through Scientology's Internal Ethics, Justice and binding religious arbitration procedures." The agreements provided for "binding religious arbitration in accordance with the arbitration procedures of Church of Scientology International." They included procedures for submitting a request for arbitration to the International Justice Chief of Scientology and the opposing party and for the selection of three arbitrators "to hear and resolve the matter." Under those procedures, each party would designate one arbitrator, and those two arbitrators

would select a third.  If the arbitrators were not designated within a specified time, the Justice Chief had the authority to appoint arbitrators.  Finally, the agreements provided that the arbitration would "be conducted in accordance with Scientology principles" and that all arbitrators would be "Scientologists in good standing with the Mother Church."  The district court also heard testimony from the Justice Chief who identified various sources of Scientology justice procedures.

Following the hearing, the district court ruled that the arbitration agreements were enforceable and granted the motion to compel arbitration.  It concluded that the agreements were not procedurally unconscionable because they included enough procedures to give the Garcias some idea of the matters to be arbitrated and the manner of effecting arbitration.  And it ruled that deciding whether Scientology teaching about suppressive persons rendered the agreements substantively unconscionable would have required "an analysis and interpretation of Scientology doctrine," which the First Amendment forbids civil courts to undertake.

As the arbitration agreements required, the Garcias sent a request for arbitration to the International Justice Chief of Scientology.  They requested arbitration against all the Scientology entities named in the original complaint and explained that their claims were "as set forth in the original complaint."  They also asserted claims against an additional Scientology entity not named in either complaint.

The parties were unable to agree on the selection of arbitrators, so the district court invoked its authority under the Federal Arbitration Act to appoint them.  *See* 9 U.S.C. § 5.  It ordered Flag Service and Flag Ship to provide a list of 500 Scientologists in good standing.  It then confidentially selected five Scientologists to serve as arbitrators or alternates.

The parties participated in a two-day arbitration—the first in the history of the Church of Scientology.  The Garcias' attorney did not attend the arbitration because church representatives informed him that Scientology procedures did not allow secular lawyers to play a substantive role in the proceedings.  Luis tried to bring a reading assistant with him to the arbitration, but a security guard denied the assistant access because she was not on the guest list.  When Luis raised the issue, the International Justice Chief refused to admit Luis's reading assistant but offered to provide someone else to assist him.  Luis declined the offer.

On the first day of arbitration, the International Justice Chief met with the Garcias and the arbitrators separately.  The Justice Chief told the Garcias that he needed to "hat" the arbitrators—a term that the Garcias say Scientologists use to mean "train"—because it was their first arbitration.  He gave the arbitrators background materials about the case, including the request for arbitration, the complaint, and church policies.  He also gave the arbitrators a report from the Scientology Claims Verification Board, which expressed the Board's view that the Garcias were not entitled to a refund.  The Justice Chief gave the Garcias copies of these

documents.  He also collected documentary evidence from the Garcias so that he could review it for "entheta," a term that the Garcias say Scientologists use to refer to anything critical of the church.  According to an affidavit Luis submitted to the district court, the Justice Chief redacted or excluded most of the documentary evidence as "entheta" or otherwise irrelevant.  The Justice Chief gave the remaining materials to the arbitrators to review in advance of the hearing the next day.  Finally, the Justice Chief told the Garcias that they could not bring witnesses to the hearing.

The next day, the arbitrators held a hearing with the Garcias present.  According to Luis's affidavit, near the end of the hearing, he complained that they had not received a fair hearing.  The lead arbitrator allegedly responded by "explod[ing] in a long platitude that lasted almost five minutes."  He told Luis that his complaints about fairness were misdirected because he was a big proponent of a Scientology program the Garcias had supported and knew that the church's promotional statements about the program were true.  He stated that it was a "stroke of luck" that the district court "chose [him] out of a list of 500 people" to be an arbitrator.  And he told the Garcias that he knew from prior experience that other suppressive persons were working to destroy the church and had "fed [the Garcias] all these lies" and sold them "a bill of goods."

The arbitrators issued written findings and awarded the Garcias $18,495.36 in refunds for deposits toward religious retreats they never attended.  The arbitrators assessed $16,161.35 against

Flag Ship and $2,334.01 against Flag Service. They rejected all other claims.

The Garcias returned to the district court and moved to vacate the arbitration award. They argued that the arbitrators exhibited evident partiality and were guilty of misconduct. They also moved for an evidentiary hearing on their motion to vacate. The district court denied both motions.

## II.    STANDARDS OF REVIEW

A few standards govern our review. We review de novo whether the district court had subject matter jurisdiction. *United States v. Iguaran*, 821 F.3d 1335, 1336 (11th Cir. 2016). We review the district court's factual findings for clear error and legal conclusions de novo both for a grant of a motion to compel arbitration, *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1350 (11th Cir. 2014), and for a denial of a motion to vacate an arbitration award, *Frazier v. CitiFinancial Corp., LLC*, 604 F.3d 1313, 1321 (11th Cir. 2010).

## III.    DISCUSSION

We divide our discussion into three parts. First, on the threshold issue of jurisdiction, we conclude that the district court had subject-matter jurisdiction over the case and that the denial of a motion to vacate an arbitration award is a final, appealable decision. Second, we explain that the district court correctly compelled arbitration. And third, we conclude that the district court properly denied the motion to vacate the arbitration award.

*Jurisdiction*

This appeal presents two jurisdictional issues:  (1) whether the district court had subject-matter jurisdiction; and (2) whether the district court's order denying the Garcias' motion to vacate the arbitration award was a final decision. We address each in turn.

1. The District Court Had Subject-Matter Jurisdiction

When a plaintiff amends his complaint, a federal court must look to the amended complaint to determine whether it has subject matter jurisdiction.  *See Pintando v. Miami-Dade Hous. Agency*, 501 F.3d 1241, 1243 (11th Cir. 2007).  This rule applies whether jurisdiction rests on the presence of a federal question, *see id.* at 1242–43, or, as here, on diversity of citizenship, *see Soberay Mach. & Equip. Co. v. MRF Ltd.*, 181 F.3d 759, 763 (6th Cir. 1999); *Samaha v. Presbyterian Hosp. in the City of N.Y.*, 757 F.2d 529, 531 (2d Cir. 1985).  We will consider the Garcias' amended complaint to determine whether the district court had diversity jurisdiction.

As a preliminary matter, the district court properly granted leave to amend the complaint.  The Garcias explained in their motion for leave to amend that they later determined that Flag Service spearheaded the activities underlying their complaint and that the nondiverse entities were dispensable.  The district court did not abuse its discretion by accepting this explanation and granting leave to amend.  *See* Fed. R. Civ. P. 15(a)(2).

The district court had diversity jurisdiction over the amended complaint, which named only Flag Service and Flag Ship

as defendants, neither of which are citizens of the Garcias' home-state of California.  And the amended complaint sought more than $75,000 in damages.  Because the amended complaint satisfied the requirements of complete diversity and a sufficient amount in controversy, the district court had jurisdiction.  *See* 28 U.S.C. § 1332(a).

Flag Service and Flag Ship argue that the Garcias alleged the existence of a partnership or joint venture but failed to identify the citizenship of all members of that entity, as required to establish diversity jurisdiction.  *See Underwriters at Lloyd's, London v. Osting-Schwinn*, 613 F.3d 1079, 1086–88 (11th Cir. 2010).  But no unincorporated entity has ever been a party to this suit, so we have no need to determine the citizenship of such an entity.  Nor have the Flag entities ever argued that some unincorporated entity is an indispensable party whose joinder was required under rule 19 for the suit to proceed.  *See Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1280 (11th Cir. 2003).

The Flag entities also insist that they submitted "uncontroverted evidence" that the conduct alleged in the amended complaint was committed, if at all, by the nondiverse defendants named in the original complaint.  But if that assertion is true, it means only that the amended complaint lacked merit because Flag Service and Flag Ship were not responsible for the conduct it alleged.  It casts no doubt on whether the Garcias are diverse from Flag Service and Flag Ship or whether the amount in controversy exceeds $75,000.

Although the Federal Arbitration Act does not confer federal jurisdiction, the district court had jurisdiction to compel the Flag

entities and the Garcias to arbitrate their dispute because it had di-
versity jurisdiction over the amended complaint. *See PTA-FLA,
Inc. v. ZTE USA, Inc.*, 844 F.3d 1299, 1305 (11th Cir. 2016). And
diversity jurisdiction over the amended complaint "gave the dis-
trict court not only the power to compel arbitration, but also the
power to confirm [or vacate] the resulting arbitration award." *Id.*
Under our precedent, it does not matter whether any additional
parties who participated in the arbitration were diverse or whether
the amount sought or awarded at the arbitration exceeded the re-
quired amount in controversy. *See id.* at 1305–06. Instead, if a dis-
trict court had the power to compel arbitration based on diversity
jurisdiction, "it retain[ed] jurisdiction to confirm or vacate the re-
sulting arbitration award under 9 U.S.C. [sections] 9–10." *Id.* at
1305 (internal quotation marks omitted). The district court's denial
of the motion to vacate on the merits was a valid use of that power.

2. The District Court's Order Denying the Motion to Vacate Was
a Final Decision

We issued a jurisdictional question asking whether the de-
nial of the motion to vacate the arbitration award was a final deci-
sion. A motions panel held that it was. We agree and revisit the
issue here to explain why.

The Federal Arbitration Act allows an appeal from various
district court orders regarding arbitration. *See* 9 U.S.C. § 16(a); *see
also Martinez v. Carnival Corp.*, 744 F.3d 1240, 1243 (11th Cir.
2014). An order denying a motion to vacate an arbitration award
is not one of the statutorily enumerated grounds allowing for

appeal. But the Act does allow for an appeal from "a final decision with respect to an arbitration that is subject to this title." 9 U.S.C. § 16(a)(3). We have interpreted a "final decision" under the Act to have the "well-developed and longstanding meaning of a final decision," which is a decision that "ends the litigation on the merits and leaves nothing more for the court to do but execute the judgment." *Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.*, 939 F.3d 1145, 1154 (11th Cir. 2019) (citation and internal quotation marks omitted); *see also Jackson v. Cintas Corp.*, 425 F.3d 1313, 1316 (11th Cir. 2005) ("A decision is final within the meaning of [section] 16(a)(3) where the court disposes of the entire case on the merits and leaves no part of it pending before the court." (internal quotation marks omitted and alterations adopted)). Under this "functional test," we look "to the practical effect of the district court's order, not to its form." *Martinez*, 744 F.3d at 1243–44.

We hold that an order denying a motion to vacate an arbitration award is a final decision. In denying the motion to vacate here, the district court had nothing left to decide. No motions remained pending nor does the record indicate that the district court "contemplate[d] any further action on this case." *Id.* at 1244. Often after an arbitration, one party will file a motion to vacate the award while the other party will file a motion to confirm the award. *See, e.g.*, *Schmidt v. Finberg*, 942 F.2d 1571, 1573 (11th Cir. 1991). Here, the Flag entities did not file a motion to confirm, but that does not preclude finality. For "an arbitrator's order is binding on the parties unless they expressly agree otherwise, and does not

require affirmation from a court to take effect." *Centurion Air Cargo, Inc. v. UPS, Co.*, 420 F.3d 1146, 1150 (11th Cir. 2005); *cf. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union AFL–CIO–CLC v. Wise Alloys, LLC*, 807 F.3d 1258, 1269 (11th Cir. 2015) ("[S]peculative post-arbitration proceedings cannot impact the finality of orders compelling arbitration."). Even if the Flag entities could later file a motion to confirm the award, the Supreme Court has said that "the existence of that remedy does not vitiate the finality of the District Court's resolution of the claims in the instant proceeding." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 86 (2000). Other circuits who have considered this issue have come to the same conclusion. *See United States v. Park Place Assocs. Ltd.*, 563 F.3d 907, 919–20 (9th Cir. 2009); *Motion Control Corp. v. SICK, Inc.*, 354 F.3d 702, 704 n.4 (8th Cir. 2003); *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 353 & n.2 (5th Cir. 2003). *But see Mountain Valley Prop., Inc. v. Applied Risk Servs., Inc.*, 863 F.3d 90, 94 (4th Cir. 2017) (suggesting in dicta that "it may be the case that the order denying the motion to vacate the arbitration award cannot be appealed because it is not a final judgment"). We have jurisdiction to review the district court's denial of the motion to vacate the arbitration award.

## The District Court Correctly Compelled Arbitration

The Federal Arbitration Act requires a federal court to stay or dismiss a lawsuit and compel arbitration if "the plaintiff entered into a written arbitration agreement that is enforceable under ordinary state-law contract principles" and "the claims before the court

fall within the scope of that agreement." *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008) (internal quotation marks omitted) (citing 9 U.S.C. §§ 2–4). The parties dispute only whether the arbitration agreements were enforceable under Florida law. The Garcias argue that the agreements were unconscionable. *See Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (explaining that the Act allows courts to invalidate arbitration agreements using "generally applicable contract defenses," including unconscionability).

Under Florida law, a party must establish both procedural and substantive unconscionability to void an arbitration agreement. *Basulto v. Hialeah Auto.*, 141 So. 3d 1145, 1158 (Fla. 2014). Procedural unconscionability "relates to the manner in which the contract was entered," and substantive unconscionability asks whether the terms of the agreement are themselves too unfair to enforce. *Id.* at 1157–58 (internal quotation marks omitted). The Garcias established neither procedural nor substantive unconscionability.

### 1. Procedural Unconscionability

Florida courts consider several factors to determine whether a contract is procedurally unconscionable, but "[t]he central question . . . is whether the complaining party lacked a meaningful choice when entering into the contract." *Id.* at 1157 n.3. A contract of adhesion "is a strong indicator that the contract is procedurally unconscionable." *VoiceStream Wireless Corp. v. U.S. Commc'ns, Inc.*, 912 So. 2d 34, 40 (Fla. Dist. Ct. App. 2005) (internal quotation

marks omitted).  But "the presence of an adhesion contract alone does not require a finding of procedural unconscionability."  *Id.* More is needed.  *See id.*

The Garcias argue that the arbitration agreements were procedurally unconscionable because they were contracts of adhesion and failed to disclose sufficiently the procedures that would govern an arbitration under the contract.  To establish the second feature, they rely on Florida decisions about the essential terms that must appear in an arbitration agreement to form a contract.  *See, e.g.*, *Greenbrook NH, LLC v. Est. of Sayre ex rel. Raymond*, 150 So. 3d 878, 881 (Fla. Dist. Ct. App. 2014).  We may assume that the presence of both features would render an arbitration agreement procedurally unconscionable and that these contract-formation decisions are relevant to procedural unconscionability.  Even so, the arbitration agreements disclosed adequate procedures.

Under Florida law, the terms of an arbitration agreement "must be definite enough so that the parties have some idea as to what matters are to be arbitrated and provide some procedure by which arbitration is to be effected."  *Id.*  The essential terms of an arbitration agreement include the "form and procedure for arbitration, the number of arbitrators, how the arbitrators [are] to be selected, [and] the issues to be decided by arbitration."  *Malone & Hyde, Inc. v. RTC Transp., Inc.*, 515 So. 2d 365, 366 (Fla. Dist. Ct. App. 1987).

Applying this principle, Florida courts have invalidated arbitration agreements for failing to include essential terms when the

agreements referenced arbitration but provided *no* procedures to effect arbitration.  *See id.*; *Spicer v. Tenet Fla. Physician Servs., LLC*, 149 So. 3d 163, 166 (Fla. Dist. Ct. App. 2014); *Wood-Hopkins Contracting Co. v. C.H. Barco Contracting Co.*, 301 So. 2d 479, 480 (Fla. Dist. Ct. App. 1974).  When an agreement says that disputes are subject to arbitration and provides procedures, such as a process for the selection of arbitrators and a timeframe for decisions, Florida courts enforce the arbitration provision.  *See, e.g., Intracoastal Ventures Corp. v. Safeco Ins. Co. of Am.*, 540 So. 2d 162, 164 (Fla. Dist. Ct. App. 1989), *abrogated on other grounds as recognized in Nationwide Mut. Fire Ins. Co. v. Schweitzer*, 872 So. 2d 278, 279 (Fla. Dist. Ct. App. 2004).

In *Intracoastal Ventures*, the agreement created a process for appraisals of the insured's loss.  *Id.* at 163.  It provided that if either party made a written demand for an appraisal, each side must nominate an appraiser within twenty days. *Id.*  The two party appraisers would then select a neutral umpire, but if they could not agree on one within fifteen days, either party could petition a court to appoint one. *Id.*  The contract required the appraisers to set the loss in a "reasonable" amount of time with any deadlock broken by the third appraiser. *Id.*  The court held that the "agreement thus set[] forth in detail the procedure and time limits for resolution of the dispute," leaving no "uncertainties" as to the essential terms of the arbitration agreement. *Id.* at 164.

The arbitration agreements the Garcias signed were sufficiently definite.  The agreements covered "any dispute, claim or

controversy" between the Garcias and any Scientology-affiliated entity. They required the Garcias to resolve any dispute that could not be settled informally "exclusively through Scientology's Internal Ethics, Justice and binding religious arbitration procedures." And they provided procedures for arbitration under which the Garcias would submit a request for arbitration naming an arbitrator "to hear and resolve the matter" to the International Justice Chief and the opposing party. Within fifteen days of receiving the request, the opposing party was required to name an arbitrator, and within fifteen days after that the two arbitrators were required to name a third. If either the opposing party or the arbitrators themselves failed to act within the specified timeframe, the Justice Chief would appoint the arbitrator. Finally, the agreements provided that the arbitration would be "conducted in accordance with Scientology principles" by arbitrators who were "Scientologists in good standing with the Mother Church." This tracks the agreement upheld in *Intracoastal Ventures*—it "sets forth in detail the procedure and time limits for resolution of the dispute" and provides the terms required by Florida law. *See* 540 So. 2d at 164. These provisions were sufficient to give the Garcias "some idea" of the matters to be arbitrated and to "provide some procedure" to effect arbitration. *Greenbrook*, 150 So. 3d at 881.

The dissenting opinion relies on the district court's fact findings and the Florida court decision in *Spicer* to conclude that the arbitration agreements were procedurally unconscionable. But, as to the district court's fact findings, it found that the Garcias had

"some idea" about the arbitration procedures.  The district court based its finding on Luis's testimony that he was a "committed" Scientologist and that he had "successfully completed the 'Ethics Specialist Course,' during which he studied . . . the Committee on Evidence and its procedures, as well as the Scientology Justice System."

And, as to the *Spicer* decision, we find it distinguishable because the arbitration agreement "d[id] not set forth any procedures for arbitration."  149 So. 3d at 166 (emphasis omitted).  Here, on the other hand, the arbitration agreements did provide some procedure for the arbitration.  The Garcias' agreements provided that the arbitration would be "[i]n accordance with the discipline, faith, internal organization, and ecclesiastical rule, custom, and law of the Scientology religion."  And the agreements provided that the arbitration would be "conducted in accordance with Scientology principles, and consistent with the ecclesiastical nature of the procedures and the dispute, claim or controversy to which those procedures relate."

## 2. Substantive Unconscionability

A contract is substantively unconscionable if its terms "unreasonably favor[]" one party and "are so unfair" that a court should not enforce them.  *Basulto*, 141 So. 3d at 1158 n.4 (internal quotation marks omitted).  The Garcias assert two grounds of substantive unconscionability:  (1) the parties were not mutually obligated to arbitrate; and (2) the requirement that the arbitrators be Scientologists in good standing ensured that the Garcias, as

suppressive persons, could not receive a fair and neutral adjudication of their claims.

The Flag entities argue that the Garcias failed to raise the mutuality point in the district court and have therefore waived our consideration of it. The Garcias counter that they raised the mutuality issue before the district court in: (1) their opposition to the motion to compel arbitration; (2) the district court's colloquy with defense counsel; (3) their brief before the hearing on the motion to compel; and (4) the testimony of the International Justice Chief.

We have long held that "if a party hopes to preserve a claim, argument, theory, or defense on appeal, she must first clearly present it to the district court . . . in such a way as to afford the district court an opportunity to recognize and rule on it." *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1111 (11th Cir. 2020) (internal quotation marks omitted). So, "[a] mere recitation of the underlying facts . . . is insufficient to preserve an argument; the argument itself must have been made below." *Ledford v. Peeples*, 657 F.3d 1222, 1258 (11th Cir. 2011). Likewise, a "single, passing reference" to an issue does not preserve it for appellate review. *Gennusa v. Canova*, 748 F.3d 1103, 1116 (11th Cir. 2014).

The Garcias have not preserved the mutuality issue. In their opposition to the motion to compel, the Garcias mentioned mutuality only in a quote from a federal district court case that listed several of the grounds for substantive unconscionability. But "[a]n insignificant recitation of black letter law is not tantamount to raising an issue for adjudication." *Bryant v. Jones*, 575 F.3d 1281, 1308

(11th Cir. 2009). In that same brief, they contended that Scientology allowed civil court actions against suppressive persons, but with no reference to the mutuality legal doctrine, that is nothing more than a "mere recitation of the underlying facts." *See Ledford*, 657 F.3d at 1258.

The district court also discussed the lack of mutuality with defense counsel, who perhaps conceded that the arbitration provision here lacked mutuality, but at no point in that hearing did the Garcias themselves raise the lack of mutuality. After the colloquy with defense counsel, the district court inquired about the Garcias' opposition, but counsel responded that they would rely on their filed opposition, which did not discuss mutuality. That colloquy does not meet the standard either because "if a party hopes to preserve" an issue "*she* must first clearly present it to the district court." *See Ruckh*, 963 F.3d at 1111 (emphasis added) (internal quotation marks omitted). In their brief before the hearing, the Garcias again made no reference to mutuality but, rather, cited the testimony of the International Justice Chief that the church is not required to arbitrate a claim it brings—another "mere recitation of the underlying facts." *See Ledford*, 657 F.3d at 1258. And the testimony of the Justice Chief does nothing to show that *the Garcias* presented this issue to the district court. The Garcias gave the district court no opportunity "to recognize and rule on" the mutuality issue and therefore have forfeited that issue as a basis for substantive unconscionability. *See Ruckh*, 963 F.3d at 1111 (internal quotation marks omitted).

As to the second ground, the Garcias argue that Scientology doctrine made it impossible for suppressive persons to receive a fair arbitration before Scientologists in good standing.  They offered evidence that the Church of Scientology regarded suppressive persons as insane individuals who have no rights as Scientologists and are treated as enemies of the church.  Based on this evidence, they urged the district court not to enforce the arbitration agreements because Scientology doctrine would compel any Scientologist in good standing to be hostile against them, which would make it impossible for them to receive a fair and neutral arbitration.

In contrast to this view of Scientology doctrine, the International Justice Chief testified that Scientologist arbitrators must "follow the procedures of the Scientology justice codes" and "treat everyone impartially regardless of who they are."  He stressed that specific Scientology tenets "apply to justice situations" and that Scientologist arbitrators would be "obliged to follow those policies."  When asked whether church doctrine would allow Scientologist arbitrators to "listen to a suppressed person and find for them, believe them," he explained that church justice policies required arbitrators to determine "the truth of the matter" regardless of "personality or opinion."  If a suppressive person appeared at a Scientology arbitration, he explained, Scientologists in good standing would have to be "impartial in that matter."

The Supreme Court has made clear that the First Amendment forbids civil courts to decide legal disputes involving churches by "resolving underlying controversies over religious

doctrine."[1] *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969); *accord Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 368 (1970); *cf. Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 716 (1981). But no First Amendment concerns arise when a civil court relies on "neutral principles of law" to decide a church dispute. *Jones v. Wolf*, 443 U.S. 595, 602 (1979). Courts are free to resolve legal disputes involving churches and religion so long as their resolution "involves no consideration of doctrinal matters." *Id.* (internal quotation marks omitted).

Based on these well-established precedents, the district court correctly ruled that the First Amendment prevented it from entertaining the argument that Scientology doctrine rendered the arbitration agreements substantively unconscionable. Although the Garcias presented evidence to support their interpretation of Scientology doctrine, the International Justice Chief offered a conflicting interpretation. The First Amendment barred the district court from resolving this underlying controversy about church doctrine. *See Presbyterian Church*, 393 U.S. at 449. To do so would have required it to decide whether the Garcias or the Justice Chief "more correctly perceived the commands of [the Scientology religion]." *Thomas*, 450 U.S. at 716.

---

[1] The parties assume that the First Amendment's religion clauses apply to the Church of Scientology. We do the same.

\* \* \*

To complete the unconscionability analysis under Florida law, a court is required to balance both procedural and substantive unconscionability. *See Basulto*, 141 So. 3d at 1159. Florida courts employ a sliding-scale approach, which means that "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.* (internal quotation marks omitted). Here, the Garcias have not presented evidence, other than the adhesive nature of the contract, to establish procedural unconscionability. But adhesiveness alone is insufficient to prove "any degree of procedural unconscionability." *Kendall Imps., LLC v. Diaz*, 215 So. 3d 95, 110 (Fla. Dist. Ct. App. 2017); *see also Hobby Lobby Stores, Inc. v. Cole*, 287 So. 3d 1272, 1276 (Fla. Dist. Ct. App. 2020) (concluding that "the trial court erred in finding the Agreement procedurally unconscionable" despite the adhesive nature of the arbitration agreement).

Without any other evidence of substantive unconscionability and no degree of procedural unconscionability, the Garcias have not met their burden to prove the arbitration agreements unconscionable. *See Basulto*, 141 So. 3d at 1159 ("[P]rocedural and substantive unconscionability must be established to avoid enforcement of the terms within an arbitration agreement."); *Palm Beach Motor Cars Ltd. v. Jeffries*, 885 So. 2d 990, 992–93 (Fla. Dist. Ct. App. 2004) (requiring evidence of procedural unconscionability to invalidate an arbitration provision lacking mutuality).

*The District Court Correctly Denied the Motion to Vacate*

The Federal Arbitration Act allows federal courts to vacate an arbitration award in limited circumstances. *See* 9 U.S.C. § 10(a). The party requesting vacatur bears the burden to prove one of the statutory grounds. *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1289 (11th Cir. 2002). That party must "set forth sufficient grounds to vacate the arbitration award in his moving papers." *O.R. Sec., Inc. v. Prof'l Planning Assocs., Inc.*, 857 F.2d 742, 748 (11th Cir. 1988).

Judicial review of an arbitration award "is among the narrowest known to the law." *AIG Baker Sterling Heights, LLC v. Am. Multi-Cinema, Inc.*, 508 F.3d 995, 1001 (11th Cir. 2007) (internal quotation marks omitted). The Act "presumes that arbitration awards will be confirmed." *Davis v. Prudential Sec., Inc.*, 59 F.3d 1186, 1190 (11th Cir. 1995). For that reason, "federal courts should defer to the arbitrator's resolution of the dispute whenever possible." *Lifecare Int'l, Inc. v. CD Med., Inc.*, 68 F.3d 429, 433 (11th Cir. 1995) (internal quotation marks omitted).

Before addressing the statutory grounds for vacatur, we address two threshold arguments that the First Amendment bars or severely restricts our review of the arbitration award. Flag Service and Flag Ship rely on Supreme Court precedents that affirm the right of churches to resolve matters of "ecclesiastical cognizance" in religious tribunals without interference by civil courts. *See Serbian E. Orthodox Diocese for the U.S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 698 (1976); *Kedroff v. St. Nicholas Cathedral*

*of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 115 (1952); *Watson v. Jones*, 80 U.S. 679, 729 (1871). They also invoke the principle that the First Amendment bars civil courts from deciding whether religious law has been violated. Neither principle has any application to our review of this arbitration award.

The Flag entities' reliance on *Serbian Eastern Orthodox Diocese*, *Kedroff*, and *Watson* is misplaced. Those decisions make clear that civil courts may not disturb the decisions of ecclesiastical tribunals on matters of church discipline and governance, minister selection, and other matters of faith and doctrine. *See Serbian E. Orthodox Diocese*, 426 U.S. at 697–98 (reversing a state-court decision that reinstated a defrocked bishop and invalidated a diocesan reorganization by the Serbian Orthodox Church); *Kedroff*, 344 U.S. at 106–10 (reversing a state-court decision that transferred control over a Russian Orthodox cathedral in New York City from the Supreme Church Authority in Moscow to the authorities of the Russian Church in America); *Watson*, 80 U.S. at 727–29 (accepting as binding the resolution of a church-property dispute by the General Assembly of the Presbyterian Church). But the Garcias do not ask us to disturb an ecclesiastical tribunal's resolution of a dispute that is "ecclesiastical in its character," such as a dispute about "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Serbian E. Orthodox Diocese*, 426 U.S. at 713–14 (internal quotation marks omitted). They instead ask us to review a monetary award issued by an arbitration panel. Our

review of that award poses no risk of intruding upon the authority of the Church of Scientology in matters of "ecclesiastical cognizance." *Id.* at 698.

Nor does the principle that civil courts may not resolve questions of religious doctrine help the Flag entities. A civil court may decide whether religious arbitrators exhibited "evident partiality" or were "guilty of misconduct," 9 U.S.C. § 10(a)(2)–(3), using neutral principles of law. *See Wolf*, 443 U.S. at 602. Deciding these questions requires us to apply our precedents, without any need to resolve disputes over Scientology doctrine. Unlike the parties' dispute over the effect of the Garcias' status as "suppressive persons" on the arbitration agreements' enforceability, their dispute over whether the arbitrators exhibited "evident partiality" or were "guilty of misconduct" does not require us to pick sides in a doctrinal dispute. At least in this appeal, we can decide whether the arbitrators were evidently partial or engaged in misconduct without deciding whether any religious law was violated.

To be sure, we must take care not to treat religious arbitrators less favorably than their secular peers when reviewing an arbitration award. *Cf. Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2254–55 (2020); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017). But religious arbitrations are not subject to a special exemption from the neutral and generally applicable legal standards that apply to any arbitration under the Federal Arbitration Act. *Cf. Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 878–79 (1990); *Our Lady of Guadalupe*

*Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020) ("[The First Amendment] does not mean that religious institutions enjoy a general immunity from secular laws . . . ."). Under these neutral and generally applicable standards, we treat religious and secular arbitrators equally.

The Garcias moved to vacate the arbitration award on the grounds that the arbitrators exhibited "evident partiality" and were "guilty of misconduct." 9 U.S.C. § 10(a)(2)–(3). We conclude that the district court did not err in denying their motion.

### 1. Evident Partiality

A federal court may vacate an arbitration award "where there was evident partiality . . . in the arbitrators." 9 U.S.C. § 10(a)(2). Our caselaw interpreting this provision largely concerns challenges to an award based on an arbitrator's failure to disclose an actual or potential conflict of interest. *See, e.g., Univ. Commons-Urbana, Ltd. v. Universal Constructors Inc.*, 304 F.3d 1331, 1339 (11th Cir. 2002). In adjudicating these challenges, we have often stated that "an arbitration award may be vacated due to the 'evident partiality' of an arbitrator *only* when either (1) an actual conflict exists, or (2) the arbitrator knows of, but fails to disclose, information which would lead a reasonable person to believe that a potential conflict exists." *See, e.g., id.* (emphasis added) (internal quotation marks omitted). But this language is imprecise. The phrase "evident partiality" is not limited to undisclosed conflicts of interest, and we have considered arguments based on other forms of partiality without applying this two-part test. *See, e.g., Riccard*,

307 F.3d at 1289; *Scott v. Prudential Sec., Inc.*, 141 F.3d 1007, 1015 (11th Cir. 1998), *abrogated on other grounds by Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008).

The Garcias do not base their claim of evident partiality on a conflict of interest, but rather on comments made by one of the arbitrators during the arbitration and the purported tension inherent in requiring Scientologists in good standing to arbitrate a dispute between the church and former members of that church—"suppressive persons."  In response to similar challenges, we have said that "[a]n arbitrator appointed by a party is a partisan only one step removed from the controversy and need not be impartial." *Lozano v. Md. Cas. Co.*, 850 F.2d 1470, 1472 (11th Cir. 1988), *quoted in Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 759 (11th Cir. 1993), *abrogated on other grounds by Arthur Anderson LLP v. Carlisle*, 556 U.S. 624 (2009).  In *Sunkist Soft Drinks*, the party-appointed arbitrator, after his appointment but before the arbitration, "assisted [the party] in preparing its case by attending and participating in meetings with [the party's] witnesses"; "suggested lines or areas of testimony"; "helped select one of [the party's] consultants"; and "advised an expert witness on how to improve a chart related to the expert's testimony."  10 F.3d at 759.  But we noted that none of the witnesses "gave testimony in any sense of the word" to the arbitrator; that no evidence indicated the arbitrator shared what he learned with the other arbitrators; and that nothing showed the arbitrators "based their deliberations and award on anything other than the evidence of record."

*Id.* We described the arbitrator's conduct as "not only unobjectionable, but commonplace." *Id.* And we concluded that "a party-appointed arbitrator is permitted, and should be expected, to be predisposed toward the nominating party's case." *Id.* at 760.

Other circuits have extended this reasoning to preclude challenges to evident partiality when partiality inherently exists in the arbitration procedure selected by the parties. *See NFL Mgmt. Council v. NFL Players Ass'n*, 820 F.3d 527, 548 (2d Cir. 2016); *Williams v. NFL*, 582 F.3d 863, 885 (8th Cir. 2009). "[T]he parties to an arbitration choose their method of dispute resolution, and can ask no more impartiality than inheres in the method they have chosen." *Williams*, 582 F.3d at 885 (internal quotation marks omitted). That rule stems from the recognition that "arbitration is a matter of contract," *NFL Mgmt. Council*, 820 F.3d at 548, so the "regime" for selecting arbitrators is "bargained for and agreed upon by the parties, which we can only presume they determined was mutually satisfactory," *id.* at 532 (rejecting Tom Brady's evident partiality challenge to an arbitration award for which the NFL's commissioner acted as the sole arbitrator after imposing the very discipline Brady challenged).

The Garcias agreed to a method of arbitration with inherent partiality and cannot now seek to vacate that award based on that very partiality. Luis submitted an affidavit identifying various comments made by the lead arbitrator reflecting bias in favor of the church, its policies, and its programs. But the arbitration agreements provided that any disputes between the Garcias and the

church would be resolved "solely and exclusively through Scientology's Internal Ethics, Justice and binding religious arbitration procedures." The Garcias also agreed that their "specific intention" was that "all . . . arbitrators be Scientologists in good standing with the Mother Church." A Scientologist in good standing would naturally be expected to have bias (or even a great deal of bias) in favor of the church, yet the Garcias accepted this method of arbitration to resolve any disputes between them and the church. We "can only presume" that arrangement was "mutually satisfactory," *id.*, and see no problem here with the "predispos[ition]" of the arbitrators, *Sunkist Soft Drinks*, 10 F.3d at 760.

The Garcias also argue that the arbitrators were evidently partial because of an ex parte meeting between them and the International Justice Chief, but we disagree. That the arbitrators received background materials and documentary evidence outside the presence of the Garcias, some of which was unfavorable to them, does not prove that the arbitrators harbored bias or prejudice. This meeting between the convening authority and these first-time arbitrators was unremarkable in the context of an informal religious arbitration proceeding. *See 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 269 (2009) (explaining that parties to an arbitration agreement "trade the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration" (alteration adopted) (internal quotation marks omitted)); *Advanced Bodycare Sols., LLC v. Thione Int'l, Inc.*, 524 F.3d 1235, 1239 (11th Cir. 2008) (explaining that an arbitrator must consider

evidence and argument from each party "however formally or informally"). The allegations of partiality based on this meeting are not "direct, definite and capable of demonstration" but are instead "remote, uncertain and speculative." *Scott*, 141 F.3d at 1015 (internal quotation marks omitted).

### 2.  Misconduct

A federal court may also vacate an arbitration award "where the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(a)(3). The Garcias argue that the arbitrators were guilty of misconduct for three main reasons: (1) they refused to hear any evidence critical of Scientology; (2) they allowed the International Justice Chief to present evidence outside the presence of the Garcias; and (3) Luis's lawyer and reading assistant were not allowed to attend the arbitration. None of these alleged acts of misconduct warrant vacatur.

The Garcias have not established misconduct based on the refusal to hear evidence. Vacatur for failure to hear evidence is warranted only if the evidence is "pertinent and material" and its exclusion "prejudiced" the rights of a party. 9 U.S.C. § 10(a)(3); *see Rosensweig v. Morgan Stanley & Co.*, 494 F.3d 1328, 1333 (11th Cir. 2007). Although the Garcias assert that the International Justice Chief barred them from bringing witnesses to the arbitration and redacted or excluded nearly 900 pages of documentary

evidence, they have not identified any witnesses they wished to call or submitted the 900 pages of evidence.  Nor have they explained what those witnesses might have said or how the documentary evidence was relevant to their claims.  So they have failed to establish that this evidence was pertinent and material to their claims or that its exclusion prejudiced their rights.

Nor have the Garcias established misconduct based on ex parte submissions of documentary evidence by the International Justice Chief.  The Justice Chief submitted documentary evidence from both the church and the Garcias in advance of the arbitration hearing to allow the arbitrators to prepare.  And he provided the Garcias with copies of the documentary evidence he submitted to the arbitrators.  It was not misconduct for the arbitrators to receive documentary evidence outside the presence of the parties in advance of the arbitration hearing.

We also reject the argument that vacatur is warranted on the grounds that Luis's reading assistant and attorney were barred from attending the arbitration.  Although a security guard denied the reading assistant entry, the International Justice Chief offered to provide Luis a different person to read for him.  And in any event, Luis has not explained how the lack of a reading assistant prejudiced him.  To the contrary, his affidavit states that he read twenty-eight pages of church policies in about twenty minutes on the first day of the arbitration.  And as the district court found, "[t]here is no evidence that [the Garcias'] attorney attempted to attend [the arbitration] but was turned away."  Instead, after learning

34                      Opinion of the Court                    18-13452

that attorneys could play no substantive role in Scientology arbitration proceedings, their attorney chose not to attend the arbitration.

   **AFFIRMED.**

18-13452            ROSENBAUM, J., dissenting            1

ROSENBAUM, Circuit Judge, dissenting:

You can't make up the rules as you go along.  It's a basic concept of fairness, and it's one that applies to arbitration as well. No wonder.  If a party to the arbitration can create the rules governing the arbitration as the arbitration progresses, it enjoys an insurmountable advantage that effectively guarantees its victory. That's not an arbitration; it's just plain arbitrary.  And a federal court should not be a rubber stamp for the kind of inherently unfair,   anything-the-arbitration-contract-drafting-party-wants-goes "arbitration" that necessarily occurs when the agreement-drafting party can subject the other party to whatever rules it desires—even changing the rules—as the arbitration unfolds.

I would vacate the district court's order compelling arbitration here because the arbitration agreement is not a valid agreement to arbitrate.  Rather, in requiring the Garcias to agree to be governed at arbitration by rules that did not exist and would be devised by the Church and evolve while the arbitration proceeded, the arbitration agreement was as one-sided and unconscionable as an arbitration agreement can be.  Because that kind of spectacle is not an arbitration and we should not stamp it with the imprimatur of the federal courts, I respectfully dissent.

I divide my discussion into two parts.  In Section I, I review the district court's factual findings about the arbitration "process" involved here.  And Section II applies the caselaw to the facts and shows why the arbitration agreement here was not valid.

## I.

I reprint the entirety of the relevant language of the arbitration agreement, since that is what governed the "arbitration" here. It provided,

> d.  In accordance with the discipline, faith, internal organization, and ecclesiastical rule, custom, and law of the Scientology religion, and in accordance with the constitutional prohibitions which forbit governmental interference with religious services or dispute resolution procedures, should any dispute, claim or controversy arise between me and the Church, any other Scientology church, any other organization which espouses, presents, propagates or practices the Scientology religion, or any person employed by any such entity, which cannot be resolved informally by direct communication, I will pursue resolution of that dispute, claim or controversy solely and exclusively through Scientology's Internal Ethics, Justice and *binding religious arbitration procedures*, which include application to senior ecclesiastical bodies, including, as necessary, final submission of the dispute to the International Justice Chief of the Mother Church of the Scientology religion, Church of Scientology International ("IJC") or his or her designee.

> e.  Any dispute, claim or controversy which still remains unresolved after review by the IJC shall be

submitted to **binding religious arbitration in accordance with the arbitration procedures of Church of Scientology International**, which provide that:

i.  I will submit a request for arbitration to the IJC and to the person or entity with whom I have the dispute, claim or controversy;

ii.  In my request for arbitration, I will designate one arbitrator to hear and resolve the matter;

iii.  within fifteen (15) days after receiving my request for arbitration, the person or entity with whom I have the dispute, claim or controversy will designate an arbitrator to hear and resolve the matter.  If the person or entity with whom I have the dispute, claim or controversy does not designate an arbitrator within that fifteen (15) day period, then the IJC will designate the second arbitrator;

iv.  the two arbitrators so designated will select a third arbitrator within fifteen (15) days after the designation of the second arbitrator.  If the arbitrators are unable to designate a third arbitrator within the fifteen (15) day period, then the IJC will choose the third arbitrator;

v.  consistent with my intention that the arbitration be conducted in accordance with Scientology principles, and consistent with the ecclesiastical nature of

4                    Rosenbaum, J., dissenting                    18-13452

> the procedures and the dispute, claim or controversy
> to which those procedures relate, it is my specific in-
> tention that all such arbitrators be Scientologists in
> good standing with the Mother Church.

(emphasis added).

This language, of course, conveys that, at the time the arbi-
tration agreements were entered, the Church of Scientology had
"binding religious arbitration procedures."

But following an evidentiary hearing, the district concluded
that, in fact, it did not.  In response to the Church's[1] assertion that
its Committee on Evidence provides the rules and procedures gov-
erning arbitration, the district court determined that the Church
"failed to present any convincing evidence supporting [this] con-
strained contention."  Among other reasons why the court found
that to be the case, the court noted that (1) "the arbitration agree-
ments make no reference to the Committee on Evidence"; (2) "the
word 'arbitration' cannot be found in the Committee on Evidence
or in L[.] Ron Hubbard's book"; and (3) "even a superficial com-
parison of the arbitration agreements with the provisions in the
Committee on Evidence supports Plaintiffs' contention that the
Committee on Evidence could not, absent an *ad hoc* determina-
tion, provide the rules and procedures of arbitration."  As the court
explained,   "[E]ven   [the   IJC]   acknowledged[]   numerous

---

[1] For ease of reference, I refer to the Defendants collectively as the "Church of
Scientology" or the "Church."

18-13452                 Rosenbaum, J., dissenting                    5

irreconcilable inconsistencies exist between [the arbitration agreements and the provisions in the Committee on Evidence]."

And with respect to the IJC's testimony allegedly "identif[ying] various sources of Scientology justice procedures," Maj. Op. at 6, the district court rejected it.  The court "g[ave] no weight" to correspondence the IJC created, noting that the IJC "could recall little about circumstances giving rise to [a letter to the IJC] and [the IJC's] response, even though his response[] was written only a few months before the evidentiary hearing."  Indeed, the court concluded that "the timing of the [letter to the IJC] raise[d] a compelling inference that it was conveniently written only after [the Church] had represented to the Court that [the IJC] had 'ruled' that the Committee on Evidence applied to Scientology arbitration and the Court directed [the Church] to submit proof of that representation."  As the district court observed, "[a] mere six days passed between that Order . . . and [the letter to the IJC]."  And as for the IJC's testimony that he "made a prior determination that the Committee on Evidence applies to Scientology arbitration . . . five to ten years before," the district court found the IJC's "testimony was not credible."

Even the Church's counsel implicitly conceded that the Church lacked existing rules of procedure.  In fact, he advised the Garcias' attorney in writing before the arbitration that "[t]he

conduct of the religious arbitration *will be decided by the IJC at the appropriate time during the arbitration.*"[2]  (emphasis added).

Not only did the Church not have existing arbitration rules and procedures as late as the time of the Garcias' "arbitration" here, but until the Garcias' "arbitration," the district court found, "there ha[d] never even been an arbitration in the Church."  The district court cited this fact as further support for the Garcias' position that "no rules and procedures for conducting arbitration exist[ed]" at the time of the Garcias' "arbitration."

In short, the district court found, as a matter of fact, that the Church had no rules and procedures for conducting the actual "arbitration" not only at the time the Garcias signed the agreements but as late as when their "arbitration" occurred.  Instead—and as

---

[2] At the "arbitration," the IJC did, in fact, make up the rules—and change them—as the proceedings went on.  For example, before arbitration, the IJC testified in his deposition that the attorney for the Garcias could be present at the arbitration, but could not "represent" them.  Once it was time to actually arbitrate, though, the Garcias were told that the procedures "[did] not contemplate participation by an attorney" and that civil lawyers "[had] no role to play at the arbitration."  The IJC also testified that the Garcias would be permitted to testify at the arbitration, but the arbitrators consistently cut Mr. Garcia off when he tried to present his case and told him he could not submit any "entheta," a Scientology term for material that is critical of Scientology.  Similarly, pre-arbitration, the IJC testified that the Garcias would be able to "present [their] side of the story" and "originate whatever [they] wanted to."  But then at the arbitration, the IJC prohibited the Garcias from bringing witnesses because "their testimony could not possibly be confirmed," and he heavily redacted the Garcias' evidence for entheta before giving it to the arbitrators.

counsel for the Church conceded in his letter referenced above, the IJC simply made things up as the "arbitration" proceeded.

We review the district court's factual findings for clear error. *Smith v. Owens*, 13 F.4th 1319, 1325 (11th Cir. 2021). As we have explained, "[a] factual finding is clearly erroneous if the record lacks substantial evidence to support it or we are otherwise left with the impression it is not the truth and right of the case—a definite and firm conviction that a mistake has been committed." *Knight v. Thompson*, 797 F.3d 934, 942 (11th Cir. 2015) (cleaned up). On this record, I see no basis for concluding that the district court's factual findings in these regards were clearly erroneous. Nor has the Church even suggested they are. So our legal analysis must account for these facts.

## II.

As the Majority Opinion notes, under the Federal Arbitration Act, a federal court must stay or dismiss a lawsuit and compel arbitration when "the plaintiff entered into a written arbitration agreement that is enforceable under ordinary state-law contract principles," and "the claims before the court fall within the scope of that agreement." *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008) (internal quotation marks omitted) (citing 9 U.S.C. §§ 2-4). Here, the "ordinary state-law contract principles" we must apply are those of Florida.[3]

---

[3] Although the arbitration agreements do not include a choice-of-law clause, the district court concluded that Florida law governed because, under Florida

8                     ROSENBAUM, J., dissenting                 18-13452

Under Florida law, a valid arbitration agreement must "establish the basic terms of an arbitration proceeding such as the form and procedure for arbitration, the number of arbitrators, how the arbitrators [a]re to be selected, . . . [and] the issues to be decided by arbitration." *Malone & Hyde, Inc. v. RTC Transp., Inc.*, 515 So. 2d 365, 366 (Fla. 4th DCA 1987). By separately identifying "the form and procedure for arbitration," "the number of arbitrators," and "how the arbitrators [a]re to be selected," *Malone & Hyde* necessarily indicates that "the form and procedure for arbitration" are different things than "the number of arbitrators" and "how the arbitrators were to be selected."

I agree with the Majority Opinion that the arbitration agreements here sufficiently identified the issues to be arbitrated, the number of arbitrators, and the manner by which they were to be selected. But I part company with the Majority Opinion when it comes to "the form and procedure for arbitration."

To conclude that the arbitration agreements sufficiently stated "the form and procedure for arbitration," the Majority Opinion relies primarily on the procedure set forth in the enrollment

---

choice-of-law principles, the rule of *lex loci contractus* applies. Doc. 189 at 5 (citing *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1163 (Fla. 2006)). That rule provides that the law of the place where the contract was executed—meaning "where the last act necessary to complete the contract was done"—controls. *Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1093 (11th Cir. 2004) (citation and internal quotation marks omitted). Here, the district court found that was Florida. The parties do not challenge this finding on appeal.

agreement for *selecting arbitrators*. But as I have noted, "the form and procedure for arbitration" is different and separate from the "number of arbitrators" and "how the arbitrators [a]re to be selected." So the procedure for selecting arbitrators can't also stand in as "the form and procedure for arbitration."

   Plus, when it came to "the form and procedure for arbitration," the arbitration agreements themselves specified that "binding religious arbitration procedures" and "binding religious arbitration in accordance with the arbitration procedures of Church of Scientology International" would govern. Just two problems with that: as the district court concluded, there were no such things, and the Church had never once conducted an arbitration. Given that the rules identified in the agreement didn't exist and the Garcias could not have looked to any precedent for the rules and procedures because the Church had never conducted an arbitration previously, it's hard to conceive of how the Garcias could have had even "some idea" of the arbitration form and procedures that would apply at the time they signed the agreements (or even at the time the arbitration began, for that matter). *See* Maj. Op. at 18 (quoting *Greenbrook NH, LLC v. Est. of Sayre ex rel. Raymond*, 150 So. 3d 878, 881 (Fla. 2d DCA 2014)).

   Nor, contrary to the Majority Opinion's conclusion, is the agreements' provision that arbitration would be "conducted in accordance with Scientology principles" enough. First, this aspect of the Majority Opinion ignores the fact that the arbitration agreements promised that dispute resolution would occur through

10                    ROSENBAUM, J., dissenting                    18-13452

"binding religious *arbitration procedures*" and "binding religious arbitration in accordance with *the arbitration procedures* of Church of Scientology International."  It offers no answer as to what these things were at the time the Garcias entered the agreements other than to refer to the method for selecting arbitrators—which, as I have noted, is separately accounted for and not a part of "the form and procedure for arbitration"—and to refer generally to "Scientology principles."

But as noble as religious principles may be, no matter the religion—Scientology, Christianity, Judaism, Islam, or any other—religious principles are not arbitration procedures and do not and are not meant to establish a form for conducting arbitration.  And saying an arbitration will be "conducted in accordance with Scientology principles" is a lot like saying a football game will be played in accordance with Scientology principles or principles of any other religion (secular Alabama Football Religion aside—I'm talking to you, Chief), such as Christianity, for example.  What does that mean?  Will it be tackle, touch, flag, or something else?  Will there be eleven people on a team?  Will there be four downs?  Will the teams have to pick up ten yards within those four downs to receive another four downs?  Will the field be 100 yards long?  Will holding qualify for a penalty?  How about clipping?  False starts?  And if so, what will those penalties be?  Will there be touchdowns, field goals, extra points, safeties, and two-point conversions?  If so, how much will each count?  And so on.

Religious principles are no more meaningful in identifying the form and procedure of arbitration than they are in establishing the form and procedure of a football game.  Will the parties be permitted attorneys?  Will they be allowed to put on evidence?  Cross-examine witnesses?  Make statements themselves?  Present argument?  For those matters, will the parties even be allowed to be present for the arbitration, or will it be determined on submissions?

The fact is, a vague statement that arbitration will be "conducted in accordance with Scientology principles" answers none of these or any other procedural or format questions.  And that is especially the case here, where the Church had never conducted a single arbitration before the Garcias'.  So perhaps it is not surprising that the district court found the Church had no rules and procedures for conducting the arbitration.

Yet the Majority Opinion insists that the district court made a factual finding "that the Garcias had 'some idea' about the arbitration procedures," based on "Luis's testimony that he was a 'committed Scientologist and that he had 'successfully completed the "Ethics Specialist Course," during which he studied . . . the Committee on Evidence and its procedures, as well as the Scientology Justice System.'"  Maj. Op. at 19.  But the district court did not describe this conclusion as a factual finding.  Rather, at best, the district court characterized its conclusion that the Garcias had "some idea" about the arbitration procedures as a mixed question of law and fact (*see* Dist. Ct. Ord. at 15 (stating that it arrived at this conclusion after "[a]pplying these principles [of law]").  And a review

of the district court's analysis shows that to be the case. *See United States v. Steed*, 548 F.3d 961, 966 (11th Cir. 2008) (holding that application of the law to facts determined by the district court presents a mixed question of law and fact). So the district court's conclusion is subject to de novo review. *See id.*

For the reasons I have discussed, though, the district court's conclusion that the Garcias had "some idea" of the form and procedures of the arbitration was not correct, based on the district court's own factual findings, which were not clearly erroneous. The problem with concluding that Luis Garcia must have had "some idea" of the form and procedure for the arbitration based on his testimony that he completed the "Ethics Specialist Course," where he studied the Committee on Evidence and its procedures and the Scientology Justice System is that that district court expressly found that the Committee on Evidence did not provide any procedures for arbitration. And as I have noted, the district court likewise determined that the Church could point to nothing—including the Scientology Justice System—to identify any procedures for arbitration. So again, it is not clear to me how Garcia's study of the Committee on Evidence and the Scientology Justice System—neither of which refers to any procedures of arbitration because, again, none existed at the time Garcia studied the Committee on Evidence and the Scientology Justice System—could have given the Garcias any idea of the procedures of arbitration.

Indeed, the Church could point to nothing that the court found would advise the Garcias of the arbitration rules and

procedures (because there weren't any) or would rein in the Church's conduct of the arbitration (because no rules and procedures bound the Church). The Church's failure to identify even the most fundamental aspects of the form and procedures governing the arbitration allowed the Church to supply answers that best suited it in the moment. And that circumstance rendered the arbitration agreements invalid under Florida law.

I can perceive no meaningful difference between the arbitration agreements here and the one ruled invalid in *Spicer v. Tenet Fla. Physician Servs., LLC*, 149 So. 3d 163 (Fla. 4th DCA 2014).

In *Spicer*, the arbitration agreement stated, "[Y]ou agree that any and all disputes regarding your employment . . . are subject to the Tenet Fair Treatment Process ["FTP"], which includes final and binding arbitration. You also agree to submit any such disputes for resolution under that process . . . ." 149 So. 3d at 164 (alteration in original). But the FTP was not attached to the agreement, and the agreement did not explain how the employee could access the FTP. *Id.*

So the court concluded the agreement did not bind the employee to arbitration. *Id.* at 166. As the court explained, the agreement itself did "not set forth any procedures for arbitration as required by *Malone*." *Id.* (emphasis omitted). Nor did the agreement incorporate the FTP by reference. *Id.* at 166-67. *Spicer* stated that incorporation by reference required "the incorporating document . . . (1) [to] specifically provide that it is subject to the incorporated collateral document[,] and (2) the collateral document to be

incorporated must be sufficiently described or referred to in the incorporating agreement *so that the intent of both parties may be ascertained.*" *Id.* at 166.  In *Spicer*, the court determined that the second condition was not met.  *Id.* at 167-68.

The Garcias' case is even more compelling than *Spicer*.  At least in *Spicer*, the FTP existed somewhere at the time the parties signed the agreement referencing it.  In contrast, the "binding religious arbitration procedures" that the Garcias' arbitration agreements referred to did not.

Not only that, but in *Spicer*, the employee actually received an electronic copy of the FTP seventeen days after she signed the agreement and well before she had a dispute with the company. *See id.* at 165.  Here, as we know, the Garcias never received a copy of the "binding religious arbitration procedures" because they did not exist until the IJC made them up on the spot.

The Majority Opinion does not meaningfully explain why *Spicer* does not require the conclusion that the arbitration agreements here were invalid.  *See* Maj. Op. at 19.  Instead, it says that "[t]he Garcias' agreements provided that the arbitration would be '[i]n accordance with the discipline, faith, internal organization, and ecclesiastical rule, custom, and law of the Scientology religion.'"  *Id.*  But again, since the district court found as a matter of fact that "the discipline, faith, internal organization, and ecclesiastical rule, custom, and law of the Scientology religion" did not include any arbitration procedures and the Church had never previously conducted an arbitration and concededly made up the

arbitration rules as the arbitration progressed, the reference in the Garcias' agreement on which the Majority Opinion relies provides no answer to the form and procedures for the arbitration.

The Majority Opinion also rests on *Intracoastal Ventures Corp. v. Safeco Ins. Co. of Am.*, 540 So. 2d 162 (Fla. 4th DCA 1989), *abrogated on other grounds as recognized in Nationwide Mut. Fire Ins. Co. v. Schweitzer*, 872 So. 2d 278, 279 (Fla. 4th DCA 2004), and *Greenbrook NH, LLC v. Est. of Sayre ex rel. Raymond*, 150 So. 3d 878 (Fla. 2d DCA 2014). But both are materially distinguishable.

The arbitration requirement in *Intracoastal Ventures* involved an appraisal provision in an insurance contract. *Intracoastal Ventures*, 540 So. 2d at 163. Under it, if the insured and the insurer could not agree on the amount of a covered loss, the contract required them to each select "a competent independent appraiser." *Id.* Then the two selected appraisers were to choose "a competent, impartial umpire." *Id.* If the two appraisers could not agree, either or both parties could petition a judge in the state to select an umpire. *Id.* With the appraisers and umpire selected, the appraisers were to set the amount of the loss. *Id.* If they could not agree, they were to submit their differences to the umpire, and written agreement by any two of the three would establish the amount of the loss. *Id.* The Florida District Court of Appeal upheld the arbitration requirement because it found that the provision satisfied the requirements set forth by *Malone & Hyde*. *Id.* at 164.

The provision in *Intracoastal Ventures* differs with regard to "the form and procedure for arbitration," *Malone & Hyde*, 515 So.

2d at 366, in important respects from the arbitration agreement at issue here. Notably, the *Intracoastal Ventures* arbitration concerned only "amount of the loss." *Intracoastal Ventures*, 540 So. 2d at 163. For that reason, the provision had to establish only a form and procedure for determining the amount of the loss. By requiring both appraisers to be "competent" and "independent" and the umpire to be "competent and impartial," the provision necessarily demanded that all three decision-makers involved in the arbitration be competent appraisers—that is, that they adequately apply generally accepted appraisal methods in performing appraisals.

In other words, by requiring that the appraisers be "competent" and "independent" and the umpire by "competent and impartial," the arbitration provision in *Intracoastal Ventures* established the procedure by which the appraisal (and thus, the arbitration) would be determined—the application of generally accepted appraisal methods. Put simply, the *Intracoastal Ventures* provision effectively incorporated generally accepted appraisal methods, in conjunction with its specified procedure for breaking a tie between the arbitrators, as its procedural mechanism (rules) for conducting the arbitration once the arbitrators (appraisers and umpire) were selected.

In contrast, the Scientology provision ties the arbitration form and procedure to no set of rules other than the non-existent "binding religious arbitration procedures" of the Church. So unlike in *Intracoastal Ventures*, where anyone who read the arbitration

18-13452               ROSENBAUM, J., dissenting               17

provision could understand the rules and procedure by which the subject matter there—amount of the loss—would be determined, here, the arbitration agreements give no idea of the form and procedure the arbitration itself will take.  For that reason, the basis for upholding the *Intracoastal Ventures* agreement does not exist here.

As for *Greenbrook*, there, the parties adopted the Florida Arbitration Code, Fla. Stat. §§ 682.01-.22, as a part of their arbitration agreement.  450 So. 3d at 882.  So there was no issue that the arbitration agreement did not set forth the form and procedure of the arbitration.  *See id.*  But again, that's not the situation here.  Though Florida law governs the contract principles here, the parties did not adopt the Florida Arbitration Code, so those rules didn't apply to the arbitration here.

## III.

Ultimately, the arbitration agreements at issue here are not valid under Florida law.  They do not identify "the form and procedure" of the arbitration as Florida law requires.  Worse yet, at the time they were entered and at the time of the so-called arbitration here, the agreements purported to incorporate non-existent rules and procedures.  As a result, the Church was able to make up the arbitration rules as the arbitration progressed.  We should not condone—let alone sanction—this type of arbitrary and unfair proceeding in the name of the Federal Arbitration Act.  I respectfully dissent.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

November 02, 2021

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  18-13452-AA
Case Style:  Maria Burgos Garcia, et al v. Church of Scientology, et al
District Court Docket No:  8:13-cv-00220-JDW-TBM

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing, are available at www.ca11.uscourts.gov.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against appellant.

Please use the most recent version of the Bill of Costs form available on the court's website at
www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number
referenced in the signature block below. For all other questions, please call T. L. Searcy, AA at
(404) 335-6180.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs